1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    UNITED STATES OF AMERICA :
                               :
 3                             :
                               :
 4        vs                   :     3:CR-17-324
                               :
 5                             :
                               :
 6    FAIZAL BHIMANI & OM SRI  :
      SAI, INC.                :
 7

 8        BEFORE:      THE HONORABLE MALACHY E. MANNION

 9        PLACE:       COURTROOM NO. 4

10        PROCEEDINGS:  JURY TRIAL

11        DATE:        TUESDAY, OCTOBER 6, 2020

12    APPEARANCES:

13    For the United States:

14    SEAN A. CAMONI, ESQ.
      JENNY P. ROBERTS, ESQ.
15    U.S. ATTORNEY'S OFFICE
      235 N. WASHINGTON AVENUE
16    SUITE 311
      SCRANTON, PA 18503
17
      For Defendant Bhimani:
18
      BERNARD J. BROWN, ESQ.
19    58 8TH AVE.
      CARBONDALE, PA 18407
20
      For OM SRI SAI, INC.:
21
      WILLIAM A. DESTEFANO, ESQ.
22    TERRI PAWELSKI, ESQ.
      STEVENS & LEE
23    CENTRE SQUARE - EAST TOWER
      1500 MARKET STREET
24    SUITE 1800
      PHILADELPHIA, PA 19102
25
```

2

INDEX TO WITNESSES

2

FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

3

WILLIAM DOHERTY
4  By Ms. Roberts     49                 96
   By Mr. Brown              62
5  By Ms. Pawelski           84

6  SIRVONN TAYLOR
   By Mr. Camoni      99                176
7  By Mr. Brown              156
   By Ms. Pawelski          173

8

9  SELENA BAYER-DAVIS
   By Ms. Roberts    181

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  All right.  Good morning.  Welcome back.

2    Today we're going to begin the trial, so I'm going to begin

3    with in a moment having Barbe swear you in, and then I'm going

4    to give you some preliminary instructions on how the case will

5    proceed and some preliminary matters related to the law.  At

6    the conclusion of the case, I will instruct you more fully on

7    that.  So, Barbe, if you'd begin by swearing in the jurors.

8          (The jury was sworn at this time.)

9          THE COURT:  Thank you all very much.  Now, members of

10   the jury now you have been sworn, let me tell you a little

11   about your role as jurors in this case.  Under our system of

12   justice, the role of the jury is to find the facts of the case

13   based on the evidence that is presented in the trial.  You must

14   decide the facts only from the evidence presented to you here

15   in this courtroom during the trial.

16         From the evidence that you will hear and see in the

17   court, you will decide what the facts are and then apply those

18   facts to the law as I will give it to you in my final

19   instructions.  That's how you will reach a verdict in the case.

20   Now, whatever your verdict, it will have to be unanimous.  All

21   of you will have to agree on it, or there will be no verdict.

22   In the jury room when the case is complete, you will discuss

23   the case among yourselves, but ultimately each of you will have

24   to make up his or her own mind.

25         Therefore, each of you has a responsibility, which

4

1   you cannot avoid, and you should do your best throughout the

2   trial to fulfill this responsibility.  Now, I play no part in

3   finding the facts.  You should not take anything that I may say

4   or do during the trial as indicating what I think of the

5   evidence or what your verdict should be.  My role is to make

6   whatever legal decisions have to be made during the course of

7   the trial and to explain to you the legal principles that must

8   guide your decisions at the conclusion of the case.

9            You must apply my instructions about the law.  Each

10  of the instructions will be important.  You must not substitute

11  your own notion or opinion of what the law is or ought to be.

12  You must follow the law as I give it to you, whether you agree

13  with it or not.  Perform these duties fairly and impartially.

14  Do not let sympathy, prejudice, fear or public opinion

15  influence you in any way.  You should not be influenced by a

16  person's race, color, religion, national ancestry or gender.

17           Now, here are some important rules for your conduct

18  as jurors during the course of the case.  No. 1, keep an open

19  mind.  Do not make up your mind about the verdict until you

20  have heard all of the evidence and I have given you the final

21  instructions on the law at the end of the trial, and at that

22  point that you will have discussed the case with your fellow

23  jurors during those final deliberations.  In the meantime, do

24  not discuss the case among yourselves until the end of the

25  trial when you retire to the jury room to deliberate.

5

1        You need to allow each juror the opportunity to keep

2   an open mind throughout the entire trial.  During trial you may

3   talk with your fellow jurors about anything else of a personal

4   nature or of common interest but nothing about the trial, the

5   witnesses or the evidence until the conclusion of the case when

6   you formally go back to deliberate.

7        Now, during the trial, you should not speak to any of

8   the parties, the lawyers or witnesses involved in the case, not

9   even to pass the time of day.  So if you happen to pass one of

10  the lawyers in the elevator and they ignore you like you're not

11  there, they are not being rude.  They're being ethical and

12  professional.  And so you should know that in the beginning.

13  If any lawyer, party or witness does not speak to you when you

14  pass them in the hall, ride with them in the elevator or the

15  like, remember it's because they are supposed -- they're not

16  supposed to talk or visit with you either.

17        Do not talk with anyone else or listen to others talk

18  about this case until the trial has ended and you have been

19  discharged as jurors.  It is important not only that you do

20  justice in this case but that you give the appearance of

21  justice.  If anyone should try to talk to you about the case

22  during the trial, please report that to me immediately.

23        Do not discuss the case with anyone outside of the

24  courtroom or at home including your family and friends.  This

25  is never an easy one because, as I said, during the course of

1  the trial, you will go home and whoever you happen to live

2  with, your best friend or significant other or mother, father,

3  brother, husband, wife, they'll all be saying, well, you can

4  tell me, I'm not going to tell anybody.  The importance of this

5  is not necessarily telling them -- although that's what's not

6  allowed.  The idea is not to have anyone else influence you by

7  their opinion of what they think of something when they have

8  not heard the evidence.

9          At the end of this trial, you will be the only 16

10 people that have heard everything that is presented in this

11 courtroom about the case, and that's the entire universe of

12 information that you can use to decide this case.  No one else

13 is going to have that knowledge except you, and so their

14 opinion may be based on partial information or their surmise or

15 guess or wonder.  That's not enough.

16         You may tell your family and friends that you've been

17 selected as a juror in a case, and you may tell them how long

18 the trial is expected to last.  However, you should also tell

19 them that the judge has instructed you not to talk any more

20 about the case, and they should not talk to you about the case.

21 The reason, as I mentioned, is that sometimes someone else's

22 thoughts can influence you.  Your thinking should be influenced

23 only by what you learn here in the courtroom.  Now, until the

24 trial is over and your verdict is returned, do not watch or

25 listen to any television or radio news programs or reports

1  about this case or read any news or internet stories or

2  articles about this case or about anyone involved in this case.

3  Do not use a computer, cell phone or electronic device or tools

4  of technology while in the courtroom or at the end during your

5  deliberations.  I will express that at the end.  These devices

6  may be useful -- may be used during breaks or recesses for

7  personal use but may not be used to obtain or disclose

8  information about the case.

9           You may not communicate with anyone about the case on

10  your electronic device or media such as a phone, cell phone,

11  smart phone, internet service, text, instant messaging service,

12  chat room, blog, anything, Facebook, chat, Twitter, anything

13  that I haven't mentioned.  You get the point.  Any similar

14  technology is not to be used in any way related to this case.

15  Do not research or any make investigation on your own about any

16  matters related to the case or this type of case.

17           This means, for example, you must not visit the

18  scene, conduct experiments, conduct reference -- or consult

19  reference works or dictionaries or search the internet,

20  websites or blogs for additional information or to use your

21  computer or any electronic devices in any way to try to gain

22  additional information about this case, the type of case, the

23  parties in the case or anyone else who is involved in the case.

24           Please do not try to find out information from any

25  source outside of the confines of this courtroom.  As I

1    mentioned, you must decide this case based only upon the

2    evidence in this courtroom and my instructions to you about the

3    law.  It would be improper for you to try and supplement that

4    information on your own.  Now, finally, you should not concern

5    yourself with or consider the possibility of punishment that

6    might be imposed if you returned a guilty verdict.  That's my

7    obligation and my obligation alone.  It has nothing to do with

8    the jury.

9           As you can see, the courtroom has been modified to

10   comply with the CDC safety protocols regarding COVID-19 for

11   your safety, the safety of the witnesses, the parties and the

12   attorneys.  Now, during the trial it may be necessary for me to

13   talk with the lawyers outside of your hearing.  You saw that

14   yesterday when we had jury selection.  This is called a bench

15   or sidebar conference.  If it happens, please be patient.  We

16   also ask that you advise me through the courtroom deputy if

17   you're able to hear any of the bench or sidebar conferences

18   because the purpose is to hold these discussions outside of the

19   hearing of the jury for important reasons.

20          I know you may be curious about what it is we're

21   discussing.  We're not trying to keep important information

22   from you.  These conferences are necessary for me to discuss

23   with the lawyers objections to evidence and to be sure that the

24   evidence is presented to you correctly under the rules of

25   evidence.  We will, of course, do what we can to keep the

1  number and length of these conferences to an absolute minimum.
2  If I think the conference will be long, I'll call a recess and
3  allow you to go out to stretch.  I may not always grant a
4  lawyer's request for a conference.  Do not consider my granting
5  or denying a request for a conference as any suggestion of my
6  opinion of the case or what your verdict should be.  Now, at
7  the end of the trial, you must make your own decision based on
8  what you remember of the evidence.  You will not have a written
9  transcript of the testimony to follow or review.

10            You must pay close attention to the testimony as it
11  is given.  If you wish, you may take notes to help you remember
12  what a witness said.  My courtroom deputy will arrange for
13  pens, pencils and paper.  If you take notes, keep them to
14  yourself until the end of the trial when you and your fellow
15  jurors go to the jury room to decide the case.  Here are some
16  more specific points concerning note taking if you decide to do
17  that.  First and most importantly, you may take notes.  It's
18  permitted.  It is not required that you take notes.

19            How many notes you want to take, if any, is entirely
20  up to you.  Be brief.  Do not allow note taking to serve as a
21  distraction.  Do not let your note taking distract you from
22  your task as jurors.  You must listen to all of the testimony
23  of each witness.  You also need to decide whether and how much
24  of each witness' testimony you believe.  That will require you
25  to watch the appearance, behavior and manner of each witness

1   while he or she testifies.  You cannot write down everything

2   that's said.  There's always a fear that a juror will focus so

3   much on note taking that he or she will miss the opportunity to

4   make important observations.  Now, your notes are memory aids.

5   They are not evidence.  Notes are not a record or written

6   transcript of the trial.  Whether or not you take notes, you

7   will need to rely on your own memory of what was said.  Notes

8   are only to assist your memory.  You should not be overly

9   influenced by notes.

10          In your deliberations, at the end of the case, do not

11  use your notes or any other jurors' notes as authority to

12  persuade fellow jurors, and do not give any more or less weight

13  to the views of a fellow juror just because the juror did or

14  did not take notes.  Do not assume that just because someone

15  said something is in someone's notes that it necessarily took

16  place in court.  It is just as easy to write down something

17  incorrectly as it is to hear or remember it incorrectly.  Notes

18  are not entitled to any greater weight than each jurors'

19  independent memory of the evidence.

20          You should rely on your independent and collective

21  memories when you deliberate and reach your verdict.  If you

22  take notes, do not take your notes away from the courthouse.  I

23  repeat.  At the end of each day, please place your notes in the

24  jury room.  There will be an envelope.  You can put your notes

25  in your envelope.  Put your name on your envelope.  No one will

1   look at your notes.  The jury area will be closed to everyone

2   during the course of this trial and deliberations.  Once the

3   case is over at the conclusion of the case when your

4   deliberations are done, we will collect all your notes.  No one

5   will read those notes.  They will be shredded.  You must make

6   your decision in this case based only on the evidence you see

7   and hear in the courtroom.  Do not let rumors, suspicion, or

8   anything else that you may see or hear outside of the Court

9   influence you in any way.

10          The evidence from which you are to find the facts

11  consists of the following:  The testimony of witnesses,

12  documents or other things received as exhibits, any fact or

13  testimony that is stipulated to, that is, formally agreed to by

14  the parties.  The following are not evidence, the statements

15  and the arguments of lawyers in the case, questions by lawyers

16  and questions that I might ask.  You must not assume that a

17  fact is true just because one of the lawyers or I ask a

18  question about it.  It is the witness' answers that are the

19  evidence.  Of course, you my need to consider the question to

20  know what the witness means by his or her answer.  For example,

21  if a witness answers yes to a question, you would have to

22  consider what the question was in order to understand what the

23  witness was saying.

24          Objections by lawyers including objections in which

25  they state facts are not evidence.  Any testimony that I strike

1  or tell you to disregard is not evidence, anything you may see

2  or hear about this case outside of the courtroom.  You should

3  use your common sense in weighing the evidence.  Consider it in

4  a light of your everyday experience with people and events and

5  give it whatever weight you believe it deserves.  If your

6  experience and common sense tell you that certain evidence

7  reasonably leads to a conclusion, you may reach that

8  conclusion.  The rules of evidence control what can be received

9  into evidence.

10          When a lawyer asks a question or offers an exhibit

11  into evidence and a lawyer on the other side thinks it's not

12  permitted under the rules of evidence, that lawyer may object.

13  An objection simply means the lawyer is asking me to decide

14  whether the evidence should be allowed under the rules of

15  evidence.  Lawyers have a responsibility to their client to

16  make objections when they think that the evidence being offered

17  is improper under the rules of evidence.  You should not be

18  influenced by the fact that an objection is made.  You should

19  not be influenced by my ruling on the objection to the

20  evidence.

21          If I overrule the objection, the question will be

22  answered or the exhibit will be received into evidence, and you

23  should treat that testimony or exhibit like any other.  If I --

24  I may allow evidence only for a limited purpose.  If I do that,

25  I will instruct you to consider the evidence only for that

13

1  limited purpose, and you must follow that instruction.  If I

2  were to sustain an objection, the question will not be

3  answered, or the exhibit will not be received into evidence.

4  Whenever I sustain an objection, you must disregard the

5  question or the evidence entirely.  Do not guess or think about

6  what the witness might have said in answer to the question.

7          Do not think about or guess what the exhibit might

8  have shown.  Sometimes a witness may have already answered

9  before the lawyer objects or before I ruled on the objection.

10  If that happens and I sustained the objection, you should

11  disregard the answer that was given.  Also I may order that

12  some testimony or other evidence be stricken or removed from

13  the record.  If I do that, I will instruct you to disregard

14  that evidence.

15          That means when you are deciding the case you must

16  not consider or be influenced in any way by the testimony or

17  other evidence that I have told you to disregard.  Now,

18  although the lawyers may call your attention to certain facts

19  or conclusions that they think are important, what the lawyers

20  say is not evidence and is not binding on you.  It is your own

21  recollection and interpretation of the evidence that controls

22  your decision.

23          Also do not assume from anything that I do or say

24  during the trial that I have any opinion about what the

25  evidence -- I'm sorry -- any opinion about the evidence or

1  about any of the issues in the case or about what your verdict

2  should be.  Generally there are two types of evidence that may

3  be used at trial, direct evidence and circumstantial evidence.

4  You may use both types of evidence in reaching your verdict.

5  Direct evidence is simply evidence which if believed directly

6  proves a fact.

7         An example of direct evidence occurs when a witness

8  testifies about something the witness knows from his or her or

9  her own senses, something the witness has seen, touched, heard

10  or smelled.  Circumstantial evidence is evidence which if

11  believed indirectly proves a fact.  It is evidence that proves

12  one or more facts from which you could find or infer the

13  existence of some other fact.  An inference is simply a

14  deduction or conclusion that reason, experience and common

15  sense leads to you make from the evidence.  An inference is not

16  a suspicion or a guess.  It is a reasoned, logical decision to

17  find that a stipulated fact -- or a disputed fact exists on the

18  basis of another fact.  The example I always use because we all

19  live in northeastern or north central Pennsylvania is if it was

20  January and before you went to bed, you looked outside and your

21  grass was all brown, no leaves on the trees, but it was a

22  bright and sunny day, and you woke up the next morning, opened

23  your curtain and there was an inch of snow out there, and yet

24  it was still bright and sunny in the morning.  That would be

25  circumstantial evidence.  You could reasonably conclude that it

snowed during the night.  If you had gotten up in the middle of night, and you opened your curtains and you saw white flakes coming down from the sky, that would be direct evidence that it had snowed during the night.

Now, sometimes different inferences may be drawn from the same set of facts.  The government may ask you to draw one inference, and the defense may ask you to draw a different inference.  You and you alone must decide what inferences you will draw based on all of the evidence in the case.  You should consider all of the evidence presented in this trial, direct and circumstantial.  The law makes no distinction between the weight you should give to either direct or circumstantial evidence.  It is for you to decide how much weight to be given to any evidence.

Now, in deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of witnesses.  Now, credibility refers to whether a witness is worthy of belief.  Is the witness truthful?  Is the witness' testimony accurate?  You may believe everything a witness says, only a part of it or none of it.  You may decide whether to believe a witness based on his or her behavior and manner in testifying, the explanation the witness gives, and all of the other evidence in the case just as you would in any important matter where you are trying to decide if a person is being

16

1    truthful, straightforward and accurate in his recollection or

2    her recollection in your own life.

3           In deciding the question of credibility, remember to

4    use your common sense, your good judgment and your worldly

5    experience.  In deciding what to believe, you may consider a

6    number of factors.  These include the opportunity and ability

7    of the witness to see or hear or know the things about which

8    the witness testifies, the quality of the witness' knowledge,

9    understanding and memory, the witness' appearance, behavior and

10   manner while testifying, whether the witness has an interest in

11   the outcome of the case or any motive, bias, or prejudice, any

12   relation the witness may have with a party in the case and any

13   effect that a verdict may have on the witness, whether the

14   witness said or wrote anything before trial that is different

15   from the witness' testimony in trial, whether the witness'

16   testimony is consistent or inconsistent with other evidence

17   that you believe and any other factor that bears on whether the

18   witness should be believed.

19          Now, inconsistencies or discrepancies in a witness'

20   testimony or between the testimony of different witnesses may

21   or may not cause you to disbelieve a witness' testimony.  Two

22   or more persons witnessing an event may simply see or hear it

23   differently.  Mistaken recollection like failure to recall is a

24   common human experience.  In weighing the effect of an

25   inconsistency, you should consider whether it's about a matter

1   of importance or an insignificant detail.  You should also

2   consider whether the inconsistency is innocent or intentional.

3   You're not required to accept the testimony even if the

4   witness' testimony is not contradicted and the witness is not

5   impeached.  You may decide that the testimony is not worthy of

6   belief because of the witness' bearing or demeanor or because

7   of the inherent probability of the testimony or for any other

8   reason that is sufficient to you.

9           After you have made your own judgment about the

10  believability of a witness, you can then attach to that

11  witness' testimony the importance or the weight that you

12  believe it deserves.  The weight of the evidence to prove a

13  fact does not necessarily depend on the number of witnesses who

14  testify.  What is more important than numbers is how believable

15  the witnesses are and how much weight you think their testimony

16  deserves.

17          Now, the defendants Faizal Bhimani, Om Sri Sai, Inc.,

18  Nazim Hassam and the Pocono Plaza Inn, formerly known as the

19  Quality Inn, are charged with violating federal law.

20  Specifically, an indictment was filed against the defendants

21  Faizal Bhimani, Om Sri Sai, charging them with sex trafficking

22  by force and coercion and conspiracy to commit sex trafficking

23  by force and coercion.  The indictment also charges that the

24  defendants Faizal Bhimani, Om Sri Sai, Inc. and Nazim Hassam

25  with conspiracy to distribute and possess with intent to

18

1  distribute controlled substances, namely, cocaine and cocaine

2  base, schedule two controlled substances, and heroin and

3  marijuana, schedule one controlled substances.  Also all of the

4  defendants, namely, Faizal Bhimani, Om Sri Sai, Inc., Nazim

5  Hassam and the Pocono Plaza Inn, formerly known as the Quality

6  Inn, are charged with managing a drug premises.

7          The charges against defendants are contained in an

8  indictment.  An indictment is just the formal way of specifying

9  each crime the defendant is accused of committing.  An

10 indictment is simply a description of the charges against the

11 defendant.  It is an accusation only.  An indictment is not

12 evidence of anything, and you should not give any weight to the

13 fact that the defendants have been indicted in making your

14 decision in this case.  It is merely the procedural method by

15 which we come into a trial.

16         Now, the defendants have pled not guilty to the

17 offenses charged.  They are presumed to be innocent.  They

18 start the trial with a clean slate with no evidence against

19 them.  The presumption of innocence stays with the defendants

20 unless and until the government presents evidence that

21 overcomes that presumption by convincing you that the

22 defendants are guilty of the offenses charged beyond a

23 reasonable doubt.

24         The presumption of innocence requires that you find

25 the defendants not guilty unless you are satisfied that the

1  government has proved their guilt beyond a reasonable doubt.

2  The presumption of innocence means that the defendants have no

3  burden or obligation to present any evidence at all or to prove

4  that they are not guilty.  The burden or obligation of proof is

5  on the government to prove that the defendants are guilty, and

6  this burden stays with the government throughout the trial.

7          In order for you to find the defendants guilty of the

8  offenses charged, the government must convince you that they

9  are guilty beyond a reasonable doubt.  That means the

10  government must prove each and every element of the offense

11  charged beyond a reasonable doubt.  The defendants may not be

12  convicted based on suspicion or conjecture but only on evidence

13  proving guilt beyond a reasonable doubt.  Now, proof beyond a

14  reasonable doubt does not mean proof beyond all possible doubt

15  or to a mathematical certainty.  Possible doubts or doubts

16  based on conjecture or speculation are not reasonable doubts.

17          A reasonable doubt is a fair doubt based on reason,

18  logic, common sense and experience.  A reasonable doubt means a

19  doubt that would cause an ordinary reasonable person to

20  hesitate to act in matters of importance in his or her own

21  life.  It may arise from the evidence or from the lack of

22  evidence or from the nature of the evidence.  If after hearing

23  all the evidence you are convinced that the government has

24  proved the defendants guilty beyond a reasonable doubt, you

25  should return a verdict of guilty.  However, if you have a

1    reasonable doubt as to any element of the offenses, then you

2    must return a verdict of not guilty.  Now, as to the trial

3    proceedings themselves, in a moment we will begin with what are

4    called opening statements.  Opening statements are where each

5    side has the opportunity if they choose to outline for you what

6    it is they expect the evidence will prove in the case.  The

7    government has the burden of proof, and they go first.

8              After they've considered -- completed their opening

9    statement, then the defense has an opportunity if they wish to

10   do an opening statement as well.  After the opening statements

11   are complete, we will begin the trial.  The government, as I

12   mentioned, has the burden of proof.  They will go first.  They

13   will call witness to the stand to testify.  When they call

14   those witnesses, the government counsel will ask those

15   witnesses questions.  That's called direct examination.  Once

16   the government has completed asking the questions they wish to

17   ask of a witness, the defense will have an opportunity to

18   question the witness.

19             That's called cross examination.  This process will

20   continue -- let me stop for a second -- after the defense has

21   finished their cross examination, the government will have an

22   opportunity to do a redirect examination if necessary.  That

23   process will continue as the government presents all of the

24   witnesses it wishes to present in the case.  Once they have

25   presented all of the witnesses they wish to present, they will

21

1    rest.  After they rest, the defense will have the opportunity
2    if they choose to call witnesses.  It will be the same process.
3    The defense will call a witness to the stand if they choose to
4    the stand.  Defense would question that witness.  That would be
5    direct examination.  When they're done, the government would
6    have the opportunity to cross-examine that witness.  And when
7    that's done, the defense under certain circumstances would have
8    the opportunity to redirect that witness.

9          That process would continue until the defense has
10   called all of the witnesses that it wished to call in the case.
11   After everyone has rested and called all of the witnesses in
12   the case, then I will charge you on the law.  I will tell you
13   what the law is for your deliberations.  After I've done that,
14   I will allow counsel to do their closing arguments in the case
15   where they will argue to you why they believe you should agree
16   with their position in the case.  The once that is completed, I
17   will give you some housekeeping instructions on how you will
18   perform your deliberations.

19         I will also give you a copy of the charge that is the
20   law that I will have already read you at that point in time.  I
21   will give you a copy of that to take back with you during your
22   deliberations in case you wish to refer to that.  Once you
23   begin your deliberations, you will continue those until you
24   have reached a verdict in the case.  So that's the process that
25   I expect will take place as we go through the trial here today.

1  Finally, you must keep your minds open during the trial.  Do

2  not make up your minds about any of the questions in the case

3  until you have heard each piece of evidence and all of the law

4  which you must apply to that evidence.  In other words, until

5  you begin your deliberations at the conclusion of the case you

6  are to keep an open mind and listen to all of the evidence in

7  the case.  All right.  Government counsel ready to open?

8          MR. CAMONI:  Yes, Your Honor.

9          THE COURT:  You may remove your mask while you're at

10  the podium since you will be clearly socially distanced from

11  anybody for purposes of speaking.

12          MR. CAMONI:  Thank you, Your Honor.  Good morning.

13  Greed at its heart -- this case is about greed.  Faizal Bhimani

14  was not a kingpin or a mafia don or some kind of criminal

15  mastermind.  He was the general manager of a hotel in the

16  Poconos, a Howard Johnson in Bartonsville, Pennsylvania, owned

17  by his relative, Nazim Hassam.  Somewhere along the line Faizal

18  Bhimani got greedy.  Starting in 2011 drug dealers and sex

19  traffickers began to set up shop in Monroe County.  Violent

20  gangs became more and more active, and Bhimani saw an

21  opportunity for himself and for the family business.

22          For years Bhimani provided a safe place for criminals

23  to sell drugs and sex at the Howard Johnson that he managed.

24  Women who were brutalized and kept strung out on drugs were

25  forced and coerced to sell their bodies by traffickers whom

1   Faizal Bhimani protected.  Drug dealers met with customer after
2   customer in their rooms or out in the open in the parking lot
3   knowing that if police came near, Faizal would warn them, and
4   warn them he did.  Why?  Greed.  Faizal Bhimani wanted money
5   for himself and for his family's business, and he wanted sex.
6   You will hear in Faizal Bhimani's own words that he knew
7   exactly who was staying in the hotel that he managed and that
8   he told those sex traffickers and drug dealers when there were
9   police on site because Faizal Bhimani was interviewed by
10  officers after his arrest.

11          You will see messages between Bhimani and sex
12  traffickers that revealed that he knew exactly what was going
13  on in the hotel that he managed and he was happy to rent them
14  rooms.  The hotel owner, Nazim Hassam, Bhimani's uncle and
15  direct supervisor, lived at the hotel just like Bhimani, and
16  Hassam chose to allow all of this.  He told his employees not
17  to call police because it was bad for business.  He led by
18  example at the Howard Johnson and at his other hotel in
19  Stroudsburg turning his head and pretending not to see what was
20  right under his nose for years.

21          Even some of his employees sold and used drugs while
22  on the job.  Both hotels became notorious with local law
23  enforcement.  Why?  Greed.  Nazim Hassam wanted to fill those
24  rooms -- as many rooms as he could -- and he didn't care how.
25  These defendants Faizal Bhimani, Nazim Hassam, the company that

1  owns the Howard Johnson in Bartonsville called Om Sri Sai,

2  Incorporated, and the Pocono Plaza Inn, formerly known as the

3  Quality Inn in Stroudsburg, profited from the suffering and

4  misery of victims and drug addicts for years.  This case is

5  about holding these defendants responsible not for crimes

6  committed by other people but for the crimes they committed by

7  helping criminals to succeed by facilitating and protecting

8  criminals and by profiting from and even by directly

9  participating in criminal activities.

10         This case began with an investigation into a violent

11  street gang in the Stroudsburg area that called themselves the

12  Black P. Stones.  In 2014 the F.B.I. teamed up with local and

13  state police in an effort to stem the tide of drugs and

14  violence by dismantling the P. Stone gang, a local set or

15  subgroup of the notorious national gang the Bloods.

16  Investigators learned that the gang members made money through

17  means typical to street gangs, drug dealing, but also through

18  an even darker line of criminal activity, sex trafficking.

19         As the investigation continued and expanded to

20  identify drug dealers and sex traffickers beyond the P. Stone

21  members, a common theme became clear.  As investigators

22  followed the mounting evidence, a pattern emerged.  Many of the

23  sex traffickers and drug dealers arrested described a common

24  ally in their criminal endeavors and a safe place where they

25  were free to do whatever they liked.  They described a person

1   who knew what they were up to and who would warn them when

2   police were near, a man who ran a hotel where a pimp or a drug

3   dealer could always get a room out of the way with easy access

4   to a secluded rear parking area away from the highway, a man

5   who'd let them pay cash without a deposit and allow them to

6   have a room without payment upfront knowing that they would be

7   working through the night and would pay after they earned

8   enough, a man who was willing to trade sex for discounted or

9   free rooms.

10          Throughout Monroe County, criminals knew that they

11  could count on Faizal Bhimani and that they had a safe place to

12  do business at the Howard Johnson hotel in Bartonsville.  That

13  hotel was a hot bed of drug trafficking and sex trafficking for

14  years between 2011 and 2017.  The evidence that the government

15  will present during the course of this trial will show that

16  Faizal Bhimani was the general manager at the Howard Johnson

17  hotel on Route 611 in Bartonsville.

18          Bhimani lived at the hotel and worked there full-time

19  directing the day-to-day operations of the business.  That

20  hotel is owned by a company called Om Sri Sai, Incorporated.  A

21  man Bhimani refers to as his uncle, Nazim Hassam, is the

22  managing shareholder of Om Sri Sai, and he and his wife also

23  live at the hotel.  Hassam listed as an officer of Om Sri Sai

24  was Bhimani's supervisor and oversaw the finances of the hotel.

25          After Bhimani was arrested in 2017 as a result of

26

1  this investigation, Hassam took over Bhimani's day-to-day

2  management duties at the Howard Johnson as well.

3       Hassam is also part owner and managing shareholder in

4  a second hotel in Stroudsburg, formerly known as the Quality

5  Inn, but now called the Pocono Plaza Inn.  The indictment in

6  this case charges Faizal Bhimani and Om Sri Sai, Incorporated,

7  with participating in and aiding and abetting sex trafficking.

8  It charges them with sex trafficking conspiracy as well.

9       It charges Bhimani, Om Sri Sai and Nazim Hassam with

10 drug trafficking conspiracy and charges all four defendants,

11 including the Pocono Plaza Inn, with managing the two hotels as

12 drug related premises.  Now, I want to be clear about something

13 from the outset.  Sex trafficking as it is charged in this case

14 is not just prostitution.  It is not a person charging money

15 for sex of their own free will.  This case is also not about

16 women chained in a basement or smuggled into a foreign country

17 as you may see in the movies.  Under federal law if a victim

18 engages in commercial sex, that's sex for money or in trade for

19 anything of value and they do it because they were compelled to

20 do it by force, threats, coercion or fraud, that's sex

21 trafficking.

22       That means that the person who forced them or

23 threatened them or coerced them or defrauded them is guilty of

24 sex trafficking.  But the law also makes it a crime if someone

25 knows that the victim is being trafficked or they recklessly

27

1   disregard that fact and they help to make it happen or benefit

2   financially from it.  Now, Judge Mannion will instruct you on

3   the law.  And you need to follow his instructions, and it is

4   important to understand as you take in all of the evidence you

5   will hear and see during into trial that while there is no

6   doubt that voluntary prostitution took place in this hotel,

7   too, that is not what is charged in this case.

8          Instead, the evidence in this case will show that

9   women were assaulted, manipulated, threatened, lied to and kept

10  high and addicted to drugs all to keep them working selling sex

11  for the profits of other people.  Likewise, the government is

12  not claiming that Faizal Bhimani or Nazim Hassam or any other

13  employee of the hotels directly forced any victim to have sex

14  for money.  Rather, the evidence will show that Bhimani and Om

15  Sri Sai, the Howard Johnson hotel, participated in sex

16  trafficking in other ways, aided and abetted sex trafficking

17  and conspired with or made criminal agreements with sex

18  traffickers.

19         Faizal Bhimani and the hotel provided rooms for sex

20  traffickers for their victims, agreed to let traffickers earn

21  money before paying for rooms and shielded traffickers from

22  police, and Bhimani and the hotel benefitted financially

23  knowing that money was the proceeds of sex trafficking.  As you

24  will hear from the people who have lived it, sex trafficking

25  and drug trafficking are crimes driven by greed.  Sex

1  traffickers -- sometimes also referred to as pimps -- control

2  women and exploit their vulnerabilities for one reason, to make

3  money.  Drug dealers peddle poison and exploit the addictions

4  of their customers for one reason, to make money.  In both,

5  those who suffered, generate profits for those who run the

6  business.  And as you will hear during this trial, the Howard

7  Johnson hotel, Om Sri Sai, Incorporated, had no problem

8  profiting from that suffering, too.  Sex traffickers sell sex

9  to their customers or their johns.

10            They sell the illusion that a young woman desires

11  them, and these johns pay for pleasure.  For the woman when she

12  is selling her body not because she wants to but because that

13  pimp has forced her or coerced her or induced her under

14  fraudulent pretenses to do it, there's no pleasure in the act.

15  There's no pleasure in having sex with strangers a dozen times

16  a day only for the pimp to take all of the money.  You will

17  hear that a trafficker uses whatever leverage he can to control

18  a victim.  Hunger, the victim can't eat unless the pimp

19  provides food.  Addiction, the pimp keeps a victim who is

20  addicted to heroin or meth or crack in line by providing just

21  enough drugs to keep her working, to keep her from getting dope

22  sick through withdrawal and to keep her under control.  Fear, a

23  pimp will threaten force, will threaten retribution against the

24  victim or her family if a victim escapes or hides money or

25  disobeys the rules in the slightest.  Pain, a trafficker will

strike or choke or rape a victim to maintain control.  A sex
trafficking victim can't even buy tampons unless the pimp
allows it.  The trafficker sets the rules, sets the prices and
decides when and where the victim works.  This is not a case
about voluntary prostitution.  You will also hear directly from
sex traffickers, pimps, who will tell you how they conducted
their business.

You will hear firsthand accounts from people who have
already pleaded guilty to their crimes about what they did at
those hotels and agreements and dealings they had with this man
Faizal Bhimani.  You will hear how much easier these defendants
made it for these criminals to succeed and evade detection for
so long.  And you will hear how these pimps plied these women
with drugs, manipulated them, assaulted them, intimidated them
and threatened these women to keep the money coming in all
within the Howard Johnson hotel.  This is not a case about
voluntary prostitution.

This is not a case about a man who bought sex from a
woman who willingly sold it.  This is a case about a man,
Faizal Bhimani, who bought and traded for sex with women whom
he knew were being trafficked, whom he knew were being beaten
and who were scared and who were addicted to drugs.  Bhimani
provided a safe place for pimps and drug dealers and actively
helped them to avoid law enforcement and succeed in their
criminal enterprises, and in exchange he got sex, he got money

30

1    and he made money for his family's business.  And his employers

2    knew it.  You will hear from witnesses who will describe

3    criminal activity at the Howard Johnson was so rampant they

4    could not possibly have missed it.  You'll hear from employees

5    who were managed by Faizal Bhimani at the Howard Johnson who

6    saw drug dealers and pimps and prostitution staying at the

7    hotel, employees who told their manager, Bhimani, and his

8    manager, Nazim Hassam, what they saw, but nothing changed.

9    Why?  Greed.

10             Even after Bhimani was arrested in 2017 and Nazim

11   Hassam took over the day-to-day operations of the hotel, drug

12   dealer after drug dealer were renting rooms in that back

13   hallway at the Howard Johnson.  You will hear from law

14   enforcement officers who conducted search warrant after search

15   warrant at the hotel and seized drugs and materials used to

16   package and sell drugs.  And at the same time, the other hotel

17   owned by Nazim Hassam, the Quality Inn, now the Pocono Plaza

18   Inn, was also notorious as a drug den.  It still is.  You will

19   hear from employees at that hotel about the drug dealing and

20   drug use that went on.

21             You will hear about police responding to multiple

22   overdoses involving guests, about search warrants and arrests

23   of drug dealers allowed to stay at the hotel for extended

24   periods of time while they were selling and even employees of

25   the hotel who were selling and using drugs while they were on

1  the clock.  And the owner, Nazim Hassam, and the companies who

2  benefitted, Om Sri Sai and the Pocono Plaza Inn, cannot avoid

3  responsibility by pretending they didn't know.  They cannot

4  hide their heads in the sand and claim they had no idea what

5  went on behind closed doors because the law says --

6         MR. DeSTEFANO:  This is argument rather than opening

7  statement.  I will object on that basis.

8         THE COURT:  It's overruled.  Go ahead.

9         MR. CAMONI:  The law says no one can avoid

10 responsibility for a crime by deliberately ignoring what is

11 obvious.  And I submit to you, ladies and gentlemen of the

12 jury, by the time you have heard from all of the witnesses and

13 review all of the evidence, it will become quite clear the

14 crimes at these hotels were blatantly obvious.

15        In this case two of the defendants are flesh and

16 blood people, and two of the defendants are corporate entities

17 or companies.  Now, a company is not a solid real thing.  It is

18 not something you can see or touch.  You can see the buildings

19 were the companies employees work.  You can see a logo, see

20 what a company builds, you can touch what they make or sell.

21 But the company itself only exists because the law says it

22 does.

23        Under the law a company can own property, make

24 contracts, do business, make money, and a company can also

25 commit crimes.  See, a corporation can only act through the

32

1  flesh and blood people who are authorized to act on the

2  company's behalf to conduct the company's business.  Those

3  people are called the company's agents.  You will hear from

4  many of the agents of these companies, employees, people who

5  did the business of these companies.  Those people are called

6  the company's agents.

7       If those agents, the employees and especially the

8  managers and owners and officers, people who make the decisions

9  about what the company will do and how it does business, people

10  like Faizal Bhimani and Nazim Hassam -- if those people through

11  whom the company acts commit a crime while acting on behalf of

12  the company in order to benefit the company, then the law holds

13  the company responsible for that crime.

14       So just as an employee who rents a room to a guest at

15  the hotel can earn money for the company, if that employee

16  commits a crime while doing his or her job and the crime is

17  intended to benefit the company, then the law also holds the

18  company responsible for that crime.  So if the agent knows, the

19  company knows.  What the agents do for the company, the company

20  is responsible for.  That is what the evidence will show in

21  this case, ladies and gentlemen, that the agents, the

22  employees, knew that the agents and employees did on behalf of

23  the company engaged in activities to make the hotels available

24  for the purposes of the use, storage and distribution of

25  illegal drugs.

1          One of the crimes charged in this case -- two of the

2    counts in the indictment is that of maintaining a drug related

3    premises.  Federal law makes it a crime to manage or maintain a

4    premises or a place for the purposes of drug dealing or storing

5    illegal drugs or using illegal drugs, but the government does

6    not need to prove that the drug dealing or drug use was the

7    defendant's sole purpose or only reason -- only use of the

8    property.  So if that hotel rents out 50 rooms to law abiding

9    guests on a given night but knowingly makes one room available

10   to someone whom the defendants know is selling or using drugs,

11   that is enough.  That is a crime.

12          If the defendants knowingly profited from drug

13   activities on their property or even just made the space

14   available for that use without getting paid a dime knowing that

15   it would be used for drug activity, that is a crime.  That's

16   maintaining a drug related premises as charged in counts four

17   and five.  That is exactly what the evidence will show that all

18   four of these defendants did and not just once.  It happened

19   regularly at both hotels for years.  Many of the governments

20   witnesses are criminals, people with long records, drug

21   addicts, unsavory characters to say the least, but the

22   government did not select the witness to these crimes, ladies

23   and gentlemen.  The defendants did by hiring drug dealers and

24   users to work at the hotels, by allowing sex traffickers and

25   drug dealers and drug users free reign in their hotels.  The

34

1  defendants' own actions determined who the witnesses would be

2  in this case.

3       Some of the witnesses you will hear from are women

4  who were trafficked at the Howard Johnson hotel, women who will

5  tell you about how their traffickers leveraged their addictions

6  against them, threatened them and their families, assaulted

7  them, raped them all to make them sell their bodies.  Some of

8  this testimony will be difficult to listen to, but it is

9  important to hear because all of these victims have suffered

10  for someone else's profit including the defendants.

11       All of these victims knew Faizal Bhimani.  Some of

12  them even had sex with him either because he paid for it or in

13  exchange for free or discounted rooms.  You will hear that

14  Faizal Bhimani knew about the violence, about the fear, about

15  their misery, and you will hear that it did not make a

16  difference.  He still had sex with them anyway.  And Howard

17  Johnson still profited from them.  Why?  Greed.  Greed for

18  money and for sex.

19       The government's evidence will prove beyond a

20  reasonable doubt that Faizal Bhimani and Om Sri Sai, the owner

21  of the Howard Johnson, knowingly participated in sex

22  trafficking, aided and abetted sex traffickers and conspired

23  with sex traffickers.  The evidence will prove beyond a

24  reasonable doubt that Bhimani, Om Sri Sai and Nazim Hassam

25  conspired with drug dealers and maintained the Howard Johnson

35

1  as a drug related premises, and the evidence will prove beyond

2  a reasonable doubt that Bhimani, Om Sri Sai, and Nazim Hassam

3  conspired with drug dealers and maintained the Howard Johnson

4  as a drug related premises.  The evidence will prove beyond a

5  reasonable doubt that Bhimani, Hassam and the Pocono Plaza Inn

6  maintained that hotel as a drug related premises, too.  And

7  after all of the evidence has been presented, I will stand

8  before you again, and I will ask you at that time to return a

9  verdict of guilty on all counts.

10           I will ask you, and the evidence will demand that you

11 hold these defendants responsible not for the crimes of anyone

12 else but for the crimes that they committed in the name of

13 greed.  Thank you.

14           THE COURT:  Thank you, Mr. Camoni.  Now, I will

15 remind the jury I told you in the preliminary instructions that

16 I had given you the statements of counsel are not evidence in

17 the case.  It's what they anticipate the evidence will show and

18 prove in the opening statements, but there's not evidence.  You

19 have not heard any evidence yet in this case.  Mr. Brown?

20           MR. BROWN:  Thank you, Your Honor.  May it please the

21 Court, good morning, ladies and gentlemen.  As I looked at the

22 evidence in this case, I kept coming back to one question, and

23 it's a question of why.  So I looked up the question of why.

24 Why exposes purpose.  It's the reason somebody does something

25 or something exists.  Aristotle in the age of philosophers

36

1   called it Telos.  Albert Einstein said if he had to solve a
2   science problem in an hour and his life depended on it, he
3   would spend 55 minutes answering the question of why because he
4   knew if he answered that question, he could solve that problem
5   in less than five minutes.  Alfred Hitchcock, Martin Scorsese,
6   Steven Spielburg and now Chris Nolan all say the question of
7   why drives their movies.  It moves the plot along.  It draws
8   the audience in.  It's the reason for their stories.

9           In criminal defense it's called mens rea or intent,
10  commonly referred to as motive.  This is the defense's opening
11  statement, ladies and gentlemen.  My name is attorney Bernie
12  Brown.  I represent the accused, Faizal Bhimani, in this case.
13  On behalf of Mr. Bhimani, I want to thank you for your service
14  on this jury.

15          Now, you just heard from the government, and the
16  government accepted the burden, and they told you that they
17  will prove to you the charges in the indictment.  I ask you
18  that you hold them to those promises, make them prove to you
19  each and every element of the offenses beyond a reasonable
20  doubt.  As Judge Mannion said, that's not beyond all doubt or
21  to a mathematical certainty.  I agree with that.  It is a doubt
22  that arises in reasonable prudent people like yourselves that
23  would cause you to pause or hesitate when acting on a matter of
24  highest importance in your own life.

25          Buying a house, buying a car, going on an expensive

1  vacation, these are the type of matters that are -- have high

2  importance.  An example I like to use in my cases is before you

3  came to court today, you got yourself ready and got in your

4  car.  As you were driving to the courthouse, you asked

5  yourself, did I lock the front door and set the alarm.  Now,

6  whether or not that front door is locked or alarm is set, quite

7  frankly whether or not you even go back and check it, you had a

8  reasonable doubt simply by asking yourself did I do it.  So if

9  on any part of the evidence -- if on any parts of the testimony

10  that leads you to ask yourself, did he do it, did Faizal

11  Bhimani engage in human trafficking and drug trafficking and

12  operating a drug premises at the Howard Johnsons in

13  Bartonsville, Pennsylvania, between 2011 and 2017 when he was

14  arrested, then that is a reasonable doubt, and you must find

15  Faizal Bhimani not guilty.

16         Now, there are questions of why that will be answered

17  through the evidence, and you will have to choose that answer.

18  The first question is, why did these women choose to work as

19  prostitutes.  The second one would be, why did drug dealers

20  sell drugs.  Then why did they choose the Howard Johnson hotel

21  in Bartonsville, Pennsylvania, to operate out of.  And then the

22  next question will be, why when they were arrested did they

23  turn to the government for plea deals and to provide evidence

24  against that Howard Johnsons.  You heard attorney Camoni talk

25  about the evidence.  He's going to tell you about these crimes

38

1  that a witness like Sirvonn Taylor committed or Thurman

2  Stanley.  Ask yourself the question, why is the government

3  calling them and making a deal with them?  Why is the

4  government investigating the Howard Johnsons?  But there are

5  questions of why that they will not be able to answer.  And

6  those questions of why will be, why did Faizal Bhimani allow

7  the criminal activity to go on at the hotel?

8        Why would his uncle when he was interviewed by

9  government say he didn't like women?  Why would Mr. Bhimani

10  call the cops on the same people he's accused of participating

11  in this conspiracy with?  Why would he then assist in

12  investigations with Ms. Lippincott and the Monroe County

13  District Attorney's Office providing them information, giving

14  them evidence, allowing them to set up stings at the hotels

15  even to the point of testifying against some of the

16  individuals?

17        And why if Mr. Bhimani was so greedy did he live in a

18  hotel room on the premises?  Why did he live -- live in a hotel

19  room on the premises, and why doesn't the government show any

20  assets, any bank accounts, any property, any cars, any jewelry,

21  any debt that Mr. Bhimani had ?  Now, these are the questions

22  with the evidence, ladies and gentlemen.  But as the Court

23  said, you are the sole judge of the facts, and you are the sole

24  judge of the testimony in this case.  The point is that the

25  government has promised to prove to you these things beyond a

1  reasonable doubt.  And if they do, then you should find Mr.

2  Bhimani -- you should find Mr. Bhimani guilty of charges.  I

3  promise you through the evidence and through the testimony in

4  this case I will be able to show you where these areas of

5  reasonable doubt are and that you will have a question of why

6  at the end of this case.

7          All that we ask you is you sit back right now and you

8  wait until you hear all of the testimony and see all of the

9  evidence, and then and only then with your fellow jurors

10 scrutinize it with a watchful eye and a careful ear as if

11 someone you loved was on trial, and I am sure that when you do

12 that, you will ask -- still be asking yourself the question

13 why.  And that's why when I come back in front of you at the

14 end of this case I will ask you to find Faizal Bhimani not

15 guilty of these charges.  Thank you.

16         THE COURT:  All right.  Thank you, Mr. Brown.  Mr.

17 DeStefano?

18         MR. DeSTEFANO:  Good morning, ladies and gentlemen.

19 I'm Bill DeStefano.  As you know from yesterday along with

20 Terri Pawelski, my law partner and colleague, we represent

21 Nazim Hassam, who you heard Mr. Camoni talk about, and the two

22 corporate entities, Om Sri Sai, whose only asset was the Howard

23 Johnsons motel and the Pocono Plaza Inn.  Today here in the

24 courtroom with us is Mr. Hassam.  Please stand.  I know there's

25 partitions and whatever.  Also here today is his wife, Mrs.

40

1   Hassam.  Would you stand up, please?  Now, she's here because
2   she is a substantial shareholder in the corporate entity Om Sri
3   Sai -- I slur that every time I say it -- and also lived on and
4   off in the Howard Johnson motel with her husband, Nazim Hassam.
5   The evidence will show, ladies and gentlemen, that that wasn't
6   a full-time thing.

7           They have family.  Both Mr. and Mrs. Hassam grew up
8   or -- in a country in Africa.  They are of Indian dissent.
9   Their parents moved to Africa until they were about 20 years
10  old, and the country in Africa expelled all non-citizens.  It
11  was Uganda --  did they come to both the United States and
12  Canada.  The evidence will show Mr. Hassam is one of ten
13  children, who he and his twin brother, brought his family over
14  to the United States one by one, brother, sisters, mother --
15  his father died before he can get here -- to the United States.

16          And in the courtroom are some of Mr. Hassam's
17  brothers, sisters and relatives here supporting Mr. and Mrs.
18  Hassam in this case.  Ladies and gentlemen, I am a lawyer, as
19  you know, as is Ms. Pawelski.  And I have to tell you today is
20  my birthday.  I was born October 6th, 1946, 74 years ago today.

21          And just by way of a little background, I spent the
22  first seven or eight years of my career which started in 1971,
23  nearly 50 years ago, doing the job that these folks here are
24  doing for the Department of Justice.  I was a trial attorney
25  with the Department of Justice and assistant U.S. attorney.

41

1  After that first so many years -- I don't know whether it was

2  six, seven or eight, somewhere in that vicinity -- and from

3  that time forward, I've been on this side of the courtroom

4  representing both companies and individuals who were charged

5  with crimes.

6          Now, introduction out of the way, folks, let me just

7  take a few minutes and take you through what the evidence in

8  this case will show.  Now, this is a sensitive matter, but I

9  think it's an important piece of evidence.  The evidence is

10 that Mr. and Mrs. Hassam and Mr. Bhimani's family were

11 essentially raised in Africa.  In Africa it's an alternate

12 universe than the United States.  United States, 95 let's say

13 percent of the people are white, Anglo-Saxon or other European

14 descendants, all you folks fit into that category.

15         And unfortunately, the evidence will show that these

16 alleged pimps, drug dealers and prostitutes were all

17 African-American.  But you ought to keep in mind, members of

18 the jury, that Mr. Hassam and his wife grew up in an alternate

19 universe where 90 percent of the people were black.  So the

20 evidence will also show, and you won't hear any of these

21 so-called pimps, prostitutes or drug dealers say that they came

22 to the Howard Johnsons with a sign on their front of their --

23 of their shirts saying, prostitute, pimp, drug dealer.  They

24 presented as African-American males and females largely,

25 largely.

42

1          So I think it's important, ladies and gentlemen, for

2    you to guys to realize that you don't have a situation here

3    where somebody who you know is a drug dealer and you are

4    saying, okay, I am going to rent you a room -- quite the

5    contrary -- or someone you know who was a pimp or a sex

6    trafficker.  You heard Mr. Camoni say this case is not about a

7    -- not about prostitution.  These folks are not charged with

8    prostitution.

9          Prostitution is not a federal crime.  So if

10   prostitution was going on at either place, that's not at issue

11   here.  What is at issue -- and Mr. Camoni is correct about this

12   -- is something more than mere prostitution.  The element that

13   some or all of these young ladies -- primarily young ladies,

14   both black and white -- had to be forced, and these guys had to

15   know, know or act in reckless disregard that they were forced

16   somehow to be prostitutes, that they weren't doing it of their

17   own free will.

18         The evidence is -- I submit to you folks -- may show

19   that they were forced but will not show that they knew or

20   recklessly believed they were forced.  Indeed, the evidence

21   will show that when they had a strong suspicion that even

22   prostitution was going on or that one of their room occupants

23   or guests was either using or selling drugs.  They called the

24   police repeatedly.  We pulled the incident reports from the

25   upper Stroud Area Township Area Police Department where these

43

1  hotels both sit in the Poconos, and time after time somebody
2  called because there was an incident, somebody got removed from
3  the room.  The evidence will show that there was even a
4  do-not-rent list where somebody came to one of these motels,
5  primarily the Howard Johnsons, and acted in such a way that Mr.
6  Bhimani or Mr. Hassam thought was probably criminal or -- but
7  again, you don't know.  The evidence is not going to show that
8  either individual and especially Mr. Hassam saw these drug
9  dealing or drug using incidents with their own eyes.
10           They'd be going on complaints from somebody or
11  suspicion or some other thing.  But the evidence will show that
12  not only were the police called frequently whenever there was
13  something really potentially criminal or some belief they had
14  something was going on that wasn't proper or that at minimum
15  they put these people on the do-not-rent-to list.  Okay.  They
16  leave.  If they come back, don't rent, don't rent.  There's a
17  witness coming in, I believe, probably this afternoon, Sirvonn
18  Taylor that will testify, well, at first, I registered under my
19  own name for a couple times.  He's not very specific, but then
20  he says, shortly after that, I had to get somebody else to go
21  in and register and get the room for me.  Now, Mr. Taylor
22  probably didn't know about this list, or maybe he did.  But why
23  in the world would he have to come in and get somebody else to
24  rent a room under his -- somebody else's name that he would
25  stay in if he wasn't put on the do-not-rent list, which he was?

1   So, ladies and gentlemen, two of you I think you ought to have

2   in your minds very clearly -- and I thank Mr. Camoni for making

3   this clear as he could to you -- but Mr. Hassam is not charged

4   with any of the sex trafficking offenses in this case.  He's

5   not charged with sex trafficking or conspiracy to engage in sex

6   trafficking.  What that means, ladies and gentlemen, is the

7   government doesn't have enough evidence to even bring before

8   you that he knew anything about or participated in or aided and

9   abetted sex trafficking.  He simply is not charged with those

10  crimes.

11          The hotel is owned by Mr. and Mrs. Hassam.  They're

12  both stockholders in the corporate defendant, Om Sri Sai.  Mrs.

13  Hassam is not charged with anything, sex or drugs.  So your

14  focus, ladies and gentlemen, when you hear this evidence coming

15  in is that it simply does not pertain to Mr. Hassam if they are

16  talking about sex trafficking.  They're talking about

17  prostitution, which is, I guess, a part of sex trafficking, but

18  a separate offense.  He is only charged -- he's the company --

19  is only charged with the drug offenses, and I will go one more

20  step, ladies and gentlemen.

21          The government's evidence is going to relate to

22  alleged drug dealers or even actual people who sell drugs

23  coming in while Mr. Hassam was shorthanded, Faizal Bhimani was

24  no longer employed -- his employment ceased when he was

25  arrested by the police in 2017.  So you got late 2017, 2018,

45

1  2019, maybe even into 2020 where Mr. Hassam unfortunately -- he

2  hired other people to work at the motel, but he had to take a

3  more active role in those years because his relative, Mr.

4  Bhimani, was no longer working for the Howard Johnson.  The

5  evidence will show that Mr. Bhimani didn't even manage the

6  Pocono Plaza Inn approximately four miles down the street in

7  Stroudsburg.

8          The evidence will show that that property was managed

9  by a lady by the name of Janet Bush, whose daughter, Jennifer

10  Bush, was employed as a bartender in the Pocono Plaza.  You

11  will hear evidence from Mrs. Bush, the manager, is that if

12  there were any incidents of prostitution, drug dealing or they

13  had to call the police -- and there were many at the Pocono

14  Plaza -- they didn't even tell Mr. Hassam about that.  They

15  were afraid he would get nervous, oh, my God, what is

16  happening.  They didn't even tell him about that.

17          Yet, Mr. Hassam and his company, his other company,

18  Pocono Plaza Inn, a/k/a, Quality Inn, is charged with managing

19  a drug premises, not sex, drug premises at the Pocono Plaza

20  Inn.  How's that?  They don't tell him.  He's not living there.

21  He's not the manager.  The manager doesn't even tell him what's

22  going on.  He comes to collect the money maybe once a week or

23  in the morning, how is everything going, very good, and he goes

24  home or he goes back to the other motel where he lives

25  part-time -- with his wife part-time.  So, members of the jury,

46

1  the other thing is we have to understand the premises here, and

2  I'm going to ask Kevin Siegel -- I will introduce Kevin Siegel

3  to you.  He's our technical assistant here at trial.  I will

4  ask him to show if you would the government's exhibit 1 for the

5  jury, which is the Howard Johnson hotel.  That's government 1.

6  It's the front of the Howard Johnson motel.

7         However, what that shot does not show you and what

8  other evidence will show you that that premises is a sprawling

9  premises of approximately 160 rooms on two separate levels, 160

10 rooms, and that all of this so-called prostitution, which he's

11 is not charged with, sex trafficking -- which he's not charged

12 with, but drug -- supposed drug dealing or drug usage took

13 place way in the back.  Now, Kevin, can you show some shots of

14 the whole motel just to give the jury a little idea of what

15 they're dealing with here?  A couple more, Kevin.  Stop there.

16        The front, ladies and gentlemen, the evidence will

17 show these photos show upfront where the street is 611, but the

18 drug activity took place in smoking rooms way in the back.  So

19 somebody comes in, checks in upfront, that's where the front

20 office is.  That's where the lobby is, bar and restaurant and

21 whatever is.  And then because it's so far -- it's a long walk,

22 they get back in their car, and back they go to the back of the

23 motel, and this is where this drug activity and alleged sex

24 trafficking took place.  There's no surveillance cameras back

25 there, certainly not inside the rooms and none outside of the

47

1  rooms.  So I ask you as you're listening to this evidence and
2  you're appreciating the size and scope of this property, how is
3  Mr. Hassam, who doesn't check people in, he lives there
4  part-time, he lives upfront, one of the front rooms, or his
5  wife know or apprehend what might be going back there on a
6  given night?  Sure, if somebody says there's a fight in the
7  parking lot or, hey, looks like there's some drug trafficking,
8  of course, call the police, that's what they did.  Other than
9  that, how is he supposed to know this activity is taking place
10 dark at night?  He's probably in bed.
11          And unless somebody comes to them, unless the cops
12 come -- now, the cops patrol, ladies and gentlemen.  The
13 evidence will show the Upper Stroud Area police force patrols
14 all around looking for, surveilling for drug dealers.  Okay,
15 good.  I think that's what they are supposed to do.  How does
16 that come back to Mr. Hassam?  And because Mr. Hassam is the
17 Howard Johnsons property, he's part owner with his wife, if
18 other silent partners you will see as well -- but how does that
19 come back to the hotel itself?
20          Ladies and gentlemen, the same situation is true --
21 you can take that picture down -- but the size of the Pocono
22 Plaza Inn down the street four miles away from the Howard
23 Johnson is the same, and the layout is the same, and the
24 testimony will show that this drug activity which he and the
25 Pocono Plaza Inn are charged with, again similarly took place

48

1   in the back at night, police patrol.  But who is waking Mr.

2   Hassam up four miles away there and telling him what's going

3   on?  Janet Bush will tell you they didn't bother.  They wanted

4   to keep that from him.  So, members of the jury, as everybody

5   has told you, including Mr. Camoni and the judge and Mr. Brown,

6   you ought to keep an open mind.

7           You ought to view the evidence -- because I am

8   arguing to you here, what Mr. Camoni said to you, who was

9   arguing to you a lot, even what Mr. Brown is arguing is not

10  evidence.  Your oath as jurors is to follow the evidence, and

11  unless that evidence convinces you beyond a reasonable doubt --

12  beyond a reasonable doubt, your duty as jurors is to return a

13  not guilty verdict that I respectfully submit you I will argue

14  to you in more detail that your verdict as to Mr. Hassam and

15  your verdict as to Mr. -- as to the two corporate entities

16  ought to be not guilty, not guilty, not guilty.  Thank you very

17  much, folks.

18          THE COURT:  Thank you, Mr. DeStefano.  All right,

19  ladies and gentlemen, we're going to take a morning break to

20  let you use the facilities and stretch a bit.  You will hear

21  admonitions from me all the time.  You're to keep an open mind.

22  You are not to form any opinions.  You have not heard even one

23  piece of evidence in this case yet, not one.  All right.  No

24  research of any kind concerning anything you heard, any

25  terminology, any locations, places, anything of that nature.

49

1  You're not to speak with anyone about the case including among

2  yourselves.  If anyone were to try to talk to you about the

3  case, you must advise us of that immediately.  All right.  See

4  you back in here about ten to 15 minutes.  All right.

5              (A brief recess was taken.)

6              THE COURT:  Looks like we will break for lunch.  It's

7  almost noon.  There's electronic problems.  It looks like it

8  will take some time to get resolved.  It doesn't make sense for

9  us to bring the jurors back to start something at 20 after 12.

10  So we will break now for lunch.  If it's okay with counsel,

11  rather than bring the jury back, I will advise of them of the

12  admonitions, don't do any research, talk to anybody, and tell

13  them to be back here at 1:00.  Does that work for everybody?

14  All right.  That's what we will do then.  See you all at 1.

15              (A lunch recess was taken.)

16              THE COURT:  All right.  Welcome back.  Ms. Roberts?

17              MS. ROBERTS:  Thank you, Your Honor.  The government

18  is going to call F.B.I. special agent Will Doherty.

19              WILLIAM DOHERTY, called as a witness, being duly

20  sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MS. ROBERTS:

23  Q.   Good afternoon, sir.  Can you please state to the jury how

24  you're employed?

25  A.   Yes, good afternoon.  I'm a special agent with the F.B.I.

1  located in the Philadelphia division.

2  Q.    And how long have you been with the F.B.I.?

3  A.    It will be nine years next April, so eight years as of

4  today.

5  Q.    What do your current job duties include?

6  A.    As a special agent, I'm assigned to a violent gang squad

7  in Philadelphia.  We as in gangs work with the Philadelphia

8  Police Department and other local law enforcement agencies

9  combating narcotics sales, firearms sales, drug trafficking

10  both in Philadelphia and in the Eastern District of

11  Pennsylvania.

12  Q.    Prior to working at the Philadelphia office, where were

13  you located at?

14  A.    The Philadelphia office has several resident agencies, one

15  of them being the Scranton resident agency.  I was assigned

16  there as of September 2012.

17  Q.    So how long were you actually at the Scranton resident

18  office.

19  A.    Approximately September 2012 until October 2015.

20  Q.    While you were in Scranton working with the F.B.I., what

21  did your job duties include at that point?

22  A.    I was assigned to the criminal branch of the F.B.I. as

23  opposed the national security branch.  The primarily focus was

24  as a member of the Safe Streets Task Force, Scranton -- the

25  office here has a -- it's called the Steamtown Safe Streets

1  Task Force, so it investigates violent crime and gangs.

2  Q.    And can you just briefly describe for the jury what your

3  educational background and your training is for the position

4  that you have with the F.B.I.?

5  A.    I have a bachelor's in political science.  I was an

6  Airborne infantry team leader with the 82nd Airborne prior to

7  serving in this capacity as an agent.  I was also employed by

8  the D.E.A. in Baltimore, Maryland as a support employee doing

9  technical and administrative functions.  And then when I became

10  an F.B.I. agent in 2012, I attended the F.B.I. academy at

11  Quantico.  It was approximately 20 weeks long.  It involved

12  firearms training, legal training, process training and other

13  forms of training that you would see in a regular police

14  academy.

15  Q.    While working with the F.B.I. office in Scranton, did you

16  participate in any type of investigations relating to gang

17  activity in the Middle District of Pennsylvania?

18  A.    Yes, I did.

19  Q.    Can you describe for the jury what was that investigation?

20  A.    In early 2014 I initiated an investigation in Monroe

21  County in the Poconos.  The investigation targeted a gang known

22  as the Black P. Stones, which is a Blood set based out of

23  Chicago, but it expanded into New York City and from New York

24  City into the Poconos.

25  Q.    How did you actually become interested in investigating

1  this gang, the P. Stones?

2  A.    In early 2014, I believe it was January, there was a drive

3  by shooting in -- I believe it was in Stroudsburg, maybe East

4  Stroudsburg, and during this shooting, an innocent man was shot

5  and killed and they identified that the --

6            MR. BROWN:  Objection, Your Honor, relevance.

7            THE COURT:  Overruled.  It's background information.

8  Go ahead.

9            THE WITNESS:  And during the course of the

10 investigation -- subsequent investigation by the Pennsylvania

11 State Police and by local law enforcement, they determined that

12 the gang -- the Black P. Stones, the members of this gang were

13 involved in the drive by shooting.  And subsequently to that,

14 there was a news article by the Pocono Record that detailed the

15 influx of Black P. Stones from the New York City area into the

16 Stroudsburg Pocono area.

17 BY MS. ROBERTS:

18 Q.    So once you started collecting information on the Black P.

19 Stones, what was the focus of your investigation?

20 A.    Traditionally, the Safe Streets Task Force, we target

21 narcotics trafficking, firearms trafficking and conspiracy

22 charges.  But we identified in this investigation right away

23 that there was a significant human trafficking element with

24 this gang and the activities they were conducting.

25 Q.    And when you say human trafficking, can you explain to the

53

1  jury what you're talking about when you say human trafficking?

2  A.    So there's a misconception between human trafficking and

3  prostitution.  Prostitution traditionally is a commercial sex

4  act between two individuals -- can be more -- but traditionally

5  two individuals -- but human trafficking, the element there is

6  that --

7            MR. BROWN:  Objection, Your Honor.  Calls for a legal

8  conclusion.

9            THE COURT:  Overruled.

10            THE WITNESS:  The difference between human

11  trafficking is that there's the sex act but it's done with the

12  -- or under the threat of violence, threat of violence, force

13  or coercion by another person not engaged in the sex act.

14  BY MS. ROBERTS:

15  Q.    So in this particular investigation when you were looking

16  into the P. Stones for human trafficking or sex trafficking as

17  you're describing, were you looking for women who were chained

18  to a bed or chained in a basement?

19  A.    That wasn't our primary goal.  If we came across that, I'm

20  sure we would have investigated appropriately.  In this case

21  what we found were the girls that were being trafficked in this

22  case, they started off underage, high school aged, and they

23  were addicted or they were provided narcotics as essentially a

24  payment so they would engage in the sex acts, and then members

25  of the Black P. Stones would provide them narcotics as payment.

54

1      Once you're hooked on opium, heroin, pain medication, once

2    that happens your body develops the addiction to it, and it's a

3    survival mentality where you need to do anything you can to get

4    that next fix or that next hit.

5    Q.    What did you do to initiate your investigation?  What

6    steps did you take?

7    A.    One of the first steps was to meet with local law

8    enforcement.  I met with the acting chief of police at Stroud

9    Area Regional Police Department, and I met with the detectives

10   from the Monroe County D.A.'s office, detectives from Pocono

11   Mountain Regional and homicide detectives from Pennsylvania

12   State Police.  I just spent the first few weeks gathering

13   information on the P. Stones, who the hierarchy was, who there

14   leaders were, where they were based out of, residences or

15   hotels and their main function as a gang.  Once I had a good

16   understanding, I opened an F.B.I. investigation and proceeded

17   to essentially recruit law enforcement officers both from the

18   D.A.'s office, Pennsylvania State Police and the local larger

19   police departments that were in the Poconos and together using

20   their institutional knowledge of individuals and gang members

21   in the Poconos, we established an ad hoc task force to target

22   the P. Stones and to eliminate the threat they posed to not

23   only to high school aged kids but girls who were out of high

24   school but were being trafficked.

25   Q.    How were you able to locate specifically where some of

55

1  these individuals were?

2  A.    Back in 2014, the website Back Page was functional and it

3  was operational.  It's an open source website similar to

4  Craig's List.  You're allowed to search by region.  You can

5  search for keywords, phone numbers.  And in this case Back Page

6  was the primary means of advertising for the P. Stones -- by

7  advertising I mean advertising girls to do -- to engage in

8  these sex acts.  So the first step was to identify who these

9  females were, trying to identify common phone numbers and then

10 to subpoena Back Page for pertinent information.

11 Q.    Can you describe for the jury what types of investigative

12 techniques that you used throughout the investigation to

13 collect information and collect evidence?

14 A.    As F.B.I. we bring a wide range of resources to the task

15 force and to the safe streets resources.  We provide manpower

16 resources and financial resources and technical resources.

17 During this investigation, we utilized all of them.  We

18 provided additional manpower to understaffed law enforcement

19 agencies to surveil potential locations where the P. Stones

20 were operating.  We provided other technical resources to set

21 up what we call a human trafficking sting, recording equipment,

22 provided money for narcotics, controlled narcotics buys, for

23 controlled firearms buys using a confidential source, and we

24 provided -- or we obtained grand jury subpoenas for information

25 from Back Page, from hotels and other businesses in the Pocono

1  region.

2      And then one of our biggest tools is just our ability to

3  interview people, both victims and coconspirators, what we call

4  subjects.  As an F.B.I. and as law enforcement, it's being able

5  to interview someone, talk to them, get them to speak against

6  their own self interest or to provide information that they may

7  be embarrassed to talk about is really how we make our cases is

8  direct interviews of witnesses, victims and subjects.

9  Q.    In this particular investigation, were you able to conduct

10  some of those interviews with women and with some of the pimps?

11  A.    Yes, that's correct.

12  Q.    Were you able to determine during your investigation where

13  the P. Stones were mainly operating out of?

14  A.    We identified hotels in the Pocono region, Stroudsburg,

15  East Stroudsburg and along the I. 80 corridor between the New

16  Jersey boarder and roughly I. 380.

17  Q.    I'm going to show you for identification purposes exhibit

18  1.  It should pop up on your screen.

19  A.    I see it.

20  Q.    Do you recognize what Government's Exhibit 1 is?

21  A.    That is the Howard Johnson hotel, and that is the front

22  entrance.

23  Q.    And was that one of the hotels that the P. Stones were

24  operating out of based upon your investigation?

25  A.    Yes.

57

1          MS. ROBERTS:  Your Honor, the government is going to

2   request that Government's Exhibit 1 be moved into evidence.

3          THE COURT:  Any objection?

4          MR. BROWN:  No objection.

5          MR. DeSTEFANO:  No.

6          THE COURT:  It's admitted.

7   BY MS. ROBERTS:

8   Q.   I'm also going to show you just for identification

9   purposes Government's Exhibit 34.  Do you recognize what's

10  Government's Exhibit 34?

11  A.   Yes, that's a hotel in Stroudsburg.  I remember it as the

12  Quality Inn.  It's clearly labeled the Pocono Plaza Inn.

13  During my time in this investigation, it was known as the

14  Quality Inn.

15  Q.   Was that also one of the hotels in your investigation

16  identified as being where the P. Stones were operating out of?

17  A.   That's correct, it is.

18  Q.   Okay.  Were there also other hotels that they -- the P.

19  Stones worked out in the Pocono area as well?

20  A.   Yes, there were.

21  Q.   Approximately how long did your investigation continue

22  for?  You stated -- you testified that it started in early

23  2014.

24  A.   The homicide, I believe, was in January of 2014.  I

25  believe I opened the investigation in -- officially in March of

58

1  2014, and then it continued past when I departed -- when I

2  transferred to the Philadelphia office, which was in October of

3  2015.  So my role in the investigation was roughly a year and

4  eight months or a year and a half.

5  Q.   As a result of the part of the investigation that you did,

6  what did you do?

7  A.   Once we identified who the main players were in this

8  investigation, the subjects, the hierarchy, one of the first

9  steps was to try to mitigate the risk to some of these girls

10  being trafficked.  We decided to collectively work with the

11  task force to set up what we call a human trafficking sting

12  operation.

13  Q.   And based upon that, were you able to present information

14  to a federal grand jury?

15  A.   That's correct.  Based on interviews, our surveillance

16  operations as a result of grand jury subpoenas and this

17  targeted enforcement operation of the P. Stones during the

18  human trafficking sting, I was able to present to the grand

19  jury.

20  Q.   And were you able to actually indict or criminally charge

21  individuals based upon your investigation?

22  A.   That's correct, several.

23  Q.   Do you remember the names some of those individuals you

24  charged based upon this investigation.

25  A.   I do.

1  Q.    What are they?

2  A.    We identified Sirvonn Taylor, the leader the Black P.

3  Stones in the Poconos.  Sirvonn Taylor was indicted.  We

4  identified a relative of his, Arty Taylor.  He was also

5  indicted for the same offense.

6  Q.    What offenses were they?

7  A.    For human trafficking.  Within the gang we identified a

8  sub organization.  It was called Sev Squad, Sev being short for

9  Seven Squad.  And that was headed by Jose Velazquez, Junior.

10 His street name was Sev, and within this Sev Squad we

11 identified Jamiell Sims.  We identified Salena Bayer-Davis and

12 Sheryl Patishnock all being involved and all being indicted

13 except Sheryl Patishnock.  She was not indicted.

14 Q.    And were you able to identify any other individuals based

15 upon your investigation who were not in the actual P. Stone

16 gang but were also involved in the human trafficking and drug

17 trafficking?

18 A.    Yes, the during the human trafficking sting we also

19 arrested Thurman Stanley, who went by the street name of Black.

20 Q.    I'm going to show you Government's Exhibit 10.

21 A.    I recognize him.

22 Q.    Do you recognize what Government's Exhibit 10 depicts?

23 A.    That is Sirvonn Taylor.

24 Q.    I am going to show you Government's Exhibit 11.

25 A.    That's Arty Taylor.

1  Q.    Government's Exhibit 98?

2  A.    The individual on the left wearing the backwards black

3  hat, and prominently displayed on his shirt is the word east.

4  That's Jose Velazquez, Junior, street name Sev.  In the green

5  shirt with the white Nike swoosh is Arty Taylor.

6  Q.    Government's Exhibit 13.

7  A.    That is Salena Bayer-Davis.

8  Q.    Government's Exhibit 19.

9  A.    That is Thurman Stanley.

10  Q.    Government's Exhibit 12.

11  A.    Sheryl Patishnock.

12  Q.    Government's Exhibit 18.

13  A.    Kenya Evans.

14         MS. ROBERTS:  Your Honor, the government requests,

15  Government's Exhibit 34, 10, 11, 98, 13, 19, 12 and 18 be

16  entered into evidence.

17         THE COURT:  Any objections?

18         MR. BROWN:  No objection.

19         THE COURT:  Mr. --

20         MR. DeSTEFANO:  No objection.

21         THE COURT:  It's admitted.

22  BY MS. ROBERTS:

23  Q.    Do you remember the timeframe that was charged for the

24  drug and sex trafficking investigation?

25  A.    I believe the scope of the indictment was from 2000 -- end

1  of 2010, early 2011 all the way up to 2014.

2  Q.   While you were investigating these crimes, was your focus

3  on the actual locations where this criminal activity occurred?

4  A.   No, our primary focus was on the females underage and

5  overage that were being trafficked and to mitigate the risk

6  against them as soon as possible.

7  Q.   And at some point during the investigation while you were

8  still in Scranton, did that primary focus from the actual

9  individuals shift?

10 A.   Yes, it did.

11 Q.   And how did that shift?  Can you explain that to the jury?

12        MS. PAWELSKI:  Objection, basis for knowledge.

13        THE COURT:  It's overruled.

14        THE WITNESS:  I can't hear.

15 BY MS. ROBERTS:

16 Q.   Can you explain to the jury how that shift occurred while

17 you were working in Scranton?

18 A.   Yes, around the same time -- again, I transferred from the

19 Scranton resident agency to the Philadelphia office

20 approximately October -- end of September, early October 2015.

21 During -- around that same time my partners in this

22 investigation, once the hierarchy of the P. Stones was charged

23 and arrested, the investigation shifted towards where the P.

24 Stones had been functioning and working backwards to target

25 these locations, these hotels.  And around that at the same

62

1  time is when I departed and no longer had a role in the

2  investigation, but I had knowledge that shift was in process.

3            THE COURT:  Before the next question, Mr. DeStefano

4  and Ms. Pawelski, only one counsel handles each witness.

5            MS. PAWELSKI:  My apologies.

6            THE COURT:  So only -- it's not everyone, okay.

7  BY MS. ROBERTS:

8  Q.    Did other members of the Scranton resident office take

9  over that portion of the investigation after you got

10 transferred to the Philadelphia office?

11 A.    Yes, they did.

12 Q.    Do you recall who that was?

13 A.    Task force officer Chris Shelly, who is a detective or

14 police officer from the Stroud Area Regional Police Department,

15 and then trooper William Patton, who was with Pennsylvania

16 State Police.

17 Q.    You said was with the Pennsylvania State Police?

18 A.    Yeah, that's correct.  He has retired since.

19            MS. ROBERTS:  Your Honor, I have no further questions

20 for this witness at this time.

21            THE COURT:  Mr. Brown?

22            MR. BROWN:  Thank you, Your Honor.

23 CROSS EXAMINATION

24 BY MR. BROWN:

25 Q.    Agent Doherty, my name is attorney Bernie Brown.  I

1  represent Faizal Bhimani, and I have a couple questions.  Is it

2  true that you began your investigation and did a report on

3  September 17th of 2014?  Do you recall that?

4  A.    Not the specific report.

5  Q.    Can we bring up Bates 2189, please?  Is it --

6          THE COURT:  Hold on.  That will be brought up only to

7  the witness.

8          MR. BROWN:  Right.  I was going to ask a foundational

9  question.  In the course of your training and experience, you

10  write reports as a result of what you investigate, correct?

11          THE WITNESS:  Correct.

12  BY MR. BROWN:

13  Q.    Okay.  And -- is there a report in front of you?

14  A.    It's up.

15  Q.    I would like you to look over that report.  It's two pages

16  in length.  When you're done with the first page, just let me

17  know, and then we'll flip to the second page.

18  A.    Okay, second page, please.  Could you go back to that

19  first page so I can get the transition?  Okay.  Back to the

20  second page.

21  Q.    Does that refresh your recollection as to your report from

22  October of 2014?

23  A.    As it's written there, yes.

24  Q.    Yes, okay.  What I want to talk about is what is written

25  there.  And you had information that Thurman Stanley was

1  working out of and staying at the Howard Johnson in 2014,

2  correct?

3  A.   That's what it says in the report.  I can't recall what

4  the specific information was though.

5  Q.   It's your report though, correct?

6  A.   Correct.

7  Q.   You wrote it?

8  A.   Yes.

9  Q.   Okay.  That's your name at the bottom, by William Doherty

10 dated draft 10/12/14, correct, down at the bottom of the first

11 page?

12 A.   The one I am looking at says 10/20/14.

13 Q.   So in your report you write that you have information that

14 Thurman Stanley was staying at the Howard Johnsons, correct?

15 A.   That's correct.

16 Q.   Did you receive that information from hotel management?

17 A.   I don't recall.

18 Q.   So is it possible that you could have received it from the

19 management of Howard Johnsons?

20 A.   I don't know that I ever received any information from

21 management at Howard Johnson.  I am reluctant to say yes.

22 Q.   So let me direct you to paragraph No. 2, the first

23 sentence.

24 A.   I see it.

25 Q.   Okay.  Investigators received intelligence that Thurman

1  Stanley was at the Howard Johnson hotel room 145 in

2  Bartonsville.  Did I read that correctly?

3  A.    You did.

4  Q.    You received information not only of where Mr. Thurman

5  Stanley was but what room number he was in, correct?

6  A.    Yes, according to this report.

7  Q.    Right.  And could you have received that information from

8  anywhere else but the front desk or management?

9  A.    Yes.

10 Q.    Okay.  Fair enough.  And then you also received -- did you

11 go to the hotel?

12 A.    So in this report it says that we conducted spot

13 surveillance -- sorry.  Is this displayed?

14 Q.    Yes.

15 A.    In this report it says that we conducted spot surveillance

16 at the Howard Johnson but also says we conducted spot

17 surveillance at six other locations.  Having not -- not -- not

18 recalling exactly from five years ago what our course of action

19 was, but reading this, we must not have seen the vehicle at the

20 Howard Johnson and gone to the other five hotels here to try to

21 see if the vehicle was there.

22 Q.    So my first question, did you go to the Howard Johnson?

23 A.    It says we did in this report, so I believe we did.

24 Q.    Okay.  You went to the Howard Johnson, and you conducted a

25 spot surveillance, correct?

66

1  A.    Yes.

2  Q.    Okay.  And you looked for Thurman Stanley's car, correct?

3  A.    Correct.

4  Q.    And you did not find it there, correct?

5  A.    I don't believe we did.

6  Q.    Okay.  Does your report say that you did not find Thurman

7  Stanley's car at the Howard Johnson, yes or no?

8  A.    Can you switch to the second page real quick?

9  Q.    No, it's on the first.  The last paragraph, first line,

10 first sentence of that paragraph.  That one right there.

11 A.    Sorry.  It keeps moving around here.

12 Q.    Investigators were unable to locate the vehicle --

13        THE COURT:  There's a question.  Let the question --

14        MR. BROWN:  I apologize, Judge.

15        THE WITNESS:  No, it was not located at the hotel.

16        MR. BROWN:  Fair enough.

17 BY MR. BROWN:

18 Q.    And it was located somewhere else, correct?

19 A.    That's correct.

20 Q.    Then do you -- actually I'm going to stick with that

21 exhibit there since we have it.  When you were talking about

22 the spot surveillance, there were six other hotels, correct?

23 A.    As I am looking at it again.  I see the last one is Stroud

24 Mall.  That's not a hotel, so it would have been the Howard

25 Johnson plus four other hotels and a fifth location being the

1  Stroud Mall.

2  Q.    Okay.  So the first one would have been the Quality Inn,

3  correct?

4  A.    That's how it's reported.  That doesn't necessarily

5  reflect that's first hotel I went to.

6  Q.    Okay.  In your report you wrote -- the first name of a

7  hotel is the Quality Inn, yes or no?

8  A.    That's correct.

9  Q.    Okay.  The second name is the Econo Lodge, yes or no?

10  A.    Yes.

11  Q.    The third name is Budget Inn, correct?

12  A.    Correct.

13  Q.    Then the fourth was the Howard Johnson, yes or no?

14  A.    Yes.

15  Q.    And the fifth was the Comfort Inn, correct?

16  A.    Correct.

17  Q.    So that was the information that you had of where Thurman

18  Stanley would run his drug and human trafficking operations out

19  of, correct?

20  A.    Meaning room 145 or those six locations?

21  Q.    Those six locations the reason why you would include those

22  in the report in -- when you're looking for spot surveillance

23  as to where Thurman Stanley is, is because you had information

24  that he was operating out of those hotels, correct?

25  A.    In part.

68

1    Q.    Well, isn't the point of your investigation on September

2    17th, 2014 to find out where Thurman Stanley is?

3    A.    Yes.

4    Q.    Okay.  And so you go to the -- you have information that

5    he's at the Howard Johnson, correct?

6    A.    Correct.

7    Q.    And the reason why those names that I just went over with

8    you are included in your report would be because you had

9    information that he was also working out of the Quality Inn,

10   correct?

11   A.    Not necessarily on this Friday, September 17th.

12   Q.    Okay.  Then why would you on September 17th when trying to

13   locate Thurman Stanley go to the -- include these six other

14   hotel rooms -- or six other hotel names in your report, sir?

15   A.    As part of our investigation and preparation for our human

16   trafficking sting, we made sure that we gathered as much

17   intelligence, and part of that for me as a newer F.B.I. agent

18   at the time was to work with Pennsylvania State Police and

19   other county detectives from other areas that the Scranton

20   resident agency covers and we'd conduct human trafficking

21   stings in those locates just so I can gain the experience and

22   know how to run a successful one.  As part of my process for

23   checking these six locations, as part of my training into this

24   investigation, these are hotels that we conducted other

25   surveillances at and other prostitution stings at the county

1  level where I participated.  So these were known locations

2  where women would go or would be frequented by either narcotics

3  traffickers or prostitution -- or prostitutes, excuse me.

4  Q.    Right.   In particular Thurman Lamont Stanley?

5  A.    In particular what?

6  Q.    In these locations where you are trying to find out where

7  Thurman Stanley is, you include them in there for that reason,

8  yes or no?

9  A.    It's not a yes or no question for this particular event.

10  Q.    Sir, I'm asking the questions.  It is a yes or no

11  question.  Did you include it in your report when your

12  investigators received intelligence that Thurman Stanley was at

13  the Howard Johnson's, you included in a report looking for

14  Thurman Stanley?

15  A.    Correct.

16  Q.    Did you yes or no include those names in there in your

17  surveillance of trying to find out where Thurman Lamont Stanley

18  was?

19  A.    It would make sense so, yes.

20  Q.    Okay.  Thank you.  Now, you eventually find out where

21  Thurman Lamont Stanley is in your surveillance, correct?

22  A.    I believe I find out where his vehicle is.  I don't know

23  that he's in that location.

24  Q.    Okay.  So you find out that his vehicle is located at 212

25  Lackawanna Avenue in East Stroudsburg P.A., correct?

70

1  A.    Correct.

2  Q.    Okay.  You drive past the residence.  You see it's there.

3  You find out who the residence belong to, correct?

4  A.    The only reason why I'm struggling on this answer is

5  because I don't know if the residence belonged to Michelle

6  Oswald or just based on the license plate information for that

7  Chevy S. U. V.  So I don't know the answer to that.

8  Q.    Did you have information that Thurman Stanley was inside

9  that residence?

10  A.    I did not.

11  Q.    Okay.  So you didn't do anything more there?

12  A.    If I did, I would have reported it, so I'll say no.

13  Q.    Okay.  No arrest was made for human trafficking or drug

14  activity of Thurman Stanley?

15  A.    Not on Friday, September 17th.

16  Q.    How about -- do you recall doing or trying to make a

17  controlled purchase on February 20th, 2015?

18  A.    From this location?

19  Q.    No, just in your investigation.  Sorry.

20  A.    I'm sure there's a report documenting that I did one so --

21  Q.    There is.

22  A.    Yes, I do recall but not the pertinent details.

23  Q.    And it is Bates 2131.

24        THE COURT:  Mr. Brown, when you refer to a document

25  aside from whatever the Bates number is, do you have it marked

1  as a defense exhibit for purposes of identification?

2          MR. BROWN:  I didn't.

3          THE COURT:  You need to mark them.  Anything you show

4  as a defense exhibit just for identification purposes so our

5  record is clear as to what the document is, all right.

6          MR. BROWN:  Okay.  So then I will mark Bates 2189 --

7          THE COURT:  Is that the one just previously showed?

8          MR. BROWN:  Previously showed -- 2190, surveillance

9  from September 17th, 2014.

10          THE COURT:  As?

11          MR. BROWN:  Defendant's Exhibit No. 1.

12          THE COURT:  Okay.

13          MR. BROWN:  And I will mark this attempted controlled

14  purchase on February 20th, 2015 as Defendant's Exhibit 2, Your

15  Honor.  It would be Bates 2131 to 2232.

16          THE COURT:  Okay.

17  BY MR. BROWN:

18  Q.    Agent Doherty, was there an attempted controlled purchase

19  made on this date as it related to your investigation?

20  A.    Based on my reading of the first page, that is correct.

21  Q.    And is it true that you guys had a confidential informant

22  meet a known drug trafficker by the name of Anton Woodson in

23  order to conduct a controlled purchase?

24  A.    Again, based on this report that appears to be accurate.

25  Q.    Okay.  And when directed to go back to the Howard Johnson

72

1    at Bartonsville in order to obtain that, the investigation and

2    controlled purchase was terminated, correct?

3    A.    Correct.

4    Q.    And so that means no purchase was made on that date,

5    correct?

6    A.    Can you just go to the second page so I can just make

7    sure?

8    Q.    Sure.

9    A.    That is correct.

10   Q.    Okay.  Thank you.  And you testified on direct examination

11   that you've testified before in relation to your investigation

12   into the P. Stones?

13   A.    Just testified in grand jury.

14   Q.    Right.  During that grand jury testimony, is it true the

15   information from your investigation specifically focused on the

16   P. Stones gangs and their operation on that date?

17   A.    Correct.

18   Q.    And did you say during your testimony that the P. Stones

19   operated out of numerous hotels in or about the Stroudsburg and

20   Monroe County area?

21   A.    Correct.

22   Q.    Okay.  Did you testify that your investigation revealed a

23   large drug sale that occurred out of the Super 8 motel in East

24   Stroudsburg?

25   A.    I am sure I did.  I don't recall the details though.

73

1  Q.    But you did?

2  A.    Yeah, I'm sure I did.

3  Q.    Did you also testify that the main sales for the P. Stones

4  also occurred out of that same Super 8 motel?

5  A.    You say main sales?

6  Q.    Sorry.  The main drug sales that occurred for the

7  operation occurred out of the Super 8 Motel.

8  A.    Without having the transcript in front of me, I'm sure I

9  did.  I don't remember the details though.

10  Q.    Is that a yes?

11  A.    Do you have a transcript I can review?

12  Q.    I do.

13        MR. BROWN:  I will mark the entire transcript, Your

14  Honor.  I will get you the pages, but right now I have a

15  specific page of 2131.  That would be the Bates number -- lines

16  21 to 24.  I will mark that as Defendant's Exhibit No. 3.

17        THE COURT:  Okay.

18        MR. BROWN:  Thank you, Judge.

19        THE WITNESS:  Just to clarify, I am reading page 82?

20        MR. BROWN:  Yes, page 2131, lines 21 to 24.

21        THE COURT:  Let me just ask you.  You thought the

22  previous Defendant's Exhibit 2, the 302 you showed him was

23  Bates exhibits 2131 to Bates 2132.  If that's the case, how can

24  this be 2131?

25        MR. BROWN:  Excuse me.  I have 2231.

74

1          THE COURT:  As to No. 2?

2          MR. BROWN:  As to No. 2.  I apologize.  I misspoke.

3  Did you have a chance to review your grand jury testimony?

4          THE WITNESS:  As I have read line 21 through 25, yes.

5  BY MR. BROWN:

6  Q.    And is it true that the P. Stones, in particular Jose

7  Velazquez mainly operated out of the Super 8 Motel in East

8  Stroudsburg?

9  A.    That's what it says.  I don't recall based on this page

10 the timing of when this information was provided, whether it

11 was indictment or following the human trafficking sting.  I

12 don't have context of when this information she was providing

13 actually occurred.

14 Q.    Okay.  Well, go back to that first page.  2130.  Grand

15 jury testimony September 22nd, 2015.

16 A.    No, I get -- I know what I testified.  I am testifying to

17 an interview I conducted with in this example Sheryl

18 Patishnock.  I don't know the date of the information she was

19 providing.

20 Q.    Fair enough.  You don't disagree with what that says

21 there?

22 A.    Correct.

23 Q.    Do you know if any hotel managers like my client from the

24 Super 8 were indicted?

25 A.    Were indicted?

75

1  Q.   Yeah.

2  A.   Not -- not to my knowledge.

3  Q.   Did you testify that you also interviewed a Millie McKee?

4  A.   Yes.

5  Q.   And did you know that Millie McKee when she was

6  interviewed said that she was a prostitute and that she was not

7  human trafficked?

8  A.   If you have the transcript I can review it.

9  Q.   I'm asking did you know that?

10 A.   That she said that to me?

11 Q.   That she said that during an interview.

12 A.   I don't recall her saying that to me.  Again, if I had the

13 report to review, I can confirm it.  But without that, I

14 wouldn't feel comfortable.

15 Q.   So did you know that she -- Millie McKee said in her

16 interview that she was actually interviewed by her employer,

17 her pimp, and given the opportunity to make a decision whether

18 or not she wanted to become a prostitute?

19 A.   I'm sorry.  I am confused by your question.

20 Q.   Did you know that Millie McKee said she was interviewed

21 and given a day or two to make a decision whether or not she

22 wanted to work for her employer, her pimp?

23 A.   I don't recall the interview with Millie McKee.  Just like

24 the surveillance report that I was shown earlier, any interview

25 I would have conducted would have either been completed --

76

1  documented in an F. D. 302 or a -- if there's another law

2  enforcement entity with me, they would have documented it.  So

3  if it's reported in there, then I can review it and answer that

4  question.  But without that, I just do not recall five years

5  later what she said to me.

6  Q.    Okay.  So then you also not recall Millie McKee -- did you

7  know that Millie McKee said she'd rather be paid in drugs than

8  money?

9  A.    I just don't recall.

10  Q.    Okay.  You knew you were testifying here today, correct?

11  A.    Correct.

12  Q.    And you didn't take the opportunity to review any of your

13  302s or the grand jury report?

14  A.    I did.

15  Q.    Okay.  You just don't remember as you sit here today

16  whether or not you asked those questions and she gave you those

17  answers?

18  A.    That's correct.

19  Q.    How about Salena Bayer-Davis, who you identified, do you

20  know she said she wanted to work for money?

21  A.    I just don't recall.

22  Q.    Okay.  But you recall her being a prostitute for the P.

23  Stones?

24  A.    That's correct.

25  Q.    Did she also tell you she was voluntarily and made a

77

1  decision to enter the gang?

2  A.   I don't recall.

3  Q.   And that she made a voluntary decision to leave the gang?

4  A.   I don't recall again five years later.  I don't recall

5  anyone saying that they voluntarily left the gang.  Just based

6  on gang initiation, that wasn't in our investigation, that

7  wasn't something that was feasible without significant

8  consequences.  So I feel I would remember that.  If I had the

9  report to review --

10 Q.   How about your grand jury testimony?

11 A.   That's fine.

12       MR. BROWN:  2168.  This is still -- this is

13 Defendant's Exhibit 3.

14       THE COURT:  This is 3?

15       MR. BROWN:  This is Defendant's Exhibit 3.  It's the

16 entire grand jury testimony, Your Honor.  I apologize I don't

17 have the pages.

18       THE COURT:  That's okay.

19       MR. BROWN:  Just one minute, Your Honor.  I think I

20 gave him the wrong page.  I apologize.  May I have a moment?  I

21 just gave him the wrong number.

22       THE COURT:  Sure.

23       MR. BROWN:  I will move on.

24 BY MR. BROWN:

25 Q.   Do you recall her saying that she wasn't being forced to

1  stay in the gang?  Yes or no, do you recall her saying that?

2  A.    Again, just going back through my interviews -- I

3  interviewed several individuals in this case, and I don't

4  recall anyone ever saying that to me -- but again going off of

5  general review.

6  Q.    And let me ask you if you recall this.  Do you remember

7  her saying the reason why she wanted to leave because it used

8  to feel like family but then she realized they didn't have her

9  back, meaning the P. Stones?

10  A.    I remember that.

11  Q.    And that was the reason why she was leaving the gang,

12  correct?

13  A.    That makes sense, yeah.

14  Q.    Okay.  Does that refresh your recollection as to whether

15  or not she made a decision to leave the gang?

16  A.    Again, these questions all make sense.  I just -- I can't

17  say definitively.

18  Q.    Right.  As you sit here today?

19  A.    As I sit here.

20  Q.    You talked about Sheryl Patishnock?

21  A.    Yes.

22  Q.    Did she say she -- she knew Mr. Taylor since high school,

23  correct?

24  A.    Sounds right.

25  Q.    Okay.  And that she chose to be in the gang, too, correct?

79

1   A.   That sounds right.

2   Q.   Okay.  And did she say that she went through the

3   initiation and still wanted to be a member of the gang?

4   A.   I don't remember that.

5   Q.   Okay.  How about -- did she say that she wanted to

6   voluntarily leave the P. Stones, too?

7   A.   I don't know we would have asked in any interview with one

8   of the girls that were being trafficked -- I don't know we

9   would ask them did you want to voluntarily leave, and I don't

10  know -- they proffer that information, so I just don't recall.

11  Q.   Okay.  How about 2129?  Does that refresh your

12  recollection?  Did she attempt to leave and want to leave the

13  gang?

14  A.   This grand jury testimony would have been a recollection

15  of my interview with her or one of my interviews with her.

16  Q.   Correct.

17  A.   In this instance, can I quote this or read this?  When

18  Patishnock told Taylor --

19             THE COURT:  Hold on.  If we are showing him something

20  under rule 612, all right, you read it.  And after you've read

21  it, you can answer his question, okay.

22             THE WITNESS:  Okay.

23             THE COURT:  This is not information that's admissible

24  other than 612 for refreshing recollection.

25             THE WITNESS:  Would you mind repeating the question?

80

BY MR. BROWN:

Q.   My question was, did Patishnock tell you she was leaving -- she left the gang?  It had to deal with her leaving the gang.

A.   From my recollection of this -- of my testimony from 2015, she said she attempted to leave the gang.

Q.   Right.  And did she leave the gang to your knowledge?

A.   I don't know.

Q.   Okay.  Fair enough.  Did Patishnock also say she was having sex for money?

A.   It's not reflected in this page, but it was -- it was information that we learned through our interviews with her, yes.

Q.   Yes, okay.  So that's a, yes, she was having sex for money?

A.   Yes.

Q.   And she would attribute this money to the gang, correct?

A.   Correct.

Q.   So she would have possession of the money, and she would pay dues to the gang?

A.   Yes, that's correct.

Q.   Did you testify to her complaining about training a recruit because she would rather make money for the gang?  Do you recall testifying to that?

A.   Did you say training a recruit?

81

1  Q.   Yeah, recruit -- training a recruit, so a new female to

2  come into the gang and engage in their prostitution operation

3  that -- did she -- did she complain about having to train a

4  recruit when she wanted and rather make money?

5  A.   I know she discussed it.  I just don't recall if she

6  complained about it.

7  Q.   2176.

8  A.   What's the line again?

9  Q.   21 to 24.

10         MS. ROBERTS:  I am going to object.  The women are

11 going to testify.  This is all based upon information that's

12 not even in evidence at this point.  There's no impeachment

13 value in this case.  There's no contrary statements.

14         THE COURT:  No, it's overruled.  He can question the

15 witness about his 302s or investigation that he conducted.

16 BY MR. BROWN:

17 Q.   Did -- sorry.  I don't know if you're done reading yet.

18 A.   Okay.

19 Q.   Okay.  And so what you just read, did Ms. Patishnock say,

20 I'll make the money myself instead of -- sorry.  I make the

21 money myself because I don't have time to make money and train

22 a bitch, too?

23 A.   Yes.

24 Q.   And is that recalling -- is that referring to her not

25 having time to train a recruit and that she would rather make

1  money?

2  A.    Yes.

3  Q.    And there was a Ms. Evans, Kenya Evans.  Do you recall

4  talking to her and interviewing her?

5  A.    Generally, not the specifics.

6  Q.    Okay.  Did she have sex for money, too?

7  A.    Yes, she did.

8  Q.    Did you testify based upon your time in the F.B.I. it's

9  common for people who are involved in illegal activities to --

10  for some reason to photograph the proceeds of their activities?

11  A.    I'm sure I did.

12  Q.    Okay.  And based on your training and experience, why is

13  that common, and why would somebody do that?

14  A.    In the social media world that we live in, and back in

15  2014, 2015 social media was still developing.  But flashing

16  money was a sign of -- for lack of a better term -- street

17  cred.  Obviously if you have little bills, you have little

18  street cred, and if you have hundred dollar bills and a large

19  stack of them fanned out, then it makes you look like a bigger

20  player, makes you fit the role that you want people to consider

21  you as.

22  Q.    And so it is telling about a person's involvement in the

23  criminal activity such as prostitution or drug trafficking,

24  would you agree?

25  A.    I would.

83

1  Q.   Is it equally telling if somebody doesn't put pictures of
2  themselves on social media?
3  A.   With money?
4  Q.   With money.
5  A.   It's telling that they are more careful in their actions.
6  Q.   How about their lack of involvement?  Would that be
7  telling also?
8  A.   Is there -- I'm sorry.
9  Q.   So is lack of photographs on social media with money in
10 your hand showing what type of big baller you are, big player
11 you are?  Is that telling about an individual when you don't
12 see that?
13 A.   If we know that they are a player and they don't post,
14 sure.
15 Q.   In your investigation into the Howard Johnson and Faizal
16 Bhimani, did you find any Facebook posts that he had with
17 pictures?
18 A.   My investigation was up until the indictment of the P.
19 Stones members.  I was not around for the component with the
20 Howard Johnson specifically targeting the hotel.
21 Q.   But you're here for the government, correct?
22 A.   Correct.
23 Q.   You are here testifying based on your knowledge of the
24 investigation, correct?
25 A.   My direct knowledge, yes.

84

1  Q.    And did the government ever provide you any Facebook

2  pictures of Faizal Bhimani with large money on Facebook?

3  A.    No.

4           MR. BROWN:  I have nothing further, Judge.  Thank

5  you?

6           THE WITNESS:  Thank you.

7           THE COURT:  Ms. Pawelski?

8           MS. PAWELSKI:  Thank you, Your Honor.

9  CROSS EXAMINATION

10  BY MS. PAWELSKI:

11  Q.    Good afternoon, special agent.

12  A.    Good afternoon.

13  Q.    You were in Scranton for how long?

14  A.    Approximately three years.

15  Q.    And then you moved to Philly when?

16  A.    I can't remember if it was September or October, but

17  around then 2015.

18  Q.    2014 to 2015 you moved to Philadelphia?

19  A.    Say again.

20  Q.    You were in Scranton in 2014 and you -- up until 2014, and

21  you moved to Philadelphia in 2015?

22  A.    October 2015.

23  Q.    Okay.  I want to go back to something that you testified

24  earlier on with Ms. Roberts about your training at Quantico.

25  You stated you had training there.  But I was wondering if you

85

1  can go into the little bit more detail about what type of

2  training you had at the F.B.I. in Quantico?

3  A.    Broadly or --

4  Q.    Broadly, sure.

5  A.    Quantico is broken down in defensive tactics, firearms,

6  legal investigations, defensive driving.

7  Q.    Let me stop you there.  With respect to investigations,

8  was it part of your training to receive training on writing

9  reports?

10  A.    Just generally what a F. D. 302 is --

11  Q.    Why don't you tell the jury what is a F. D. 302?

12  A.    F. D. 302 is a summary of an interview conducted with

13  anyone, a witness, a subject, victim, it can be a surveillance

14  report.  It could be -- it can be pretty wide ranging.  It's

15  kind of the catch-all for our interviews and our

16  investigations.

17  Q.    Did you actually receive training at Quantico about

18  writing reports?

19  A.    I don't know.  You really get that in the field.

20  Q.    Were you taught at Quantico it's important to write

21  accurate reports?

22  A.    Yes.

23  Q.    Extremely accurate reports?

24  A.    Correct.

25  Q.    Why is that?

86

1  A.   Because five years later when you're on the witness stand
2  if you don't remember something, it's good to have a refresher.
3  Q.   And it happened, right.  So it's better to take it down
4  then and take it down accurately, correct?
5  A.   Correct.
6  Q.   Because there is a chance that those reports will be
7  discoverable to defense attorneys, correct?
8  A.   Correct.
9  Q.   Okay.  Thank you.  Now, you are actual F.B.I., you're an
10 F.B.I. agent?
11 A.   Correct.
12 Q.   And are you familiar with the case agents in this case,
13 and that would be William Patton?
14 A.   I am, yes.
15 Q.   And is William Patton an F.B.I. agent?
16 A.   No, he's what we call a task force officer.
17 Q.   What is that?
18 A.   Again, going back to the safe streets when the F.B.I.
19 started the safe streets back in early 90s, the idea was to
20 have an organization like the F.B.I. to consolidate resources
21 with state and local partners, in this case Mr. Patton was a
22 task force officer, was a trooper with the Pennsylvania State
23 Police.
24 Q.   Great.  So his background was actually a Pennsylvania
25 state trooper?

87

1  A.    Yes.

2  Q.    And he did not go -- he did not attend Quantico and

3  graduate from the F.B.I., correct?

4  A.    They have another national academy.  I don't think he

5  attended that.  He did not attend the special agent academy.

6  Q.    As you did?

7  A.    Correct.

8  Q.    How about Christopher Shelly, the other agent who is not

9  at counsel table today, but are you familiar with Christopher

10  Shelly?

11  A.    I am, yes.

12  Q.    Great.  Can you please tell us whether he's an F.B.I.

13  agent such as yourself?

14  A.    No, he's not.  He's a sworn task force officer which gives

15  him the same statutory authority as an F.B.I. agent, but he's

16  not a special agent.

17  Q.    And I understand in your opinion he has the same

18  authority.  But has he received all the same education and

19  training as you have?

20  A.    I'm not sure if it's the same, no.

21  Q.    Okay.  I'm sorry.  Did you say he was from the Stroudsburg

22  or did not -- did I not --

23  A.    He's an officer with the Stroud Area Regional Police

24  Department.

25  Q.    Okay.  Thank you.  I don't need -- let me ask you in your

1  grand jury testimony did you come back to Philadelphia to

2  testify in that case -- I'm sorry.  Did you come back to

3  Scranton to testify in that case?

4  A.    No, as I was reviewing my grand jury testimony, I saw the

5  date was September 22nd, 2015.  So I would have still been here

6  and -- I would not have returned for that grand jury testimony.

7  Q.    Okay.  But when you were in the grand jury testimony, it

8  was your responsibility to be truthful?

9  A.    Correct.

10  Q.    And accurate?

11  A.    Correct.

12  Q.    And you wanted to be truthful and accurate, correct?

13  A.    Absolutely.

14  Q.    Sure.  Okay.  It's true that you interviewed many people

15  in this case?

16  A.    Correct.

17  Q.    Do you have any idea about the number?

18  A.    In the P. Stones case?

19  Q.    Yes.

20  A.    Dozens.

21  Q.    Dozens.  You gained a lot of information?

22  A.    Say again.

23  Q.    You gained a lot of information?

24  A.    Correct, some of it from law enforcement partners who

25  already had it, and some of it I developed through interviews

89

1  and through my partners.

2  Q.   You conducted a lot of direct interviews?

3  A.   I did.

4  Q.   You conducted an interview of Ashley Jones, correct?

5  A.   I'm sure I did.

6  Q.   Okay.  And you were aware of the fact that she assisted

7  Sirvonn Taylor in selling heroin, correct?

8  A.   I'm sure I did.

9  Q.   Would you like to see your grand jury testimony?  I am not

10 sure if that was a request.

11 A.   Yes.

12 Q.   I am happy to show your grand jury testimony.

13 A.   Thank you.

14 Q.   What has already been marked as D. 3, Mr. Siegel, pull up

15 Bates number 00002068 for the witness.  Do you see that page

16 there?

17 A.   I do.

18 Q.   Special agent, do you see the -- starting at line 11 if

19 you would like to refresh your recollection.

20 A.   Okay.

21 Q.   Okay.  And it's true, special agent, that under oath you

22 testified that Ms. Jones helped Sirvonn Taylor selling heroin

23 mainly out of the Days Inn in Marshall Creek and sometimes out

24 of the Days Inn in Tannersville, correct?

25 A.   Yes, in 2013.

90

1  Q.    In 2013, correct?

2  A.    Correct.

3  Q.    She specifically did not say that she sold out of the

4  Howard Johnson, correct, according to your grand jury

5  testimony?

6  A.    That's correct.

7  Q.    And just as Mr. Brown -- similarly to Mr. Brown, I'm going

8  to ask you, do you know whether the Days Inn or the Days Inn in

9  Marshall Creek or the Days Inn in Tannersville has been

10 indicted by the government or sex trafficking or human

11 trafficking?

12 A.    I don't believe they have, no.

13 Q.    I'm sorry?

14 A.    I don't believe they have, no.

15 Q.    Similarly, do you know whether the government has

16 attempted to forfeit those Days Inn hotels?

17 A.    I don't believe they have, no.

18 Q.    And do you know what forfeiting a hotel means, when the

19 government tries to forfeit or seize a hotel?

20         MS. ROBERTS:  Judge, I am going to object.  This has

21 to do with penalty phase.

22         THE COURT:  Yeah, I am going to sustain the -- let me

23 see counsel for a second.

24         (The following discussion occurred at sidebar:)

25         MS. ROBERTS:  The government is going to object to

1  that line of questioning.  Forfeiture is a determination after

2  the jury makes a determination as to guilt.  It has to do with

3  penalties just like a fine or a --

4          MS. PAWELSKI:  It's a count in the indictment, and

5  they've gone into --

6          THE COURT:  Well, you have to include the forfeiture

7  count even though it's technically a penalty in the indictment.

8  So that in itself doesn't mean --

9          MS. PAWELSKI:  Well, they have asked about sex

10 trafficking.  They've asked about human trafficking.  You have

11 allowed questions regarding whether or not those were indicted,

12 whether they were, and the forfeiture count is part of the

13 indictment which the government has brought in this case.  She

14 is -- he is an F.B.I. agent who has worked on this case from

15 its inception.  I don't understand how that's not relevant to

16 everything that has already been testified to.

17         THE COURT:  The objection is sustained.  As to

18 speaking of sex trafficking or drug trafficking, they are

19 criminal charges, not the penalties.  They are the criminal

20 charges.  The way we bifurcate a criminal case when it relates

21 to forfeiture that once the jury has made a determination of

22 that -- of guilt or innocence, then and only then on the

23 underlying charges will the forfeiture phase come up.

24         And you can argue whatever you want at that point or

25 call witnesses if necessary at the forfeiture stage related to

92

1    forfeiture, not now.  No. 2, as I understand the first witness

2    in any case is the one that takes the longest even if they have

3    the least information to say, that they are almost irrelevant

4    to the case, and yet it's taken a tremendous amount of time.

5    Please do not say -- ask questions that have been asked by

6    co-counsel, like, let -- I know Mr. Brown already asked you

7    this, but let me ask you, blah, blah, blah, don't do that

8    unless -- unless the specific question relates directly to your

9    client.  And as to forfeiture, that's my ruling.  Forfeiture

10   occurs if and only if the jury decides that your clients are

11   guilty.  Then there be a forfeiture proceeding afterwards.

12   It's a penalty.  It's not part of the original charge, okay.

13   Let's keep going.

14            (The discussion at sidebar concluded.)

15   BY MS. PAWELSKI:

16   Q.   Going back to the same page we were on, 2068, regarding

17   the Days Inn, no one -- the Days Inn itself was not indicted

18   for drug trafficking to the best of your knowledge, correct?

19   A.   No.

20   Q.   Thank you.  Special agent, you became aware of the fact

21   that meetings were held by the P. Stones on a monthly basis

22   during the course of your investigation?

23   A.   Correct.

24   Q.   And it was approximately two meetings every month?

25   A.   Sounds right.

1  Q.    And those meetings occurred at the Super 8 or the Budget

2  Inn was your testimony, correct?

3  A.    I believe, yes.

4  Q.    Okay.  And to the best of your knowledge, has the Super 8

5  or the Budget Inn been indicted?

6  A.    No.

7  Q.    No.  And if it was a monthly or bimonthly meeting, did you

8  gain any information as to the number of gang members that

9  would be showing up at either the Super 8 or the Budget Inn?

10 A.    Did I gain knowledge of that?

11 Q.    Yes, did you find out?  Was it a large number?

12 A.    I don't know the number.

13 Q.    It was a meeting for the gang, correct?

14 A.    Right.

15 Q.    Is it safe to assume a large number of gang members showed

16 up for these meetings?

17 A.    That's a safe assumption.

18 Q.    I want to ask you one other thing.  In the course of your

19 investigation, you testified about a technique that you used

20 involving a Jose Velazquez.  Do you remember Mr. Velazquez?

21 A.    I do.

22 Q.    Do you recall that you testified about an investigative

23 technique whereby you searched his phone and it showed all of

24 the places that he had been according to his Wi-Fi connections

25 at different hotels?

94

1    A.    I recall testifying to that, yes.

2    Q.    Okay.  You remember that investigative technique?

3    A.    Cell phone download.

4    Q.    Yes.  That's still a technique that's employed today?

5    A.    Yes.

6    Q.    Do you know, sir, whether that was employed in this case?

7    A.    It was, yes.

8    Q.    It was employed in this case?

9    A.    Yes.

10   Q.    As to who -- as to whose phones?

11   A.    I mean, I believe a lot of phones were seized in this

12   investigation.

13   Q.    You just don't know that --

14   A.    I don't know how many.  Standard practice would be to

15   obtain a search warrant or a consent for any phone we collect

16   because obviously these days or even back in 2014 and '15 a

17   phone contains an immense amount of data.

18   Q.    Therefore, the government should be in possession of all

19   those downloaded phones, the information they gathered from all

20   those downloaded phones?

21   A.    If they were downloaded -- I recall some phones back in

22   2014 or '15 may not have been supported by the technology back

23   then so --

24   Q.    How about later on?

25   A.    You mean today?

95

1  Q.    Sure.  I mean, in this investigation that we're talking
2  about that you're here to testify about.
3  A.    It depends.  Back then there were a lot of different
4  brands and models of phones.  So whether or not every single
5  phone, every single software feature -- back then there was a
6  plethora of flip phones, which you don't see anymore these
7  days.  So I just don't recall if some of the phones recovered--
8  some of the phones -- I believe one of Jose Velazquez's phones
9  was from years prior to our investigation.  It was just in
10 evidence in Stroud Area.  There may have been an issue
11 conducting a download based upon the technology available at
12 that time.
13 Q.    Okay, fair enough.  I understood you testified that your
14 investigation primarily covered the gang members and not the
15 locations, correct, of --
16 A.    Focus, yes.
17 Q.    The focus.
18 A.    A byproduct of that focus was some hotels in our
19 investigation.
20 Q.    And but you did gain knowledge of hotels that were being
21 used by the P. Stones?
22 A.    Through the course of the investigation.
23 Q.    Through the course of the investigation and through your
24 interviews?
25 A.    Correct.

96

1  Q.   You testified in the grand jury for I close to 139 pages.

2  Do you remember how long you were in there?

3  A.   All morning.

4  Q.   All morning.  You remember that.  And, special agent, it's

5  true, is it not, that during the course of that entire grand

6  jury testimony you were never asked one question -- not one

7  question about Nazim Hassam?

8  A.   That's correct.

9       MS. PAWELSKI:  May I have a moment just to confer,

10 Your Honor?

11      THE COURT:  Sure.

12      MS. PAWELSKI:  Thank you.  That's all I have.  Thank

13 you, special agent.

14      THE COURT:  Thank you, Ms. Pawelski.  Redirect?

15      MS. ROBERTS:  Thank you, Your Honor.

16 REDIRECT EXAMINATION

17 BY MS. ROBERTS:

18 Q.   During the course of your investigation, did it uncover

19 evidence that the Super 8 motel or any of its employees or

20 agents were conspiring with drug dealers and drug traffickers?

21 A.   I don't believe so, no.

22 Q.   During the course of your investigation, did it reveal

23 evidence that anyone at any other hotels that were mentioned

24 such as the Budget Inn were conspiring with drug dealers and

25 drug traffickers?

97

1   A.    I don't believe so, no.

2   Q.    And who was the leader of the P. Stones?

3   A.    Sirvonn Taylor.

4   Q.    What happened to the P. Stone gang when Sirvonn Taylor was

5   arrested?

6   A.    It essentially was dismantled.

7   Q.    Was that the goal of the investigation?

8   A.    It was to stop the human trafficking of the women and to

9   dismantle the organization in its entirety.

10  Q.    When you say it was dismantled, what do you mean by that?

11  A.    Leadership indicted, actions stopped, violence stopped,

12  targeting them through the Safe Streets Task Force with federal

13  law enforcement, with state and with local law enforcement, and

14  the appropriate charging mechanisms, whether it is the D.A.'s

15  office, state or attorney general or state or federal

16  government.

17  Q.    Did the members or individuals who were members of the P.

18  Stones go their separate ways out of the gang?

19  A.    A significant number of them -- significant number of them

20  were indicted though during my time in the investigation.  Some

21  of those members who were not indicted were subsequently

22  indicted, moved to other areas or were charged and arrested

23  through the state or local mechanisms.

24  Q.    You were asked on cross examination by attorney Brown

25  regarding Sheryl Patishnock leaving the P. Stones.  Do you

98

1 recall what Sirvonn Taylor did when Sheryl Patishnock mentioned

2 that she wanted to leave the P. Stones gang voluntarily?

3 A.    From my recollection, I believe ordered an assault on her

4 or attack on her.  And then I have the benefit of having read a

5 page of a grand jury testimony, so I can -- I can respond to

6 that based on that recollection.  When he directed that other

7 women in the gang assault her because she had paid the dues of

8 those girls to Sirvonn, they were all hesitant or reluctant to

9 assault her because they appreciated the gesture she had done

10 on behalf of them.  But the threat was still there, and

11 ultimately I believe it was Salena Bayer- Davis agreed to

12 assault Sheryl Patishnock and commence to a slap or punch her.

13 Q.    One final question with regard to -- I know we talked

14 about the Super 8 and Budget Inn.  What about with regard to

15 the Days Inn?  Did your investigation reveal any type of

16 evidence any employees or agents associated with the Days Inn

17 who were conspiring with drug dealers and human traffickers?

18 A.    Not that I can recall.

19         MS. ROBERTS:  Nothing further, Your Honor.

20         THE COURT:  You may step down.

21         THE WITNESS:  Thank you.  Thank you.

22         THE COURT:  Next witness.  Ms. Roberts, is the next

23 witness yours or Mr. Camoni's?

24         MS. ROBERTS:  Mr. Camoni.

25         SIRVONN TAYLOR, called as a witness, being duly

99

1  sworn, testified as follows:

2  DIRECT EXAMINATION

3  BY MR. CAMONI:

4  Q.    Mr. Taylor, are you known by any nicknames or street

5  names?

6  A.    Yes.

7  Q.    What names?

8  A.    Black.

9  Q.    Is that the only one?

10  A.    Amir or P. Black, Prince Black.

11  Q.    What did you go by mostly?

12  A.    Black Stone also, but Black basically.

13  Q.    How old are you today?

14  A.    I'm 37.

15  Q.    How far did you go in school?

16  A.    I got my G. E. D.

17  Q.    Where do you currently reside?

18  A.    Right now in jail.

19  Q.    Which jail?

20  A.    I'm at Lackawanna right now.

21  Q.    Are you in prison?  You're in Lackawanna because you're

22  testifying here, correct?

23  A.    Correct.

24  Q.    Are you in prison in general because you're serving a

25  sentence?

100

1  A.    Yes.

2  Q.    And, in fact, right now you're serving two sentences,

3  correct?

4  A.    Yes.

5  Q.    Let's start -- were you prosecuted by the U. S. Attorney's

6  Office?

7  A.    Yes.

8  Q.    What were you convicted of?

9  A.    Conspiracy to sex trafficking and conspiracy to traffic in

10 heroin, distribution of heroin.

11 Q.    All right.  Was that a conspiracy to traffic over a

12 kilogram of heroin?

13 A.    Yes, one to three kilos.

14 Q.    Between one and three kilos?

15 A.    Yes.

16 Q.    The sex trafficking conspiracy, was that conspiracy to sex

17 traffic by force or coercion?

18 A.    Yes, force, fraud or coercion.

19 Q.    All right.  Were you dealing any other types of drugs

20 other than heroin?

21 A.    Early on, but heroin was my main drug.

22 Q.    Were you dealing heroin with other people?

23 A.    Yes.

24 Q.    Were you prosecuted with any of those other people?

25 A.    Yes.

1  Q.    Can you name some of the people you were prosecuted with?

2  A.    Jose Velazquez, Jamiell Sims -- I know their nicknames --

3  Sean Griffin, Arthur Taylor.

4  Q.    Arthur Taylor is your cousin?

5  A.    Yes.

6  Q.    What about Salena Bayer-Davis?

7  A.    Her, too.

8  Q.    Did you plead guilty to those drug and sex trafficking

9  charges you mentioned?

10 A.    Yes.

11 Q.    Have you been sentenced for those crimes yet?

12 A.    Yes.

13 Q.    What were you sentenced to?

14 A.    240 months.

15 Q.    Were you also sentenced to a term of supervised release

16 after you served your prison sentence?

17 A.    Yes.

18 Q.    How long was that term?

19 A.    Eight years.

20 Q.    And when you pleaded guilty, did you enter that plea

21 because you entered a plea agreement with the United States?

22 A.    Yes.

23 Q.    I would like to bring up exhibit 16.

24         THE COURT:  Is there going to be any objection to 16

25 coming in?

102

1    MR. BROWN:  Not from Mr. Bhimani, Your Honor.

2    MS. PAWELSKI:  No.

3    THE COURT:  So we will display it.

4    MR. CAMONI:  Thank you, Your Honor.

5  BY MR. CAMONI:

6  Q.    What do we see on the screen, Mr. Taylor?

7  A.    My plea agreement.

8  Q.    What are we looking at on the screen here?

9  A.    My plea agreement.

10  Q.    Is that a fair and accurate plea agreement you entered

11  into with the government?

12  A.    Yes.

13  Q.    I would like to go to page 26, please.  Do you recognize

14  the signature at the top of that page?

15  A.    Yes.

16  Q.    Whose signature is that?

17  A.    That's my signature.

18  Q.    It's a little bit faint.  When did you sign the plea

19  agreement?

20  A.    11/09/2015.

21  Q.    Whose signature is that below yours?

22  A.    My lawyer.

23  Q.    Was that person your lawyer through the criminal case

24  where you entered your guilty plea?

25  A.    Yes.

1  Q.    She was your lawyer the whole time?

2  A.    No, I had two different lawyers after her.

3  Q.    But you had lawyers the entire time?

4  A.    Yes.

5  Q.    All right.

6          MR. CAMONI:  Your Honor, at this time I would like to

7  move to admit Government's Exhibit 16.

8          MR. BROWN:  No objection.

9          MS. PAWELSKI:  No objection.

10         THE COURT:  It's admitted.

11  BY MR. CAMONI:

12  Q.    Back to page one -- and bring up paragraph one, please.

13  So what charges did you agree to plead guilty to in this

14  agreement.  This is the first?

15  A.    Count one, I believe that was the drug charge, the

16  distribution of heroin, one to three kilos.

17  Q.    If we can move down to page two, first page at the top.

18  What was the second count you pled guilty to?

19  A.    Count two was the sex trafficking.

20  Q.    That was a sex trafficking conspiracy, correct?

21  A.    That's conspiracy to commit sex trafficking by threat,

22  force or coercion.

23  Q.    These charges, they are felonies, correct?

24  A.    Yes.

25  Q.    Can we bring up page nine, please?  As part of this

104

1  agreement in paragraph 13, did the government reserve its right

2  to recommend up to the maximum sentence for you?

3  A.    Yes.

4  Q.    Do you remember what the maximum sentences were, sir?

5  A.    Life.

6  Q.    All right.  As part of this agreement -- you can take that

7  down.  Did you also enter into a cooperation agreement with the

8  government?

9  A.    Yes.

10 Q.    Can we bring up Exhibit No. 17, please?  Do you recognize

11 this document?

12 A.    Yes.

13 Q.    What is this?

14 A.    This my cooperation agreement that I cooperate with all

15 federal, state and local enforcement, government basically.

16 Q.    As part of this agreement, you agreed to cooperate with

17 whatever investigation the government asked you to?

18 A.    Yes.

19 Q.    All right.  Can we go to page six, please?  And again,

20 whose signature is at the top there?

21 A.    That's my signature.

22 Q.    Did you sign this document the same day as the other part

23 of your agreement?

24 A.    Yes.

25 Q.    And again, is that your attorney's signature below yours?

105

1   A.    Yes.

2   Q.    Now, what did you agree to -- you mentioned cooperate with

3   investigations.  But what did you agree to in this agreement?

4   A.    In this agreement basically tell full -- fully truthful

5   testimony in any trial the government may need me in or

6   anything that I may be of use in.

7   Q.    All right.  So did you agree to be interviewed?

8   A.    Yes.

9   Q.    And you agreed if called to testify?

10  A.    Yes.

11  Q.    And is it a part of this agreement -- go back to page one,

12  please.  That it's a material condition of this agreement that

13  the cooperation is complete and truthful.  Is that what's in

14  the agreement?

15  A.    Yes.

16  Q.    And do you understand no part of this agreement gives you

17  any protection if you lie under oath or commit perjury?

18  A.    Yes.

19  Q.    Now, in preparation for your testimony today, did you meet

20  with attorneys for the government?

21  A.    Yes, I have.

22  Q.    And did the attorneys for the government tell you what to

23  testify to?

24  A.    No.

25  Q.    What did the attorneys for the government tell you?

1  A.   To tell the truth by any means and don't lie and just

2  basically tell the truth.

3  Q.   So why did you agree to cooperate in this your federal

4  case?

5  A.   In my federal case I agreed to cooperate because

6  basically, like, because I was a gang leader at the time and I

7  just wanted to do right.  I wanted to get out, distance myself

8  from the gang basically and have a chance at a normal life with

9  my children.

10  Q.   You were also looking for a break in your sentence, fair?

11  A.   Yes, that, too.

12  Q.   You're hoping by cooperating you get out of jail sooner

13  than you would if you didn't cooperate?

14  A.   Yes.

15  Q.   Has anyone made you any promises that that's definitely

16  going to happen?

17  A.   No.

18  Q.   And you understand based on what we just discussed in that

19  cooperation agreement if you lie during your testimony that

20  that definitely will not happen?

21  A.   Yes.

22  Q.   All right.  Are the felony charges that you pled guilty to

23  in this case the only felony convictions that you have on your

24  record?

25  A.   No.

107

1  Q.   All right.   In 2004 were you convicted of felony

2  possession of a controlled substance crack or cocaine base?

3  A.   Yes.

4  Q.   In 2005 were you convicted of a firearm carried without a

5  license and receiving stolen property?

6  A.   Yes.

7  Q.   In 2007, were you convicted of assault?

8  A.   Yes.

9  Q.   In 2014, were you convicted of criminal solicitation to

10 commit homicide in the third degree?

11 A.   Yes.

12 Q.   Now, was that a Pennsylvania state case?

13 A.   Yes.

14 Q.   Have you been sentenced on that?

15 A.   Yes.

16 Q.   And you're currently serving that sentence; is that

17 correct?

18 A.   Yes.

19 Q.   Does your plea agreement with the United States Attorney's

20 Office have anything to do with your state case?

21 A.   No.

22 Q.   You mentioned that you were a gang leader.

23 A.   Yes.

24 Q.   At the time that you were arrested, is that what you

25 meant?

108

1  A.    Yes.

2  Q.    What gang was that?

3  A.    The Black P. Stones.

4  Q.    What was your highest rank in that gang?

5  A.    I was a prince.  I was basically the leader of the gang.

6  Q.    And what area were you the leader of?  What was your

7  territory?

8  A.    In Pennsylvania, New Jersey, New York and Maine.

9  Q.    And so your rank was called prince?

10  A.    Yes.

11  Q.    Were there people that were ranked under you?

12  A.    Yes.

13  Q.    What was the rank directly under you?

14  A.    O. G.s.

15  Q.    O. G.  What does that stand for?

16  A.    Original gangster.

17  Q.    Were there any O. G.s that worked with you in the

18  Stroudsburg area?

19  A.    Yes.

20  Q.    Who are the O. G.s there?

21  A.    You had Arthur Taylor, my cousin, and Xavier Petty.

22  Q.    What was Xavier Petty's street name?

23  A.    X.

24  Q.    When did you become a prince in the P. Stones?

25  A.    In 2001, around 2001.

1  Q.   You were a prince in the P. Stones for a while?

2  A.   Yes.

3  Q.   Did you always lead a Pennsylvania set of the P. Stones?

4  A.   Yes.

5  Q.   So where in Pennsylvania was this -- the group you led?

6  A.   East Stroudsburg, Stroudsburg and Mount Pocono.

7  Q.   You said though as a prince you covered a wide territory

8  in numerous states, correct?

9  A.   Yes.

10 Q.   Were you always physically located in East Stroudsburg and

11 that area?

12 A.   Physically, yeah, I come, but I wouldn't be -- I wouldn't

13 stay there.  I go to different states.

14 Q.   Was there a time when you started spending more time

15 there?

16 A.   Yeah.

17 Q.   When was that?

18 A.   Around 2011-ish, '11.

19 Q.   When were you arrested?  When did it end?

20 A.   2014.

21 Q.   So between 2011 and 2014, was that the time that you spent

22 the most time in that Stroudsburg area?

23 A.   Yes.

24 Q.   Are the Black P. Stones affiliated with any other gang?

25 A.   Yeah, Bloods.

110

1  Q.    So how does that affiliation work?

2  A.    It's, like, the Black P. Stones came before the Bloods,

3  but you have a Black P. Stone named T. Rogers that went to L.

4  A. and formed the Bloods.  So it's like -- it's kind of like an

5  alliance basically.

6  Q.    So they are ally gangs?

7  A.    Yes.

8  Q.    So you mentioned Arty Taylor?

9  A.    Yes.

10  Q.    You mentioned Jose Velazquez?

11  A.    Yes.

12  Q.    Can we bring up what's been previously admitted as exhibit

13  98?  Who are we looking at here?

14  A.    Sev, which is Jose Velazquez, and Arthur Taylor.

15  Q.    Is Arthur the one in the green or the blue shirt?

16  A.    The green.

17  Q.    What was Arthur Taylor's rank?

18  A.    O. G.

19  Q.    What was -- did Sev have a rank?

20  A.    Yes.

21  Q.    What was his rank?

22  A.    A five star general.

23  Q.    Five star general?

24  A.    That's right beneath O. G. basically.

25  Q.    He was also an O. G. or five star general the same?

111

1    A.    No, it's O. G., and then you got the five star.

2    Q.    So he was right below where Arty Taylor was?

3    A.    Yes.

4    Q.    Did Sev have any other roles in the gang?

5    A.    Yes.

6    Q.    What was his role?

7    A.    Sev was a pimp.  He had Seven Squad, which was basically a

8    set, like, where the females would be prostitutes basically.

9    Q.    So Seven Squad was the group that handled --

10   A.    The prostitution.

11   Q.    Prostitution.  Was that all of the prostitution the P.

12   Stones did, or was he just the main force?

13   A.    He was the main force.

14   Q.    All right.  Let's bring up No. 13, please.  Who is that?

15   A.    That's Salena.

16   Q.    Did she have a street name?

17   A.    Yeah, vicious.

18   Q.    What was Salena's role in the gang?

19   A.    Salena was also like a pimp but they call madams, too.

20   And also, like, she was kind of, like, an enforcer.

21   Q.    What does an enforcer do?

22   A.    She basically violate the females if they violate.

23   Q.    So can you explain to the jury what do you mean?  What

24   does violate mean?

25   A.    If they do something wrong where it's -- let's say we have

1  a set of rules, and you violate a rule, then you get violated.

2  And sometime that means the violation could be physical.

3  Q.    What do you mean by physical?

4  A.    You get beat up basically.

5  Q.    By how many people?

6  A.    Females three, and the guys five.

7  Q.    So who was in charge of violating the males?

8  A.    I was basically.

9  Q.    So if someone violated, you would order an assault?

10 A.    Yes.

11 Q.    And who would actually carry out that assault?

12 A.    Different men, different P. Stone members.  It depends who

13 was being violated.

14 Q.    Did you pick?

15 A.    Yeah, I picked.

16 Q.    If the women that were being violated, was it Salena that

17 picked?

18 A.    Yes, and Salena nine out of then times was in it.

19 Q.    I'm sorry?

20 A.    Salena nine out of ten times was involved in the beatings,

21 too, not ten she would be involved.

22 Q.    I understand.  So can we bring up No. 12, please?  Who is

23 this?

24 A.    That's Sheryl.

25 Q.    Sheryl who?

Case 3:17-cr-00324-MEM   Document 196   Filed 04/08/21   Page 113 of 203

113

1    A.    Sheryl Patishnock.  We called her Scarlet.

2    Q.    You understand -- you remembered her last name as

3    Patishnock.  What was her role in the gang?

4    A.    At one time she was the first lady.

5    Q.    What's that?

6    A.    That's, like, what I am.  Like, when I was the prince, you

7    have somebody, like, that control the females, and that was

8    her.

9    Q.    So she would have been in control of the females for some

10   period of time?

11   A.    Yes.

12   Q.    Was there another first lady during the time we're talking

13   about?

14   A.    Angel.

15   Q.    Can we bring up 15, please?  This one has not been

16   admitted yet.  Who was this?

17   A.    That's Angel Jordan Capone.

18   Q.    Is that a fair and accurate depiction of the person you

19   know as Jordan Capone?

20   A.    Yes.

21              MR. CAMONI:  Your Honor, move to admit 15.

22              THE COURT:  Any objection?

23              MR. BROWN:  No objection.

24              MS. PAWELSKI:  No.

25              THE COURT:  It's admitted.

114

1  BY MR. CAMONI:

2  Q.   What was her role as first lady?

3  A.   Her role basically was the same thing.  Like, she would

4  control the females, make sure that everything is going right

5  within the gang as in with the females and make sure that they

6  wouldn't violate any rules.

7  Q.   All right.  How about -- can we bring up 14?  What's been

8  previously identified as Government's Exhibit 14, do you

9  recognize this person?

10 A.   That look like Millie.

11 Q.   Do you know her full name?

12 A.   No.

13 Q.   Did you have any nicknames for her?

14 A.   Millie.

15 Q.   Millie.  What was her role in the gang?

16 A.   She was -- she wasn't really involved in the gang, but she

17 was with Arty, and she was being prostituted by Arty, by

18 Arthur.

19 Q.   She was not a member of the gang?

20 A.   Huh-uh.

21 Q.   But Arty was her pimp?

22 A.   Yes.

23 Q.   Okay.

24      MR. CAMONI:  Your Honor, move to admit No. 14.

25      MR. BROWN:  No objection.

115

1  BY MR. CAMONI:

2  Q.    Can we bring up what was been previously admitted as

3  Government's Exhibit 18?  Do you recognize this person?

4  A.    Yes.

5  Q.    Who is that?

6  A.    Kenya.

7  Q.    Kenya what?

8  A.    Evans.

9  Q.    Who is Kenya Evans?

10 A.    Kenya Evans was a prostitute.

11 Q.    Was she a member of the gang?

12 A.    Seven Squad, yeah.

13 Q.    So that means she was also a P. Stone?

14 A.    Yes.

15 Q.    What was your relationship with Kenya Evans?

16 A.    Me and Kenya had a romantic relationship at one point in

17 time.

18 Q.    Any other relationships?

19 A.    Yeah, and at one point in time I also -- me and Ricquell

20 Lindo prostituted her.

21 Q.    So you were her pimp?

22 A.    Yes.

23 Q.    So the P. Stones have male and female members?

24 A.    Yes.

25 Q.    Take that down.  How did male members become a member of

116

1  the gang?

2  A.    Fight.  You fight for 21 seconds five people for 21

3  seconds.

4  Q.    So a man who wants to be become a member of the gang had

5  to fight five members of the gang?

6  A.    Yes.

7  Q.    How did the women become members of the gang?

8        MS. PAWELSKI:  I will object on relevance at this

9  point.

10        THE COURT:  The objection is overruled.

11        THE WITNESS:  Some women got sexed in, and some women

12  fought.

13  BY MR. CAMONI:

14  Q.    So let's start with the fighting.  Was it the same rules?

15  A.    Yes, 21 seconds, but it was three females instead of five.

16  Q.    What does it mean to be sexed in?

17  A.    You have sex with five gang members.

18  Q.    All right.  Who -- where did the women who joined the gang

19  come from?  How did you find them?  How did they find you?

20  A.    They would just be around, like, we would all be around

21  each other maybe probably in the parks, gatherings, things of

22  that nature.

23  Q.    You get to know them?

24  A.    Yeah.

25  Q.    How did you decide who to invite to join the gang?

117

1  A.   It was who was closest to us basically, who we trusted the

2  most, you know, who we felt like was family.

3  Q.   Do you know how old these girls were when they joined the

4  gang?

5  A.   Some of them, yes.

6  Q.   Some of them?

7  A.   Yes.

8  Q.   Who did you know?

9  A.   I knew Jordan Capone age.

10 Q.   How old was she?

11 A.   Jordan was 15.

12 Q.   How did she join the gang?

13 A.   She fought.

14 Q.   Fought into the gang at 15?

15 A.   Yes.

16 Q.   Any others you knew the age?

17 A.   Who else?  Stephanie.

18 Q.   Who was Stephanie?

19 A.   Hazel.

20 Q.   How did she come to the gang?

21 A.   Hazel got sexed in.

22 Q.   How old was she?

23 A.   16.

24 Q.   All right.  So as leader of the gang, was part -- let me

25 back up.  Was part of the gang's operations to make money?

118

1    A.    Yes.

2    Q.    All right.  So as leader of the gang, were you in charge

3    of any of that operation?

4    A.    Yes.

5    Q.    What were you in charge of?

6    A.    Drugs.

7    Q.    You said it was heroin mostly, right?

8    A.    Yeah.

9    Q.    Any other drugs that were involved?

10   A.    In the beginning we was -- first we started off with crack

11   and then coke and then moved up to perc's and heroin.

12   Q.    All right.  Tell the jury -- let's focus us on between

13   2011 and your arrest in 2015.

14   A.    '14.

15   Q.    '14.  How did the drug business work?

16   A.    Basically what I do is get drugs from New York.  I'm not

17   going to use the word cop -- but purchase drugs from New York,

18   and basically what I do is I come out of town to Pennsylvania

19   first.  I will head to the East Stroudsburg area, and I come

20   out here, get rooms at the hotel.  What I do is I distribute

21   drugs to the drug dealers, some of them being P. Stones, some

22   of them not.  Afterwards what I do is I go to Maine and

23   distribute the rest of the drugs in Maine.

24   Q.    In the State of Maine?

25   A.    Yes.

1  Q.    Were there other members involved in the drug trafficking?

2  A.    Yes.

3  Q.    Now, you pleaded guilty to sex trafficking, too, you said?

4  A.    Yes, conspiracy to sex trafficking, yes.

5  Q.    How did that start with the P. Stones?

6  A.    That started with Sheryl because Sheryl was prostituting

7  in New York, and I came home from upstate 2008, and I seen

8  Sheryl, and she left her pimp.  When she left her pimp, she

9  came back up to the Poconos area, and she started prostituting

10 for herself at the time.  And then afterwards that's how

11 basically the prostitution got started in the P. Stones.

12 Q.    So she got to know the P. Stones at a time while she was

13 prostituting independently?

14 A.    Yes.

15 Q.    And did the P. Stones and you as leader see that as a way

16 for the gang to make money?

17 A.    Yes.

18 Q.    You mentioned Sev and Seven Squad was in charge of that?

19 A.    Yes.

20 Q.    How did that work?

21 A.    That happened -- it worked because her and Sev wound up

22 getting together, like, romantically, and she basically --

23 like, Sev seen the money.  I seen the money with them pimping.

24 We established that basically Sev should take over since he's

25 around her most of time, he's around the females, he knows the

120

1  business now, he now how to do the Back Page thing and so forth

2  and so on.

3  Q.   You mentioned Back Page.  What's that?

4  A.   Back Page is a website you go on, and you could post the

5  females, like, specials and things of that nature, how many

6  females you have prostituting for you and how much you pay per

7  hour, for the half hour.

8  Q.   So advertising essentially?

9  A.   Yes.

10  Q.   Right.  Who placed those ads for the P. Stones?

11  A.   Sheryl or Sev did, but Sheryl nine out of then -- Scarlet

12  -- because she knew how to do it.

13  Q.   Who paid for those ads?

14  A.   Sometime me, sometimes Sheryl, sometimes Sev.

15  Q.   Who was Sev directly responsible for?  Whose pimp was he?

16  A.   He was Kenya's.  He was Baby's, and he was Scarlet.

17  Q.   Who is Baby?

18  A.   Baby -- Abigail -- I forget her last name.

19  Q.   What was Baby from?

20  A.   Baby was from -- she was from Baltimore.

21  Q.   How old was Baby?

22  A.   Baby was at the time -- we thought she was 18, but Baby

23  was 15, 16 years old.

24  Q.   And you mentioned Arty was a pimp, too?

25  A.   Yes.

121

1  Q.   Who did Arty pimp?

2  A.   Millie.

3  Q.   And can we bring up what's been previously marked as

4  Government's Exhibit 99?  Do you recognize that person?

5  A.   Yes.

6  Q.   Who is that?

7  A.   That's Buck.  William Battle.

8  Q.   Was he a P. Stone?

9  A.   Yes.

10  Q.   What was role in the gang?

11  A.   He was a pimp more or less not doing it like Sev but

12  independently.

13  Q.   He was a member of the gang, but his pimping was on his

14  own?

15  A.   Yes.

16  Q.   Do you know how many girls he was pimping?

17  A.   Two.

18        MR. CAMONI:  Move to admit Government's Exhibit 99.

19        THE COURT:  Any objection?

20        MR. BROWN:  No.

21        MS. PAWELSKI:  No.

22        THE COURT:  Admitted.

23  BY MR. CAMONI:

24  Q.   I would like to bring up Government's Exhibit 100.  Do you

25  recognize this person?

1  A.    Yes.

2  Q.    Who is that?

3  A.    Derrel.

4  Q.    Derrel.  Do you know his last name?

5  A.    Wilson I believe.

6  Q.    Did he have a street name?

7  A.    Big.

8  Q.    Big?

9  A.    Yes.

10 Q.    What was his role?

11 A.    Big was a pimp.

12 Q.    Was he a P. Stone?

13 A.    Yes.

14 Q.    Where was he from?

15 A.    New York.

16 Q.    Ever bring him to the Poconos?

17 A.    Yeah, I brought him up the Poconos.

18 Q.    Why did you bring him to the Poconos?

19 A.    Because at the time -- see, all right.  Can I explain the

20 whole thing?  All right.

21 Q.    Explain to the jury.

22 A.    In Black P. Stone it's different hoods.  So how it is my

23 hood, which was my gang, which was my set was G. B. S., and I

24 gave out another set under my set to him, which was G. S. R.,

25 and that's how basically when the pimping got involved, I

1  brought him up to the Poconos basically because he had girls --

2  he had three girls -- and also to basically show everybody else

3  how to pimp and things of that nature.

4  Q.    You brought him in because you thought he knew the

5  business better than the people that you had around you?

6  A.    Yes.

7  Q.    You brought him in to train your squad on how to --

8  A.    Yes.

9  Q.    Did he teach you how to run the business better?

10 A.    Yes.

11 Q.    What kind of stuff did he teach you?

12 A.    The fact of like difference between a gorilla pimp and

13 Romeo pimp, things of that nature.

14 Q.    What's a Romeo pimp?

15        MS. PAWLESKI:  Objection.

16        THE COURT:  The objections are overruled.  This is a

17 sex trafficking and drug trafficking case.  Background how it

18 occurred is relevant to the case.  It's overruled.  Go ahead.

19 BY MR. CAMONI:

20 Q.    What's a Romeo pimp?

21 A.    A Romeo pimp is basically a pimp that doesn't put his

22 hands on female and a pimp that basically talks to her sweet

23 like -- like, romancing basically, romancing her to get her to

24 do what he her wants to do by basically romancing her.

25 Q.    Does he mean it?

124

1  A.   No, he don't mean it.  He tell her what she wants to hear.

2  Q.   What's a gorilla pimp?

3  A.   A pimp that does it by force, which is basically if you

4  don't do this, I'm going to put my hands on you.

5  Q.   Any gorilla pimps in the P. Stones?

6  A.   Yes.

7  Q.   Who were the gorilla pimps?

8  A.   Sev and Salena.

9  Q.   What kind of pimp were you?

10  A.   I was a Romeo, but it was one time where me and -- me and

11  Kenya had a situation romantically because she was a prostitute

12  for Sev at the time, and that's the time where now she has sex

13  with Sev, and we had a thing where me and her agreed that we

14  wouldn't have sex with other people that we knew basically.  So

15  when I found out, I put my hands on her that one time when we

16  was in the Howard Johnson.

17  Q.   We will come back to that.

18  A.   All right.

19  Q.   How were the girls who -- you can take that one down.

20  Thank you.  How were the girls pimped by the P. Stones get

21  paid?

22  A.   Drugs.

23  Q.   Money?

24  A.   No.

25  Q.   What did they get?

125

1   A.   Drugs.

2   Q.   What kind of drugs?

3   A.   Heroin.

4   Q.   Where did the P. Stones who paid their girls in drugs get

5   the heroin?

6   A.   From me.

7   Q.   So what was the purpose of giving the girls drugs?

8   A.   Basically to keep them under your control.

9   Q.   How -- why would giving them drugs keep them under

10   control?

11   A.   Because heroin -- heroin is a -- is a real, real bad drug.

12   And once you're on it, your body craves it.  So first it

13   started off with per's -- some of the girls using perc's first.

14   And perc's is like heroin, but it's more expensive.  So what

15   Sev would do if she was using perc's, he get her hooked on

16   dope.  He will give her heroin because perc's is more

17   expensive.  Perc's is $30 when you get heroin for $10 a bag.

18   He give her heroin, so now the fact her body needs the heroin

19   and if she don't do -- if she don't make no calls or make no

20   money, she won't get the heroin.

21   Q.   Sev and the other pimps in the P. Stones would tell them,

22   they don't work, they are not getting their heroin?

23   A.   Yes.

24   Q.   Kenya Evans, was she on drugs?

25   A.   Yes, she was on heroin.

1  Q.    Did you give her heroin to keep her working?

2  A.    Yes.

3            THE COURT:  Let me ask you, I assume you're going to

4  be here for a little bit yet.

5            MR. CAMONI:  Yes, Your Honor.

6            THE COURT:  It's 3:00.  We will take the break so

7  everyone can use the facilities.  It's been two hours.  So we

8  will take 15 minutes, and then we will come back and continue.

9  Now, no conversations or discussions among yourselves or with

10 anybody else.  Don't form any opinions.  You haven't heard all

11 of the evidence in the case.  No research of any kind related

12 to anything on the case.  No reading or listening to anything

13 about the case.  If anyone were to talk to you about the case,

14 you must advise us of that immediately.  All right.  See you in

15 15 minutes.

16            (A jury recess was taken.)

17            THE COURT:  For defense exhibits, the rules require

18 you to give me an exhibit sheet.  I would like to make sure I

19 note uses of an exhibit.  So if you would by tomorrow give me

20 our form that's in the local rules -- an exhibit form so I can

21 make sure I keep track of what you use when you're speaking to

22 a witness.

23            MR. BROWN:  Will do, Your Honor.

24            THE COURT:  All right .  And then, Mr. Camoni, you

25 didn't move to admit the plea agreement addendum 17.  Did you

127

1  intend to move that?

2          MR. CAMONI:  I will move to admit it, Your Honor.  I

3  think I will ask to move it -- admit it under seal because it's

4  filed under seal in Mr. Taylor's case.

5          THE COURT:  I am the one who sealed it, right?

6          MR. CAMONI:  I believe so, Your Honor.

7          THE COURT:  But sealed in terms of the rest of the

8  world.  Counsel obviously I am sure will have questions on

9  that.  We need to make sure it's available.

10          MR. CAMONI:  Understood.

11          THE COURT:  I assume you have no objection to the

12  addendum to the plea agreement being admitted?

13          MR. BROWN:  No, Your Honor.

14          MS. PAWELSKI:  No, Your Honor.

15          MR. CAMONI:  I think I neglected to move in 100,

16  which is a photograph as well.  I was going to do that when we

17  come back.  It's up to you if you want to handle that now.

18          THE COURT:  100?

19          MR. CAMONI:  100.

20          THE COURT:  Mr. Wilson?

21          MR. CAMONI:  Yes.

22          THE COURT:  Any objection?

23          MR. BROWN:  No objection.

24          MS. PAWELSKI:  Your Honor, I have no objection to

25  that.  I would like to put respectfully a continuing objection

128

1  on the record going forward to this conduct until and unless it

2  is tied to the Howard Johnson because I have an obligation to

3  my client to do so respectfully.

4          THE COURT:  Oh, that's no problem.  Your objection is

5  noted.  As I said, this is a sex trafficking and drug case that

6  involves a background that brings us to those locations.  All

7  of this is particularly relevant in my mind and also

8  appropriate in the case.  Your objection will be noted as

9  continuing to evidence, I guess, of -- does that mean you won't

10 be cross-examining anybody on the P. Stones of their

11 activities?

12         MS. PAWELSKI:  Depending -- that does not mean that.

13 Until it's tied to this, I just note a continuing objection.

14         THE COURT:  All right.

15         MS. PAWELSKI:  On relevance.

16         THE COURT:  Okay.  We will take a break for 15

17 minutes.

18         (A brief recess was taken.)

19         THE COURT:  Welcome back.  Okay.  You may continue.

20         MR. CAMONI:  Thank you, Your Honor.

21 BY MR. CAMONI:

22 Q.   Mr. Taylor, we were talking about the sex trafficking

23 business the P. Stones were conducting?

24 A.   Yes.

25 Q.   Where did you and the other P. Stones conduct the sex

129

1  trafficking business?

2  A.    In East Stroudsburg.   Are you talking about hotels?

3  Q.    You went to hotels?

4  A.    Yes.

5  Q.    What hotels did you use?

6  A.    We used the Howard Johnson, the Quality Inn, the Econo

7  Lodge, the Days Inn.

8  Q.    Did you use something called a Comfort Inn?

9  A.    Yes.

10  Q.    Hampton Inn?

11  A.    Yes.

12  Q.    Several different hotels you used?

13  A.    Yes.

14  Q.    Over the course of several years we are talking about?

15  A.    Yes.

16  Q.    So specifically between 2011 and 2014, did the P. Stones

17  spend any more time doing sex trafficking at any one or more

18  hotels than any of the others?

19  A.    Yes.

20  Q.    Where did you most of the sex trafficking?

21  A.    Howard Johnson.

22  Q.    Is that the Howard Johnson in Bartonsville?

23  A.    Yes, next to the truck stop.

24  Q.    Why?  Why did you spend more time there than anywhere

25  else?

1  A.    Because basically it was -- how can you say -- a safe

2  haven for us.  Like, we knew when the cops was around, the

3  rooms that we was put in was in the back where there was no

4  cameras working.  So we can do basically anything we wanted to

5  do in there.

6  Q.    How did you know when the cops were around?

7  A.    Because we get a call, and they tell us, like, hey, the

8  police is in the front, the state troopers was in the front.

9  So it the state troopers was in the front of the hotel, like,

10 across the street is food places.  So we go -- it's Chili's.

11 It's a few food places over there.  So if the police was in the

12 front of the hotel sitting in front of the hotel, we go to one

13 of the food places to eat where we can watch the hotel until

14 the police leave and then go back into the hotel.

15 Q.    So you said you would receive a call that the police were

16 there?

17 A.    Yeah.

18 Q.    Did you ever receive such a call?

19 A.    Yes.

20 Q.    How many times?

21 A.    About two, three times.

22 Q.    Who was it that called you?

23 A.    Faizal.

24       MR. BROWN:  Objection.  Speculation of the person on

25 the other end of the line.

131

1        THE COURT:  That's overruled.

2   BY MR. CAMONI:

3   Q.    Who was Faizal?

4   A.    The manager of the hotel.

5   Q.    How did you know Faizal?

6   A.    Through Sheryl, through -- yeah, Sheryl, Scarlet.

7   Scarlet, she started prostituting in that hotel around 2010.

8   Her and some other females that she knew at the time, and they

9   got real acquainted with him.  And afterwards when we got into

10  the -- when the P. Stones got into the prostitution business,

11  she was already real acquainted with him.  We was able to get

12  rooms at a discount price and sometimes even for free.

13  Q.    So did you ever talk to this Faizal in person?

14  A.    I only had about three -- three times, like, face-to-face

15  contact with him.

16  Q.    But you did meet him in person?

17  A.    Yes.

18  Q.    It wasn't just over the phone?

19  A.    No.

20  Q.    Do you see Faizal in the courtroom today?

21  A.    Yes.

22  Q.    Where do you see him?

23  A.    Seated in next to his lawyer right there.

24        MR. CAMONI:  Let the record indicate the witness has

25  identified the defendant, Faizal Bhimani.

132

1      THE COURT:  Could you describe something he's

2  wearing?

3      THE WITNESS:  He got on the blue blazer, and he --

4  the screen is over here.  He next to -- he got one lawyer next

5  to him.

6      THE COURT:  Okay.  The record reflect will reflect he

7  identified the defendant.

8  BY MR. CAMONI:

9  Q.   You mentioned that you didn't always pay full price for

10 the Howard Johnson?

11 A.   No.

12 Q.   How did you get discounts?

13 A.   Sometime he give us the coupons or most times Sheryl,

14 like, because Sheryl was a prostitute basically, and sometimes

15 you know, like, I was never there, but when we come to the

16 hotel, like, they would be, like, all right, we going to meet

17 up at 9:00, and she say, yeah, and get rooms for $50 a room

18 basically.

19 Q.   How many rooms -- first of all, who booked the rooms?

20 A.   I mainly booked the rooms, me.

21 Q.   How did you book the rooms?

22 A.   Sometime through hotels.com, or sometime we come in and

23 play cash, things of nature.

24 Q.   Did there come a time when you booked rooms -- whose names

25 did you put them in?

133

1  A.    Multiple people's.  It depends on who there at the time,

2  who got I. D.

3  Q.    Did you ever book a room when you weren't in the area?

4  A.    Yeah.

5  Q.    So what did you do?  Where were you?

6  A.    If I in Maine or New York or say anyplace out of state and

7  Sheryl call me, what I do I go on hotels.com.  You can book a

8  room, but you don't have to put your name on the room.  You can

9  use your card, and you could use basically payment information.

10 And then it say who room do you want the name under, and they

11 give me a name, and I do it like that.

12 Q.    Why were you the one booking the rooms?

13 A.    Because I had the card, and I had the money.

14 Q.    Did the girls keep any money?

15 A.    No.

16 Q.    So if the girls need a room, they need someone to book it?

17 A.    Yes.

18 Q.    Why were you booking under somebody else's name?

19 A.    Because I wasn't there and also because they needed I.

20 D.s.

21 Q.    Did there ever come a time where you couldn't book rooms

22 at the Howard Johnson under your own name?

23 A.    No.

24 Q.    Were you ever aware of a time when you tried to book a

25 room under your own name and you weren't allowed to?

134

1  A.    No.

2  Q.    Did you ever have a problem booking a room at the Howard

3  Johnson hotel?

4  A.    No.

5  Q.    All right.  How many rooms did you rent at a time when you

6  went to the Howard Johnson?

7  A.    Three.

8  Q.    Why three?

9  A.    Because one would be, like, if I'm around, I'm renting

10 three rooms.  One is my room, and one room is basically where I

11 keep my drugs and guns if I have a gun when I come down.  And

12 one is for the prostitution.

13 Q.    Were these rooms near each other?

14 A.    Yeah.

15 Q.    Would they be connected in some way?

16 A.    Yes.

17 Q.    So you can move inside the rooms from one room to another?

18 A.    Yes.

19 Q.    With when you say you kept drugs in one of the rooms,

20 which out of three, if they were next to each other -- which

21 room would have the drugs?

22 A.    The one that was connected.

23 Q.    The one that was connected to whose?

24 A.    Mine.

25 Q.    And the girls would be in a different room working?

1  A.   Yes.

2  Q.   Where in the Howard Johnson were the rooms that you stayed

3  in?

4  A.   It was all the way in the back.

5  Q.   Was it always in the same --

6  A.   Always is the same place.  I never seen no more of the

7  hotel but that area.  I've never been on any other floors of

8  the hotel but that area.

9  Q.   I would like to bring up what's been previously marked as

10  Government's Exhibit 9.  Do you recognize what you're looking

11  at?

12  A.   Yeah.

13  Q.   What is it we see here?

14  A.   It's the layout of the hotel.

15  Q.   Does this reflect the layout as you remember when you were

16  at the hotel?

17  A.   Yes.

18  Q.   Now, you said you were only on the first floor, right?

19  A.   Yes.

20  Q.   So does the first floor section reflect what you remember?

21  A.   Yes.

22  Q.   All right.  Can you indicate to the jury what part of the

23  hotel you are describing when you say your rooms were in the

24  back?

25  A.   All right.  This right here around from 166, 165, 145,

136

1  that area back there, like, 186.

2  Q.   You are indicating 166 and 145?

3  A.   Yeah.

4  Q.   Was it somewhere on that back hallway?

5  A.   Yes.

6  Q.   Is this the area that you're indicating?

7  A.   Yes.

8  Q.   We can take that down.  You said your rooms were always in

9  that same area?

10  A.   Yes.

11  Q.   Did you request rooms in that area?

12  A.   No.

13  Q.   You didn't ask to have your room in the back hallway every

14  time?

15  A.   No, we didn't have to ask.

16  Q.   I would like to bring up what's been previously marked as

17  Government's Exhibit 1.1.  Does this look familiar to you, sir?

18  A.   Yes.

19  Q.   What are we looking at?

20  A.   We basically looking at the front of the hotel, the hotel

21  in the sky view.

22  Q.   If you were above the hotel looking down?

23  A.   Yes.

24  Q.   All right.  So what part of the hotel did you stay in

25  based on where we're looking now?

137

1    A.    This side right here.

2          THE COURT:  You can put your finger on that monitor

3    and then drag a circle around it.

4          THE WITNESS:  This side right here.

5          MR. CAMONI:  Let the record reflect the witness has

6    circled -- I don't know how to describe this, lower left-hand

7    portion as we look at it on the screen on Government's Exhibit

8    1.1.  Your Honor, I move to admit Government's Exhibit 1.1 into

9    evidence.

10          THE COURT:  Any objection?

11          MR. BROWN:  No objection.

12          MS. PAWELSKI:  No.

13          THE COURT:  It's admitted.

14   BY MR. CAMONI:

15   Q.    When you would check into the hotel in person, who checked

16   you in?

17   A.    Faizal nine out of ten.

18   Q.    Nine out of ten?

19   A.    Yeah.

20   Q.    Who checked you in the other times?

21   A.    Probably it was only one other -- a female, some chick.  I

22   don't know her.

23   Q.    Somebody at the front desk?

24   A.    Yes.

25   Q.    Did that person also put you in the back hallway?

1  A.   Yes, because when I'm checking in, nine out of ten I'm

2  checking in with Scarlet so -- and they know her like real

3  well.

4  Q.   All right.  Did you know anybody else that worked at the

5  Howard Johnson?

6  A.   No.

7  Q.   What kinds of things did you and the people who stayed

8  with you from the P. Stones do while you were at the Howard

9  Johnson?

10  A.   Prostitution, sell drugs, bag drugs up, party, things of

11  that nature.

12  Q.   Can you describe some of the parties you are talking

13  about?

14  A.   Like, some of the parties would be in -- kind of vulgar --

15  excuse me -- but orgies, things of that nature.

16  Q.   Where did these take place?

17  A.   In the hotel rooms.

18  Q.   Were there ever parties that moved outside of the hotel

19  rooms?

20  A.   Yeah, sometime we be in the pool area after dark after the

21  pool area closed.  Scarlet get open the pool area.  We'd be in

22  the pool area, drinking, smoking.

23  Q.   Smoking what?

24  A.   Weed.

25  Q.   Any other drug use in the pool area?

139

1  A.    Molly.

2  Q.    What kind of condition can you describe -- can you

3  describe the condition the pool area would be in after the

4  parties?

5  A.    Ashes and cups around the place.

6  Q.    You didn't clean it up after?

7  A.    No.  We didn't leave the bottles though.  We took the

8  bottles with us.

9  Q.    Did you ever see Faizal when you were at one of these

10  parties?

11  A.    Yeah.

12  Q.    What was Faizal doing?

13  A.    He came in, spoke to Sheryl and left.

14  Q.    So he was aware that you were in the pool after hours?

15  A.    Yes.

16  Q.    When you were having the parties whether in the room or in

17  the pool area, was there ever activity out in the hallways?

18  A.    Yeah, some girls would be out there sometimes.

19  Q.    Can you describe what the girls would be wearing?

20  A.    Lingerie.

21  Q.    In the hallway?

22  A.    Yes.

23  Q.    In the pool?

24  A.    Yes.  We didn't come with bathing suits.

25  Q.    What would they wear when they swam?

140

1  A.    Probably thongs and a bra.

2  Q.    Did you ever use drugs when you were in the Howard Johnson

3  hotel?

4  A.    Yes.

5  Q.    What drugs did you use?

6  A.    Molly and weed.

7  Q.    Did you ever see other P. Stones use drugs?

8  A.    Yes.

9  Q.    What drugs did you see other P. Stones use?

10 A.    Molly and weed, and the prostitutes would be using heroin.

11 Q.    When they used heroin, did they use needles?

12 A.    Yes.

13 Q.    So did you ever see or did you ever leave needles or

14 baggies or other paraphernalia in the rooms?

15 A.    Yes.

16 Q.    Did you ever see hotel staff come into the room to clean

17 or for some other reason while those things, needles, baggies

18 and other paraphernalia were out in the open?

19 A.    No, they wasn't coming in the rooms to clean because we

20 wouldn't let them come in the rooms to clean.  Like, if it was

21 my room and partying -- we partying in my room, they ain't

22 coming to clean.  They put the do not disturb sign on there.

23 But in the room that they prostituting in there, they clean

24 them rooms.

25 Q.    They clean those rooms?

1  A.    Yes.

2  Q.    Were those the rooms the girls would use their heroin?

3  A.    No.

4  Q.    Where would the girls use the heroin?

5  A.    They come to my room.

6  Q.    So the needles would be left in your room?

7  A.    Yes.

8  Q.    When you left the hotel, did you take the needles with

9  you?

10  A.    No.

11  Q.    So they were left in the room?

12  A.    Yes.

13  Q.    Did you yourself, or did you ever see any other P. Stones

14  do damage to a room at the Howard Johnson?

15  A.    Yes.

16  Q.    Can you describe what kind of damage you're talking about?

17  A.    T.V. knocked over, things broken of that nature.

18  Q.    To your awareness, was hotel staff aware of that?

19  A.    Yeah.

20  Q.    Who was aware of it?

21  A.    If the housekeeper came after we left, of course the

22  housekeeper and the manager evidently.

23  Q.    While you were there, did anybody find out about it?  Did

24  you talk to anybody about it?

25  A.    No, I never spoke to nobody about it.

142

1  Q.    Did they ever move to another room?

2  A.    No.

3  Q.    Did Faizal ever ask you to leave?

4  A.    No.

5  Q.    When you came -- did you ever come back to check in again

6  after you trashed a room?

7  A.    Yes.

8  Q.    Were you ever told you couldn't check back in?

9  A.    No.

10 Q.    Did the police come?

11 A.    No.

12 Q.    Now, you said that P. Stones -- there were girls working

13 for the P. Stones during prostitution at the hotel?

14 A.    Yes.

15 Q.    Let's be specific.  Were the guys pimping the girls at the

16 hotel?

17 A.    Yes.

18 Q.    Was Sev working at the hotel?

19 A.    Yes.

20 Q.    Was he giving the girls heroin to engage in sex acts with

21 customers at the hotel?

22 A.    Yes.  Arty was also.

23 Q.    With who?

24 A.    With Millie.

25 Q.    Were you?

1  A.    Yes.

2  Q.    With whom?

3  A.    Kenya and Derell.  I don't think his girls was using

4  drugs, but they was using weed and things of that nature, but

5  yes.

6  Q.    Did you sell drugs while you were at the Howard Johnson?

7  A.    Yes.

8  Q.    Did you sell drugs to people -- customers outside of the

9  P. Stones?

10  A.    Yes.

11  Q.    But you also gave drugs to P. Stones members while you

12  were at the hotel, right?

13  A.    Yes.

14  Q.    Where did you meet with those other customers when you

15  were selling at the hotel?

16  A.    In my room where I kept the drugs at.

17  Q.    So in one of the rooms in that back hallway?

18  A.    Yes.

19  Q.    How would the customers come to you?

20  A.    They call me, or I call them to tell them I'm up here now

21  and up here at the Howard Johnson, what room, I tell them the

22  room, and when they come to the Howard Johnson, they pull

23  around, and they call me back, I'm here.  I tell them, all

24  right, come back to the room.  They come right to the room.

25  Q.    They come around you mean to the back?

1  A.    Yes.

2  Q.    Did they come in a back door or come into through the

3  lobby?

4  A.    No, the back door.

5  Q.    So between the drug sales --

6         MR. BROWN:  I didn't area hear that answer.

7         THE WITNESS:  The back door.

8         MR. BROWN:  Thank you.

9  BY MR. CAMONI:

10  Q.    Between the drug sales and the sex trafficking, how much

11  foot traffic was coming into the P. Stones rooms?

12  A.    A lot as in -- can I say?

13  Q.    Yes.

14  A.    If I am running a business and if I see all this traffic

15  coming to my business, I am definitely going to be suspicious

16  of what was going on, and I will know what's going on.

17         MR. BROWN:  Objection, Your Honor.

18         THE COURT:  That objection is sustained.

19         MR. CAMONI:  We will move on.

20  BY MR. CAMONI:

21  Q.    Other than the P. Stones you described, did you know any

22  other drug dealers and sex traffickers staying at the hotel at

23  the same time?

24  A.    Yeah, it was one dude named Forty that was there one point

25  in time.

1  Q.    Okay.  Who was Forty?

2           MS. PAWELSKI:  I'm sorry to interrupt.  I am -- we're

3  having a hard time hearing the witness.  Can he possibly get

4  closer to the microphone?

5           THE COURT:  Yeah, okay.  Sure.

6           MS. PAWELSKI:  Thank you.

7  BY MR. CAMONI:

8  Q.    Who was Forty?

9  A.    Forty was Millie old pimp.

10  Q.    Millie's old pimp?

11  A.    Yes.

12  Q.    Was that before --

13  A.    Arty.

14  Q.    Arty?

15  A.    Yes.

16  Q.    Did you see Forty at the Howard Johnson?

17  A.    Yes.

18  Q.    What were the circumstances when you saw Forty at the

19  Howard Johnson?

20  A.    The circumstances was basically Millie went out for a

21  call, and Millie -- he seen Millie in the hallway, and I guess

22  Millie ran back to Arty because all I know is when I come out

23  the hotel, it's -- well, out my room, in the -- next to Arty

24  room is Arty, Millie and Forty arguing.  So I come over there

25  because Arty my cousin.  I so come over there.  They arguing

1  about Millie and about basically Arty stole his hoe -- excuse

2  me -- my language.

3  Q.    Back hallway at the Howard Johnson?

4  A.    Yes.

5  Q.    In front of the room you were staying in?

6  A.    Arty basically.

7  Q.    Was it a quiet argument or loud?

8  A.    No, it was loud.

9  Q.    Did you engage in this argument?

10  A.    Yes.

11  Q.    What happened next?

12  A.    Basically I just -- I told Arty, what you want to do, and

13  guns got drawn basically.

14  Q.    Let's be specific.  Who drew guns?

15  A.    I did, Arty and then Forty.

16  Q.    The three of you had guns out at each other?

17  A.    Not pointed, but, yeah.

18  Q.    But out?

19  A.    Yes.

20  Q.    What happened next?

21  A.    Faizal came around the corner and said -- like, basically,

22  like, this how you repay me staying at my hotel, and it was

23  over after that.  It was, like, all right, Millie went in the

24  room, Arty went in the room.  I went in my room.  Forty went in

25  his room, and we never seen him after that.

147

1   Q.   You never saw Forty after that?

2   A.   No.

3   Q.   Did Faizal ask you to leave the Howard Johnson?

4   A.   No.

5   Q.   Did the police come?

6   A.   No.

7   Q.   Did you ever check into the Howard Johnson in the future

8   after that?

9   A.   Yes.

10  Q.   Were you ever told after that you can't stay here because

11  you were using guns in the back hallway?

12  A.   No.

13  Q.   You mentioned that -- let me back up.

14  A.   Uh-huh.

15  Q.   You talked about selling drugs at the Howard Johnson.  You

16  talked about the sex trafficking at the Howard Johnson.  Did

17  you ever discuss any of this directly with Faizal?

18  A.   No.  It was only one time I came to check in the hotel,

19  and he just asked me, like, how business doing, and I was,

20  like, fine, and that's it.  Other than that, no.

21  Q.   He never asked you other than how's business doing -- he

22  didn't ask you what you were doing back there?

23  A.   No.

24  Q.   Did you ever talk to him about security cameras?

25  A.   No.  Sheryl basically -- him and Sheryl had that

1  conversation.  That's how we knew that.

2  Q.    I don't want you to talk about Sheryl's conversation.

3  A.    All right.

4  Q.    Did you ever talk to Faizal why your rooms were in the

5  back hallway?

6  A.    No.

7  Q.    He never told you?

8  A.    No.

9  Q.    You said he called you if law enforcement were around?

10  A.    Yes.

11  Q.    Did he call you on the room phone or cell phone?

12  A.    Room phone.

13  Q.    And what did he tell you?

14  A.    Basically like, oh, the state troopers are sitting in the

15  front or the Regional sitting in the front.

16  Q.    Had you asked him to do that?

17  A.    No.

18  Q.    All right.  What kind of drugs were you keeping in that

19  third room?

20  A.    Heroin.

21  Q.    Any molly?

22  A.    No, molly we had with us because that is party drugs.  We

23  sold that, too, but we mainly partied with it.

24  Q.    What you sold mainly was heroin?

25  A.    Yeah.

1  Q.    How much heroin would you have in the Howard Johnson in

2  any given time?

3  A.    Between 50 and 500 grams of heroin.

4  Q.    How much molly would you bring if you had it with you?

5  A.    Probably an ounce or two.

6  Q.    How about marijuana?  You mentioned marijuana?

7  A.    Yeah, I stayed with -- I stayed with marijuana.  So I

8  probably have an ounce or two of marijuana with me also.

9  Q.    Did you keep any money in that room as well?

10  A.    Yeah.

11  Q.    Was the money that you kept in that room proceeds from

12  drug sales?

13  A.    Yeah, and drug sales and prostitution.

14  Q.    How much money would you have in that room at any given

15  time?

16  A.    You want the most or the --

17  Q.    Give me the most and the least.

18  A.    The most was 40,000, the least probably was around -- I

19  would say five to ten thousand.

20  Q.    The heroin you brought into the Howard Johnson, was it

21  raw, or was it bagged?

22  A.    It was raw.

23  Q.    So does that mean you had to bag it before you can sell

24  it?

25  A.    Yes.

150

1  Q.   Where did you bag it?

2  A.   In the room.

3  Q.   Did you ever bag heroin at any other hotels?

4  A.   Yeah.

5  Q.   What hotel, if any, did you bag heroin at most often?

6  A.   Howard Johnson.

7  Q.   Did anybody ever help you bag heroin?

8  A.   Yes.

9  Q.   Did anybody ever help you bag heroin at the Howard

10  Johnson?

11  A.   Yes.

12  Q.   Who?

13  A.   Ashley Jones.

14  Q.   Who else?

15  A.   Arty, Sev.

16  Q.   Somebody named Jenae?

17  A.   Yeah, Jenae Evans.

18  Q.   She help you, too?

19  A.   Yes.

20  Q.   Did Ashley Jones ever help you bag heroin in any other

21  hotels?

22  A.   Yes.

23  Q.   What hotels?  Do you remember?

24  A.   I forget the name.  It's -- I forget the name.

25  Q.   But she helped you in another hotel as well?

151

1  A.    Yes.

2  Q.    She also helped you bag at the Howard Johnson?

3  A.    Yes.

4  Q.    How often did you bag heroin at the Howard Johnson?

5  A.    Often because that's where I'm going because that's where

6  everybody at.

7  Q.    Did you pay the people who helped you to bag heroin?

8  A.    No, basically what it was, was I'm selling to dealers.

9  So, like, for instance, Ashley Jones, we bag the heroin, I tell

10 her what to get me off of it.

11 Q.    You give her heroin?

12 A.    Yes.

13 Q.    To help bag?

14 A.    Yes, and then tell her -- she was also selling it for me.

15 So I tell her what to give me off of the heroin we bagged

16 together.

17 Q.    So would you give her that heroin for her to sell -- where

18 would you give her heroin for her to sell?

19 A.    In the room, in the Howard Johnson.

20 Q.    She would sell it for you?

21 A.    Yes.

22 Q.    And she would give you some of the money and keep some for

23 herself?

24 A.    Yes.

25 Q.    Where would she bring that money to?

152

1  A.    Depending where I'm at, sometime the Howard Johnson or if

2  I go to her house, I go pick it up.

3  Q.    And sometimes at the Howard Johnson?

4  A.    Yes.

5  Q.    Did you know a person by the name of G.?

6  A.    Yes.

7  Q.    Did you have any interactions with him or see him around?

8  A.    Yes, I seen him around, but me and G. wasn't --

9  Q.    You didn't work with him?

10 A.    No.

11 Q.    Did you know what he was doing?

12 A.    Yeah.

13 Q.    Where did you see him?

14 A.    G. I believe -- we seen him at the Howard Johnson before.

15 We seen each other around town driving, things of that nature.

16 Q.    You did see him at the Howard Johnson?

17 A.    Yes.

18 Q.    I would like to show you what's been previously marked as

19 Exhibit No. 27.  Do you recognize this picture?

20 A.    Yeah.

21 Q.    Who is that?

22 A.    That's G.

23 Q.    Is that a fair and accurate representation of how you knew

24 the person named G. to look?

25 A.    Yeah.

153

1  Q.    Is that what he looked like?

2  A.    Yeah, yeah.

3        MR. CAMONI:  Move to admit Government's Exhibit 27.

4        MR. BROWN:  No objection.

5        MS. PAWELSKI:  No.

6        THE COURT:  It's admitted.

7  BY MR. CAMONI:

8  Q.    What did Faizal call you?

9  A.    Black.

10 Q.    He didn't call you Mr. Taylor?

11 A.    No.

12 Q.    He didn't call you Sirvonn?

13 A.    No.

14 Q.    All right.  Did you ever witness Sev use force on any of

15 the girls he pimped?

16 A.    Yes.

17 Q.    Did you ever see Salena Bayer-Davis -- you called her an

18 enforcer?

19 A.    Yes.

20 Q.    Did you ever see her use force on any girls the P. Stones

21 pimped?

22 A.    Yes.

23 Q.    You mentioned once earlier in your testimony that you used

24 force against Kenya Evans at one point?

25 A.    Yes.

154

1  Q.    Kenya Evans was someone you were pimping?

2  A.    Yes.

3  Q.    Tell us what happened when you used force on her.

4  A.    Hit her one time, slapped her real hard one time.

5  Q.    Where were you?

6  A.    In the Howard Johnson.

7  Q.    Where in the Howard Johnson?

8  A.    In the back rooms where I --

9  Q.    Were you in the hotel room?

10  A.    Yeah, it was in the hotel room at first, and then she ran

11  out the hotel room, and we start arguing.  And some of the

12  Stones -- some of the P. Stones came out, and Faizal came

13  around the corner and told us take it back in the room.

14  Q.    Now, when you said you struck her, where did you strike

15  her?

16  A.    In the face.

17  Q.    What was her reaction?

18  A.    She was crying and hysterical.

19  Q.    She was crying hysterically?

20  A.    Yeah.

21  Q.    Could you tell us she was hit?

22  A.    Yes.

23  Q.    How can you tell?

24  A.    Kenya was light.  When you hit her, you can see the marks

25  on her.

155

1  Q.   Were you also exchanging words?  Were you having an

2  argument at the same time?

3  A.   Yes.

4  Q.   Was it quiet or loud?

5  A.   It was loud.

6  Q.   Faizal came into the area?

7  A.   Yes.

8  Q.   He told you what?

9  A.   Take it back in the room.

10  Q.   What did you do?

11  A.   Took it back in the room.

12  Q.   In what way?

13  A.   I pulled her hair and dragged her -- like, pulled her back

14  in the room.

15  Q.   While Faizal was still there?

16  A.   Yeah.

17  Q.   Did Faizal ask you to leave the hotel?

18  A.   No.

19  Q.   Did the police come?

20  A.   No.

21  Q.   Did you ever check into the Howard Johnson again after

22  that?

23  A.   Yes.

24  Q.   You mentioned you stayed at other hotels in the area?

25  A.   Yes.

156

1  Q.   You mentioned that you sold drugs in other states?

2  A.   Yes.

3  Q.   Maine, and you got drugs in New York?

4  A.   Yes.

5  Q.   Did you stay in hotels in those states as well?

6  A.   Yes.

7  Q.   So you stayed in a lot of hotels while you were conducting

8  all this criminal activity, right?

9  A.   Yes.

10 Q.   In any of those other hotels, did you behave the way that

11 you described how you and P. Stones behaved in the Howard

12 Johnson?

13 A.   No.

14 Q.   Why not?

15 A.   Because they call the cops, or we get kicked and won't be

16 allowed to come back.

17         MR. CAMONI:  Nothing further, Your Honor.

18         THE COURT:  Mr. Brown.  Cross-examine.

19 CROSS EXAMINATION

20 BY MR. BROWN:

21 Q.   Good afternoon, Mr. Taylor.  My name is attorney Bernie

22 Brown.  I have a couple questions for you, all right.

23 A.   All right.

24 Q.   Receiving stolen property 2004, you were convicted of

25 that, correct?

1  A.   Yes.

2  Q.   Firearms not to be carried without a license, that's a

3  felony in 2004, you were convicted of that, correct?

4  A.   Yes.

5  Q.   Homicide out of Monroe County, convicted of that, too?

6  A.   Yes.

7  Q.   And then there's the two charges in federal court, human

8  trafficking and drug trafficking, correct?

9  A.   Correct.

10  Q.   Do you think the jury should believe a word that comes out

11  of your mouth here today?

12  A.   Yes.

13  Q.   Let's test that, why don't we?

14  A.   Uh-huh.

15  Q.   First thing is, did you tell agent Doherty that you held

16  monthly meetings out of the Super 8 motel in East Stroudsburg?

17  A.   Yes, that was -- can I --

18  Q.   No, that's the question and answer.

19  A.   All right.

20  Q.   Is that because you did not have any such arrangement with

21  the Howard Johnson?

22  A.   No, that's because at the time -- that was earlier in the

23  gan before we start prostituting or anything like that.

24  Q.   Okay.  You also had a place called the Pocono -- P. C. P.,

25  the Pocono County Place?  Didn't one of your prostitutes like

1  Heather D-Auria purchase a house where you guys operated out

2  of?

3  A.    No, we lived out of there.  We didn't operate out of it.

4  Q.    Okay.  So you guys lived in that house, correct?

5  A.    Yes, some of the Stones, yes.

6  Q.    And did you also tell agent Doherty that you operated out

7  of the Budget Inn motel?

8  A.    I believe so.

9  Q.    Okay.  Do you agree that investigators were initially

10 interested in your gang and your activities in particular as

11 the leader?

12       MR. CAMONI:  Objection, Your Honor.  How would this

13 witness know what investigators were interested in?

14       THE COURT:  I will sustain it.  You can rephrase it.

15 BY MR. BROWN:

16 Q.    Did investigators tell you that the focus of their

17 investigation was you and your gang?

18 A.    Yes.

19 Q.    Did -- when they told you that, did you say, when you chop

20 the head off the body falls?

21 A.    Yes.

22 Q.    And that meant when you were arrested, your gang fell

23 apart, correct?

24 A.    Yes.

25 Q.    And when you were arrested in June 20th of 2014, you were

159

1  arrested for prostitution and drug dealing, correct?

2  A.   No.

3  Q.   Okay.  You were arrested at the Econo Lodge on June 20th

4  of 2014?

5  A.   Yes.

6  Q.   You were there with another individual, correct?

7  A.   Yes.

8  Q.   Okay.  And you're saying that the purpose of that

9  investigation was not because you were engaging in prostitution

10 and drug trafficking?

11 A.   What I'm saying -- you asked me did I get arrested in 2014

12 for prostitution, no, I did not.  I got arrested in 2014, June

13 20th, for solicitation of criminal homicide.  The prostitution

14 charge and the drug charge came in September 22, 2015.

15 Q.   Okay.  So then I misspoke.  So you were arrested on June

16 20th of 2014, and there was a similar investigation for you

17 operating a drug and prostitution ring out of the Econo Lodge

18 later in 2015?

19 A.   I don't know if it was just out of the Econo Lodge.  I

20 can't speak for no one else.

21 Q.   Fair enough.  You were interviewed two times in June of

22 2014 and December of 2014 by investigators.  Do you recall

23 that?

24 A.   Yeah.

25 Q.   Okay.  And at no time during neither one of those

1  interviews -- at no time during either of those interviews did

2  you mention any arrangement with the Howard Johnson or Faizal

3  Bhimani?

4  A.    No.

5  Q.    Then did you reach an agreement with the government to

6  cooperate?

7  A.    Yes.

8  Q.    Okay.  And, in fact, in March 5th of 2015, March 13th of

9  2015, you reached out to agent Doherty for him and agent Patton

10  to come see you, correct?

11  A.    Yes.

12  Q.    And at that time did you ask them to give you a better

13  deal for your charges?

14  A.    I didn't ask him for a better -- I told them I wanted to

15  cooperate.

16  Q.    Right.  But did you -- let me ask you.  Did you ever say

17  during that interview that you wanted a better deal?

18  A.    No.

19  Q.    Did you ever say in any of the interviews that you wanted

20  a better deal?

21  A.    No, I said -- what I said was in any interview I am trying

22  to get home to my kids.  I never asked for a better deal.

23  Q.    So you wanted consideration to mitigate your sentence.  Is

24  that true?

25  A.    If I'm going to cooperate, yes.

161

1  Q.    Okay.  So is it true then you were looking for something

2  from your -- the information you were providing?

3  A.    Yes.

4  Q.    Now, during the March 15th interview, is it true that the

5  first thing that you do is you tell case agents you lied to

6  them in the previous interviews?

7  A.    No, I don't recall telling them that.

8  Q.    Okay.

9         MR. BROWN:  I'm going to mark this as Defendant's

10  Exhibit No. 5, Your Honor.  It is his March 15th interview.

11  It's to impeach him with what he said to case agents.

12         THE COURT:  Is it his statement?

13         MR. BROWN:  It's his statement that was recorded, and

14  he was asked a question, and the first thing he does --

15         THE COURT:  First of all, let's have this

16  conversation --

17         MR. BROWN:  Sidebar.  I apologize.

18         THE COURT:  You should know that.

19         (The following discussion took place at sidebar:)

20         THE COURT:  Is this a 302 or is this a tape-recorded

21  -.

22         MR. CAMONI:  I think video.

23         THE COURT:  This is his actual statement?

24         MR. BROWN:  His actual statement.  He's asked the

25  question.

162

1          THE COURT:  You can ask him about that.  I thought it

2    was -- sounded to me you are talking he told the agents it was

3    a 302 you were going to use.

4          MR. BROWN:  No.

5          THE COURT:  It's his own statement.  That's -- you

6    can ask him a question about it.  Please be careful about if

7    there's -- if you have an argument to make for something that's

8    admissible that you don't have that argument if it turns out --

9    if that had been, for example, a 302 statement, you are telling

10   this jury, I have this statement he said, I don't want to have

11   a whole lot of sidebar conferences if it turns out you think

12   your argument will do something that can poison the jury before

13   the ruling.  Please don't do that.  All right.

14         MR. BROWN:  I'm sorry.

15         THE COURT:  That's okay.  It's a -- do you want to

16   say something?

17         MS. ROBERTS:  Exhibit number?

18         MR. BROWN:  Five.

19         MS. ROBERTS:  What was four?

20         THE COURT:  Four would be your next one.

21         MS. ROBERTS:  I want to make sure I didn't miss one.

22         MR. DeSTEFANO:  All of those are simply for

23   identification and not to be admitted?

24         THE COURT:  Certainly the 302s that we talked about

25   were either under 612 or 613, so they are for purposes of

163

1  refreshing recollection.  None of them were for past

2  recollection recorded as a prior inconsistent statement.  I

3  don't know what this will be depending how it's used.  I assume

4  it will be used for good faith basis to cross-examine or

5  refresh his recollection, under which case it wouldn't come in.

6  You're right.

7            (The discussion at sidebar concluded.)

8            MR. BROWN:  Mr. Taylor, who is that on the screen?

9            THE WITNESS:  That's me.

10            THE COURT:  Mr. Brown, are you using video as opposed

11  to a transcript --

12            MR. BROWN:  To impeach him, Your Honor.  He said he

13  didn't remember -- I asked him --

14            THE COURT:  Any objection to --

15            MR. CAMONI:  Judge, I don't know -- prior

16  inconsistent statement if it is, I guess the witness has denied

17  making it.

18            MR. BROWN:  Yes.

19            THE COURT:  So I am going to allow the video.  I

20  think the witness is here able to be cross-examined and able to

21  be redirected as it may be.  So I'm going to -- I am going to

22  allow you to use that.  I will turn the monitors on.  You might

23  need to make sure that -- Barbe.  Mr. Brown, this is

24  Defendant's Exhibit 4?

25            MR. BROWN:  Four, thank you.

164

1  BY MR. BROWN:

2  Q.   So did you, Mr. Taylor, tell case agents you lied?

3  A.   Yes, I said I kind of lied.  Can I say something?  This

4  was March 13th, 2015.  It was five years ago.  I didn't recall

5  that at that time, you know.

6  Q.   And who was in that video?  Do you recall?

7  A.   Myself.

8  Q.   Okay.

9  A.   The other agent, and I forget their names.

10 Q.   That's fine.  Fair enough.  Next were you asked during the

11 interview about the hotels in the Stroudsburg area that had

12 girls being run out here, meaning being prostituted out here.

13 And did you say no to that, you didn't know anything about

14 that?  Were you asked about the hotels and girls being run out

15 of hotels, and you denied that?

16 A.   I'm trying to -- can I -- not to high step.  I am trying

17 to think back.  It was five years ago this interview happened

18 so --

19 Q.   I understand that.

20 A.   No, I believe I told them that girls was being ran out of

21 hotels, that it was prostitution involved.

22 Q.   Okay.  Fair enough.  So it's your answer you did tell

23 them?

24 A.   That it was prostitution being involved, that Sev was a

25 pimp.

165

1  Q.    Fair enough.  Can I get to 9:58:20?  Who were you talking

2  about there?  Do you know?

3  A.    No, I forget.

4  Q.    Okay, fair enough.  And were you asked about payment and

5  force and dope that you -- when you were asked about payment

6  and force during this interview, did you say you didn't know

7  anything about force being used on girls?

8  A.    Yes.

9  Q.    That was a lie, correct?

10 A.    Yes.

11 Q.    Did you -- were you then asked about moving drugs and

12 girls from your operation out here in Pennsylvania, and you

13 told them that you were not doing that?

14 A.    Myself.  I said myself, I told them that I was -- I was

15 moving drugs but not girls.  I told them I was just renting

16 rooms, I believe.

17 Q.    Was that a lie?

18 A.    That I was just renting rooms?

19 Q.    Right.

20 A.    Yes.

21 Q.    And did you try to tell the case agents that members of

22 your gang the P. Stones actually had legal and legitimate jobs

23 out here?

24 A.    I said myself.

25 Q.    Right.  But did you say other members have, like, legal

166

1    and legitimate --

2    A.   Yeah, some members because they did.

3    Q.   Was that a lie?  Were you trying to divert the agents from

4    --

5    A.   It wasn't a lie because some P. Stones did have jobs.  I'm

6    not lying when -- if you asked me did this person have a job,

7    yes, this person had a job.

8    Q.   Okay.  And did you try to tell case agents there were no

9    dues to be paid for your gang?

10   A.   There was dues to be paid.

11   Q.   Yeah, but did you tell case agents there were no dues for

12   your gang?

13   A.   Yes.

14   Q.   Okay.  Was that a lie?

15   A.   Yes.

16   Q.   And did you also tell them that the female members of your

17   gang weren't sexed in for initiation?

18   A.   Yes.

19   Q.   Was that a lie?

20   A.   Yes.  And that's when I was still involved in the gang at

21   the time.  I was still the leader of the gang March 13th, 2015.

22   Q.   You just testified that your gang did have meetings,

23   correct?

24   A.   Yeah.

25   Q.   Okay.  Those meetings occurred at the Super 8 and Budget

1  Inn, correct?

2  A.    That was before 2011, yes.

3  Q.    I understand that.  But my next question -- the reason why

4  I brought you back to that is did you try to tell case agents

5  in 2015 that your group wasn't having meetings?

6  A.    Yes.

7  Q.    And was that a lie?

8  A.    Yes.

9  Q.    And did you tell case agents that there were no discipline

10  for women or women weren't treated any worse or sexually abused

11  by your gang?

12  A.    Yes.

13  Q.    Was that a lie?

14  A.    Yes, it was.

15  Q.    And did you try to tell the case agents that you weren't

16  actually involved in the prostitution racket that your gang was

17  running?

18  A.    Yes.

19  Q.    And was that a lie?

20  A.    Yes, and that was all before -- can I say this?  This was

21  all before I signed my -- my cooperation deal truthfully.

22  That's what I'm doing now, and at this time, like I said, I was

23  still very much into the gang, and I was still very much a part

24  of the gang.

25  Q.    Did you also tell case agents that you weren't into the

168

1  drug activities of your gang either?

2  A.    Yes.

3  Q.    And that was a lie?

4  A.    Yes.

5  Q.    And did the case agents specifically ask you about Vicious

6  or Salena Bayer during the interviews?

7  A.    They asked we about Sev.  I don't remember.  I believe

8  they probably did ask me about Salena.  I know they asked me

9  about Sev for sure.

10  Q.    You keep saying it was before.  And specifically were they

11  asking about Salena running girls in 2012?  Do you recall that

12  question?

13  A.    I don't remember.

14  Q.    Fair enough.  Can we go to 10:41:20?  Did you say that?

15  A.    Yes.

16  Q.    And was that a lie?

17  A.    Yes.

18  Q.    Okay.  And how about did case agents ask you about Kenya

19  Evans and whether or not she was bringing drugs from

20  Pennsylvania to Maine?

21  A.    Yes.

22  Q.    And did you tell them that she wasn't?

23  A.    Yes.

24  Q.    And was that a lie?

25  A.    Yes.

1  Q.   And did case agents ask you about whether or not Kenya

2  Evans was prostituting?

3  A.   Yes.

4  Q.   And you told her she wasn't, correct?

5  A.   Yes.

6  Q.   And that was a lie?

7  A.   Correct.

8  Q.   How about Sheryl Patishnock?  Is it true you said that

9  Scarlet was a prostitute forever since 2008 and the girls she

10 was running she was running because she wanted money?

11 A.   Yes.

12 Q.   Okay.  That wasn't a lie, correct?

13 A.   What was a lie?

14 Q.   That was not a lie that Scarlet was running her own girls

15 for her own money and --

16 A.   What Scarlet was doing before she got with Sev, her and

17 girls get together, and like I said, they would prostitute, and

18 Scarlet was -- she was doing her own thing.

19 Q.   Right.  She was doing that for money, correct?

20 A.   Yes.

21 Q.   And did she give some of that money to the gang?

22 A.   Yes.

23 Q.   And with regard to Scarlet's money, were you ever asked

24 about whether or not her money -- the rest of that money was

25 her money to keep when she was running the girls?  So when

170

1  Scarlet was running the girls, she paid her dues or paid the

2  money to the gang, and she kept the remaining of the proceeds?

3  A.   Yes.   That was before Sev got involved and the gang got

4  involved in the prostitution business.

5  Q.   But you were specifically asked about 2012, correct?  Do

6  you recall that?

7  A.   I believe so, probably.

8  Q.   Okay.  You're giving an interview in 2015, correct?

9  A.   Yes.

10  Q.   Are you aware that the -- that the indictment is from 2011

11  to 2017?

12  A.   Yes.

13  Q.   And did case agents specifically ask you about receiving

14  money from prostitution?

15  A.   Yes.

16  Q.   And did you lie to them and tell them you did not?

17  A.   Yes, I did.

18  Q.   And did you deny even being involved in the pimping or

19  prostitution game in your 2015 interview?

20  A.   Yes, I did.

21  Q.   And that was a lie?

22  A.   Yes.

23  Q.   Now, beginning of your testimony -- actually, I'm going

24  somewhere first.  I want to talk to you about the Howard

25  Johnson situation, okay.  And what I mean is, when you're

171

1  operating out of the Howard Johnson, do you agree it's to your

2  benefit that you operate without people knowing that you're

3  selling drugs so they don't call the cops?

4  A.    Yeah.

5  Q.    Yeah.  You would want to operate so people don't know that

6  you're operating out of whatever hotel room you're in to sell

7  drugs, correct?

8  A.    Can I answer?  The whole thing about using --

9  Q.    Is it yes or no?

10  A.    Using the Howard Johnson, the back rooms wouldn't have no

11  regular --

12         THE COURT:  Okay.  So we're clear on this yes or no

13  business, all right, you can ask a witness to answer yes or no.

14  If they can answer it completely in yes or no, they can do

15  that, but they can also add a short explanation if a yes or no

16  doesn't honestly answer the question that's being asked, okay.

17  Go ahead.  Ask the question.

18  BY MR. BROWN:

19  Q.    I will ask it again.  I just asked, is it true it benefits

20  you that people don't know that you're operating your drug

21  operation out of a hotel room so you don't get caught?

22  A.    Yes.

23  Q.    Okay.  Would it be the same thing with operating a

24  prostitution ring out of -- out of the same hotel?

25  A.    Yes.

172

1  Q.   Now, you were indicted for drug trafficking and human
2  trafficking October 2nd, 2015, correct?
3  A.   I was indicted -- I got my indictment papers that said the
4  indictment was September 22nd, 2015.
5  Q.   Okay.  So my bad.  I was off by a little -- September --
6  September 22nd, 2015, correct?
7  A.   Yes.
8  Q.   And once you did that, you wanted to cooperate and help
9  yourself, correct?
10 A.   Yes.
11 Q.   Okay.  And I know that attorney Camoni had talked to you
12 about what you get for your cooperation.  The reason why you
13 were doing that was not only to protect yourself, is that true?
14 Were you trying to protect somebody else by cooperating, sir?
15 A.   Was I trying to protect somebody else like who?
16 Q.   Like Arty Taylor, your cousin, did case agents tell you
17 they would throw a life preserver to Arty Taylor if you
18 cooperated?
19 A.   No, what agents said was if I can get Arty Taylor to
20 cooperate it would help me.
21 Q.   Okay.
22 A.   They never said that if I cooperated that it would help
23 Arty Taylor, like, Arty wouldn't get locked up or anything like
24 in that aspect.
25 Q.   It's your testimony under oath that case agents did not

173

1  tell you that if there's one person to throw a life preserver

2  for?

3  A.   They asked me if I had a -- like you said, if I can help

4  anybody, who would I help.

5  Q.   Right.

6  A.   I said my cousin.

7  Q.   And so --

8  A.   That's why at the end of this -- at the end of this video

9  as you can tell, they asked me about Arty, and I start crying,

10  and I didn't say nothing else after that.

11  Q.   Now, you said it's your motivation to get home to your

12  kids as soon as possible, correct?

13  A.   Yes.

14  Q.   Isn't that -- isn't that why you're testifying against Mr.

15  Bhimani here today, sir?

16  A.   Yes.

17          MR. BROWN:  No further questions, Judge.

18          THE COURT:  Okay.  Thank you, Mr. Brown.  Ms.

19  Pawelski?

20  CROSS EXAMINATION

21  BY MS. PAWELSKI:

22  Q.   Good afternoon, Mr. Taylor.

23  A.   Good afternoon.

24  Q.   I am Terri Pawelski.  If you don't understand any of my

25  questions, let me know, and I will try to rephrase them, okay?

174

1  A.    All right.

2  Q.    I will ask you about your plea agreement.  Count one, do

3  you remember what count one was?

4  A.    Drugs.

5  Q.    And do you remember what count two was?

6  A.    Sex trafficking.

7  Q.    How much time were you looking at for both charges?

8  A.    I'm not sure.

9  Q.    You are not sure?

10  A.    No, it was on my P.S.I., I believe, maybe like 25 years, I

11  believe.

12  Q.    You were looking at a mandatory minimum of 25 years in

13  prison, correct?

14  A.    Not a mandatory minimum, no, ma'am.

15  Q.    How much time are you serving?

16  A.    20 years and eight to 16 on my state case.

17  Q.    And you received a 5 K. in exchange for your cooperation,

18  correct?

19  A.    No, I haven't.

20  Q.    You didn't sign an addendum to a plea agreement in this

21  case with the government?

22  A.    Yes, I have.

23  Q.    And do you understand that the government if it agrees

24  that you have -- that you have cooperated with the government

25  that it can file a 5 K.?

175

1   A.   Yes, that was for my case basically.

2   Q.   Your case?

3   A.   Yes.

4   Q.   And that means that the Court can then go below the

5   sentencing guidelines range, correct?

6   A.   Yes.

7   Q.   And who determines whether or not you've told the truth

8   today?

9   A.   The jury.

10  Q.   The government, isn't it?  The government decides under

11  your plea agreement whether you've breached the agreement,

12  isn't that true?

13  A.   I'm not sure.

14  Q.   All right.

15       MS. PAWELSKI:  If can have one moment, Your Honor.

16  Kevin, can you bring up page nine, please, of -- I am not sure

17  what exhibit it is.

18       THE COURT:  Government's Exhibit 17?

19       MS. PAWELSKI:  Can we bring it up for the witness?

20  Page 00002489.  It's paragraph 13.

21  BY MS. PAWELSKI:

22  Q.   Mr. Taylor, do you understand that it was the government

23  who's entitled to make a sentencing recommendation in your

24  case?

25  A.   Yes.

176

1  Q.   That was based upon everything that they asked you to do

2  in order to cooperate?

3  A.   Yes, everything that -- if they came to question me about

4  anything in that aspect, yes.

5  Q.   And it's the government who decides whether or not you

6  breached this plea agreement?

7  A.   Yes.

8  Q.   Whether you breached the plea agreement and whether or not

9  they accepted your testimony as truthful?

10 A.   Yes.

11 Q.   Okay.

12        MS. PAWELSKI:  I have nothing further, Your Honor.

13        THE COURT:  All right.  Any redirect?

14        MR. CAMONI:  Briefly.

15 REDIRECT EXAMINATION

16 BY MR. CAMONI:

17 Q.   Mr. Taylor, Ms. Pawelski asked you about whether you've

18 received a 5 K. motion.  Are you familiar with what that is?

19 A.   Yes.

20 Q.   Did you understand what she was asking about?

21 A.   Did I receive time off for my cooperation.

22 Q.   So a motion by the government to reduce your sentence?

23 A.   Yes.

24 Q.   Did the government ever file that motion before you were

25 sentenced?

1  A.    No.

2  Q.    So you have not received a benefit for your cooperation,

3  correct?

4  A.    No.

5  Q.    But you think based on the agreement that if you provide

6  what's called in the cooperation agreement substantial

7  assistance that you may receive one, correct?

8  A.    Yes.

9  Q.    And what do you have to do in order to get any benefit?

10  A.    Tell the truth.

11  Q.    And what would you have to do in order to lose all that

12  benefit?

13  A.    Lie.

14  Q.    Is there anything in your cooperation agreement that says

15  you're only going to benefit if the government wins the case?

16  A.    No.

17  Q.    All right.  We saw a video interview from 2015, correct?

18  A.    Yes.

19  Q.    Do you remember how many times you've been interviewed in

20  this case?

21  A.    No.

22  Q.    Okay.  So let me ask you this.  Early on after you were

23  arrested, you were interviewed before you were indicted, right?

24  A.    Yes.

25  Q.    Before you knew they were charging you -- we were charging

1  with you sex trafficking and drug trafficking, correct?

2  A.    Yes.

3  Q.    You admitted you lied to investigators?

4  A.    Yes.

5  Q.    Early on you lied to the investigators, correct?

6  A.    Yes.

7  Q.    Was that interview in 2015 before or after you pled guilty

8  to the charges in this case?

9  A.    That was before.

10  Q.   So then after that interview that we saw you came into a

11  courtroom for a plea hearing, right?

12  A.    Yes.

13  Q.    And you told the Court, yes, I did it?

14  A.    Yes.

15  Q.    So you had lied to investigators in the interview?

16  A.    Yes.

17  Q.    But then you pled guilty when you knew you were facing

18  substantial penalties, correct?

19  A.    Yes, can I say something towards that?  What I would like

20  to say in the beginning -- in this interview right here, of

21  course, I am going to lie because I am not yet -- I didn't get

22  indicted.  So I'm basically trying for me myself not to get

23  indicted, not to get federally prosecuted.  So, of course, I

24  said some things in that interview that was a lie because at

25  that time I wasn't prosecuted yet.  I wasn't federally indicted

1  yet.  So I was basically trying to get myself out of being

2  federally indicted so certain things they asked me I didn't

3  tell the truth.  Certain things they brought up I lied.

4  Q.    In later interviews when you were asked those same

5  questions again, did you then tell the truth?

6  A.    Yes, because if I didn't tell the truth and it came out

7  that I lied, I wouldn't get my credit.  So it was either

8  basically I tell the truth and/or I lie and I keep lying, and

9  it came down to me basically telling the truth, like, you know.

10  I lied at that time also because everybody have morals, and

11  some people are ashamed what they did, and I was ashamed, and I

12  am ashamed of the things I did at that time, and that was five

13  years ago, and I'm not that person that was on this video.

14  That's not me no more.

15  Q.    I want to ask you about some of the other hotels that

16  defense attorneys asked about you that Mr. Brown asked you

17  about.  So you did sell drugs and prostitution out of the Super

18  8 Motel, correct?

19  A.    Yes.

20  Q.    Did a manager or employee there warn you when police were

21  around?

22  A.    Yes.

23  Q.    At the Super 8?

24  A.    No, no, not the Super 8, no.

25  Q.    Did anybody that worked at the Super 8 warn you when

180

1  police were around?

2  A.   No.

3  Q.   Were you able to throw big parties and wreck rooms?

4  A.   No.

5  Q.   Did the manager at the Super 8 warn there were police?

6  A.   No.

7  Q.   Were you able to do it without having police called?

8  A.   No.

9  Q.   Mr. Brown pointed out you were arrested at the Econo

10 Lodge.  Is that right?

11 A.   Yes.

12 Q.   At the time you were arrested at the Econo Lodge, did

13 anyone warn you police were arresting you?

14 A.   No.

15 Q.   You were arrested?

16 A.   Actually they went in because Salena and the other girl

17 was in there, and they set up a sting.  They went in, and I --

18 I went out to get some food, and I came back, and when I was

19 coming back, I passed the office.  And then I walk right to the

20 room, and I got locked up.  So that tell you, no, they ain't

21 warning me in the office.  They could have warned me.

22 Q.   Fair enough.  You testified earlier that the Howard

23 Johnson -- you did receive warnings from Faizal Bhimani about

24 police, correct?

25 A.   Yes.

181

1  Q.    Did you ever get arrested at the Howard Johnson?

2  A.    Never.

3  Q.    So would you say those warnings worked?

4  A.    Yes.

5            MR. CAMONI:  Nothing further, Your Honor.

6            THE COURT:  All right.  You may step down.  Thank

7  you.  All right.  Let me see counsel for a second.  In the

8  meantime, we have to sanitize our witness area.  You are

9  welcome to stand and stretch.

10           (A discussion was held off the record at sidebar.)

11           THE COURT:  Okay.  Ms. Roberts, your next witness.

12           MS. ROBERTS:  Thank you, Your Honor.  The government

13  is going to call Salena Bayer-Davis.

14           SALENA BAYER-DAVIS, called as a witness, being duly

15  sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MS. ROBERTS:

18  Q.    Good afternoon, ma'am.

19  A.    Good afternoon.

20  Q.    Can you tell the jury how old are you today?

21  A.    26 years old.

22  Q.    How far did you go in school?

23  A.    I finished high school.

24  Q.    Where did you grow up?

25  A.    Stroudsburg, Pennsylvania.

182

1  Q.    Who did you live with growing up?

2  A.    My mom until the age of 16.

3  Q.    Why just until the age of 16?

4  A.    My mom passed away when I was 16.

5  Q.    After your mom passed away, who did you live with?

6  A.    My grandmother.

7  Q.    Did you stay up in the Stroudsburg area with your

8  grandmother?

9  A.    The Saylorsburg area.

10  Q.    Is that in Monroe County?

11  A.    Yes, ma'am.

12  Q.    Are you familiar with the gang called the P. Stones?

13  A.    Yes, ma'am.

14  Q.    Can you explain to the jury how you became familiar with

15  that gang?

16  A.    I was introduced to the gang by two of my cousins, and I

17  joined the gang after my mom died.

18  Q.    You said you were introduced to the gang by two of your

19  cousins.  What are their names?

20  A.    Ellanita and Kenya Evans.

21  Q.    Approximately how old were you when you actually joined

22  the gang?

23  A.    I was 17 when I joined the gang.  I was hanging out with

24  them when I was 16 though.

25  Q.    What type of gang is the P. Stones?

183

1  A.    They are considered Blood.

2  Q.    Can you explain to the jury how it was that you became a

3  member of the P. Stones?

4  A.    When I turned Stone, I was boot in, which is you fight.

5  Then I had to encounter a 21-day period where you had sex with

6  individual -- with higher ranks.

7  Q.    How old were you at this time?

8  A.    I was 17.

9  Q.    When you said you to fight, who did you have to fight?

10 A.    It was five different women of Black's choice.

11 Q.    Of whose's choice?

12 A.    Black.

13 Q.    Who is Black?

14 A.    Sirvonn Taylor.

15 Q.    Who was Black in the P. Stones?

16 A.    He was the prince.

17 Q.    What does that mean to be the prince in the P. Stones?

18 A.    He was the highest member of the gang.

19 Q.    You said there was another way that you entered the gang?

20 A.    Yes, ma'am.

21 Q.    Can you just explain to the jury what that was?

22 A.    So 21-day period is we had to have sexual intercourse with

23 Black, Jamiell, Sev, people who were higher ranks than what we

24 were, and you had to do it for 21 days.

25 Q.    And did you have a gang name or street name once you

184

1  became Stone?

2  A.    Yes, ma'am.

3  Q.    What was that name?

4  A.    It was Vicious Stone.

5  Q.    At some point were you arrested for your activities

6  related to becoming a P. Stone member?

7  A.    Yes.

8  Q.    Do you recall when that was?

9  A.    It was arrested officially in October of 2015.

10 Q.    Do you remember what you were arrested for?

11 A.    I was arrested for conspiracy to sex traffic by force or

12 coercion.

13 Q.    Did you enter into a plea agreement with the government

14 based upon that charge?

15 A.    Yes, ma'am.

16 Q.    I am going to show you what's been marked Government's

17 Exhibit 25.

18 A.    On the screen?

19 Q.    Yeah, it should come up on your screen.  Are you able to

20 identify what Government's Exhibit 25 is?

21 A.    Yes, ma'am.

22 Q.    What is it?

23 A.    That's my written plea agreement.

24 Q.    If we can flip to the last page of that plea agreement,

25 which would be page 25.

185

1  A.    Yes, ma'am.

2  Q.    Do you see anything there that's particular to you?

3  A.    That's my signature.

4  Q.    And did you have an attorney when you signed this plea

5  agreement?

6  A.    Yes, ma'am.

7  Q.    Is his signature on there as well?

8  A.    Yes, ma'am.

9         MS. ROBERTS:  Your Honor, the government is going to

10  request that Government's Exhibit 25 be moved into evidence.

11         THE COURT:  Any objection?

12         MR. BROWN:  No objection, Your Honor.

13         THE COURT:  Objection.

14         MS. PAWELSKI:  No.  My apologies.

15         THE COURT:  No objection?  It's admitted.

16  BY MS. ROBERTS:

17  Q.    Salena, what did you plead guilty to?

18  A.    I pled guilty to the conspiracy count.

19  Q.    I am going to show you paragraph one of Government's

20  Exhibit 25.

21  A.    Yes, ma'am.

22  Q.    And does paragraph one state exactly what you pled guilty

23  to?

24  A.    Yes, ma'am.

25  Q.    What specifically was that charge?

186

1  A.    Ma'am, can you rephrase the question?

2  Q.    What specifically was the charge?

3  A.    Oh, it says the defendant agrees to plead guilty to count

4  two of the indictment which charges the defendant with a

5  violent --

6  Q.    Was the charge conspiracy to commit sex --

7  A.    Yes, ma'am.  It says conspiracy to commit sex trafficking

8  by threats of force or coercion.

9  Q.    What's the maximum penalty as indicated in paragraph one

10 of exhibit 25?

11 A.    The maximum penalty is either life imprisonment for life

12 and a fine up to $250,000.

13 Q.    Thank you.  Was there any agreement with regard to your

14 sentence?

15 A.    No, ma'am.

16 Q.    Did you also enter into a cooperation plea agreement with

17 the government?

18 A.    Yes, ma'am.

19 Q.    I'm going to show you what's been marked Government's

20 Exhibit 26.  That will pop up on your screen.  Do you recognize

21 what Government's Exhibit 26 is?

22 A.    Yes, ma'am.

23 Q.    What is it?

24 A.    It's my cooperation.  It's a -- I can't pronounce that

25 word to my plea agreement.  I'm sorry.

187

1  Q.   That's okay.  That's okay.  It's your cooperation plea

2  agreement?

3  A.   Yes, ma'am.

4  Q.   Okay.  I'm going show you the last page of that plea

5  agreement.  Is there anything on that last page of Government's

6  Exhibit 26 that's particular to you?

7  A.   Yes, ma'am, that's me, my lawyer and Mr. Fran Sempa's

8  signature.

9  Q.   And based upon this agreement, did you agree to provide

10 truthful information to the government?

11 A.   Yes, ma'am.

12       MS. ROBERTS:  Your Honor, the government is going to

13 request that government's 26 be moved into evidence.

14       MR. BROWN:  No objection, Your Honor.

15       THE COURT:  Any objection?

16       MS. PAWELSKI:  No.

17       THE COURT:  That's admitted under seal that

18 particular exhibit, all right.

19 BY MS. ROBERTS:

20 Q.   Have you already been sentenced in your case based upon

21 the charge of the conspiracy to commit sex trafficking?

22 A.   Yes, ma'am.

23 Q.   And what was the sentence that you received?

24 A.   I received 34 months, which is three years.

25 Q.   In exchange for your cooperation, were you promised a

188

1   reduction in sentence?

2   A.    No, ma'am.

3   Q.    Did the government at the time of your sentencing request

4   a reduction in your sentencing?

5   A.    No, ma'am.

6   Q.    Do you expect at the end of your testimony here today that

7   the government will request a reduction in your sentence?

8   A.    I don't expect it, but I hope it.

9   Q.    Was that the only time that you were charged with a

10  criminal offense?

11  A.    No, ma'am.

12  Q.    Did you also enter a guilty plea to a false information

13  misdemeanor charge in 2019?

14  A.    Yes, ma'am.

15  Q.    If you can explain to the jury why it was that you wanted

16  to become a member of the P. Stones.

17  A.    Growing up I didn't have my dad.  My dad was in and out,

18  never really cared, cared more about his woman than his kids.

19  My mom when she died, it was my only piece of family I really

20  had.  When I met Sirvonn, he knew my story, and he told me that

21  they would be the family that I didn't have.  It sounded good

22  from the outside looking in, you know.  Everything that

23  glitters isn't gold.  But when you got into the gang, it was

24  totally different than what you expect it.

25  Q.    When were 17 years of age, is that what you were looking

189

1   for, family?

2   A.    Yeah, I was just looking for somebody who cared about me.

3   Q.    When you became a member of the gang, did people tell you

4   what to do who were already members of the gang?

5   A.    Yes, ma'am.

6   Q.    What types of things were you told to do?

7   A.    We were told when to violate people.

8   Q.    What's violate people mean?  What does that mean?

9   A.    A violation is -- let's say I did something that a gang

10   member didn't approve, like, Black or Sev somebody higher up

11   than me, they would put me in a violation where I would have to

12   be beat up by five girls.

13   Q.    And did that ever happen to you?

14   A.    Yes, ma'am.

15   Q.    Did you ever violate other individuals?

16   A.    Yes, ma'am.

17   Q.    And were you told to do that by other members of the gang?

18   A.    Yes, ma'am, if you didn't, you'd be next.

19   Q.    If you didn't, I'm sorry.  I didn't hear what you said.

20   A.    If you didn't do the violation, you would receive a

21   violation.

22   Q.    And did you want to receive a violation?

23   A.    No, ma'am.

24   Q.    Can you remember some of the other members of the P.

25   Stones?

190

1  A.    Yes, ma'am.

2  Q.    Start with some of the males.  Was it both males and

3  females obviously?

4  A.    Yes, ma'am.

5  Q.    Okay.  So what are the males you remember who were actual

6  members of the P. Stones?

7  A.    Arthur Taylor, which was Arty, Sirvonn Taylor, which was

8  Black, Jose Velazquez, which was Sev, Jamiell Sims, which was

9  Mills, Don P., his real name was Paul, B. Nasty, Buddha.

10  Q.    What about the females?  Can you remember any females

11  other than yourself that were actual members of the P. Stones?

12  A.    Yes, ma'am, there was Baby, who was Abigail Hendrix.

13  There was Scarlet, who was also Sheryl Patishnock, Ellanita

14  Evans, who was also L. Stone, Jordan Capone, who was also Angel

15  and Lady, who was also Yohanna Bradley.

16  Q.    What were some of the rules the P. Stone members had to

17  follow?

18  A.    Some of the rules were like if you were big homie called,

19  you had to do it.

20  Q.    What did you say, if you were what?

21  A.    Big homie called.

22  Q.    What does that mean big homie?

23  A.    For instance, one day we were in the room and I was big

24  homie called to go to the store and I didn't want to do it, and

25  he tried to violate me for that.  If a big homie tells you to

1  do something, you do it.  They'll say, I big homie call you to

2  do whatever, whether it's go to the gas station, you know.

3  Q.    In the beginning, did you mind doing things for the big

4  homies?

5  A.    No, not until it became, like, criminal activity, you

6  know.

7  Q.    At some point you had testified that in the beginning you

8  lived with your grandmother in Saylorsburg.  At some point did

9  you moved out of your grandmother's house?

10  A.    Yes, ma'am, in the summer of 2012, I took my money from my

11  mom's death, and I got a house on Main Street -- if I am not

12  mistaken, the address was 2002 Main Street, Stroudsburg, P.A.,

13  18360.

14  Q.    In 2012 approximately, how old were you when you got that

15  house?

16  A.    I was turning 18.

17  Q.    Who stayed at that house with you?

18  A.    Everybody.

19  Q.    When you say everybody, do you mean P. Stones members?

20  A.    Yes, ma'am.

21  Q.    What about individuals who hung out with the P. Stones who

22  weren't members, did they -- did the P. Stones allow people to

23  hang out with them that weren't actually members?

24  A.    Yeah, we'd call them 550s though, and we wouldn't talk

25  business in front of them.

192

1  Q.    Did they also hang out at the house you had?

2  A.    Yes, ma'am.

3  Q.    Did you rent that house or purchase that house?

4  A.    I rented that house.

5  Q.    Can you explain to the jury how the P. Stones made money?

6  A.    By selling drugs and women.

7  Q.    Where would this drug selling and the sale of women where

8  would that occur?

9  A.    Everywhere in Monroe County.

10 Q.    Can you name some of the places?

11 A.    We used to be at the Howard Johnson.  We used to be at the

12 Quality Inn on Main Street.

13 Q.    When you say the Howard Johnson, are you talking about the

14 Howard Johnson in Bartonsville?

15 A.    Yes, ma'am, right off the exit across the street from the

16 Chili's down the street from the Crossings.

17 Q.    Okay.  What about the Quality Inn, what --

18 A.    That's right there on Main Street -- right there by --

19 there's a gas station.  That's not Ponderosa.  I can't remember

20 the name of the restaurant, but it's right across the street.

21 Q.    Would that be the -- in Stroudsburg?

22 A.    Yes, ma'am.

23 Q.    And where else?

24 A.    We also used to be at the hotel over by the hospital.

25 It's the Super 8 if I'm not mistaken.

1  Q.    And did you yourself ever actually stay at any of these

2  hotels?

3  A.    Yes, ma'am.

4  Q.    When was that?  Was that before you got the house, after

5  or both?

6  A.    Both.

7  Q.    Let's start with the Howard Johnson.

8  A.    Yes, ma'am.

9  Q.    Was there a particular section of the Howard Johnson that

10  you and the other P. Stones stayed in?

11  A.    When we would always check in, they would give us a room

12  in the back hallway.

13  Q.    I'm going to show you in -- on your screen Government's

14  Exhibit 1.1.  If you take a look at Government's Exhibit 1.1?

15  A.    All right.

16  Q.    Do you recognize what this --

17  A.    Yeah, this the Howard Johnson.  This is 601 right here.

18  Q.    Would that be 611?

19  A.    Yeah, 611.  I'm sorry.  I'm thinking about South Carolina.

20  Q.    That's okay.

21  A.    Right here is the front of the building.

22  Q.    Is that the only entrance?

23  A.    No, there's an entrance here, and there's an entrance

24  here.  And if I am not mistaken, I think there's one there,

25  too.

194

1  Q.    With doors into the hotel?

2  A.    Yes, ma'am.

3  Q.    What about by a car, how do you get in if you're driving a

4  car?

5  A.    If you're driving a car --

6  Q.    From 611?

7  A.    From 611, you come in this way, I think, and this is right

8  here where the -- where the, like, the lobby is.

9  Q.    What section was it that you were actually staying in?

10  A.    Back here.

11  Q.    Always?

12  A.    Yes.

13  Q.    In order to get to that back section, do you have to pass

14  the lobby?

15  A.    Yeah, you drive this way.  There's no in.  You have to

16  come this way.

17  Q.    Every car that enters the lodge has to pass in that --

18  A.    Yeah.

19  Q.    By the lobby?

20  A.    Yeah.

21  Q.    How often approximately would you stay at the Howard

22  Johnson?

23  A.    Frequently, like, we would get there, and we would pay,

24  like, daily but when we get there, and we pay daily, there

25  would be days where we say, okay, when we make the money

195

1  tonight, we'll just redo the room in the morning.

2  Q.   When you say we, who else -- can you give some names of

3  other individuals --

4  A.   Black, Scarlet, my son's father, his name is Benjamin

5  Lingard.  And he's the one I went with after I got the house.

6  Q.   Okay.  Was your son's father, is he a P. Stones member?

7  A.   No.

8  Q.   Was he staying at the Howard Johnson as well?

9  A.   Yes, ma'am.

10 Q.   Let's start with before you purchased the house.

11 A.   Yes, ma'am.

12 Q.   Why would you stay at the Howard Johnson before you

13 purchased a house if at the time you had a home with your

14 grandmother?

15 A.   Honestly, when -- the reason why I left my grandma's house

16 was because I got pregnant.  But my grandfather had told me if

17 I ever got pregnant I didn't have to worry about living there,

18 that he raised his kids.  So when I got pregnant, I was

19 basically homeless, and a lot of the other P. Stones members

20 were homeless.  So we'd bounce from hotel to hotel.

21 Q.   So when you started staying at the Howard Johnson, was it

22 a day or two here and there or for long periods of time?

23 A.   A week sometimes or a day or two.  It was never really a

24 specific time how long we stayed there.  It was more or less we

25 went with the flow.

1  Q.   When you say we, are you talking about your --

2  A.   We as the gang.

3  Q.   And once you -- at some point did you lose the house on

4  Main Street?

5  A.   Yes, I did.

6  Q.   When was that?

7  A.   Not even a month after getting the house.

8  Q.   So you had it for approximately how many months?

9  A.   Approximately, like, maybe two months, if that.  A month

10  and a half at most.

11  Q.   After you lost the house where would you go?

12  A.   I was back bouncing from hotel to hotel.

13  Q.   And would you go to the Howard Johnson?

14  A.   Yes, ma'am.

15  Q.   Did you know anyone employed at the Howard Johnson?

16  A.   I didn't know him personally, but I do know of the -- one

17  of the owners.

18  Q.   And do you know what one of the owners -- who you're

19  talking about, do you know what his name is?

20  A.   Faizal.

21  Q.   Do you see him in the courtroom today?  You can stand up

22  if you need to.

23  A.   Faizal is the one closer to the left down this way closer

24  to the jury.

25          MS. ROBERTS:  Can you describe what he's wearing

1  briefly?  If you can see.

2        THE WITNESS:  I don't have any glasses on.

3        MS. ROBERTS:  Okay.

4        THE WITNESS:  He got kind of cowlicks right here and

5  a black mask, and I can't see if that's a blue suit.  We can't

6  see.

7        THE COURT:  We will let the record reflect she

8  identified the defendant.

9        THE WITNESS:  Thank you.

10 BY MS. ROBERTS:

11 Q.   How did you know Faizal?

12 A.   When we would come to the Howard Johnson, there would be

13 times -- and this has both happened when I was with the P.

14 Stones and when I was with my son's father where he would tell

15 us, you don't want to get a room here tonight, the feds are

16 here.

17 Q.   And so would you go someplace else?

18 A.   He would tell us we can try the Quality Inn.

19 Q.   Would you go to the Quality?

20 A.   There would be times we did go to the Quality and other

21 times we didn't.  We just went somewhere else.

22 Q.   Where would Faizal be when you would talk to him?

23 A.   Behind the counter.

24 Q.   When you say behind the counter, in what building?

25 A.   The Howard Johnson.

1  Q.   Would that be the reception area of the hotel?

2  A.   The main lobby.

3  Q.   When you did stay there --

4  A.   Yes, ma'am.

5  Q.   How would you pay for the rooms?  Would they be in your

6  name?

7  A.   Sometimes they would be in my name.  Sometime they would

8  be in other people name.  When we and my son's father started

9  saying there, it was in his name mostly.

10  Q.   How come they wouldn't be in your name?

11  A.   I didn't think I was old enough.

12  Q.   And how were you actually paying for the rooms at the

13  Howard Johnson?

14  A.   We would go and put money on a prepaid debit card.  We use

15  the American Express cards.  They are blue, and you can get

16  them from C. V. S.

17  Q.   When you were staying at the Howard Johnson with the P.

18  Stones, was there any criminal activity?

19  A.   Yes, ma'am.

20  Q.   By the P. Stones there?

21  A.   Yes, ma'am.

22  Q.   Can you describe for the jury what type of criminal

23  activity was going on at the Howard Johnson?

24  A.   They would sell girls and sell drugs.  We would be in the

25  room, and they would get a call, and let's say somebody wanted

1  to buy a bundle of heroin, which is ten bags of heroin, they

2  would tell them, we're at the Howard Johnson and give them the

3  room number, and they would walk right in and come, or we let

4  them in sometimes if the door was locked.

5  Q.    When you say you would let them in, do you mean the --

6  A.    The side door.

7  Q.    Of the hotel?

8  A.    Yes, ma'am.

9  Q.    Did you have rooms by side doors of that hotel?

10  A.   Yes, ma'am, that back hallway there's two doors.  There's

11  one on each end.

12  Q.   And did you observe the members actually selling the

13  drugs?

14  A.   Yes, ma'am.

15  Q.   Did you actually see the drugs?

16  A.   Yes, ma'am.

17  Q.   You're talking about heroin.  Were there any other types

18  of drugs you saw?

19  A.   Molly and -- from the Black P. Stones it was molly,

20  heroin, and they also sold weed, my son's father also sold

21  crack cocaine out the hotel and coke.

22  Q.   Other than your son's father, what P. Stones members were

23  selling drugs out of the Howard Johnson?

24  A.   Black, Arty, Sev, Mills, basically everyone.

25  Q.   You talked about bundles.  What about the molly, do you

1  remember how they were -- how the molly was being --

2  A.   Well, Black got the molly from New York, and he would

3  bring it down in a capsule, or he would get it into grams and

4  sell by the grams, which is like broken down molly.  It comes

5  in a rock, but you can also get it in a gram, and it will come

6  in a baggie.

7  Q.   How often would the drugs be sold?

8  A.   Daily.

9  Q.   Were people that you saw at the Howard Johnson -- some of

10  the P. Stones, were they actually also using drugs?  Did you

11  observe any drug use?

12  A.   Yes, ma'am.

13  Q.   How often?

14  A.   Often.  Like, I'm not perfect.  I used to smoke weed.  We

15  all used to smoke weed, and we'd smoke in the hotel pretty

16  heavy.

17  Q.   When you used to smoke weed, would it have an odor to it?

18  A.   Yes, ma'am.

19  Q.   Did the hotel rooms themselves you stayed in, did they

20  smell --

21  A.   They smelled like smoke, yes, ma'am.

22  Q.   Did they smell like cigarette smoke or marijuana smoke?

23  A.   Both.

24  Q.   What about the hallways?  Because it's a hotel and not a

25  motel and the hallways are interior, did the hallways have an

1  odor of marijuana?

2  A.   Yeah, pretty much if you would walk in and somebody was

3  smoking weed and you were walking past their door, you could

4  smell it pretty much where you knew to knock on that door if

5  you wanted it.

6  Q.   Is that what people would do?

7  A.   Random people wouldn't knock on your door.  You know what

8  I mean, but, yeah.

9  Q.   Were people in that section of the hotel that you

10 described, that back section, were they random people, or were

11 they P. Stones and friends of P. Stones?

12 A.   Honestly I feel like it was -- I don't want to say it

13 wasn't just the P. Stones back there.  So it wasn't like that

14 section was just for the P. Stones, nothing like that.  But I

15 feel like if they knew they had some type of criminal activity

16 or had an idea what they were doing, they would put -- no

17 offense when I say this -- they'd put the value customers in

18 the hallway where you're not going to walk down and smell weed

19 if you get what I'm saying.

20 Q.   Okay.  Did you notice other than P. Stones members were

21 other people that you observed in that hallway selling drugs?

22 A.   Definitely.

23 Q.   What about the P. Stones members selling women?  Who were

24 they?

25            THE COURT:  Let me ask you, it's 5:00, and that's

202

1  kind of a new area, and I am thinking that that's going to take

2  some time.  So I think what we will do is we will break for the

3  day at this point.  We have got until 5:00.  You had a full

4  day, and this seems to be a logical time for us to break.  And

5  so we will do that and continue tomorrow morning at 9:30.  In

6  the meantime --

7              THE WITNESS:  Am I supposed to be back here at 9:30?

8              THE COURT:  Yes.  In the meantime -- a couple things.

9  Some of you are taking notes.  Please remember the notes have

10 to be left in an envelope in the jury room.  They can't be

11 taken out of the courthouse.  Secondly, no conversation or

12 discussion among yourselves or with anyone else about the case.

13 Don't form any opinions.  You have not heard all of the

14 evidence or the law that relates to the case.  No research of

15 any kind concerning any names, locations, terminology, anything

16 related to the case, no research of any kind.  Don't read or

17 listen to anything about the case.  If anyone were to talk to

18 you about the case, you must advise us of that immediately.

19 All right.  That being said, have a safe trip home.  We'll see

20 you back here tomorrow ready to go for 9:30.  All right.  We

21 will pick up then.

22

23

24

25

203

1                        REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                      s/ Laura Boyanowski, RMR,CRR
                        Laura Boyanowski, RMR, CRR
15                      Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503
20

21         (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25