1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    UNITED STATES OF AMERICA :
                              :
 3                            :
                              :
 4         vs               :      3:CR-17-324
                              :
 5                            :
                              :
 6    FAIZAL BHIMANI & OM SRI :
      SAI, INC.               :
 7
          BEFORE:      THE HONORABLE MALACHY E. MANNION
 8
          PLACE:       COURTROOM NO. 4
 9
          PROCEEDINGS:  JURY TRIAL
10
          DATE:        WEDNESDAY, OCTOBER 7, 2020
11
      APPEARANCES:
12
      For the United States:
13
      SEAN A. CAMONI, ESQ.
14    JENNY P. ROBERTS, ESQ.
      U.S. ATTORNEY'S OFFICE
15    235 N. WASHINGTON AVENUE
      SUITE 311
16    SCRANTON, PA 18503

17    For Defendant Bhimani:

18    BERNARD J. BROWN, ESQ.
      58 8TH AVE.
19    CARBONDALE, PA 18407

20    For OM SRI SAI, INC.:

21    WILLIAM A. DESTEFANO, ESQ.
      TERRI PAWELSKI, ESQ.
22    STEVENS & LEE
      CENTRE SQUARE - EAST TOWER
23    1500 MARKET STREET
      SUITE 1800
24    PHILADELPHIA, PA 19102

25
```

2

# INDEX TO WITNESSES

FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

SALENA BAYER-DAVIS

By Ms. Roberts      3                40
By Mr. Brown                16
By Ms. Pawelski             29

SHERYL PATISHNOCK
By Ms. Roberts     42
By Mr. Brown                63

KENYA EVANS
By Ms. Roberts     74                110
By Mr. Brown                91
By Mr. DeStefano            96

THURMAN STANLEY
By Mr. Camoni      113
By Mr. Brown                182
By Mr. DeStefano            197

RACHEL SZLASA
By Mr. Camoni      225
By Mr. Brown                234
By Mr. DeStefano            237

3

```
1          THE COURT:  Do we have Ms. Bayer-Davis?
2          MS. ROBERTS:  Yes, Your Honor.  Do you want me to put
3   her on the stand?
4          THE COURT:  Yes, you can go get her.
5          SALENA BAYER-DAVIS resumed the witness stand.)
6          THE COURT:  Welcome back.  We all set?  Ms.
7   Bayer-Davis, you're reminded you are still under oath, all
8   right?
9          THE WITNESS:  Yes, sir.
10          THE COURT:  Mr. Camoni.  I thought Mr. Camoni was
11   doing the examination of Ms. Bayer-Davis.
12          MR. CAMONI:  No, Your Honor, Ms. Roberts.
13          THE COURT:  Ms. Roberts.  I worked too late last
14   night -- okay -- because there's really not a similarity
15   between the two of you.
16   DIRECT EXAMINATION CONT.'D
17   BY MS. ROBERTS:
18   Q.   Good morning, ma'am.
19   A.   Good morning.
20   Q.   Going back to the last question that I asked yesterday
21   afternoon before we broke for the day, if you can explain to
22   the jury which members of the P. Stones were involved in
23   selling women.
24   A.   Black, Arty --
25   Q.   When you say Black --
```

4

1  A.    That's Sirvonn Taylor.  Arty is Arthur Taylor, Jose

2  Velazquez, was also Sev, and Jamiell Sims was also Mills.

3  Q.    How were the women advertised for sex?

4  A.    Back Page.

5  Q.    What is Back Page?

6  A.    It's a website where you post pictures of yourself, and

7  you post your number, and a man will call or -- and ask for a

8  date.

9  Q.    Who was actually posting the ads?  Was it the women who

10  are actually the ones being sold, or was it the individuals you

11  named who were selling the women or both?

12  A.    Both.

13  Q.    How do you pay for the ads on Back Page?

14  A.    With a debit card.

15  Q.    Who actually was being sold by the P. Stones?  Was it

16  women who were in the gang or women who were not in the gang or

17  both?

18  A.    Both.

19  Q.    Can you provide some of the names of the non-members if

20  you can remember?

21  A.    Michelle Ferrate, Millie -- I don't know her last name.

22  Those are really the only two I can think of right now.

23  Q.    That's okay.  Were there more you just can't remember?

24  A.    Yes, ma'am.

25  Q.    Did you ever hear of any threats being made to the women?

5

1  A.    Yes, ma'am.

2  Q.    Can you describe for the jury what you remember, what

3  threats were being made, who was making them to who?

4  A.    Black used to -- used to make threats towards the girls if

5  they didn't do what he said.  He would get one of his members

6  to beat them up, and normally he took me because I was the

7  biggest one meaning, like, in size, and he would have me stand

8  next to him.

9  Q.    Would he ever order you to beat up the women?

10  A.    Yes, ma'am.

11  Q.    Did you do it?

12  A.    Yes, ma'am, I slapped Michelle Ferrate.

13  Q.    Why would you do that?

14  A.    Because I knew if I didn't I would be violated.

15  Q.    What did that mean to you to be violated?

16  A.    That I would have to be jumped by five girls and couldn't

17  fight back.

18  Q.    Do you remember -- you talked about Black or Sirvonn

19  Taylor.  Do you remember which women were working for Black?

20  A.    Kenya Evans.  I think Millie worked for Arthur Taylor.

21  I'm not sure.  Baby worked for black.  Buffy worked for Black,

22  and I can't remember really who else.

23  Q.    Were any of these women you mentioned Kenya Evans, Millie,

24  Michelle Ferrante, Baby, Buffy -- any of these women addicted

25  to drugs?

6

1    A.    Yes, ma'am.

2    Q.    Which women?

3    A.    All three.

4    Q.    All three meaning who, which ones?

5    A.    Kenya Evans, she was addicted to heroin.  Michelle

6    Ferrante was also addicted to heroin, and I'm positive Millie

7    was addicted to heroin, too.

8    Q.    Who provided these women with the drugs?

9    A.    Sirvonn Taylor -- well, the Black P. Stones.

10   Q.    So not just Sirvonn Taylor or Black, it was other members

11   as well?

12   A.    Yes, ma'am.  I mean, if Black was out of town, he would

13   send somebody else.

14   Q.    When these women made money, were did the money go?  Who

15   got the money?

16   A.    Black did.  He would give them so much dope that when they

17   did their call he would tell them that they owed him that

18   money.

19   Q.    Would they give all the money to Black?

20   A.    Yes, ma'am.

21   Q.    If they gave all the money to Black, what did they get in

22   return for what they were doing?

23   A.    Heroin, food and a hotel room.

24   Q.    Approximately during the course of the time that you were

25   staying at the Howard Johnson, can you estimate on a daily

1  basis how many men would come to see these women at the Howard

2  Johnson?

3  A.   It depends on what kind of night it was.  It could be

4  anywhere from one to five, five to ten.

5  Q.   Per woman?

6  A.   Uh-huh.

7  Q.   I didn't hear your answer.

8  A.   Yes, ma'am.

9  Q.   Would they meet them in the hotel rooms at the Howard

10  Johnson?

11  A.   Yes, ma'am.

12  Q.   Do you remember how much the charge was for these women?

13  A.   It was different.  It was sometimes a hundred fifty for

14  the hour, 200 for the hour.  It all depends on which girl it

15  was.

16  Q.   Who set those prices?

17  A.   He did.

18  Q.   When you say he, who are you talking about?

19  A.   Sirvonn Taylor.

20  Q.   While you were at the Howard Johnson, did you ever see any

21  of the P. Stone members with guns?

22  A.   Yes, ma'am.

23  Q.   Who had guns?

24  A.   Arthur Taylor, Sirvonn Taylor, Tyshon Mack, Sean Griffin,

25  Mills, Sev.

8

1   Q.    Did you ever participate in any type of parties at the

2   Howard Johnson hotel when you would stay there?

3   A.    Yes, ma'am, we would have G. P.s all the time.

4   Q.    G. P.s?  What's a G. P.?

5   A.    Gangster party.

6   Q.    So explain to the jury what a gangster party is.

7   A.    So we would all get together, and as I said earlier in my

8   testimony, we had to go through 21 day periods.  And they would

9   use that -- a G. P. party as that.  It's like a big orgy where

10  they are smoking, getting high, drinking and having sex.

11  Q.    Where would these G. P. parties happen within the hotel?

12  A.    We would be in the room, and then there was times that --

13  I'm sorry, when we were at the Quality, we would be at the

14  pool, too.  Obviously, we wouldn't be having sex at the pool,

15  but we would be at the pool -- like maybe ten of us on the side

16  of the pool hanging out while other people were in the room

17  getting high, drinking and stuff.

18  Q.    While you were at the Howard Johnson, did you ever see

19  Faizal, the defendant, interacting with any of the members of

20  the P. Stones?

21  A.    I seen him speaking to Black.

22  Q.    When you saw him speaking to Black, would you hear what

23  they would be talking about?

24  A.    I heard a couple conversations.

25  Q.    What would they be talking about?

9

1    MR. BROWN:  Objection.

2    MS. ROBERTS:  Can I rephrase the question, Your

3  Honor?

4    THE COURT:  Yeah.

5    MS. ROBERTS:  What would Faizal be saying if you

6  know.

7    THE WITNESS:  Faizal said to Black in one of those

8  conversations hey, can you give me some more girls, we had fun

9  the last time.

10 BY MS. ROBERTS:

11 Q.   When you would check in at the Howard Johnson, other than

12 Faizal, would you see anybody else on a regular basis that was

13 an employee or who you associate with working at the Howard

14 Johnson?

15 A.   I seen another male, but I always thought, like, he didn't

16 speak English because he -- behind the Howard -- when you check

17 into the Howard Johnson, behind the counter there's a room

18 with, like, computers.  Like, it's their office, and he used to

19 be sitting in that office.

20 Q.   I am going to show you what's been marked as Government's

21 Exhibit 6.

22 A.   Okay.

23 Q.   Do you recognize what Government's Exhibit 6 depicts?

24 A.   Yeah, this is the Howard Johnson's main lobby.  Right

25 there, this is the front desk, and I used to see the man

10

1  sitting back here in this room.

2  Q.    When you'd check in, would that man be there?

3  A.    Yes, ma'am.  Not all the time, but he would be there.

4  Q.    Do you see that man in the courtroom today?

5  A.    Yes, ma'am, he's sitting over there in the corner.

6  Q.    Can you just identify maybe what color mask he has on?

7  A.    I think that's a tan mask.  He's sitting next to a lady

8  with a black mask.  I can't see from here.

9         THE COURT:  You said you can't see.  You described

10  the man sitting next to the lady over there at the far table.

11        THE WITNESS:  Yeah, the lady with the blondish

12  grayish hair with the black mask, and then -- she's sitting in

13  the middle with two men.  He's the man on her --

14        THE COURT:  The record will reflect you identified

15  the defendant.

16        THE WITNESS:  Okay.

17  BY MS. ROBERTS:

18  Q.    While you were staying at the Howard Johnson, were you or

19  any of the other members of the P. Stones trying to hide the

20  illegal activity that was going on sex and drug trafficking?

21  A.    No, ma'am.

22  Q.    Okay.  Was it pretty much out in the open?

23  A.    We thought we ran that town.  It was out in the open.

24  Q.    When you say out in the open, what do you mean by that?

25  So --

1  A.   It was no hiding it.  You could see how many people went

2  in and out that room.  There was no way to hide it.

3  Q.   Was there multiple rooms the P. Stones had at one time?

4  A.   Sometimes we would have two rooms because Black -- Sirvonn

5  Taylor would like his own room sometimes.  That was because he

6  was the big homie.

7  Q.   Did you ever say -- I know you talked about the pool.  But

8  did you ever actually stay at the Quality Inn in Stroudsburg?

9  A.   Yeah.

10 Q.   How often would you stay at the Quality Inn in

11 Stroudsburg?

12 A.   I would stay there frequently, like, off and on because it

13 was more convenient because it had a pool.  It was on Main

14 Street, and right across the street at that restaurant it had

15 booklets for, like, coupon hotels, and it would be, like, the

16 cheapest hotel I can go to sometimes.

17 Q.   Did anyone from the Howard Johnson ever refer you to the

18 Quality Inn?

19 A.   Yes, ma'am.

20 Q.   Who would that person be?

21 A.   Faizal.

22 Q.   Why?

23 A.   He would say, not tonight, the feds are here, you could

24 try the Quality Inn on Main Street.

25 Q.   Did you actually know any employees at the Quality Inn?

12

1  A.    I personally know somebody there, but she's not relevant

2  to that if you get what I'm saying.

3  Q.    Well, at that time, did you know someone who was working

4  there?

5  A.    No, I didn't know nobody personally.

6  Q.    While you were at the Quality Inn, would there still be

7  drug use going on?

8  A.    Yes, ma'am.

9  Q.    Okay.  You talked about pool parties at the Quality Inn.

10  Can you describe those pool parties?

11  A.    There would be, like, ten of us that come out of one room

12  and go into the pool, and we would dunk each other.  Mills and

13  Sev would throw us into the pool, the girls.

14  Q.    Was there drug use going on?

15  A.    Sometimes.  It depend how late we were at the pool because

16  the pool technically closed at I think 10 or 11.  We'd be out

17  there sometimes until, like, one in the morning.

18  Q.    So would you be allowed to stay in the pool or go to the

19  pool after hours?

20  A.    Sometimes, yes, ma'am.

21  Q.    While you were at the Howard Johnson and you were a P.

22  Stone member, were you actually trafficking the women as well?

23  A.    I was considered Black's enforcer.

24  Q.    You said you were considered Black's enforcer.  What does

25  that mean if you can explain that to the jury?

13

1  A.   It means that I did what Black told me.  If he had a girl

2  that was there and she wasn't doing right, he would call me to

3  come over to the room or something and, you know, make her give

4  him the money or threaten her.

5  Q.   Was there a time when you stopped becoming an active

6  member of the P. Stones?

7  A.   Yes, ma'am.

8  Q.   Why did you decide to stop becoming an active member?

9  A.   I got pregnant with my beautiful baby boy.

10 Q.   When was that?

11 A.   I got pregnant in 2000 -- I got pregnant the end of 2012,

12 which was December.  I had my son December 5th, 2013.

13 Q.   At that time did you leave the P. Stones for a period of

14 time?

15 A.   Yes, ma'am, I moved to South Carolina.

16 Q.   And at some point did you come back then to Pennsylvania?

17 A.   I came back because my son's father beats on me, and I

18 wanted to go back to my family because I thought he was going

19 to kill me.

20       MS. PAWELSKI:  I apologize for interrupting.  Again

21 we're having trouble hearing the witness.

22       THE WITNESS:  I'm sorry.

23       THE COURT:  You need to speak up, okay.  Thank you

24 for advising us of that.

25       THE WITNESS:  Sorry about that.

14

1    THE COURT:  That's okay.

2  BY MS. ROBERTS:

3  Q.    I will repeat the question.  So at some point you said you

4  went to South Carolina, and then at some point did you come

5  back to Pennsylvania?

6  A.    Yes, ma'am.  Me and my son's father were in a bad way, and

7  he was beating on me, and I was down there with just his

8  family.  So I moved back to Pennsylvania, and I was living with

9  my mom's best friend in Scranton -- well, Jessup, P.A.

10  Q.    At some point, did you get back together with Black?

11  A.    My son -- yes, to answer that question.

12  Q.    Did you go back to the Howard Johnson?

13  A.    Yeah, he was helping me get my son back.

14  Q.    After that time period when you came back to the Howard

15  Johnson, did you see Faizal at that point?

16  A.    Yeah, he still worked there.

17  Q.    You talked about the father of your child.  What was --

18  what's his name?

19  A.    Benjamin Lingard, Junior.

20  Q.    Did you ever stay at the Howard Johnson with him?

21  A.    Plenty of times.

22  Q.    What years would that have been?

23  A.    When I moved back in 2014, I moved back to get away from

24  him, but I wound up getting back with him when our son got

25  taken.  So I want to say 2014.

15

1  Q.   Did you ever see your son's father interact or have

2  conversations with Faizal?

3  A.   Yes, ma'am.

4  Q.   Do you remember anything that Faizal would have said to

5  Benjamin at that time in 2014?

6  A.   Yes, ma'am.  Benjamin nickname is Coolie.  If you don't

7  know what that is, it's cocaine inside of a cigarette.  He had

8  asked my son's father can he get some cocaine.

9  Q.   Where you when Faizal asked about the cocaine?

10 A.   I was standing behind him.

11 Q.   Who?

12 A.   My son's father Benjamin.

13 Q.   Were you at the Howard Johnson?

14 A.   Yes, ma'am, at the front lobby.

15 Q.   What happened after that?

16 A.   We went to the room, and my baby father told me he would

17 be right back.

18 Q.   When you went back to the room?

19 A.   Me and Benjamin Lingard.

20 Q.   When you got to the room with Benjamin after Faizal asked

21 for the cocaine, what did he do, Benjamin?

22 A.   He called his brother, and he said, I be right back.

23 Q.   Then did he leave?

24 A.   He left.

25 Q.   Then at some point did Benjamin come back to the room?

16

1   A.    Yes, ma'am.

2   Q.    Did he have anything with him?

3   A.    He had money on him, money that he didn't have prior.

4          MS. ROBERTS:  Your Honor, if I can just have one

5   moment?

6          THE COURT:  Sure.

7          MS. ROBERTS:  The government is going to request

8   Government's Exhibit 6 be moved into evidence.

9          THE COURT:  All right.  Any objection?

10          MR. BROWN:  No objection, Your Honor.

11          MS. PAWELSKI:  None.

12          THE COURT:  It's admitted.

13          MS. ROBERTS:  The government has no further questions

14   for this witness at this time.

15          THE COURT:  All right.  Mr. Brown?

16          MR. BROWN:  Thank you.

17   CROSS EXAMINATION

18   BY MR. BROWN:

19   Q.    My name is Bernie Brown.  I have a couple questions for

20   you.

21   A.    Good morning, Mr. Brown.

22   Q.    All right.  You're convicted of false I D. you said during

23   direct examination?

24   A.    Yes, sir, I was.

25   Q.    Okay.  And you're convicted of conspiracy to commit human

17

1  trafficking and drug charges?

2  A.    I was not convicted on drug charges.  I was convicted on

3  conspiracy to sex traffic.  I was not convicted on the drug

4  charges, no, sir.

5  Q.    And you pled guilty, correct?

6  A.    Yes, I did.

7  Q.    Have you served any portion of that sentence yet?

8  A.    Not yet.

9  Q.    Okay.  You think the jury can believe anything you said

10  today?

11  A.    I'm not perfect, but, yes, they can.

12  Q.    Okay.  And let's talk about you not being perfect.  Is it

13  true that you voluntarily fought to get into the P. Stones

14  gang?

15  A.    Yeah.

16  Q.    And that is how you got your name Vicious, correct?

17  A.    Yes, sir.

18  Q.    Because you viscously beat Yolan Bradley to get into the

19  gang?

20  A.    No, it didn't go like that.

21  Q.    Okay.  But you did get the name Vicious as a result of

22  that fight, correct?

23  A.    That's not why my name is Vicious.  My name is Vicious

24  because my head game is vicious.  Mills named me Vicious

25  because of that.

18

1   Q.    Okay.  Because your head game is vicious.  What about the

2   fact -- you said you were an enforcer for Mr. Taylor?

3   A.    Yes, sir.

4   Q.    Did you beat up Michelle Ferrante?

5   A.    I slapped her, yes, sir.

6   Q.    Did you beat up general Jessica Kishbaugh?

7   A.    Yeah, back in high school.

8   Q.    Did you beat up Yolan Bradley?

9   A.    I mean, it was a woman so --

10  Q.    Did you beat up Yolan Bradley?

11  A.    I don't want to say yes or no to that.

12  Q.    Did you beat up Abigail Hutsick?

13  A.    No, I did not beat up Abby.

14  Q.    Did you admit to beating Abigail Hutsick up in one your

15  interviews?

16  A.    Beating up her up how, sir?  Can you explain that?

17  Q.    Let me bring up Bates 413, last paragraph.

18              THE COURT:  Again, is this --

19              MR. BROWN:  This is for impeachment purposes, Your

20  Honor.

21              THE COURT:  I understand that.  Is this her

22  statement?

23              MR. BROWN:  It is her statement to --

24              THE COURT:  302 or --

25              MR. BROWN:  It was a 302.

19

1            THE COURT:  That's not her statement.  That's the
2    agent's statement of what she said.  So that's a different
3    issue.
4            MR. BROWN:  Okay.
5    BY MR. BROWN:
6    Q.    You disagree --
7    A.    I disagree with that part, yes.
8            THE COURT:  You can show it to her if you wish.
9            THE WITNESS:  You can show it to me if you want to.
10           MR. BROWN:  413, paragraph three.
11           THE WITNESS:  Which part did you want me to read?  I
12   see it.
13           THE COURT:  You can read it to yourself.  When you're
14   done, you can answer whether that refreshes your recollection
15   or doesn't refresh your recollection as to the question that
16   was asked.  If you are done reading it, you can reask your
17   question.
18           MR. BROWN:  Thank you.
19   BY MR. BROWN:
20   Q.    I will start at the beginning.  Ms. Bayer-Davis, did you
21   admit to being a -- an enforcer with the P. Stones?  Do you
22   agree with that statement?
23   A.    I agree with that.
24   Q.    Okay.  Do you also agree that you were threaten -- you
25   threatened Michelle Ferrante?

20

1  A.    I agree to that.  I agree to that.

2  Q.    Okay.  And do you admit you also beat up Michelle Ferrante

3  or hit Michelle Ferrante?

4  A.    Yeah, I agree to that.

5  Q.    Do you agree with the statement you also admitted to

6  assaulting Jessica Kishbaugh for bothering Ferrante?

7  A.    I agree to that.

8  Q.    And do you also agree that you were ordered -- this was

9  ordered because Ferrante was such a big investment for the gang

10  because she made a lot of money?

11  A.    Yeah.

12  Q.    Okay.  Do you also agree that you admitted to assaulting

13  three other members of the female P. Stones, a black female

14  known as Buffy from stealing molly from the gang?  Do you agree

15  to that?

16  A.    I agree to that.

17  Q.    Abigail Hutsick, Ellaneta Evans and Yolana Bradley for

18  violating gang policy, do you agree to that?

19  A.    No, because Ellaneta never had a violation.  Now, I was in

20  Ellaneta's room, and Abigail -- I don't want to say no.  I

21  probably was in one of her violations.  I mean, if a woman --

22  there was only a certain amount of women in the gang.  So women

23  have to fight women.  Men cannot violate women.  So if I was

24  being violated, Black would have called the same three names.

25  Abigail Hendrix, Ellaneta Evans, Yolana Bradley, Scarlet, who

21

1  is also on this one, Jordan Capone, who is also Angel, we all

2  had to put our hands on each other.

3  Q.    You did that, correct?

4  A.    We all did that, correct.

5  Q.    Okay.  And in answering my question, you had said men

6  cannot violate women in the P. Stones?

7  A.    Meaning they can't put their hands on a woman.  Like, if

8  you're anywhere -- if you're in a gang and they are trying to

9  have you violated, a man cannot violate a female.

10 Q.    So if there has been testimony that there would be sexual

11 violations --

12 A.    I mean --

13 Q.    -- would that be true?

14 A.    You're talking physical, not sexual.

15 Q.    Only physical violations, is that what you're saying, men

16 don't --

17 A.    Men don't do physical violations, correct.

18 Q.    Now, you became a prostitute to make money for the gang,

19 correct?

20 A.    Yeah.

21 Q.    And who paid for the ads?

22 A.    Black.

23 Q.    And he did so by a prepaid?

24 A.    Debit card.

25 Q.    Or cash?

22

1  A.    Prepaid debit card, correct.

2  Q.    He always paid with a prepaid debit card?

3  A.    I don't want to say he always paid with a debit card, but

4  he always pay for the rooms, that's correct.

5  Q.    So then you never interacted with Mr. Bhimani at the

6  hotel?

7  A.    I couldn't hear what you said.

8  Q.    You never interacted with Mr. Bhimani at the hotel,

9  correct?

10  A.    I mean, I been around him.  I never really talked to him

11  myself.

12  Q.    Okay.  Fair enough.  And isn't it true that one time you

13  were not allowed to be -- purchase a room because it's against

14  hotel policy?

15  A.    No, because after me and my boyfriend -- when my boyfriend

16  beat me up, and we broke the thing in the hotel, he still sold

17  us the room a week later.

18  Q.    But that would have been after.  I'm talking about were

19  you not allowed to purchase a room because of your age because

20  you didn't have proper I. D.?

21  A.    Correct.

22  Q.    Okay.  You weren't given a room because you didn't comply

23  with hotel policy in renting a room.  Is that true?

24  A.    What does that mean?

25  Q.    I said so you didn't -- you weren't of age to rent a room?

23

1   A.   Correct.

2   Q.   So Mr. Bhimani didn't give you a room, is that correct?

3   A.   I mean, I didn't have I. D.   There was no way he could

4   give me a room without I. D.

5   Q.   You never admit to having sex with Mr. Bhimani for a room,

6   correct?

7   A.   I never had sex with Mr. Bhimani for a room.

8   Q.   Would you have other people check in for you when you

9   could got get a room?

10  A.   There was never a time he wouldn't -- I mean, yeah, you

11  can say that because it wouldn't be in my name, so, yes.

12  Q.   Can you bring up Government's Exhibit 1.1, please?  Ms.

13  Bayer-Davis, can you point to where your section was?  I

14  believe you did that during direct examination.

15  A.   Do you want me to circle it or --

16  Q.   Please.

17  A.   We be back here in this section.

18  Q.   And is it true, Ms. Bayer-Davis, in that section there

19  would be two exits?

20  A.   Yeah, one right here, and there's one right here.

21  Q.   Right.  And so if somebody was coming to purchase drugs or

22  to meet with one of the women, you could let them in either one

23  of those doors, correct?

24  A.   Yes, but they still got to come in back the past the front

25  lobby.  There's no way around that.

1  Q.   They can drive to the back, and you could let them in --

2  A.   Uh-huh.

3  Q.   -- correct?

4  A.   Yeah.

5  Q.   And that could be whether they park in this area here?

6  A.   Uh-huh.

7  Q.   Or this area here?

8  A.   Yes, sir.

9  Q.   If they did that, they wouldn't have to pass past the

10  front desk?

11  A.   Yeah.

12  Q.   Therefore, you wouldn't be detected about the criminal

13  activity going on in the rooms, correct?

14  A.   No.  The hotel got cameras.

15  Q.   Say that again.

16  A.   A hotel has cameras.

17  Q.   Isn't that true you guys asked for the smoking section?

18  A.   No, he gave us the smoking section.  We wouldn't have to

19  ask.

20  Q.   But --

21  A.   So --

22  Q.   I thought you said that on one occasion I believe it was

23  Black or Sev asked for the smoking section and then he gave it

24  to you guys?

25  A.   I mean, if that was the case, that might have happened,

25

1   but I don't recall that.  I recall every time I checked in no
2   matter when I checked in I had a room back here.
3   Q.   Okay.  And again when you checked -- you're saying when
4   you checked in.  But you didn't actually purchase the room,
5   correct?
6   A.   When we checked in.
7   Q.   Thank you.  And so isn't it true that you said that there
8   would be smoking in the room all of the time?
9   A.   Yes, yes.
10  Q.   Okay.  So if somebody passed by, and they would know if
11  you came in they would give you the smoking section because
12  you're somebody who smokes weed?
13  A.   But why would they give us a room to smoke weed in their
14  hotel?
15  Q.   Oh, well -- and you said when you purchased -- you were
16  given -- sorry.  Let me start that again.  For prostitution you
17  were given heroin, correct?
18  A.   Uh-huh.
19  Q.   Food, correct?
20  A.   Uh-huh.
21  Q.   And the hotel room, correct?
22  A.   Uh-huh.
23  Q.   You operated out of other hotels in the Monroe County
24  area?
25  A.   Correct.

1   Q.    One of those being the Econo Lodge?

2   A.    Correct.

3   Q.    And do you recall sending text messages to Mr. Taylor

4   regarding setting up the purchase of rooms and paying --

5   A.    Yeah.

6   Q.    And is it true that when you sent that text you would

7   discuss pricing?

8   A.    Yes.

9   Q.    Of the room?

10  A.    Yes, sir, we discuss pricing of the room.

11  Q.    You also discuss how you would pay --

12  A.    Him back.

13  Q.    Pay him back or how you would keep money from the

14  prostitution, correct, you'd keep money from the prostitution?

15  A.    I would, yeah.

16  Q.    That's because you're the enforcer and because --

17  A.    No, because when I was doing it, that was my body, and I

18  did it on my own to take care of my child.  He had nothing to

19  do when I -- when I chose to become a prostitute, it wasn't

20  with him.  I chose that when I was with my son's father before

21  I got -- before I started hanging back out with Black.  I

22  started doing that on my own because I was homeless sleeping on

23  the streets with nowhere to go, nothing to eat.  When you don't

24  know when your next meal is going to come up or diapers for

25  your child, you will do anything in this world.

27

1  Q.    Including making the choice to be a prostitute and sell

2  your body?

3  A.    Including being a whore, yes.

4  Q.    Did you say in a 302 that the prostitutes had to pay their

5  way?

6  A.    Say that one more time.  I couldn't hear you.  I heard you

7  say 302.  Did I say something?

8  Q.    Sorry.  Did you say that the P. Stones made the

9  prostitutes pay their own way?

10  A.    What you mean pay their own way?

11  Q.    You made the prostitutes pay money to the P. Stones?

12  A.    Yeah.

13  Q.    Now, you said on direct examination that one time Faizal

14  told you not to come because the feds were there, correct?

15  A.    Yes.

16  Q.    Do you know that Mr. Bhimani was actually cooperating with

17  the sting and the feds?

18  A.    No, I did not.  Can you repeat that question?  You said

19  did I know he was cooperating with the feds?

20  Q.    Yeah, or helping the feds.

21  A.    Oh, I did not know he was helping the feds, sorry.  I just

22  wanted to make sure I answered that question correctly.

23  Q.    I appreciate that.  Thank you.  I will bring up 2635.

24          THE COURT:  An exhibit number?

25          MR. BROWN:  Sorry.  It is Exhibit No. 6.

28

1          THE COURT:  Defendant's 6?

2          MR. BROWN:  Defendant's 6, yes, Your Honor.

3          THE COURT:  You can't see it I know because -- but

4  thanks for -- in case that occurs, you know you can let us

5  know.  This is not for you yet.

6  BY MR. BROWN:

7  Q.   And --

8          THE COURT:  Is there a question?

9          MR. BROWN:  Yes, Judge.

10         THE WITNESS:  I just talked about that.

11 BY MR. BROWN:

12 Q.   And I wanted to say you never saw your husband at the time

13 give drugs to Mr. --

14 A.   Oh, he was never my husband, but, no.

15 Q.   The man you were with?

16 A.   Yes.

17 Q.   And you gave a proffer in this case, correct, that was an

18 interview with your attorney?

19 A.   I'm sorry?  Say that one more tame.

20 Q.   Did you give an interview with your attorney?

21 A.   Did I have an interview with my attorney?

22 Q.   Yes, with the government.

23 A.   Yeah.

24 Q.   Did you and your attorney have an interview with the

25 government?

29

1  A.   Yes.

2  Q.   That was a proffer interview, correct?

3  A.   That was what?

4  Q.   A proffer interview.  Did they tell you that you would not

5  be prosecuted for any of the information or crimes that you

6  admitted to?

7  A.   When I first got arrested, me and my attorney did have

8  conversation with them, and, yes.

9  Q.   Okay.  And are you hoping for a reduction of your sentence

10 for your testimony here today?

11 A.   Absolutely.  I have three kids.

12         MR. BROWN:  Thank you.  No further questions, Judge.

13         THE COURT:  Okay.  Ms. Pawelski?

14         MS. PAWELSKI:  Yes.  Thank you, Your Honor.

15 CROSS EXAMINATION

16 BY MS. PAWELSKI:

17 Q.   Good morning, Ms. Bayer-Davis.

18 A.   Good morning.  It's kind of hard for me to hear you.

19 Q.   Sorry about that.  I will try to get closer to the mic.

20 If you can't hear me or understand anything, please let me

21 know, and I will do better.

22 A.   Yes, ma'am.

23 Q.   Yesterday you said that you joined the gang because you

24 wanted a family?

25 A.   Yes, ma'am.

30

1  Q.    But you had a living grandmother at the time?

2  A.    Me and my grandmother -- I feel like I'm the black sheep

3  of my family.  I am mixed black and white.  My grandmother was

4  an old white lady, and we don't have -- when I was younger, you

5  know what they say sometimes, you don't listen to the ones that

6  really care about you.  When I was younger, I just didn't

7  listen to her.  My mom was gone, my rock, everything, I felt

8  like I had nobody.

9  Q.    And you said that she told you that her home was always

10 open to you even when you got pregnant, you testified to that

11 on direct?

12 A.    No, I did not.  Yesterday I said that my grandfather told

13 me if I ever got pregnant I did not have to worry about having

14 a home with them.

15 Q.    So in other words, you could live with them?

16 A.    No.  I just said he said, if I ever got pregnant, I do not

17 have to worry about living with them, that he raised his

18 children basically telling me if you ever got pregnant, you

19 cannot live underneath my roof with that baby.

20 Q.    Okay.  So --

21 A.    Yes.

22 Q.    So you moved with your boyfriend or your baby's daddy --

23 A.    No, because that wasn't my first pregnancy.

24 Q.    Let me -- please can you allow me to ask the question and

25 then you answer?

1  A.    Uh-huh.

2  Q.    Did you at some point move in with your baby's daddy and

3  stay at a hotel?

4  A.    Yes.

5  Q.    Okay.  Can you please explain the timing of that?

6  A.    Okay.  So I was with Jamiell Sims, and he got arrested in

7  2012.  I then met Benjamin Lingard.  I got pregnant fairly

8  early.  He -- I was homeless.  He put me in a hotel.  He -- he

9  was staying with his -- he's from South Carolina, so he was

10 staying with his brother's mom, so I couldn't stay there.  I

11 eventually moved in with my uncle, and then I left my uncle's

12 house, and then I went with Benjamin to a hotel again.

13 Q.    He was a drug dealer, correct?

14 A.    Yes, ma'am, he was.

15 Q.    Right.  That is how it works.  I ask the questions, and

16 you can answer.

17 A.    You asked was he a drug dealer, and I said yes.  And I was

18 trying to finish that statement, and you cut me off.

19 Q.    Okay.  When you were with Benjamin?

20 A.    Uh-huh.

21 Q.    Did you deal drugs also?

22 A.    I did not.

23 Q.    You prostituted yourself?

24 A.    I prostituted myself.

25 Q.    For money?

32

1  A.    Yes, I did.

2  Q.    By choice?

3  A.    By choice.

4  Q.    Okay.  And when you were at the hotels with Benjamin, did

5  you have your child with you there?

6  A.    My child was in foster care.

7  Q.    Okay.  And you lost your child to foster care because of

8  the criminal activity you were engaging in?

9  A.    No, ma'am.

10  Q.    Okay.

11  A.    My child got taken to foster care off a false allegation I

12  proven in court.

13  Q.    So it was a false allegation?

14  A.    Yes.

15  Q.    Against you and you lost your child?

16  A.    Yes, and the documents, my case was founded unfoundable.

17  They said I tried to choke and suffocate my five-month-old, and

18  when they took him to the hospital, there was no signs of

19  abuse, neglect nor malnourishment.  The only reason they kept

20  him I was homeless and didn't have a stable place to stay with

21  him.

22  Q.    So that was just a mistake on their part?

23  A.    What do you mean?

24  Q.    I will withdraw that question.  I'll move on.

25  A.    I'm a good mother.

33

1  Q.   No, I said I'll -- I will ask the next question, okay?

2  A.   Uh-huh.

3  Q.   You were given the nickname Vicious.  Did you ever say to

4  your fellow gang members, you know what, can I have a different

5  nickname, Vicious doesn't really represent me as a person?

6  A.   That's not how it works.

7  Q.   I asked you a question.  Did you ever ask your other gang

8  members --

9  A.   No, I didn't.

10  Q.   Because you liked that name?

11  A.   I guess so.

12  Q.   You embraced it?

13  A.   Yeah, at that time I did.

14  Q.   Because you enjoyed beating other people, you viscously

15  beat other women?

16  A.   No, because I enjoyed sucking Mill's dick.

17  Q.   And you enjoyed beating other women?

18  A.   No, I did not.

19  Q.   You rented a home?

20  A.   Yes, I did.

21  Q.   Because you had money to do so?

22  A.   Yes, I did.

23  Q.   And that became a sort of haven for other gang members,

24  correct?

25  A.   Yeah.

34

1  Q.   They stayed there?

2  A.   Yes, ma'am.

3  Q.   Sirvonn Taylor had his own room?

4  A.   Yeah.

5  Q.   You packaged drugs?

6  A.   I did not package drugs.

7  Q.   All the gang members were free to come to your home,

8  correct?

9  A.   Yeah.

10 Q.   You're saying there was never any drug dealing or drug

11 packaging that went on in your home?

12 A.   I said I didn't package any drugs.

13 Q.   Oh, I'm sorry.  Okay.  But all the other gang members used

14 your home as a sort of drug den to package drugs?

15 A.   I mean, to sell their drugs, yeah.

16 Q.   Right.

17 A.   Uh-huh.

18 Q.   You never objected to that, correct?

19 A.   No.

20 Q.   Because the gang was making money?

21 A.   No, because I didn't have no say.

22 Q.   I'm sorry, what?  You didn't have no what?

23 A.   No say.

24 Q.   I don't understand.  It was your house?

25 A.   I didn't have no say.

35

1  Q.    Do you understand --

2  A.    That's my house, but that's not how it works.  I didn't

3  have no say.  I did what was told.  I was the lowest of the

4  lowest on the totem pole.

5  Q.    You were the lowest of the lowest?

6  A.    On the totem pole, yes, ma'am.

7  Q.    You were an enforcer, correct?  Were you a female enforcer

8  in the gang?

9  A.    Yes, ma'am, but like I said, I had no saying.  I couldn't

10  recruit nobody to the gang.  I wasn't a big homie.  I was none

11  of that.

12  Q.    You mentioned partying at the pool of the Quality Inn?

13  A.    Yeah.

14  Q.    And it's true, is it not, that pool is sort of in the

15  middle of the hotel?

16  A.    Yes, ma'am, if you have a pool side room, you could go

17  right out to the pool.

18  Q.    So there were pools surrounding the entire hotel?

19  A.    Yes, ma'am.

20  Q.    So other people could see what was going on?

21  A.    Yes, ma'am.

22  Q.    At the pool.  There was -- it wasn't hidden or locked away

23  in any way?

24  A.    Correct.

25  Q.    You weren't charged with any drug trafficking in this

36

1    case?

2    A.    I was not charged on the drug trafficking case.

3    Q.    That's despite the fact you ran drugs for this gang,

4    correct?  Correct?

5    A.    Yes, ma'am.

6    Q.    You actually went to New York City?

7    A.    Uh-huh.

8    Q.    You picked up all types of different drugs including

9    heroin, correct?

10   A.    Uh-huh.

11   Q.    Crack?

12   A.    I went with Black to New York City, and we picked up

13   crack, heroin and I think molly, and we went to Maine.

14   Q.    So you took over two bricks of heroin to Maine?

15   A.    Yes.

16   Q.    From New York City?

17   A.    I mean, I was with him when we took it, yes.

18   Q.    You admitted all this to the government?

19   A.    I'm an open book.  You can Google me.

20   Q.    Essentially you got a pass on the drug trafficking,

21   correct?  You weren't charged?

22   A.    No.

23   Q.    You've been sentenced in this case?

24   A.    34 months.

25   Q.    34 months.  Have you served any sentence yet?

37

1  A.    I answered that question earlier, no, ma'am.

2  Q.    No.  That's because the government is waiting for you to

3  testify to see how you do in this case, correct?

4  A.    I think a lot it had to do with COVID, too.  I was

5  supposed to turn myself in July 3rd.  The COVID had the

6  outbreak.

7  Q.    Okay.  And where are you living?

8  A.    I'm living in South Carolina.

9  Q.    Okay.  So not only have you been sentenced --

10  A.    Uh-huh.

11  Q.    You've been allowed to live in South Carolina, which is

12  outside the Eastern District of Pennsylvania?

13  A.    I was arrested in South Carolina.  I was already arrested

14  in South Carolina when I was arrested on my charges, so when

15  they gave me my bail, they did agree to let me go home to my

16  kids, my school, my job, my home.

17  Q.    The government allowed you to go back to South Carolina,

18  correct?

19  A.    The judge and the government, yes.

20        THE COURT:  Let's be careful here.  I'm the one that

21  decides where somebody goes.  The government doesn't decide --

22        MS. PAWELSKI:  I will rephrase.

23        THE COURT:  Let's be careful how we are phrasing

24  questions.  I ultimately make the decision, not to the

25  government who is released, where they go and where their

38

1   supervision is and when they surrender.  You should know that.

2            MS. PAWELSKI:  Very well.

3            THE COURT:  Next question.

4   BY MS. PAWELSKI:

5   Q.   The government made an application or requested the judge

6   to allow you to go to South Carolina, correct?

7   A.   I don't know how that went.  When I got arrested, I was --

8   I turned myself in in Lexington County in Columbia, South

9   Carolina.  I flew -- they bussed me to Georgia.  Then they flew

10  me to Oklahoma.  Then they flew me here.  My two-year-old son

11  was living in South Carolina when I got arrested.  I turned

12  myself in.  I'm not perfect.  If him or them decided to let me

13  go back to South Carolina, that doesn't have to do nothing with

14  this case, and I would not like to answer any more questions

15  about where I live.

16           THE COURT:  Well, wait to see what the questions are.

17           THE WITNESS:  I'm sorry.  I don't feel comfortable

18  answering where I live at.

19           THE COURT:  Hold on.  We will wait to see what the

20  questions are.

21  BY MS. PAWELSKI:

22  Q.   You've been sentenced to 34 months, and by testifying

23  you're hoping and expecting that the government will ask --

24  will make an application to the Court to lower that sentence

25  even more, correct?

39

1  A.    Yeah, wouldn't you all?

2  Q.    I'm sorry?

3  A.    Yeah, wouldn't you?

4           MS. PAWELSKI:  That's all I have for this witness.

5           THE COURT:  Any redirect?

6           THE WITNESS:  Can I have a minute, please?

7           THE COURT:  Can I see everyone at sidebar including

8  the court reporter?

9           (The following discussion occurred at sidebar:)

10          THE COURT:  Ms. Pawelski, so we are very clear, I am

11 trying to give you leeway in your questions.  I assume you're

12 an experienced lawyer and you know that ultimately I make the

13 decision as to where somebody is either released or where they

14 stay.  The government does not make that decision.  I have no

15 problem in you asking if the government recommended something.

16 That's fine.  But when you say to the jury or you say to the

17 witness the government made that decision, you know that's not

18 a correct statement, and so please don't do that again.

19          MS. PAWELSKI:  Understood, Your Honor.

20          THE COURT:  All right.  Okay.

21          (The discussion at sidebar concluded.)

22          THE COURT:  This is a good time.  We will take a

23 morning break.  Remember the admonitions.  They remain the

24 same.  You have to hear them each time.  No conversations or

25 discussions among yourselves or with anyone else.  Don't form

1    any opinions.  You have not heard all of the evidence and the

2    law that's related to the case.  You are not to read or listen

3    to anything about the case.  If anyone were to talk to you

4    about the case, you must advise us of that immediately.  All

5    right.  See you in about 15 minutes.

6            (A brief recess was taken.)

7            THE COURT:  Welcome back.  Ms. Roberts?

8    REDIRECT EXAMINATION

9    BY MS. ROBERTS:

10   Q.   Salena, I want to talk about something that you discussed

11   on cross examination with attorney Brown.

12   A.   Yes, ma'am.

13   Q.   With regard -- with regard to physical violations, are

14   physical violations part of the structure of the gang?

15   A.   Yes.

16   Q.   If a male member based upon gang rules is not permitted to

17   physically violate a female, does that mean that the male

18   member can't assault that female separate from a violation?

19   A.   Yeah -- no, I mean -- I don't know if I answered that

20   correct.  Like, they could.

21   Q.   But that's separate from an actual --

22   A.   Violation, yes.

23   Q.   Did you actually observe any male members physically

24   assault women --

25   A.   No.

41

1  Q.    -- outside of violations?

2  A.    Yeah, but they weren't -- I seen Critical slap a girl

3  before, but it had nothing to do with Star.  Let's just put it

4  like that.  We were at a club --

5  Q.    That's fine.

6  A.    But as far as any -- they call the girls Stones or

7  Stonettes, as far as any of the Stonettes, I haven't witnessed

8  -- any Stonie put their hands on a Stonette.

9  Q.    You testified that you were a prostitute?

10  A.    Yeah.

11  Q.    When you were a prostitute were you working for the P.

12  Stones, or were you by yourself?

13  A.    I was by myself.

14  Q.    When you also talked about Kenya, Millie, Michelle

15  Ferrante, Buffy, Baby, when they were prostitutes, were they

16  prostituting and being trafficked by the Stones?

17  A.    Yes.

18  Q.    So were you separate from them?

19  A.    Yeah, I made the decision to do that, and that was around

20  the time I fell off -- when you asked me was there a time I

21  went rogue, that was around the time I went rogue.

22  Q.    Just for clarification purposes, who gives the women in

23  the gang their names, their street gang names?

24  A.    Black and obviously Mills and Sev, like --

25  Q.    The men --

42

1  A.    The men, yes.

2  Q.    Do you have a choice in what your name is going to be?

3  A.    No, ma'am.

4  Q.    And for clarification purposes, you're not -- your name

5  wasn't Vicious because you viscously beat people?

6  A.    Correct.

7            MS. ROBERTS:  No further questions, Your Honor.

8            THE COURT:  You may step down.

9            THE WITNESS:  Thank you.  Have a great day.

10            THE COURT:  You, too.  Do our usual sanitation.  That

11  will take a minute.  You're welcome to stand and stretch or sit

12  and relax.  Who's the next witness?

13            MS. ROBERTS:  The government is going to call Sheryl

14  Patishnock.

15            THE COURT:  Okay.

16            SHERYL PATISHNOCK, called as a witness, being duly

17  sworn, testified as follows:

18            THE COURT:  Before we start -- I'm sorry.  Go ahead,

19  Ms. Roberts.

20  DIRECT EXAMINATION

21  BY MS. ROBERTS:

22  Q.    Good morning, ma'am.

23  A.    Good morning.

24  Q.    Tell the jury how old you are today?

25  A.    I'm 36.

43

1  Q.    How far did you go in school?

2  A.    Tenth grade.

3  Q.    And where were you born?

4  A.    I was born in Plainfield, New Jersey.

5  Q.    Where did you grow up?

6  A.    In Mount Pocono, Pennsylvania.

7  Q.    Are you familiar with a gang called the P. Stones?

8  A.    Yes, ma'am.

9  Q.    Can you explain to the jury how you became familiar with

10 the P. Stones?

11         THE COURT:  Ms. Patishnock, pull that microphone

12 closer to you if you could, please.  You can slide up -- you

13 can push it down.  Thank you.

14         THE WITNESS:  Yes, sir.

15 BY MS. ROBERTS:

16 Q.    Can you explain to the jury how you became familiar with

17 the gang the P. Stones?

18 A.    I met Sirvonn Taylor in school.

19 Q.    What school was that if you can remember?

20 A.    Pocono Mountain Academy.

21 Q.    Did you become a member of the P. Stones?

22 A.    Yes, ma'am.

23 Q.    Approximately how old were you when you became a member of

24 the P. Stones?

25 A.    Approximately 14 or 15.

44

1  Q.   Can you explain to the jury why you wanted to become a

2  member of the P. Stones when you were a teenager, 14 or 15?

3  A.   I just came from Jersey.  I was, you know, beat up almost

4  every day by other school members.  My father and grandmother

5  just passed away, and mom moved to Pennsylvania.  I met Sev,

6  and he taught me to defend myself and became a big brother,

7  father figure man in my life.

8  Q.   So were you two friends?

9  A.   He was my best friend.  He was my son's godfather.

10 Q.   And how did you actually become a member of the gang?

11 What did you have to do?

12 A.   We had to fight and have sex.

13 Q.   Who did you have to fight?

14 A.   I believe the girl's name was D. Bow, what -- they called

15 her D. Bow, I'm sorry.

16 Q.   And who did you have to have sex with?

17 A.   Xavier, Buddha, there was a few people.  I don't remember

18 everybody's name.

19 Q.   Okay.  Where were you living at the time?  Were you still

20 up in the Stroudsburg area?

21 A.   Yes, ma'am.

22 Q.   Did you have a gang name?

23 A.   Scarlet Stone.

24 Q.   When you became a member of the P. Stones, approximately

25 how old were some of the other members?

45

1  A.    Give or take around the same age when I became a Stone.

2  Q.    At some point you joined the Stones and left the area?

3  A.    Yes, ma'am.

4  Q.    And then did you come back to the area?

5  A.    Yes, ma'am.

6  Q.    Once you came back to the area, did you make contact again

7  or have contact again with Sirvonn?

8  A.    Yes, ma'am.

9  Q.    Did you have a particular position in the gang when you

10 came back?

11 A.    I was the first lady.

12 Q.    Can you tell the jury what it means to be the first lady

13 of the P. Stones?

14 A.    It's a ranking where you have status to where you could

15 pretty much make arrangements or call shots as they would say

16 it.

17 Q.    Do you know some of the other rankings in the gang at the

18 time?

19 A.    Yes, ma'am.

20 Q.    And what were some of the other rankings you can have in

21 that gang, and who were they?

22 A.    It was -- they went by, like, five point stars.  So the

23 points on the star was -- each person had a point -- first

24 point, which was one of the lowest, the five point was the

25 highest.

46

1  Q.   Who was at the highest point?

2  A.   Sirvonn.

3  Q.   Did he have a name?

4  A.   Black.

5  Q.   And what was the title of his position if there was one?

6  A.   The cabba, five star cabba.

7  Q.   Did any other women other than you have rankings?

8  A.   Yes.

9  Q.   Who?

10 A.   Jordan Capone.  There was a Tiffany -- a long time ago --

11 I don't remember her last name -- and Hazel.

12 Q.   Although you were first lady, did you have a male gang

13 member you had to answer to?

14 A.   Yes.

15 Q.   Who was that?

16 A.   Jose Velazquez.

17 Q.   What was his position in the gang?

18 A.   I believe he was a three or four star.

19 Q.   And how was it that you had to answer to Jose Velazquez?

20 A.   I'm not sure you mean.

21 Q.   As opposed to Black.

22 A.   I would go to Sev, and Sev would go to Black.

23 Q.   So Black was still in charge of Sev?

24 A.   Yes, ma'am.

25 Q.   And Sev is the nickname for Jose Velazquez?

47

1  A.    Yes, ma'am.

2  Q.    Is that short for anything?

3  A.    Seven.

4  Q.    What's the particular meaning behind seven, anything?

5  A.    I don't know.

6  Q.    But everyone called him Sev?

7  A.    Yes.

8  Q.    You named some of the female members.  Do you remember any

9  of other female members?

10  A.    It was me, Baby, Buffy, Vicious or Salena, Angel.

11  Q.    Was Angel Jordan Capone?

12  A.    Yes, ma'am.  Ellaneta, Yolana, Low, there was a girl named

13  Diamond.  That's all I can think of off the top of my head at

14  the moment.

15  Q.    Having the position of first lady, did you get to order

16  violations?

17  A.    I should have been able to order violations, but I wasn't

18  first lady long enough.

19  Q.    So who ordered the violations?

20  A.    Any one of the five stars.

21  Q.    Were they all men?

22  A.    Yes, ma'am.

23  Q.    Did you ever have to violate other members?

24  A.    Yes, ma'am.

25  Q.    Did someone tell you to do that?

48

1  A.    Yes, ma'am.

2  Q.    Why did you do it?

3  A.    For whatever they had done wrong, we had to violate them,

4  or we would get violated ourselves.

5  Q.    What were some things that you could do wrong that would

6  cause a violation?

7  A.    Just not doing something.  If you were told to pick

8  something up, you didn't pick it up, if you were told to have

9  sex with somebody and haven't have sex with somebody, it could

10 range from so many different things.

11 Q.    Did you ever receive a violation?

12 A.    Yes, ma'am.

13 Q.    Do you remember who violated you?

14 A.    Black.

15 Q.    What happened?

16 A.    I was simply given an essay.

17 Q.    So it was not physical.  He ordered you to write an essay?

18 A.    Yes.

19 Q.    What was that essay about?

20 A.    My prayer, my knowledge on the gang and some questions

21 that were just asked at the moment that I had answer as if it

22 was like school.

23 Q.    Who did you have to violate if you can remember?

24 A.    Baby -- I don't remember her real name -- and Salena,

25 Vicious.

49

1  Q.    Why did you have to violate Salena?

2  A.    Salena because my big homie, which was Sev, when I walked

3  up, they were arguing, and he told her if she didn't stop

4  running her mouth he was going to make me slap her.

5  Q.    And did you?

6  A.    Yes.

7  Q.    Why?

8  A.    Because I was told to.

9  Q.    Were you and Salena or Vicious friends back then?

10  A.    That was really, like, our first encounter with each

11  other.

12  Q.    How did the P. Stones make money?

13  A.    Selling drugs and women.

14  Q.    And did the money go to a particular person in the gang?

15  A.    Yes, ma'am.  It would go to Black, or what they would call

16  a pot.

17  Q.    Who held the pot?

18  A.    Black.

19  Q.    I'm going to direct your attention to the time period of

20  2011 moving forward.  Were you a P. Stone -- you would have

21  been approximately 26, 27 years old?

22  A.    Yes, ma'am.

23  Q.    During that time period, did you ever stay at the Howard

24  Johnson?

25  A.    Yes, ma'am.

50

1  Q.    Why?

2  A.    At first it was just, you know, coming around and working

3  prostitution, and then we were able to get free rooms.

4  Q.    I'm going to show you Government's Exhibit 1.1 that's

5  already been entered into evidence.  It will be on your screen.

6  Was there a particular section of the hotel -- if you'd take a

7  look at Government's Exhibit 1.1, do you know what that

8  depicts?

9  A.    I'm sorry.  Can you repeat that?

10 Q.    Do you know what Government's Exhibit 1.1 is a picture of?

11 A.    Yes, ma'am.

12 Q.    What is it?

13 A.    The Howard Johnson hotel.

14 Q.    And looking at that, is there a particular section of the

15 hotel where you would stay when you stayed at the Howard

16 Johnson?

17 A.    Yes, ma'am.

18 Q.    And if you'd touch the screen, you can actually make a

19 mark on it.  What section of the hotel would that be?  So where

20 --

21 A.    I'm sorry.  You walk in the front, and then there was

22 rooms on that side.

23 Q.    I'm sorry.  You took your mouth away from the microphone.

24 You walk in the --

25 A.    Once you walk to the right and go down the long hallway

51

1  and make the left along the side and the back.

2  Q.   So the side back is where you would stay?

3  A.   Yes, ma'am.

4  Q.   Did you know any of the employees working at the Howard

5  Johnson?

6  A.   Yes, ma'am.

7  Q.   Who did you know?

8  A.   Faizal.

9  Q.   Do you see him in the courtroom today?

10  A.   Yes, ma'am.

11  Q.   Can you identify him for the jury?

12  A.   The gentleman sitting right there.

13  Q.   If you can just say maybe what color mask or coat or

14  shirt.

15  A.   Black mask.

16  Q.   The black mask?

17  A.   Yes, ma'am.

18       THE COURT:  It's clear to me she pointed to Mr.

19  Bhimani, so the record will reflect she has identified the

20  defendant.

21  BY MS. ROBERTS:

22  Q.   How did you know the defendant, Faizal Bhimani?

23  A.   I met him at whacky wing night.

24  Q.   What is whacky wing night?

25  A.   It was a restaurant in the hotel where they would have

52

1 wings that were different from most places.

2 Q.   And would he be in that restaurant?

3 A.   Occasionally, yes.

4 Q.   Did you start talking to him?

5 A.   Yes, ma'am.

6 Q.   Did you get some type of relationship with him?

7 A.   Yes, ma'am.

8 Q.   How did you find out he actually was associated with the

9 Howard Johnson hotel?

10 A.   I believe he told me he owned it.

11 Q.   And after you got that information, did you use to contact

12 him for anything for any reason?

13 A.   We would go to the hotel to try to get free rooms and to

14 see if he wanted to hang out.

15 Q.   How would you get free rooms from the defendant?

16 A.   We would trade time, company or sex for the rooms.

17 Q.   When you say we, who are you talking about?

18 A.   Me, Angel, Millie.  That's all I can think of at the top

19 of my head right now.

20 Q.   And so you said me.  So would you actually have sex with

21 Faizal?

22 A.   Yes, ma'am.

23 Q.   Would you get a free room in exchange?

24 A.   Yes, ma'am.

25 Q.   Did that happen on one occasion or more than one occasion?

53

1  A.    More than one.

2  Q.    Why would you want to stay at the Howard Johnson to begin

3  with?  What were you doing there?

4  A.    Prostitution.

5  Q.    Was that with the P. Stones?

6  A.    Yes, ma'am.

7  Q.    How did Faizal find out that's what you were doing?

8  A.    I'm not sure.  I don't remember.  I'm sorry.

9  Q.    That's okay.  Did he ever actually pay you to have sex, or

10 was it only free rooms?

11 A.    I don't remember.

12 Q.    Other than yourself --

13        MR. DeSTEFANO:  I did not hear that answer.

14        THE COURT:  She said, I don't remember.

15 BY MS. ROBERTS:

16 Q.    Other than yourself, were there other members of the P.

17 Stones engaged in activities at the Howard Johnson that were

18 illegal?

19 A.    Yes, ma'am.

20 Q.    Who?

21 A.    Sev, Black, Arty, pretty much all of us.

22 Q.    Was there anyone else you saw at the Howard Johnson that

23 you thought was an employee or associated with the Howard

24 Johnson?

25 A.    There was another older male.

54

1    Q.    Where would you see this individual?

2    A.    Most of the time behind the desk.

3    Q.    Which desk are you talking about?

4    A.    Front desk.

5    Q.    I'm going to show you Government's Exhibit 6.  Do you know

6    what Government's Exhibit 6, which has been moved into evidence

7    is?

8    A.    Yes, ma'am.

9    Q.    What's that?

10   A.    That's the lobby of the hotel.

11   Q.    Where would you see that older gentleman you were talking

12   about?

13   A.    Usually sitting over to the right.

14   Q.    Is that when you would check into the hotel?

15   A.    Yes, ma'am.

16   Q.    Is that where you would see Faizal?

17   A.    Yes, ma'am.

18   Q.    Do you see that older gentleman you saw behind the front

19   desk in the room today?

20   A.    I can't tell.

21   Q.    Okay.  Were -- were individuals selling drugs at the

22   hotel?

23   A.    Yes, ma'am.

24   Q.    What were they selling?

25   A.    Heroin and molly.

55

1 Q.    Who was selling the heroin and molly?

2 A.    Mostly Sev.  Black would distribute it.  I was more with

3 Sev, so I seen him more, but Mills, Arty, obviously.  That's

4 all I can think of at the top of my head.

5 Q.    Where in the hotel would they be selling the drugs?

6 A.    Out of the rooms or the parking lot.

7 Q.    So would individuals come to the actual hotel rooms?

8 A.    I believe so, yeah.

9 Q.    How often would that occur?  Do you know?

10 A.    I'm not sure.

11 Q.    Which members of the P. Stones were involved in selling

12 women?

13 A.    Buck, Black, Arty and Sev.

14 Q.    What was your involvement in it?

15 A.    I was one of the prostitutes, but I also taught the girls

16 how to maneuver around the website and how to do it without

17 getting hurt.

18 Q.    And when you say maneuver around the website, what website

19 are you talking about?

20 A.    Back Page, Craig's List.

21 Q.    What is Back Page?  What did you do with Back Page?

22 A.    It was a site where escorts could go on and put pictures

23 and gentlemen can call and invite them to come over to have

24 sex.

25 Q.    Who was being sold by the P. Stones, members, non-members

56

1  or both?

2  A.   Both.

3  Q.   Can you provide some of the names of the non-members?

4  A.   Michelle Ferrante, Kenya Evans.  There's another girl, but

5  I can't think of her name off the top of my head.

6  Q.   That's okay.  Did you ever observe physical force being

7  used against these women?

8  A.   Yes, ma'am.

9  Q.   Can you describe for the jury what did you observe?

10 A.   There was a time where I walked into one of the houses

11 that we would all stay at in P. C. P., and Black was forcing a

12 girl named Star to have sex with him.  He had his hands over

13 her mouth, and you can tell she was crying.

14 Q.   Did you ever see any force being used against the women

15 you talked about, Kenya Evans?

16 A.   Yes.

17 Q.   Did you ever see any force being used at the Howard

18 Johnson hotel?

19 A.   Yes, Millie -- that was the third girl's name -- with

20 Millie often.

21 Q.   Who used force against Millie?

22 A.   And Michelle as well.

23 Q.   Okay.  Start with Millie.  Who used force with Millie at

24 the Howard Johnson hotel?

25 A.   Arty and Black.

57

1  Q.    Arty and Black.  When you say Arty, are you talking about

2  Arthur Taylor?

3  A.    Yes, ma'am, I apologize.

4  Q.    That's okay.  And you said Michelle Ferrante?

5  A.    Yes, ma'am.

6  Q.    What did you observe with Mr. Michelle Ferrante?

7  A.    Numerous things.  Michelle was pretty much raped by Black

8  as well in the Howard Johnson.  She was beaten up numerous

9  times.

10 Q.    Were any of these women you talked about addicted to

11 drugs?

12 A.    All of them.

13 Q.    Do you know what drug?  We will start with Michelle

14 Ferrante?

15 A.    Heroin.

16 Q.    Millie?

17 A.    Heroin.

18 Q.    Do you know Millie's last name?

19 A.    If you -- Mc something maybe.

20 Q.    That's okay.  What about Kenya, what drug was Kenya

21 addicted to?

22 A.    Heroin.

23 Q.    Who provided these women with the drugs?

24 A.    I've seen Black and Sev and Buck.

25 Q.    Oh, Buck?

58

1    A.    Buck.

2    Q.    Also a member of the P. Stones?

3    A.    Yes, ma'am.

4    Q.    Did you ever use physical violence against these women

5    based upon their sex acts?

6    A.    Never.

7    Q.    Did you see the violence against them and do nothing about

8    it?

9    A.    Yes.

10   Q.    Why?

11   A.    Do you want to make it worse for them or myself?

12   Q.    Okay.  Did you ever observe any members of the P. Stones

13   with guns?

14   A.    Yes, ma'am.

15   Q.    Who if you can remember?

16   A.    Sev and Black.

17   Q.    When the girls you talked about made money, where did that

18   money go?

19   A.    To whichever one of the P. Stones they were working for.

20   Q.    All of it?

21   A.    Pretty much, yes.

22   Q.    How did they pay for food or clothing if all of their

23   money went to the P. Stones?

24   A.    There were times where I would do certain things so that,

25   you know, they can keep their money and not tell them or --

59

1  Q.    What would you do?

2  A.    We would keep it from them.

3  Q.    Can you just describe for the jury, what would you do to

4  help these women?

5  A.    I don't know where to start.  There was times where

6  Michelle was stripped and left so she couldn't leave the hotel.

7  I'd bring her clothes and food.  I would take them to hotels so

8  they could work and try to get their own money so they can

9  survive without telling them and keeping it from --

10  Q.    Without telling who?

11  A.    Black, Sev or Arty or whatever they were working for.

12  Q.    What would happen if they found out, Black, Sev or Arty,

13  these women were working and not giving them all the money?

14  A.    They wouldn't get their drugs, one, and they would

15  probably get beaten on.

16  Q.    How long periods of time would you stay at the Howard

17  Johnson for?  Was it sporadically or days at a time, weeks at a

18  time?

19  A.    All of the above.

20  Q.    Okay.  While you were staying at the Howard Johnson and

21  there was drug trafficking and sex trafficking going on, was

22  anyone trying to hide what you were doing?

23  A.    If there was, like, police activity in the parking lot or

24  something going on, Faizal would let us know.

25  Q.    So that's when you'd stay in your rooms?

60

1   A.   Yes, ma'am.

2   Q.   Other than that, if Faizal didn't warn you about the

3   police being around, would you try to hide the activity?

4   A.   No.

5   Q.   So what types of things would you do?

6   A.   We would have parties, streaking, like, we did all kind of

7   crazy things.

8   Q.   When you say streaking, what do you mean?

9   A.   Running around the hotel naked or topless.

10  Q.   That would be in the interior hallways of the hotel?

11  A.   Yes, ma'am.

12  Q.   When you say parties, where would the parties be?

13  A.   A lot of times we'd go to the Quality and have pool

14  parties over there.

15  Q.   So you stayed at the Quality sometimes?

16  A.   Yes, ma'am.

17  Q.   Would that be the Quality Inn in Stroudsburg?

18  A.   Yes, right across from Perkins.

19  Q.   How often would you go to the Quality Inn?

20  A.   Usually -- either if we wanted to have, like, a pool party

21  or if we couldn't for some reason we could not get a room at

22  the Howard Johnson.

23  Q.   What would happen at the pool parties?  Would there be

24  drug use?

25  A.   Drug use, skinny dipping, all kind of crazy things.

61

1   Q.   Did people bring their bathing suits?

2   A.   Not usually.

3   Q.   Going back to the Howard Johnson for a second, did anybody

4   smoke marijuana?

5   A.   Yes.

6   Q.   Did they smoke it in the rooms of the Howard Johnson?

7   A.   Yes, ma'am.

8   Q.   Could you smell the marijuana inside the rooms?

9   A.   Yes, ma'am.

10  Q.   Could you smell it in that hallway that you talked about,

11  that --

12  A.   Yes.

13  Q.   -- back hallway?

14  A.   Yes, ma'am.

15  Q.   And is that an interior hallway enclosed?

16  A.   Yes, ma'am.

17  Q.   What type of drugs were at the parties?

18  A.   Mostly molly and marijuana.

19  Q.   At some point did you stop becoming an active member of

20  the P. Stones?

21  A.   Yes, ma'am.

22  Q.   Approximately when was that?

23  A.   Right before I turned 30.

24  Q.   Why?

25  A.   Numerous reasons.  Black had directed that -- gave me a

62

1  direct order that I had to do sexual acts with him.  He had did

2  the incident with Michelle Ferrante in the hotel where he was

3  forcing her to have sex, and he had beat up -- they had beat up

4  one of the males, young Stones, which was his -- he went by

5  Clips.  I think he was 15 at the time, and they beat him.  They

6  beat him so bad.  Grown men beat him, like, he was a -- like,

7  he was -- like he just raped somebody's daughter.

8  Q.    But he didn't?

9  A.    But he didn't.

10  Q.    And did that turn you off from the P. Stones?

11  A.    Very much.

12  Q.    Did you tell Black that you wanted to get out of the P.

13  Stones?

14  A.    Yes, ma'am.

15  Q.    What did Black do?

16  A.    He gave an order for five people to jump me out, and

17  nobody wanted to -- nobody wanted to put their hands on me

18  because I was good to them.

19  Q.    Why?

20  A.    I was good to them.

21  Q.    Because you helped them?

22  A.    Yes, ma'am.

23  Q.    While you were at the Howard Johnson, did you ever get in

24  trouble for any of the criminal activities that was going on?

25  A.    No.

63

1  Q.   Anybody ever call the police on you for drug use, drug

2  dealing, sex trafficking?

3  A.   I'm not sure at the Howard Johnson.  I don't remember.  It

4  has happened before, but I'm not sure if it --

5  Q.   At other hotels?

6  A.   Yes, ma'am.

7  Q.   But not at the Howard Johnson?

8  A.   I'm not sure.

9  Q.   Did you ever get arrested at the Howard Johnson?

10  A.   I don't think so.

11  Q.   Did you do a lot of criminal activity at the Howard

12  Johnson?

13  A.   Yes, ma'am.

14            MS. ROBERTS:  Your Honor, if I can just have a

15  moment.

16            THE COURT:  Sure.

17            MS. ROBERTS:  Your Honor, I have no further questions

18  for this witness at this time.

19            THE COURT:  Mr. Brown?

20            MR. BROWN:  Thank you, Your Honor.

21  CROSS EXAMINATION

22  BY MR. BROWN:

23  Q.   Good morning, Ms. Patishnock.

24  A.   Good morning.

25  Q.   My name is Bernie Brown.  I represent Faizal Bhimani.  I

64

1  have a couple questions for you.

2  A.    Okay.

3  Q.    So you said that you would engage in prostitution with --

4  for the P. Stones, correct?

5  A.    Yes, ma'am -- I mean, yes, sir.

6  Q.    That's all right.  And you haven't been charged for any of

7  those crimes, correct?

8  A.    No.

9  Q.    Okay.  So would you agree that in meeting with the

10  government -- how many times did you meet with the government?

11  A.    It's been a long time so -- a few.

12  Q.    Okay.  More than two?

13  A.    Yes, sir.

14  Q.    More than five?

15  A.    Maybe.

16  Q.    Okay.  And you would meet with attorney Camoni, correct?

17  Do you know attorney Camoni?

18  A.    I can't tell.  Yes, we have seen each other.

19  Q.    You know Ms. Roberts who was just questioning you?

20  A.    Yes, sir.

21  Q.    You'd meet with her?

22  A.    That's correct.

23  Q.    Do you know agent Shelly?

24  A.    Yes.

25  Q.    You would meet with him?

65

1  A.    Yes, sir.

2  Q.    Did they tell you that a benefit for your cooperation

3  would be that you would not be charged with your crimes?

4  A.    No.

5  Q.    Okay.  And were you arrested for prostitution in this --

6  A.    Several times.

7  Q.    That would be in the state, correct?

8  A.    I'm sorry?

9  Q.    That was in -- in state court?

10 A.    Yes.

11 Q.    You pled guilty to those crimes, correct?

12 A.    Yes, sir.

13 Q.    Now, you said you knew Sirvonn Taylor from high school,

14 correct?

15 A.    Yes, sir.

16 Q.    Okay.  And is it true that you wanted to be in the P.

17 Stones gang?

18 A.    Yes, I did.

19 Q.    Is it true that you voluntarily had sex with the members

20 of the gang?

21 A.    Yes, sir.

22 Q.    You voluntarily had sex with members of the gang so you

23 can be initiated?

24 A.    Yes, sir.

25 Q.    And you talked about the P. C. P. house?

66

1  A.    Yes.

2  Q.    I think it's called.  That was a house that gang members

3  would meet at or basically hang out at, correct?

4  A.    Gang members lived there.

5  Q.    Okay.  They actually lived there, and they would -- gang

6  activity would occur?

7  A.    Yes, sir.

8  Q.    Okay.  It -- some of the gang activity you're talking

9  about as far as Sirvonn Taylor and Arty, Black -- or Arty

10  Taylor and Velazquez, Sev, occurred in that house?

11  A.    Yes, sir.

12  Q.    Okay.  Isn't it true most of what you talked about on

13  direct examination occurred in that house?

14  A.    Not necessarily, no.

15  Q.    Okay.  Well, let me ask this.  Did it occur in other

16  hotels in the area?

17  A.    Yes, sir.

18  Q.    Okay.  Like the Roadway Inn, correct?

19  A.    I don't know so much about the Roadway.  Maybe once or

20  twice we had been there but not very often.

21  Q.    Tell me some of the other hotels.

22  A.    Myself.  I don't know about everybody else.

23  Q.    Why don't you tell me about some of the hotels you would

24  frequent in the Monroe County area?

25  A.    The Budget, the Quality, the Super 8 was more in the

67

1  beginning because they got banned from there after a while --

2  the Howard Johnson, and there was one down the street from the

3  Howard Johnson.  The name changed frequently.  I think the

4  Comfort it might have been.

5  Q.   Okay.  And sometimes you would go to the Mount Airy Casino

6  that's there?  Did you ever go to the Mount Airy Casino?

7  A.   Not really, no.  I might have been there once or twice.

8  Q.   Okay.  And the way in which you would earn money for the

9  gang would be through your prostitution, correct?

10  A.   Yes, sir.

11  Q.   And that would not only be yourself, but would you

12  prostitute other women in the gang?

13  A.   Yes, sir.

14  Q.   And is it true that you were put in charge of the

15  prostitution because you had experience in making money because

16  you had been a prior prostitute?

17  A.   Yes, sir.

18  Q.   And is it true you usually drive yourself -- the way that

19  prostitution works is that you would have an ad in the Back

20  Page, correct?

21  A.   Uh-huh.

22  Q.   A call would come in from a customer, correct?

23  A.   Yes, sir.

24  Q.   And they would talk to you directly, correct?

25  A.   Yes, sir.

68

1  Q.   And would you set up a price with them, correct?

2  A.   Yes, sir.

3  Q.   And you drove yourself to your calls, correct?

4  A.   Yes, most of the time.

5  Q.   And the first time that you would meet with somebody you

6  wouldn't immediately have sex with them, correct?

7  A.   No, sir.

8  Q.   And that was because you wanted to make sure that they

9  weren't law enforcement officers?

10  A.   Yes, sir.

11  Q.   Okay.  But it also provided you the opportunity to bring

12  them back so they can pay you again, correct?

13  A.   Yes, sir.

14  Q.   And did you tell detectives that there was no fee

15  structure regarding the prostitution work you were doing?

16  A.   I don't understand what you're --

17  Q.   As far as the money goes, who gets what and who -- did the

18  P. Stones -- did you keep some of your money from the

19  prostitution?

20  A.   My money, yes.

21  Q.   And the only money that went to the gang would be your

22  dues, correct?

23  A.   Not necessarily.

24  Q.   Okay.

25  A.   Whatever was needed of me whether -- no matter what

69

1  amount, if I had to get it, I would get it.

2  Q.    Say that again, no matter what amount --

3  A.    If they needed it, I would get it.

4  Q.    Right.  And is it true that you freely gave your money to

5  Sirvonn Taylor?

6  A.    Yes, sir.

7  Q.    And Mr. Velazquez?

8  A.    Yes, sir.

9  Q.    That's because they just asked you?

10  A.    Yes, sir.

11  Q.    And is it true that Millie had an arrangement with the

12  gang members that she would be paid in drugs?

13  A.    Yes, sir.

14  Q.    Now, you were interviewed in 2014.  Do you recall that?

15  A.    Yes, sir.

16  Q.    Okay.  And you were interviewed in 2015, correct?  Do you

17  recall that?

18  A.    I'm not sure.

19  Q.    Okay.  Fine.  And in neither those interviews do you

20  mention Mr. Bhimani and his involvement in the prostitution?

21  A.    No.

22  Q.    In fact, the only time that you mention the Howard Johnson

23  is when you were kicked out of there with Arthur Taylor and

24  Kenya Evans regarding a robbery incident or a theft incident;

25  is that correct?

70

1  A.    I believe so, yes.

2  Q.    The cops were called to the Howard Johnson?

3  A.    Yes, sir, but I wasn't there.

4  Q.    Now, I want to talk about when you finally mentioned

5  Faizal.  You say that he's the manager, correct?

6  A.    Yes, sir.

7  Q.    And that was when you were meeting with the government to

8  testify against your fellow members of the P. Stones, correct?

9  A.    I don't understand your question.

10 Q.    So when you first mentioned Faizal, you meet with the

11 government, but you're testifying for a case other than against

12 Mr. Bhimani, correct?

13 A.    Yes, sir.

14 Q.    Did you know that Mr. Bhimani was already arrested and in

15 custody?

16 A.    No, sir.

17 Q.    Now, did you talk about an incident that occurred where

18 Mr. Bhimani was alleged to have taken you into a back room and

19 you rubbed your feet while he stimulated himself?

20 A.    I don't remember.

21 Q.    Fair enough.  Can we bring up Bates 2637?  It would be

22 Defendant's Exhibit No. 6 or 7?

23         THE COURT:  Is this a 302?

24         MR. BROWN:  It's a 302.

25         THE COURT:  We have to remind you you're only

71

1   bringing it for use of the witness.  This is Defendant's

2   Exhibit 7, correct?

3          MR. BROWN:  Yes, it is, Your Honor.

4   BY MR. BROWN:

5   Q.   Does that refresh your recollection?

6   A.   Yes.

7   Q.   You're meeting with attorney Camoni.  You're meeting with

8   attorney Roberts.  You're meeting with agent Shelly, and they

9   ask you about this incident that you told them previously

10  regarding my client taking you in a back room and you exposing

11  his feet while he stimulated himself, correct?

12  A.   I don't remember.

13  Q.   You don't remember the -- saying that?

14  A.   I don't remember saying it or -- it's been a long time.

15  Q.   Okay.  Well, I just put up in front of you a 302.  Do you

16  disagree with the words that are on that?

17  A.   No, I don't disagree with it.  I just don't remember.

18  Q.   Okay.  So then you don't disagree with telling them --

19         THE COURT:  No, no.  The question is that she doesn't

20  remember the incident.  All right.  That's not her statement so

21  --

22         MR. BROWN:  I can't refresh her recollection by

23  reading it, right?

24         THE COURT:  You can ask whether she recollects it or

25  doesn't recollect it.

1          MR. BROWN:  Right.

2    BY MR. BROWN:

3    Q.    Did you tell detectives that story was not true?

4    A.    I don't believe so.  I said I didn't remember.

5    Q.    Okay.  Was that story made up?

6    A.    No, sir.  It happened very often with several clients.  I

7    just don't remember having the conversation about it.

8    Q.    Okay.  And is it true that you -- was it that you don't

9    remember that it happened with Mr. Bhimani?

10   A.    Yes, sir.

11         MR. BROWN:  No further questions, Judge.

12         THE COURT:  All right.  No cross?  Okay.  You may

13   step down.  Thank you.  Next witness.  Stretch for a moment.

14   You can go, Ms. Patishnock.  Thank you.

15         (The following discussion took place at sidebar:)

16         MR. DeSTEFANO:  The offer of proof as to Mr. Hassam

17   is merely that he was one of the johns that this woman had --

18   maybe if she picks him out or whatever, she was shown a

19   picture, et cetera, all right.  The probative value of that

20   evidence to these charges is in my view zero -- maybe a plus

21   two background or something plus one.  The prejudice is

22   monumental.  I will respectfully request that evidence be

23   precluded under 401 and 403.

24         THE COURT:  Okay.

25         MS. ROBERTS:  It's the government's position Om Sri

73

1   Sai is a defendant in this case charged with conspiracy for the
2   sex trafficking.  The defendant individual was the majority
3   shareholder in that company.  The testimony is going to be from
4   the witness that she had sex in exchange for free hotel rooms
5   at the Howard Johnson and that she is a sex trafficking victim.
6           MR. DeSTEFANO:  This sex for -- in return for free
7   rooms?
8           MS. ROBERTS:  Yes, that was part of the -- that was
9   part of the information provided to you yesterday.
10          MR. DeSTEFANO:  Again, I don't see it relevant to
11   these charges at all.  I see it highly inflammatory, and I
12   think the prejudicial value to Mr. Hassam is vastly -- no
13   probative value to these charges.
14          THE COURT:  Okay.
15          MR. DeSTEFANO:  It's him.  He's a defendant as well.
16          THE COURT:  The motion is denied.  It's clearly
17   strong circumstantial evidence of knowledge, lack of mistake, a
18   lot of 404(b) things theoretically it could be.  It could be
19   motive, make money.  I don't know.  It's clearly circumstantial
20   evidence that the activity was going on and he would be aware
21   of it.  Whether or not he knows about force or doesn't know
22   about force is something ultimately a jury will decide, but you
23   can't have sex trafficking by force without having sex
24   trafficking, and so the bottom line is it's clearly relevant
25   and it will be allowed.

74

1              (The discussion at sidebar concluded.)

2              THE COURT:  Next witness.

3              MS. ROBERTS:  The government is going to call Kenya

4    Evans.

5              KENYA EVANS, called as a witness, being duly sworn,

6    testified as follows:

7              THE COURT:  You can take your time, Ms. Evans.

8    There's tissues there if you need those.

9              MS. ROBERTS:  Your Honor, if I put my mask on, can I

10   move a little closer to the witness?

11             THE COURT:  Yes.  Please keep your voice up.  I know

12   you can do that, too.

13   DIRECT EXAMINATION

14   BY MS. ROBERTS:

15   Q.   Good morning.

16   A.   Good morning.

17   Q.   Can you just tell the jury how old are you?

18   A.   I'm 27.

19   Q.   How far did you go in school?

20   A.   The 11th grade.

21   Q.   So where did you grow up?

22   A.   Stroudsburg, Pennsylvania.

23   Q.   Kenya, are you familiar with the gang called the P.

24   Stones?

25   A.   Yes.

75

1  Q.    Can you explain to the jury how you became familiar with

2  this gang?

3  A.    I was dating somebody who was a leader.

4  Q.    Who were you dating?

5  A.    Sirvonn Taylor.

6  Q.    How old were you when you met Sirvonn Taylor?

7  A.    I met him when I was 15.  We started dating when I was 16.

8  Q.    Was Sirvonn your boyfriend at the time?

9  A.    I thought he was.

10 Q.    Did you ever actually become a member of the P. Stones?

11 A.    No, ma'am.

12 Q.    At the time that you met Sirvonn, where were you living?

13 A.    I was living with my grandmother.

14 Q.    You said you thought Sirvonn was your boyfriend.  Why did

15 you think that?

16 A.    Sirvonn Taylor and I had a relationship.  I thought he was

17 my boyfriend because he said that I was his main girl, his

18 girlfriend.

19 Q.    Do you know what types of things -- when you met him, do

20 you know what types of things Sirvonn did to make money?

21 A.    Not at first.

22 Q.    Eventually did you learn what he did to make money?

23 A.    Yes.

24 Q.    What was he doing to make money?

25 A.    Selling drugs, selling females.

76

1  Q.    Did you want to become involved in that?

2  A.    No.

3  Q.    Did you ever think that you would be involved in that?

4  A.    No.

5  Q.    Why?

6  A.    Made a lot of promises, and at the time I had a child, a

7  son.  So I didn't want to be involved in that type of activity.

8  Q.    Would you -- when you and Sirvonn were together, would you

9  stay together in different places?

10 A.    Yes.

11 Q.    Where were you say with Sirvonn?

12 A.    Hotels.

13         THE COURT:  Ms. Evans, I know it's difficult.  I will

14 ask you to take that microphone a little closer to you and

15 slide into that so we can hear you clearly, okay?

16         THE WITNESS:  Uh-huh.

17         THE COURT:  Thank you.

18 BY MS. ROBERTS:

19 Q.    Do you remember what hotels you would stay in?

20 A.    The quality.

21 Q.    Is that the Quality Inn in Stroudsburg?

22 A.    Yeah.

23 Q.    Across from a Perkins restaurant?

24 A.    Yes, mainly the Howard Johnson.

25 Q.    Is that the Howard Johnson in Bartonsville?

1  A.   Yes.

2  Q.   Who would get the hotel rooms if you know?

3  A.   He would.

4  Q.   Do you know how he would pay for the room?

5  A.   Money.

6  Q.   Was there a particular section of the Howard Johnson that

7  you would stay in?

8  A.   I would explain it like towards the back and anywhere that

9  there was an exit, you know, just in case, like, police came

10  and stuff like -- stuff like that.

11  Q.   Okay.  How often would you stay at the Howard Johnson on a

12  -- just sporadically or for weeks at a time or --

13  A.   Sometimes weeks at a time and sometimes sporadically when

14  things got too hot, like --

15  Q.   What do you mean by hot?

16  A.   Like, he was doing a lot of things.  We were doing a lot

17  of things.  So when stuff -- you know, like, if people were

18  constantly arguing or doing what I was doing at the time we

19  couldn't stay there for long periods of time.

20  Q.   Did you know anyone who worked or was associated with the

21  hotel?

22  A.   Yes.

23  Q.   Who did you know?  Do you remember?

24  A.   The owner.

25  Q.   Anybody else?

78

1  A.   To me the guy that was working there I thought he was the

2  owner.

3  Q.   And do you see that person, the guy you thought was the

4  owner, do you see him in the courtroom?

5  A.   Yes.

6  Q.   Can you just say what color mask he has on?

7           THE COURT:  Well, let me ask you to -- if you can --

8  you can stand up if you want there and look to see if you see

9  him.  If you do, point him out for us.

10          THE WITNESS:  He has a black mask on.

11          THE COURT:  I see a lot of black masks.  Do you see a

12  color shirt or a jacket or a --

13          THE WITNESS:  Right there.

14          THE COURT:  Gentleman there?

15          THE WITNESS:  Yes.

16          THE COURT:  The record will reflect she identified

17  Mr. Bhimani.

18  BY MS. ROBERTS:

19  Q.   Do you recognize anyone else from the Howard Johnson?

20  A.   Can I stand up?

21          MS. ROBERTS:  Can she stand up?

22          THE COURT:  Of course.

23          THE WITNESS:  Sitting next to the female in the gray

24  suit.

25          THE COURT:  She has identified --

79

1          THE WITNESS:  Mask on.

2          THE COURT:  She identified Mr. Hassam, okay.

3    BY MS. ROBERTS:

4    Q.    Let's talk about the first individual you had identified

5    with the black mask on.  How did you associate him with the

6    Howard Johnson?

7    A.    When we checked into rooms, he was the main one who

8    checked us in.

9    Q.    And would he be at the front desk?

10   A.    Yes.

11   Q.    Did you know what his name was?

12   A.    No.

13   Q.    Did you ever personally talk to him?

14   A.    Yes.

15   Q.    And when did you talk to him?  Let me withdraw that

16   question and ask you something else.  When you were staying at

17   the Howard Johnson, did you have a drug problem?

18   A.    Yes.

19   Q.    What type of drugs were you using at the time?

20   A.    Heroin.

21   Q.    Who was providing you with heroin?

22   A.    Sirvonn.

23   Q.    Prior to meeting Sirvonn, did you have a heroin problem?

24   A.    No.

25   Q.    Did you use any other drugs?

80

1  A.    Ectasy, alcohol.

2  Q.    And who provided you with those?

3  A.    Sirvonn.

4  Q.    And why would he provide you with those drugs?

5  A.    Because I worked for him.

6  Q.    Because you worked for him?

7  A.    Yes.

8  Q.    Did you ever see Sirvonn selling drugs at the Howard

9  Johnson to other people?

10  A.    Yes.

11  Q.    How often?

12  A.    All the time.

13  Q.    Would it be on a daily basis or multiple times a day?

14  A.    Yeah.

15  Q.    Where in the Howard Johnson would he be when he would sell

16  drugs?

17  A.    He would leave the room or have some people come to the

18  room sometimes.

19  Q.    What types of drugs did he sell?

20  A.    Heroin, cocaine.

21  Q.    Did you ever use cocaine?

22  A.    Yes.

23  Q.    Why did you use cocaine?

24  A.    Because I never wanted to be sober doing those things.  I

25  wanted to feel numb.

81

1  Q.    Did you want to do those things?

2  A.    No.

3  Q.    Can you explain to the jury what it's like to be addicted

4  to heroin?  Is it physical?  Is it mental?  Is it both?

5  A.    Yes.

6  Q.    Let's start with the mental aspect of it.  If you're

7  addicted to heroin, what does that mean mentally for you?

8  A.    Your body needs it all the time.  You can't focus.  You

9  can't do anything unless you have it.

10  Q.    Do you think about it all the time?

11  A.    Huh?

12  Q.    Do you think about it all the time?  Do you think about

13  doing the drug?

14  A.    No.

15  Q.    Back then did you when you were addicted?

16  A.    Yes.

17  Q.    Okay.  What about physically when you're addicted to

18  heroin, what happens to you physically?

19  A.    Sick, very, sick.

20  Q.    What type of sick?

21  A.    Stomachaches, the sweats.  Your legs will hurt.  Your body

22  will hurt.  You couldn't function.  You couldn't do anything

23  without it.

24  Q.    Is that how you were?

25  A.    Yes.

82

1  Q.   Did using cocaine to help those symptoms in any way?

2  A.   Not really.  It just kept me up.

3  Q.   Why was it -- why did -- why was it better that you were

4  up?

5  A.   So I could make money for him.

6  Q.   For who?

7  A.   Sirvonn.

8  Q.   So did you use these drugs while you were at the Howard

9  Johnson?

10 A.   Yes.

11 Q.   Did you see other women at the Howard Johnson who were

12 also using these drugs while you were there?

13 A.   Yes.

14 Q.   And do you know who some of those women are?  Do you

15 remember their names?

16 A.   No.

17 Q.   Did you see other men who were using those drugs at the

18 Howard Johnson?

19 A.   A few, yes.

20 Q.   Other than Sirvonn, did you see other members of the P.

21 Stones selling drugs?

22 A.   Yes.

23 Q.   Other than Sirvonn, were there other members of the P.

24 Stones selling women at the Howard Johnson?

25 A.   Yes.

83

1  Q.   How did -- how were women advertised with the sex

2  trafficking?  Was there advertisements posted someplace?

3  A.   Back Page.

4  Q.   Who set the prices for the acts?

5  A.   He did.

6  Q.   When you say he, who are you talking about?

7  A.   Sirvonn.

8  Q.   So once you received money as payment, what would you do

9  with the money?

10 A.   He'd take it from me.

11 Q.   All of it?

12 A.   Yes.

13 Q.   Okay.  How did you pay for food or --

14 A.   He would.

15 Q.   I'm sorry?

16 A.   He would.

17 Q.   He would give you money for that?

18 A.   Yeah, he would say that I put a roof over your head, I put

19 clothes on your back, I feed you, so I don't need money.

20 Q.   Approximately how many men would you see every day at the

21 Howard Johnson while you were staying there?

22 A.   20, sometimes even more.

23 Q.   Would they actually come to your hotel room?

24 A.   Yes.

25 Q.   Are any of the men that you saw in this courtroom today?

84

1  A.    I'm sorry?

2  Q.    Okay.  I will rephrase the question.

3  A.    Are they here?

4  Q.    Are any of the men that you -- that came to your hotel

5  room to pay you for sex, are they in this courtroom today?

6  A.    Yes.

7  Q.    Are they the two individuals that you already identified

8  for the Court?

9  A.    Yes.

10         MR. DeSTEFANO:  Objection, leading.

11         THE COURT:  Yeah, I'll sustain the objection.  You

12  can rephrase the question.

13         MS. ROBERTS:  Thank you, Your Honor.

14  BY MS. ROBERTS:

15  Q.    Can you again identify -- you stated -- you testified that

16  two men are in the courtroom who came to your --

17         MR. DeSTEFANO:  Objection.

18         THE COURT:  No, that's not leading, no.  Overruled.

19  BY MS. ROBERTS:

20  Q.    To pay you for sex, can you identify for the jury which

21  two men they are?

22  A.    Yes.

23  Q.    Who are they?

24  A.    Should I stand up again?

25         THE COURT:  You can.  Sure.

1        THE WITNESS:  The man in the black vest.

2        THE COURT:  That's Mr. Bhimani you identified.  Who

3    was the other one?

4        THE WITNESS:  The man in the white.

5        THE COURT:  Mr. Hassam?

6        THE WITNESS:  Yes.

7        THE COURT:  White mask.  You can sit back down.

8    BY MS. ROBERTS:

9    Q.   Did they actually give you money?

10   A.   Sometimes, but it was mainly for the rooms.

11   Q.   For a free room?

12   A.   Yes.

13   Q.   While you were at the Howard Johnson, did anyone ever

14   physically assault you who was a member of the P. Stones?

15   A.   Yes.

16   Q.   Who was that?

17   A.   Sirvonn Taylor.

18   Q.   Can you describe for the jury what happened?

19   A.   We got into an argument because I was keeping money, and I

20   didn't want to do this anymore, and he repeatedly hit me in my

21   face.

22   Q.   At this point, where were you in the hotel, inside a room

23   or outside?

24   A.   Yes, inside the room.

25   Q.   Okay.  And then what happened?

86

1  A.    Took my clothes off, pulled me by my hair down the hall.

2  Q.    Did you at that point go outside of the hotel room?

3  A.    Uh-huh.

4  Q.    Were you in the hallway of the hotel?

5  A.    No, I was outside.

6  Q.    Okay.  And were you crying and upset?

7  A.    Yes.

8  Q.    Who else was there?  Do you remember?

9  A.    There was people in the room, but the man that I

10 identified came outside.

11 Q.    The man you identified, was it the man in the black mask

12 or the white mask?

13 A.    Yes, the black.

14 Q.    And at the time that the man in the black mask came

15 outside, what were you wearing?

16 A.    A bra and panties.

17 Q.    Were you upset and crying?

18 A.    Yeah, I wanted to go home.

19 Q.    Did you have any visible injuries?  Where were they?

20 A.    Face.

21 Q.    Was that from Sirvonn hitting you?

22 A.    Yes.

23 Q.    I didn't hear you.

24 A.    Yes.

25 Q.    Did the man in the black mask say anything at that time

87

1  when he saw you like that?

2  A.    Told Sirvonn to calm me down and he's going to have to

3  leave.

4  Q.    And did he leave?

5  A.    Yes.

6  Q.    Did you stay?

7  A.    Yes, he said the cops were going to come.

8  Q.    Did they ever come?

9  A.    No.

10 Q.    Were you allowed to continue to stay in the hotel room

11 with Sirvonn?

12 A.    Yes.

13 Q.    Did you ever observe any other females get assaulted at

14 the Howard Johnson by P. Stones?

15 A.    Yes.

16 Q.    Do you remember any of those times or who got assaulted?

17 A.    There was another female named Millie.  She was hit in her

18 face because she was talking back.

19 Q.    Do you remember who hit her?

20 A.    No.

21 Q.    Okay.  Going back to the time when you were assaulted,

22 when Sirvonn came back to the room, did you stay in the room

23 with him?

24 A.    Uh-huh.

25 Q.    How long was he gone for when he had left?

88

1  A.    A few hours.

2  Q.    Did you ever participate in any type of parties at the

3  Howard Johnson?

4  A.    Yes.

5  Q.    And where were those parties?

6  A.    In the room, the pool area.

7  Q.    Were they during regular pool hours or were they later at

8  night?

9  A.    Later at night.

10  Q.    Was there any drug use going on at these parties?

11  A.    Yes.

12  Q.    Did people have bathing suits when they went into the pool

13  or were they --

14  A.    Sometimes.

15  Q.    Go ahead.

16  A.    Yes, sometimes.   It was our choice if we wanted to wear

17  bathing suits or not.

18  Q.    You didn't have to wear a bathing suit?

19  A.    No.

20  Q.    So who would open the pool after hours and allow you to

21  stay there?

22  A.    Point him out?

23  Q.    Did you already identify him?

24  A.    Yes.

25  Q.    What color mask did he have on?

89

1  A.    The black mask.

2  Q.    Did you ever stay at the Quality Inn hotel?

3  A.    Yes.

4  Q.    Okay.

5         THE COURT:  Ms. Evans, you will have to speak up.

6         THE WITNESS:  Sorry.

7         THE COURT:  I know it's difficult.  Take that mic

8  closer to you.  Take a deep breath.  If you need to take a

9  break, that's okay.  You need to speak up so we can hear, okay.

10         THE WITNESS:  Okay.

11  BY MS. ROBERTS:

12  Q.    Why would you stay at the Quality Inn hotel?

13  A.    Because we couldn't stay in one hotel.  Like I said it

14  before, it would get too hot, and after that incident that

15  happened with me, it was probably best to stay at a different

16  hotel.

17  Q.    How did you know it was hot at the Howard Johnson?

18  A.    Someone would inform Sirvonn Taylor.

19  Q.    And do you know who it was who informed Sirvonn Taylor?

20         MR. BROWN:  Objection, Your Honor.  Calls for

21  speculation.

22         THE COURT:  Unless she has it from her own personal

23  knowledge and was present there.

24         MS. ROBERTS:  That's what I am going to ask, Your

25  Honor.  I will rephrase the question.

90

1  BY MS. ROBERTS:

2  Q.   Do you have personal knowledge, or were you present when

3  someone told Sirvonn about it being hot?

4  A.   Yes.

5  Q.   Okay.  Can you describe that personal knowledge for the

6  jury?

7  A.   He came down to the room.

8  Q.   When you say he, who are you talking about?

9  A.   The man I identified before.

10 Q.   What color mask?

11 A.   The black mask.

12 Q.   Okay.  Were you present in the room?

13 A.   Yes.

14 Q.   And what happened?

15 A.   He had a conversation with him and told him, you know,

16 we're making the hotel, you know -- there's too much going on

17 and we couldn't stay there.

18 Q.   And after that, did you go to the Quality Inn?

19 A.   Yes.

20 Q.   At some point, did you go back to the Howard Johnson?

21 A.   Yes.

22 Q.   Were you ever told don't come back to the Howard Johnson?

23 A.   No.

24 Q.   Did you know anybody at the Quality Inn?

25 A.   No, no, not personally, no.

91

1    MS. ROBERTS:  Your Honor, if I can just have a

2  moment.

3    THE COURT:  Sure.

4    MS. ROBERTS:  No further questions at this time, Your

5  Honor.

6    THE COURT:  All right.  Mr. Brown?

7    MR. BROWN:  Thank you, Your Honor.

8  CROSS EXAMINATION

9  BY MR. BROWN:

10  Q.   Good afternoon, Ms. Evans.

11  A.   Hi.

12  Q.   Is this the first time you told the story regarding my

13  client coming to rooms and having sex with you?

14  A.   No.

15  Q.   Okay.  Did you tell that to government -- the government

16  before today?

17  A.   Yes.

18  Q.   Okay.  And was that during meetings with attorney Camoni?

19  A.   Yes.

20  Q.   Attorney Roberts?

21  A.   Attorney Roberts?

22  Q.   The young lady that was just questioning you.

23  A.   Yes.

24  Q.   Do you know agent Shelly?

25  A.   Yes.

92

1   Q.    Let me ask this.  During those meetings, did they tell you
2   what they wanted to talk about?  Did they tell you what the
3   case was about you were going to be testifying?
4   A.    Yes.
5   Q.    Did they ask you questions?
6   A.    Yes.
7   Q.    Did they talk about certain incidents that they wanted you
8   to bring up?
9   A.    Like?
10  Q.    Like, what you talked about on direct examination?
11  A.    Yes.
12  Q.    So they reviewed that with you, right?
13  A.    Yes.
14  Q.    Before today would you be surprised to know the defense
15  never received anything --
16          THE COURT:  No, no, no, that's an inappropriate
17  question.  You ask questions of a witness based upon their
18  testimony.  Don't do that sort of thing again.
19  BY MR. BROWN:
20  Q.    You said you were addicted to drugs during that time?
21  A.    Yes.
22  Q.    Do you think the -- you were asked about your mental state
23  with the drugs, correct?  Do you think that the drugs affected
24  your ability to recall what was going on, yes or no?
25  A.    No.

93

1  Q.    Okay.  But at the same time you said you used the drugs

2  because you never wanted to feel or be -- never wanted to be

3  sober, correct?

4  A.    Yeah.

5  Q.    Okay.  The person that provided you those drugs was

6  Sirvonn Taylor, correct?

7  A.    Yes.

8  Q.    Did you say that you never were initiated into the P.

9  Stones?

10 A.    No.

11 Q.    Okay.  So if there was testimony previously that you were,

12 that would be inaccurate?

13 A.    Yes.

14 Q.    And do you agree that somebody who is under the influence

15 of drugs will do anything to get their drug?

16 A.    Yes.

17 Q.    Such as lie, correct?

18 A.    Yes.

19 Q.    Steal, correct?

20 A.    Yes.

21 Q.    Cheat, correct?

22 A.    Yes.

23 Q.    So can the jury believe anything you said today as --

24 about when you were in your addiction?

25 A.    Yes.

94

1  Q.    You do admit having sex for money, correct?

2  A.    Yes.

3  Q.    And did you also make drug runs for Sirvonn Taylor to

4  Maine and other states?

5  A.    Yes.

6  Q.    Okay.  And you did that often for the P. Stones and Mr.

7  Taylor, correct?

8  A.    Not often.  The only time I did it was in Maine.

9  Q.    Have you been prosecuted or charged with any crimes for

10  that?

11  A.    Yes.

12  Q.    Okay.  What crimes were you charged with?

13  A.    I was charged in Maine with trafficking.

14  Q.    Okay.  Was that by the federal government?

15  A.    Yes.

16  Q.    Yes.  And would you agree that when you would run drugs

17  for Mr. Taylor it would be important for to you conceal those

18  drugs so you do not get caught?

19  A.    Yes.

20  Q.    And if you're stopped by law enforcement it would be

21  important for you to be able to tell a story to them so you

22  wouldn't be caught?

23  A.    Yes.

24  Q.    Now, you said most of the -- one of the issues regarding

25  Mr. Taylor at the Howard Johnson actually happened in the room,

95

1  correct?

2  A.    Yes.

3  Q.    And Mr. Bhimani told you he would call the cops, correct?

4  A.    I'm sorry.  Can you --

5  Q.    Did Mr. Bhimani when he confronted you in the parking lot

6  say that he would call the cops?

7  A.    He said somebody is going to call the cops.

8  Q.    And you said that you would choose the section of the

9  hotel because it was close to an exit so if something happened

10 you can escape, correct?

11 A.    No, I said he would choose an exit so we could leave.

12 Q.    Okay.  You don't think that he would leave you there?

13 A.    He left me there multiple times.

14 Q.    Okay.  But --

15 A.    The incident that occurred when your client was there.

16 Q.    He actually -- so Faizal made Mr. Taylor leave the --

17 A.    Yes, he told him he should leave.

18 Q.    He told Mr. Taylor to leave?

19 A.    Yes.

20 Q.    So he intervened on your behalf?

21 A.    Yes.

22 Q.    And would you agree if somebody was coming to the room it

23 would be easier for Mr. Taylor to go out to the parking lot,

24 meet that person and come back in without being detected?

25 A.    Uh-huh.

96

1  Q.    Is that a yes?

2  A.    Yes.

3  Q.    You have to say yes or no because she's taking it down so

4  --

5  A.    Yes.

6  Q.    Would that be also true for prostitution if the john came,

7  they could come in the exit, come to the room and leave?

8  A.    Yes.

9  Q.    Okay.

10         MR. BROWN:  No further questions.  Thank you.

11         THE COURT:  Thank you, Mr. Brown.  Mr. DeStefano.

12  CROSS EXAMINATION

13  BY MR. DeSTEFANO:

14  Q.    Hi, Ms. Evans.  I am Bill DeStefano.  I represent the

15  company and the gentleman with the white mask.

16  A.    Yes.

17  Q.    I would like to ask you some questions.  Bear with me.

18  Please give me truthful answers.

19  A.    Yeah.

20  Q.    Now, first of all, as I understand your testimony on

21  direct, you met Sirvonn -- were you both in high school when

22  you met?

23  A.    I was.

24  Q.    You were in high school.  He was out of high school?

25  A.    Yes.

97

1 Q.    Okay.  What high school did you go to?

2 A.    Stroudsburg.

3 Q.    Was he in the same high school or different high school?

4 A.    He wasn't in a high school.

5 Q.    What year was it when you first met him?

6 A.    I was 15 at the time.  I would say in 2000 -- I want to

7 say 2004 or 5.

8 Q.    What years did you go to high school?

9 A.    I was in high school in 2000.

10 Q.   So you were a freshman in 2000 first year.  Is that ninth

11 grade?

12 A.    Yes.

13 Q.    Tenth grade in 2001?

14 A.    Yes.

15 Q.    11th grade in 2002?

16 A.    Yes.

17 Q.    And you didn't make it to 12th grade from your testimony?

18 A.    No.

19 Q.    Would you have first met Mr. Taylor in 2002 or 2001?

20 A.    I would say in 2002 because I already dropped out of

21 school.

22 Q.    Oh, you had already dropped out of school when you met Mr.

23 Taylor.

24 A.    Yes.

25 Q.    So now that's 2004.

1  A.    I'm --

2  Q.    Are you with me?

3  A.    Yes.

4  Q.    So your best recollection is that you met Mr. Taylor in

5  2004?

6  A.    Yes.

7  Q.    And you spent some period of time as boyfriend and

8  girlfriend?

9  A.    Yes.

10  Q.    How long did you spend as boyfriend and girlfriend?

11  A.    Up until I was 23 -- until I was 23 after this situation

12  happened in Maine.  21.

13  Q.    21 or 23?

14  A.    21, I'm sorry.

15  Q.    So if you met him in '04 and you were 15 --

16  A.    Yes.

17  Q.    You were boyfriend and girlfriend for --

18         MS. ROBERTS:  Judge, I am going to at this point

19  object.  She's currently -- just so the record is clear she's

20  currently 27.  So the dates that are being given are not

21  accurate that's -- '04 she would have been 11.

22         THE WITNESS:  Yeah, it's confusing.  This happened a

23  long time ago.

24         THE COURT:  Well, I'm going to allow the questions to

25  be asked.  I'm not finding any -- I am trying to find some

99

1  relevance in them.  But I am going to let counsel ask his

2  questions, and the witness can answer as best she can answer

3  the questions.  Go ahead.

4  BY MR. DeSTEFANO:

5  Q.   How many years did you spend with Mr. Taylor as boyfriend

6  and girlfriend?

7  A.   I spent a couple of years with him up until I was 21.  I

8  met him when I was 15.

9  Q.   So that would be more than a couple years.  That would be

10 four --

11 A.   Yes, I spent quite a lot of time with him.

12 Q.   And I take it did you just have sex with him as boyfriend

13 and girlfriend and nobody else?

14 A.   Yes.

15 Q.   Okay.  So you didn't become a prostitute until sometime

16 after you were 21?

17 A.   No, I didn't become a prostitute until I was 18.

18 Q.   Okay.  All right.  How was it you just went from boyfriend

19 to girlfriend and having sex with only Mr. Taylor to having sex

20 with other people as well as a prostitute?  How did that

21 happen?

22 A.   Well, he believed that I could make money with my body, I

23 was a good looking female, and he believed I can make money for

24 him with my body I guess.

25 Q.   Did you agree with him?

100

1  A.    No.

2  Q.    Did you -- well, what did you do?  Did you just refuse?

3  A.    I told him I didn't want to do it, but there was no

4  telling him anything.

5  Q.    So he talked you into doing it?  Would that be accurate?

6  A.    He didn't talk me into it.  He told me that's what I am

7  going to do.

8  Q.    And then you became a prostitute.  You started selling --

9  A.    Yes.

10  Q.    Is it your testimony that once you became a prostitute you

11  had sex with approximately 20 men per night?

12  A.    It would vary.  I mean --

13  Q.    You gave us the number 20.  Do you recall that?

14  A.    20 or more.  On a good day it would be 20 or more.

15  Q.    Was that primarily a nighttime thing or a daytime thing?

16  A.    It was all around, 24/7.

17  Q.    Okay.  So you're saying 20 men per minute both day and

18  night or per day?

19  A.    Per day.

20  Q.    And at times it could have been more?

21  A.    Yeah.

22  Q.    So now is it your testimony that -- that you rotated

23  between several hotels in the Pocono area and maybe out of

24  state while you were a prostitute?

25  A.    I wouldn't say we rotated from multiple hotels.  The

101

1   Howard Johnson was our main hotel because we could -- we didn't
2   have to use an I. D., you know.  He knew the owner, so it was
3   easy for us to get a hotel there.  The Quality was just --
4   Q.    When you say he knew the owner, you thought the owner was
5   the person in the black mask?
6   A.    Yes.
7   Q.    And so it was your main place, but did you or did you not
8   go to other hotels?
9   A.    Yes.
10  Q.    And act as a prostitute in the other hotels?
11  A.    Yes.
12  Q.    Okay.  Which ones were they to the best of your memory?
13  You said the Quality Inn?
14  A.    Yes.
15  Q.    Any others?
16  A.    Budget.
17  Q.    Budget?
18  A.    Yeah.
19  Q.    Any others?  Days Inn?
20  A.    Days Inn.
21  Q.    Super 8?
22  A.    Yes.
23  Q.    Super 8?
24  A.    Sometimes.
25  Q.    All right.  Any others that you can remember?

102

1    A.    No.

2    Q.    Did people stay at a house, not a hotel?

3    A.    Yeah.

4    Q.    Where was that house?  Do you know?

5    A.    Main Street -- I never --

6    Q.    Never went to the house?

7    A.    I never stayed in a house.

8    Q.    You never did any prostitution in the house?

9    A.    No.

10   Q.    Okay.  You did the prostitution in the motels you

11   mentioned?

12   A.    Yeah.

13   Q.    And possibly a -- okay.  Now, how long did you do, six

14   months, a year, two years until you stopped?

15   A.    I don't want to say when he got arrested -- when he went

16   to jail, that's when basically everything stopped.  I mean,

17   when I was still in Maine, I was still prostituting because I

18   was with him so --

19   Q.    Okay.  He was arrested in 2014.  Do you recall that?

20   A.    I think so.

21   Q.    Everything stopped at that time?

22   A.    I think.  I think so.

23   Q.    So you were a prostitute for a period of time after you

24   stopped being boyfriend and girlfriend?

25   A.    Uh-huh.

1  Q.    That was up until 2014.  At least we have the end date

2  there when he was arrested.

3  A.    Uh-huh.

4  Q.    After that, did you stop all prostitution activity?

5  A.    Yes.

6  Q.    I know there were other people that weren't arrested.  I

7  think you mentioned some names, but Mr. Taylor was your main

8  man or your pimp?

9  A.    Yes.

10 Q.    You acted as a prostitute in several hotels, but you are

11 saying you spent the most time in the Howard Johnson?

12 A.    Yes.

13 Q.    Do you smoke marijuana or cigarettes during this time?

14 A.    I smoked cigarettes.

15 Q.    Cigarettes?

16 A.    Yes.

17 Q.    If you stayed at a hotel, you needed a smoking room?

18 A.    Yes.

19 Q.    You couldn't go into a non-smoking?

20 A.    What?  I'm sorry.

21 Q.    You couldn't go to a -- non-smoking?

22 A.    No.

23 Q.    Don't they ask you when you go in a hotel, do you want

24 smoking --

25 A.    If we want to smoke in the room or --

1  Q.    Right.  And because you smoked cigarettes, at least you

2  wanted a smoking room, you needed a smoking room?

3  A.    Yeah.

4  Q.    Correct?

5  A.    Yes.

6  Q.    Okay.  Now, did the other P. Stones girls you were with

7  that were also acting as prostitutes also smoke either

8  cigarettes or marijuana?

9  A.    Yes.

10 Q.    So your group however big or small group was when you came

11 to the Howard Johnson, they all needed smoking rooms, would

12 that be accurate?

13 A.    Yes.

14 Q.    Those rooms in the back of the motel you described, were

15 they smoking rooms?

16 A.    I believe so.  We smoked in them.

17 Q.    All right.  You agree you couldn't stay anywhere in that

18 hotel except a smoking room because you smoked, correct?

19 A.    Can you repeat the question?

20 Q.    You agree with me, would you not, that either in that

21 motel or any motel you went to when you checked in you needed

22 to be in a smoking room rather than a non-smoking room?

23 A.    I mean, we -- we smoked.  We smoked.  So I don't think it

24 really mattered.  We got whatever room we wanted.  He gave us

25 whatever room we wanted.  We smoked in the hotel.

1  Q.    You smoked in the rooms you were given?

2  A.    Yes, all right.

3  Q.    Was that both marijuana and cigarettes?

4  A.    Yes.

5  Q.    You met with the prosecutors in this case.  How many times

6  before coming in here this morning and testifying?

7  A.    How many times?

8  Q.    How many times?

9  A.    What do you mean how many times?

10  Q.    How many times did you have a meeting with either the

11  detectives, the prostitute -- I'm sorry -- the prosecutors or

12  both before coming into this courtroom here today?

13  A.    I met with them yesterday.  I spoke to them briefly before

14  I came -- came here.

15  Q.    So you met with them as late as yesterday?

16  A.    Uh-huh.

17  Q.    You spoke to them briefly on a prior occasion, is that

18  what you're saying?

19  A.    Yes, on the phone.

20  Q.    On the phone, okay.  You recall when the phone call was?

21  A.    It was couple of weeks ago before trial, so it was about a

22  week ago.

23  Q.    Week ago.  How long was the phone conversation?

24  A.    We were on the phone for a couple -- not a couple of

25  minutes.  We were on the phone for longer than ten minutes.

106

1  Q.   Okay.  Something longer than ten minutes, perhaps less

2  than a half hour?

3  A.   Maybe a half hour.

4  Q.   All right.  And then when you came in for the meeting

5  yesterday, how long was that meeting?

6  A.   I would say about an hour.

7  Q.   An hour.  Okay.  And you agree with me that yesterday was

8  more than six years after you stopped prostitution?

9  A.   Yes.

10 Q.   So you were talking with these people about things that

11 happened at least six years earlier?

12 A.   Yes.

13 Q.   Would you say you have a good memory or a bad memory?

14 A.   I would say my memory is not that -- that good due to the

15 drug use, but I wouldn't -- I wouldn't say it's bad.

16 Q.   I'm just asking.  You have a not good drug -- not good

17 memory.  You agree with me that your memory is not the best?

18 A.   Yes.

19 Q.   And yesterday you were talking about stuff that happened

20 six, seven, eight, nine years ago?

21 A.   Yes.

22 Q.   Correct.  That's when you were at the Howard Johnson.

23 A.   Yes.

24 Q.   You would agree with me during the time you were at the

25 Howard Johnson and others you were acting as a prostitute for

107

1    20 or more men per night?

2    A.    Yes.

3    Q.    Correct?

4    A.    Yes.

5    Q.    Is that a seven-day-a-week thing, six days a week?

6    A.    Seven days a week.

7    Q.    Seven days a week, 20 men a night?

8    A.    Yes.

9    Q.    Now, did they show you, the police, a picture of this

10   gentleman right here with the black mask on during that session

11   less than an hour session you had with them yesterday?

12   A.    No.

13   Q.    Did not show you a picture?

14   A.    No.

15   Q.    At any prior time did they show you a picture of that man?

16   A.    Yes, our phone conversation.

17   Q.    They showed you a picture during a phone conversation?

18   A.    They sent me a picture during our phone conversation.

19   Q.    How did they send it to you, on the phone?

20   A.    Yes.

21   Q.    Okay.  All right.  During yesterday's meeting, did they

22   show you a picture of that man with the white mask?

23   A.    Yes.

24   Q.    Did they show you a picture of any other john for lack of

25   a better word or customer that you had?

1  A.    No.

2  Q.    During the time in question, all those years up to 2014?

3  A.    No.

4  Q.    The only person they showed you of a customer was that

5  man?

6  A.    Yes.

7  Q.    The man in the white mask?

8  A.    Yes.

9  Q.    When she showed you that photo did, they do it in a photo

10 spread where there's, like, six photos and you have the one you

11 have sex with, or did they just show you one picture, one

12 picture only, just him?

13 A.    Yes.

14 Q.    Ms. Evans, I want you to be a hundred percent truthful.

15 A.    Yes.

16 Q.    Because it's your obligation.  You took an oath.  Didn't

17 the police put the identity of that man in the white mask in

18 your head yesterday during that telephone -- during that

19 meeting you had as one of your johns?

20 A.    No.

21 Q.    You're telling me that you can honestly remember after

22 having sex with 20 men, 365 days a year back at least six years

23 ago and probably more, that man is one of the people you had

24 sex with?

25 A.    I know for a fact he was one of the people I had sex with.

109

1  Q.    How do you know that, ma'am?

2  A.    Because he's the person that came to my room including --

3  Q.    Because the police --

4         MS. ROBERTS:  Objection, Your Honor.

5         THE COURT:  Excuse me.

6         MR. DeSTEFANO:  Finish your answer.

7         THE COURT:  Thank you.  You can finish your answer.

8  Go ahead.

9         THE WITNESS:  I know he worked at the hotel, and in

10  order for us to get rooms when Black didn't want to spend his

11  money, we would sleep with those two men.  I will not forget

12  their faces, especially the one in the black mask, who didn't

13  provide me medical attention or anything when Black did that to

14  me.  I'm not going to forget their faces.

15  BY MR. DeSTEFANO:

16  Q.    Especially the one in the black mask?

17  A.    Yes.

18  Q.    I am going to ask you one more time.  By showing that

19  picture yesterday, the only picture of the john yesterday, did

20  the police put that picture of that man into your head --

21         MS. ROBERTS:  Objection, Your Honor.

22         THE COURT:  Overruled.

23         THE WITNESS:  No.

24         MR. DeSTEFANO:  That's all I have.

25         THE COURT:  All right.  Redirect?

110

1    MS. ROBERTS:  Briefly, Your Honor.

2    REDIRECT EXAMINATION

3    BY MS. ROBERTS:

4    Q.    Kenya, when attorney Brown was questioning you, you

5    responded that people would do anything when they are on drugs

6    include lie.  Are you on drugs now?

7    A.    No.

8    Q.    How long have you been clean for?

9    A.    Nine years.

10   Q.    And just so the record is clear because I know there was

11   some confusion with years and dates and everything, what is

12   your date of birth?

13   A.    3/30/93.

14   Q.    You were born in 1993?

15   A.    Yes.

16   Q.    When you were being interviewed prior to coming into court

17   today and also when you were in court today answering questions

18   when you didn't remember something, how did you respond?

19   A.    What do you mean?

20   Q.    Did you inform anyone who was asking you questions and you

21   didn't remember the answer, did you tell them you just didn't

22   remember?

23   A.    Yes.

24            MR. DeSTEFANO:  Objection.

25            THE COURT:  Yeah, I will sustain it.  That's leading.

111

1  Go ahead.  Next question.

2  BY MS. ROBERTS:

3  Q.   Regarding the meeting last night with law enforcement,

4  prior to seeing the photo of the individual in the white mask

5  that you identified, did you provide law enforcement with a

6  description of that individual?

7  A.   Yes.

8  Q.   Did you inform law enforcement that individual worked at

9  the hotel in some capacity?

10 A.   Yes.

11 Q.   Did you provide a description of his age, older, younger?

12 A.   I told you guys that there was an older man that used to

13 come to our rooms and we referred to him as a john.

14 Q.   And did you indicate to law enforcement what race he was,

15 whether he was non-white?

16 A.   Yes.

17 Q.   And after providing law enforcement with all of that

18 information, is that when they showed you the picture?

19 A.   Yes.

20        MS. ROBERTS:  Your Honor, I have no further questions

21 for this witness.

22        THE COURT:  You may step down.  Thank you.  All

23 right, ladies and gentlemen.  We will break for lunch.  You

24 heard the admonitions but they become -- I won't say more

25 important but just as important every time we break.  So no

1   conversation or discussions among yourselves or with anyone

2   else.  Don't form any opinions.  You have not yet heard all of

3   the evidence or law related to the case.  You're not to read or

4   listen to anything about the case.  No research of any kind

5   concerning anything about the case, names, dates, places,

6   people, locations, terminology, anything like that, no research

7   at all related to anything about the case.  If anyone were to

8   talk to you about the case, you must advise us of that

9   immediately.  All right.  It's now 25 of 1.  If you would be

10  back here at, say, 1:45, an hour and ten minutes for lunch.

11  All right.

12          (A lunch recess was taken.)

13          MR. BROWN:  There's text messages and Facebook

14  messages taken, and I -- just for purposes of a stipulation,

15  attorney Camoni had asked if we would stipulate to that.  Well

16  --

17          MR. CAMONI:  To authenticity and chain of custody.

18          MR. BROWN:  The chain of custody part I don't have a

19  problem with.  The problem I have with is now Mr. Stanley will

20  apparently be questioned who the person on the other side of

21  the phone is and where it came from.  So I guess I want to

22  lodge an objection on that.  I don't know if I'm -- if I am in

23  the right grounds, but I wanted to cover --

24          THE COURT:  So are they -- you said the other side of

25  the phone.  Were they --

113

1         MR. BROWN:  Facebook.

2         THE COURT:  Talking conversations or --

3         MR. CAMONI:  Written.  There's two different sets of

4  evidence.  One is Facebook text messages through Facebook

5  Messenger that were obtained a through search warrant and sent

6  to Facebook.  The other is text messages obtained through a

7  search warrant on Faizal Bhimani's phone that was seized during

8  a search at the hotel.  Mr. Stanley wasn't told where they came

9  from.  He looked at the conversation, and he said, that was me

10  texting Faizal.  There is one that is a conversation there's --

11  there's a text conversation that said, meet me at the front

12  desk.  He said he met him at the front desk.  Faizal said,

13  she's cute, send me a picture.  There's pictures that went at

14  the same time on the text messages.  He identified the

15  pictures, identified the woman in the picture.  So he's

16  authenticated it as a conversation that he had with Faizal

17  Bhimani.

18         THE COURT:  Okay.

19         THURMAN STANLEY, called as a witness, being duly

20  sworn, testified as follows:

21         THE COURT:  Mr. Stanley, if you'd sit towards the

22  microphone and pull it down as best as you can.  When you

23  speak, speak directly into it so we can hear you.

24  DIRECT EXAMINATION

25  BY MR. CAMONI:

114

1  Q.    Good afternoon, Mr. Stanley.

2  A.    Good afternoon.

3  Q.    Are you known by any other names or nicknames or street

4  names?

5  A.    Yes.

6  Q.    What name?

7  A.    Black and Dutch.

8  Q.    Did you -- what is your middle name?

9  A.    Lamont.

10  Q.    Ever go by that name?

11  A.    Yeah, not so much in the street.

12  Q.    Was there anybody who would call you or know you by the

13  name of Lamont?

14  A.    Through my Facebook page, yes.

15  Q.    How old are you today?

16  A.    43.

17  Q.    And how far did you go in school?

18  A.    Ninth grade.

19  Q.    Where do you currently reside?

20  A.    Currently in Lackawanna County Prison.

21  Q.    And are you in prison because you are currently serving a

22  sentence for a crime you were convicted of?

23  A.    Yes.

24  Q.    I would like to start with were you prosecuted by the U.

25  S. Attorney's Office?

115

1  A.    Yes.

2  Q.    What were you convicted of?

3  A.    Three counts of interstate commerce for the purpose of

4  prostitution and one count of possession with intent to

5  deliver.

6  Q.    Was that possession with intent to deliver controlled

7  substances?

8  A.    Yes.

9  Q.    What substances did that involve?

10  A.    Heroin, crack cocaine, cocaine and molly.

11  Q.    Did you plead guilty to those drug and sex trafficking

12  charges?

13  A.    Yes.

14  Q.    And when you said -- just to be clear, you said interstate

15  commerce for the purposes of prostitution.  Is that

16  transportation of a person between states?

17  A.    Yes.

18  Q.    For prostitution purposes?

19  A.    Yes.

20  Q.    All right.  Now, after you pled guilty, were you sentenced

21  for these crimes?

22  A.    Yes.

23  Q.    What were you sentenced to?

24  A.    188 months.

25  Q.    And at the time you pleaded guilty, did you enter into a

116

1  plea agreement with the United States?

2  A.   Yes.

3  Q.   I would like to show you what's been previously identified

4  as Exhibit No. 39.  It's going to come up on your screen.  Do

5  see what's on your screen there, Mr. Stanley?

6  A.   Yes.

7  Q.   Do you recognize this?

8  A.   Yes.

9  Q.   What is it?

10 A.   My plea agreement.

11 Q.   Is this a fair and accurate copy of the plea agreement

12 that you signed in this case?

13 A.   Yes.

14 Q.   And I would like to turn to page 27.  Do you recognize the

15 signature at the bottom of that page?

16 A.   Yes.

17 Q.   And can we go on to the next page, please?  Who is that

18 signature at the top that would appear right below yours?

19 A.   That was Shelly Centini, my counsel.

20 Q.   Was she your attorney who represented you in that criminal

21 case?

22 A.   Yes.

23      MR. CAMONI:  Your Honor, I would like to move admit

24 Government's Exhibit's 39.

25           THE COURT:  Any objection?

117

1     MR. BROWN:  No objection.

2     THE COURT:  Any objection from --

3     MR. DeSTEFANO:  No.

4     THE COURT:  It's admitted.

5   BY MR. CAMONI:

6   Q.   I would like to turn back to page one.  So as part of this

7   plea agreement in paragraph one, what charge -- the first set

8   of charges you pled guilty to, what charge was that?

9   A.   To counts eight to ten, section 2421, transporting a

10  person in interstate commerce to engage in prostitution.

11  Q.   Second page, first paragraph.  You also pled to count 11;

12  is that right?

13  A.   Right.

14  Q.   What was that charge?

15  A.   Distribution and possession with intent to distribute

16  controlled substances, heroin, molly and cocaine.

17  Q.   Now, that was under section 841 A. 1, correct?

18  A.   Yes.

19  Q.   If we can go to page 12, paragraph 9.  As part of your

20  plea agreement -- that's the wrong page.  Try ten.  As part of

21  this agreement, did you and the government reach a

22  recommendation for sentencing?

23  A.   Yes.

24  Q.   Do you recall what the recommendation was?

25  A.   Between 151 and 188.

118

1  Q.    So the government and you agreed that the recommendation

2  to the Court would be between 151 and 188 months?

3  A.    Yes.

4  Q.    And you were sentenced to 188 months?

5  A.    Right.

6  Q.    And at the time of your sentencing, did you -- at the time

7  of your guilty plea, did you also enter into a cooperation

8  agreement with the government?

9  A.    Yes.

10 Q.    I would like to bring up exhibit -- previously marked as

11 exhibit 39.1.  Do you recognize what's on your screen now, sir?

12 A.    The cooperation agreement.

13 Q.    This is the agreement that covers the cooperation portion

14 of your agreement?

15 A.    Yes.

16 Q.    Is this a fair and accurate copy of the agreement you

17 signed?

18 A.    Yes.

19 Q.    If we can turn to the last page, please.  Second to last

20 page.  The first signature there, who is that?

21 A.    That's mine.

22 Q.    Whose signature is below that?

23 A.    My lawyer.

24         MR. CAMONI:  At this time, I move to admit

25 Government's Exhibit 39.1.

119

1          THE COURT:  Mr. Brown?

2          MR. BROWN:  No objection.

3          MR. DeSTEFANO:  No objection.

4          THE COURT:  It's admitted under seal.

5    BY MR. CAMONI:

6    Q.    What did you agree to do under this cooperation agreement?

7    A.    Testify.

8    Q.    Testified if called?

9    A.    Yes.

10   Q.    Did you agree to sit for interviews with investigators if

11   asked?

12   A.    Yes.

13   Q.    Did you agree to provide information to the government

14   about any criminal activity you might be asked about?

15   A.    Yes.

16   Q.    Go back to page one, please.  And that second sentence in

17   the first -- paragraph one, do you understand that it's a

18   material condition of the agreement that you provide complete

19   and truthful cooperation --

20   A.    Yes.

21   Q.    -- as part of this agreement?  Do you understand that?

22   A.    Yes.

23   Q.    Do you understand that no part of this agreement provides

24   you any protection if you lie under oath or commit perjury?

25   A.    Yes.

120

1  Q.    Now, did you meet with the government's attorneys in

2  preparation for this trial?

3  A.    Yes.

4  Q.    Did the government tell you what to testify to?

5  A.    No.

6  Q.    What did the government tell you?

7  A.    To testify to the truth.

8  Q.    Why did you agree to cooperate in your criminal case?

9  A.    Well, the hope of getting some time back.

10 Q.    So you're hoping for a break in your sentence?

11 A.    Yeah.

12 Q.    At the time of sentencing, did the government file a

13 motion to reduce your sentence?

14 A.    No.

15 Q.    Has anyone made any promises that you will definitely get

16 some kind of break in your sentence as a result of your

17 cooperation?

18 A.    No.

19 Q.    Do you understand that based on that agreement that we

20 just looked at that if you lie under oath today it will not

21 happen?

22 A.    Oh, yeah, yeah.

23 Q.    All right.  The charges that you pled guilty to and that

24 you're currently serving that sentence for, were those the

25 first crimes you've been convicted of?

121

1  A.    No.

2  Q.    In 1995 were you convicted of two sales of a controlled

3  substance?

4  A.    Yes.

5  Q.    In 1997, 1998 and 2008, in each of those years were you

6  convicted of a separate robbery charge?

7  A.    Yes.

8  Q.    A felony?

9  A.    Yes.

10 Q.    And in 2008, were you also convicted of escape?

11 A.    Yes.

12 Q.    Did you ever stay at the Howard Johnson hotel in

13 Bartonsville?

14 A.    Yes.

15 Q.    When was that?

16 A.    2014, 2015.

17 Q.    And how many times did you stay at that hotel?

18 A.    Months at a time.

19 Q.    Months at a time?

20 A.    Yeah.

21 Q.    Why were you staying at the Howard Johnson hotel?

22 A.    Prostitution.

23 Q.    What was your role in that prostitution?

24 A.    I was a pimp.

25 Q.    You were a pimp?

122

1  A.   Yes.

2  Q.   Is that how you made money?

3  A.   Yes.

4  Q.   Did you know anyone working there while you were working

5  there at the Howard Johnson?

6  A.   Yes.

7  Q.   Who?

8  A.   I knew the manager, the front desk -- pretty much knew

9  everybody that worked there.

10  Q.   You knew multiple employees there?

11  A.   Yeah.

12  Q.   Did you know anybody's names?

13  A.   Yeah.

14  Q.   Whose names did you know?

15  A.   I knew Faizal's.  I -- at the time I knew the front desk

16  guy, lady at the front desk, multiple maintenance and house

17  cleaners.

18  Q.   So let's start with Faizal.  What was Faizal's role at the

19  hotel to your understanding?

20  A.   He's a manager.

21  Q.   Do you see Faizal in the room today?

22  A.   Yes.

23  Q.   Can you describe what he's wearing for the jury, please,

24  point him out?

25  A.   He's sitting in between them two gentlemen over there, the

123

black face mask on.

Q.   What about what he's wearing other than the mask?

A.   I can't see.

Q.   You can stand up.

A.   Look like a blue suit jacket.

         MR. CAMONI:  Your Honor --

         THE COURT:  We will let the record reflect he's
identified Mr. Bhimani.

BY MR. CAMONI:

Q.   Now, you mentioned a front desk guy.

A.   Uh-huh.

Q.   Can you describe what the front desk guy looked like?

A.   Little light skinned, bald head, short.

Q.   Was he white, black?

A.   He could pass for Hispanic or Indian or someone like that.

Q.   You said he was bald headed?

A.   Yeah.

Q.   You didn't know his name, or you don't remember?

A.   I knew his name, but I don't remember it now.

Q.   Going back to Faizal, how did you know Faizal?

A.   He was a manager.  So, you know, I see him all the time.
We end up talking and establishing a relationship.

Q.   How would you describe that relationship?

A.   As far as my business, yeah, we was very close.

Q.   Did you talk to him at length about what you were doing in

124

1   the hotel?

2   A.   Yeah, yeah.

3   Q.   Did you know anybody around that time that went by the

4   name of G.?

5   A.   Yes.

6   Q.   Did you ever see G. at the Howard Johnson hotel?

7   A.   Yes.

8   Q.   All right.  So you said that in 2014, 2015 when you were

9   staying at the hotel, you made your money as being a pimp,

10  correct?

11  A.   Right.

12  Q.   Can you describe for the jury what that means, what does

13  it mean to be a pimp?

14  A.   Well, that's something -- when you take -- get some female

15  to sell their body in exchange for money and they give you the

16  money.

17  Q.   So did you recruit girls to work for you?

18  A.   Yes.

19  Q.   How?  How did you recruit girls?

20  A.   Social media, the streets, through friends, anywhere.  How

21  did I do it?

22  Q.   What did you do to recruit them?

23  A.   Oh, well, you know, you know, multiple ways, you know.

24  You can use -- mostly lies.  You lie to them.  You manipulate

25  whatever situation they in and -- yeah.

1  Q.    How do you know who to recruit?  How do you pick which

2  female to recruit?

3  A.    You don't know who to recruit.  You just -- you take

4  chances at different opportunities, and some come, some don't.

5  Q.    So what kind of lies would you tell?

6  A.    Any -- any whatever.  You find out what they

7  vulnerabilities, and you manipulate it.

8  Q.    Can you give us examples?

9  A.    If it's drugs, then you take that, and -- I mean, as soon

10 as you see for a pimp -- within five minutes of talking to a

11 female, you know pretty much know what they characteristics

12 are, what they value in life.  So you take that, and you

13 manipulate it to your advantage.

14 Q.    Use it against them?

15 A.    Yeah, yeah, yeah, I guess so, yeah.

16 Q.    Did you make them promises?

17 A.    Yes.

18 Q.    What kind of promises did you make them?

19 A.    Better life, love, relationship, cars, money, whatever,

20 whatever they are into.

21 Q.    Did you make any of them believe you were in love with

22 them?

23 A.    Yeah.

24 Q.    Can you give us an example of who?

25 A.    Rachel.  I had a female named Rachel.  She was a -- she

126

1 wasn't on drugs.  She wasn't on drugs when she was with me.  I

2 couldn't use that.  She wasn't into money, so I couldn't use

3 that.  She was into relationship and commitment.  So I had to

4 make her feel like she was my girlfriend.

5 Q.    And did you pimp Rachel at the Howard Johnson hotel?

6 A.    Yes.

7 Q.    How did you make her believe she was your girlfriend?

8 A.    Just spend the most time with her, just, you know -- like

9 you would do in any relationship except she has the

10 understanding for her to be your girlfriend she has to do this.

11 Q.    So without selling herself, she wouldn't have the

12 relationship with you?

13 A.    Yeah, no.

14 Q.    Did you have a sexual relationship with her?

15 A.    Yes.

16 Q.    Was anything you told her about being in love with her the

17 truth?

18 A.    No.

19 Q.    All right.  How did you find customers?

20 A.    Off Back Pages.

21 Q.    What is Back Pages?

22 A.    It was a site where you -- girls post pictures and you

23 post on the site and people call for sexual --

24 Q.    To buy sex?

25 A.    Yeah.

1  Q.    Who placed the ads in your business?

2  A.    Me and the women.

3  Q.    And if they placed an ad, did they do it on their own, or

4  did you direct them to?

5  A.    I directed them to.

6  Q.    Who paid for those ads?

7  A.    Me.

8  Q.    Were there rules?

9  A.    What you mean?

10 Q.    For the girls that worked for you?

11 A.    As far as placing ads?

12 Q.    As far as anything.

13 A.    Oh, yeah, there was a lot of rules, yeah.

14 Q.    What kind of rules did you impose?

15 A.    Well, you know, as far as prostitution, as far as the act

16 of prostitution, you tell them what price to charge, what to

17 do, how long they supposed to be doing it and who to see or who

18 not to see, where to go and where not to go.

19 Q.    And when you were at the Howard Johnson hotel, how many

20 girls did you have working for you then?

21 A.    Through the entire time I was there, I'm going to say

22 about 20, 25.

23 Q.    20 to 25 girls during that 2014 to 2015 period?

24 A.    Yeah.

25 Q.    How many at a given time?  What was the highest number at

128

1   once?

2   A.   Probably seven or eight.

3   Q.   And so how many rooms were you getting at the Howard

4   Johnson at any one time?

5   A.   Four or five.

6   Q.   Now, you said you set the prices, correct?

7   A.   Uh-huh.

8   Q.   Who actually got the money after they got paid?

9   A.   They get the money, but they give it to me.

10  Q.   They get the money from the men who was buying sex?

11  A.   Yes.

12  Q.   Did you instruct them what to do when the man gave them

13  money?

14  A.   They hold to keep it until they see me.

15  Q.   Did you tell them about keeping it safe or anything like

16  that?

17  A.   Yeah, I tell them where to put it so -- so the man won't

18  try to get it back or in case the police came, yeah.

19  Q.   And then they were instructed to give it to you after the

20  date?

21  A.   Yeah.

22  Q.   Did women ever try to hold out on you and keep money from

23  you?

24  A.   Yeah.

25  Q.   What would you do?

129

1  A.    I -- you know, you have to get violent.

2  Q.    You got violent with the women?

3  A.    Uh-huh.

4  Q.    In what ways?

5  A.    Numerous ways.

6  Q.    Did you pay these women for working for you?

7  A.    No.

8  Q.    What did you give them?

9  A.    Drugs -- like -- if they dependancy was drugs, I gave them

10 drugs.  If they dependancy was feeling love, I gave them love.

11 It varied.

12 Q.    So the women that you gave drugs to, what kind of drugs

13 were you giving them?

14 A.    Crack, cocaine, heroin.

15 Q.    Where did you get those drugs?

16 A.    Mostly from another girl I had that was selling drugs.

17 Q.    A girl that was working for you or a girl you knew?

18 A.    No, a girl I knew.

19 Q.    What was her name?

20 A.    Jennifer Day.

21 Q.    Jennifer Day provided with you drugs for the women that

22 worked for you?

23 A.    Right.

24 Q.    Where did you meet Jennifer Day?

25 A.    In Monroe County prison.

130

1  Q.   What -- did Jennifer Day do anything except sell drugs to

2  make money?

3  A.   Not at that time.

4  Q.   How about later?

5  A.   Yes.

6  Q.   What did she do?

7  A.   She had girls selling sex.

8  Q.   She was a pimp?

9  A.   Yeah.

10  Q.   Where did she learn how to become a pimp?

11  A.   Me.

12  Q.   All right.  So you said you would have multiple rooms at

13  the Howard Johnson any given time, correct?

14  A.   Uh-huh.

15  Q.   Were those rooms located all over the hotel or the same

16  area?

17  A.   No, they was in the back section of the hotel, first

18  floor.

19  Q.   Always?

20  A.   Always, yeah.

21  Q.   Did you specifically request rooms in that area?

22  A.   No, that was just where the hotel will put you.

23  Q.   Now, you said you knew multiple people at the front desk.

24  Is that right?

25  A.   Right.

1  Q.    And you also knew Faizal?

2  A.    Yeah.

3  Q.    Who checked you in when you went to the hotel to check in?

4  A.    Either the three I named, either Faizal, the dude or the

5  female.

6  Q.    And so was it ever anybody other than those three?

7  A.    No.

8  Q.    Okay.  So did all of those three people put you in that

9  back section?

10 A.    Yes.

11 Q.    To you as the pimp, was there ever -- was there any

12 advantage to having your rooms in that back section?

13 A.    Yeah, because the customers instead of walking through the

14 hotel, they can come to the back, go around park in the back,

15 and they would be right there.

16 Q.    So when they parked in the back, where would they have to

17 drive?

18 A.    Around, come to the front all the around the back of the

19 hotel.

20 Q.    Was there one entrance in the front?

21 A.    Yes.

22 Q.    They still had to come in the same entrance as everyone

23 else?

24 A.    Yeah.

25 Q.    Did that entrance mean they'd have to drive past the

132

1   lobby?

2   A.   Yes.

3   Q.   Did you ever discuss with Faizal why your rooms were in

4   this particular section of the hotel?

5   A.   I didn't discuss it with him, no.

6   Q.   Did he ever tell you anything related to that?

7   A.   He said -- he said something to the --

8          MR. BROWN:  Objection.  He answered he didn't discuss

9   it with him.  I would say asked and answered.

10         THE COURT:  I think that he -- he said no to the

11  first question, and then there was a follow-up question.  So

12  it's overruled.  You can answer if you can.

13  BY MR. CAMONI:

14  Q.   Did he tell you anything related to that?

15  A.   I mean, eventually he told me.  He explained why it was --

16  we was all back there.

17  Q.   What did he tell you?

18  A.   Number one, because he knew what was happening, the in and

19  out of the customers, the girls, you know, they in and out the

20  rooms and things of that nature.  Pretty much to keep them away

21  from the regular people.

22  Q.   Regular people at the hotel?

23  A.   Yeah.

24  Q.   Did he mean other guests?

25  A.   Yes.

1  Q.   Did you ever see other pimps or other people dealing drugs
2  in the back area of the hotel?
3  A.   Yeah, yeah.
4  Q.   Who did you know?
5  A.   I knew pretty much everybody that was back there.
6  Q.   Can you name anyone?
7  A.   I don't know the government names --
8  Q.   Whatever you knew them by.
9  A.   Sev, Mills, Jenn, Bigs, a lot of people, Fat Boy.
10 Q.   Did you know another person that went by Black?
11 A.   Yeah, Black.
12 Q.   Did you ever ask Faizal about -- or did you ever talk to
13 Faizal, or did he tell you anything about the other pimps or
14 drug dealers in that back hall?
15 A.   Yeah, we had discussion about it.  And my thing was there
16 was, you know, I don't care about the pimp, but the females
17 would bring competition to my girls.  So it was, like, cutting
18 into my money, so my thing was to have them leave.  So I
19 discussed that with him.
20 Q.   So you asked Faizal to have the other prostitutes leave?
21 A.   No -- yeah, yeah, yeah.
22 Q.   Did that happen?
23 A.   Yeah.
24 Q.   So he asked other prostitutes to leave so you would have
25 less competition?

134

1  A.    I don't know what he did, but they left.

2  Q.    All right.  Did you stay at the hotel yourself?

3  A.    Yeah.

4  Q.    How often did you stay at the hotel?

5  A.    I was there all the time.  As far as sleeping there wise,

6  no, I never really did that.

7  Q.    You didn't sleep at the hotel?

8  A.    No.

9  Q.    Did the girls who worked for you sleep at the hotel?

10  A.    Yeah.

11  Q.    Where did you go if you weren't sleeping at the hotel?

12  A.    I actually live five minutes away.

13  Q.    So you would leave the hotel, and they would stay

14  overnight, and you would sleep at your own house?

15  A.    Yeah, yeah.

16  Q.    What about while they were working?  Were you present at

17  the hotel while they were seeing --

18  A.    Most times.

19  Q.    Where were you while they were working?

20  A.    In the back parking lot.

21  Q.    Were you in your car or --

22  A.    Yeah, in the car.

23  Q.    What kind of car did you drive then?

24  A.    B. M. W.

25  Q.    What color?

135

1  A.    I had two.  I had a black one and a white one.

2  Q.    Black B. M. W. and a white B. M. W.?

3  A.    Yeah.

4  Q.    You'd sit in the car?

5  A.    Yeah.

6  Q.    If it was warm, would you be in the parking lot or --

7  A.    Never.

8  Q.    Just sit in the car?

9  A.    Yeah, sit in the car.

10 Q.    Why were you staying in the parking lot in the car while

11 the women were working?

12 A.    Because I didn't want to be in and out, or I'd be sitting

13 in my car on my phone trying to recruit other females.

14 Q.    So you were working at the same time?

15 A.    Yeah.

16 Q.    Could you do that from your house?  Why did you need to be

17 in the parking lot?

18 A.    No particular reason why I needed to be in the parking

19 lot.  It just --

20 Q.    So if you were going home five minutes away and not

21 staying with these women in the hotel, why didn't they just

22 leave?

23 A.    They could have left.  But, you know, they scared to

24 leave.  You put it into them that, you know, it's best to stay.

25 Q.    What would they be scared of?

1  A.    If I found them.

2  Q.    Why?  Did you tell them what would happen if you found

3  them if they left?

4  A.    You know, again, you resort to violence.

5  Q.    So did you threaten them?

6  A.    Yes.

7  Q.    What kind of threats did you make?  What specific things

8  did you tell them?

9  A.    I'm going to catch you, I'm going to kill you, beat you

10 up, I don't care who you're around, you know what I mean,

11 things like that.

12 Q.    Did you get loud with them?

13 A.    Yes.

14 Q.    Did you push them?

15 A.    Yes.

16 Q.    Did you ever grab them?

17 A.    Yes.

18 Q.    Throw them?

19 A.    Yes.

20 Q.    Did you strike them?

21 A.    Yes.

22 Q.    Who did you strike?

23 A.    Like, all of them at some point.

24 Q.    Let's start with can you name any of the women you were

25 pimping out of the Howard Johnson at that time 2014 to 2015?

137

1    A.    Can I name them?  Heather D'Auria, Lindsay Baxter, Rachel

2    Szlasa, Tamara Ellis, Melissa McKee, Amanda Vanwhy, Michelle --

3    there was a lot.

4    Q.    Did you strike all of those women?

5    A.    At some point in time, yes.

6    Q.    Did you ever do that at the Howard Johnson hotel?

7    A.    Yes.  That's the only place.

8    Q.    Where in the Howard Johnson hotel would that happen?

9    A.    In the rooms, in the hallway, the parking lot, my car.

10   Q.    Now, when you first met with the government, you met with

11   the government not just in preparation for the trial but to

12   give statements and interviews before, correct?

13   A.    Right.

14   Q.    A few times, right?

15   A.    Yes.

16   Q.    And when you first -- first few times you met with the

17   government, did you admit to using force and violence on these

18   women?

19   A.    The first time I met with the government?

20   Q.    First few times.

21   A.    For my case?

22   Q.    For any reason.  Did you admit to using violence on these

23   women?

24   A.    Yes.

25   Q.    In the beginning?

138

```
 1  A.    In the beginning, no.
 2  Q.    That's what I'm asking.  In the beginning first few times
 3  you met with the government, did you admit to using force on
 4  the women?
 5  A.    No.
 6  Q.    In fact, you did you say you did not hit them?
 7  A.    Right.
 8  Q.    Was that true?
 9  A.    No.
10  Q.    So why did you lie about using force the first few times
11  you met with the government?
12  A.    Well, because I knew that was going to get me more time.
13  Q.    So you thought you would get more time if you admitted to
14  force?
15  A.    Yes.
16  Q.    So when you admitted to force, was that after you pled
17  guilty to interstate transportation?
18  A.    Yes.
19  Q.    After you entered a plea agreement, that dropped some
20  charges from your indictment?
21  A.    Right.
22  Q.    All right.  Did you have sex with the girls that you
23  pimped out?
24  A.    Yes.
25  Q.    All of them?
```

139

1   A.   Majority of them, yes.

2   Q.   Did you ever do anything to keep a woman from leaving you

3   who wanted to leave?

4   A.   Yeah.

5   Q.   Like what?

6   A.   Threaten them, yell at them, withhold things from them.

7   Q.   Like what?

8   A.   Drugs, clothes, cars.

9   Q.   You'd take their clothes?

10  A.   Yeah.

11  Q.   What did you do to their cars?

12  A.   Flatten their tires.

13  Q.   Do you remember who you did that to?

14  A.   Lindsay Baxter.

15  Q.   You flattened her tires so she couldn't leave?

16  A.   Yes.

17  Q.   Where was it?

18  A.   In the Howard Johnson.

19  Q.   How many tires did you flatten?

20  A.   Both -- all.

21  Q.   How long was that sitting there with four flat tires?

22  A.   Four, like, two months.

23  Q.   Faizal ever ask you about that?

24  A.   Yes.

25  Q.   What did you tell him?

140

1    A.    Told him -- I told him tow it.

2    Q.    What did you tell him?

3    A.    Tow it.  He asked was I going to move it.  I said no.

4    Q.    You told him to tow it?

5    A.    Yeah.

6    Q.    Did you tell him why it was there?

7    A.    Yeah.

8    Q.    All right.  You mentioned the girls sometimes tried to

9    hide money from you or steal from you?

10   A.    Right.

11   Q.    How did you know if they were hiding money or stealing

12   from you?

13   A.    Either one of them were to tell me or, you know, you just

14   feel it or, you know.

15   Q.    So did you -- did you purposely try to manipulate it so

16   the girls would tell on each other?

17   A.    Yes.

18   Q.    Did you have one particular girl who would kind of be the

19   supervisor?

20   A.    Yes.

21   Q.    Who was that?

22   A.    Rachel.

23   Q.    Is there a term for that among pimps?

24   A.    Yeah.

25   Q.    What's that called?

141

1   A.   Bottom bitch.

2   Q.   So Rachel was your bottom bitch?

3   A.   Yes.

4   Q.   What was her role as bottom bitch?

5   A.   To make sure everything was in order when I wasn't around,

6   make sure everybody was up at the right time, make sure

7   everybody ate, posted up on the computer when they was supposed

8   to be.

9   Q.   So if you weren't there, like, when you went home to your

10  home to sleep, Rachel was still there supervising?

11  A.   Yeah.

12  Q.   Enforcing your rules?

13  A.   Yes.

14  Q.   You mentioned food.  How did these women get food if you

15  didn't give them any money?

16  A.   I mean, you know, the hotel gave food, complimentary

17  breakfast.

18  Q.   They ate their complimentary breakfast?

19  A.   Yes.

20  Q.   Is that the only food they got?

21  A.   No, you feed them throughout the day.

22  Q.   Who feeds them?

23  A.   Well, I would have Rachel go and get the food and bring it

24  back.

25  Q.   She would buy that food with whose money?

142

1  A.    Mine.

2  Q.    So you would give her the money?

3  A.    Yeah.

4  Q.    These women couldn't eat unless it was complimentary

5  breakfast or money you gave Rachel to buy the food?

6  A.    Yeah.

7  Q.    What if they needed clothes or they needed --

8  A.    Then I would have Rachel take them to a store or something

9  and --

10  Q.    They relied on your money, right?

11  A.    Yes.

12  Q.    You didn't give them money to go shopping?

13  A.    No, no.

14  Q.    All right.  So you said you would stay in your car in the

15  back parking lot while they were working?

16  A.    Yes.

17  Q.    Did you spend a lot of time back there on a daily basis?

18  A.    Yes.

19  Q.    How long were you back there every day?

20  A.    Probably from the time I woke up in the morning to late

21  that night.

22  Q.    And you're just in your car in the back parking lot?

23  A.    Yeah, I would leave for a little while and come back.

24  Q.    Did you ever see Faizal while you were in the back parking

25  lot?

143

1  A.    Yeah.

2  Q.    Where would you see him?

3  A.    Walking around the hotel or --

4  Q.    Would he ever come back to talk to you?

5  A.    Yes.

6  Q.    Did you ever yell or scream at a girl while you were in

7  the Howard Johnson hotel?

8  A.    Yes.

9  Q.    Did anyone who worked at the hotel hear you?

10 A.    The maids.

11 Q.    How do you know that?

12 A.    Because they asked me about it.

13 Q.    They asked you about it?

14 A.    Yeah.

15 Q.    Did Faizal ever tell you anything about the maids?

16 A.    Yeah.

17 Q.    What did he tell you?

18 A.    That -- he wouldn't directly say the maids told him, but

19 he ask me, is everything all right because, you know, was

20 screaming and yelling and stuff like that.

21 Q.    Did you always talk to him in person?

22 A.    Yeah.

23 Q.    Did he ever call you on the phone or --

24 A.    No, we text and talk own the phone.

25 Q.    Did the girls who used drugs that you gave drugs to -- did

144

1  they ever get drugs from other sources?

2  A.    Yes.

3  Q.    Was that something that you allowed, or was that against

4  your rules?

5  A.    That was against my rules.

6  Q.    Why was that?

7  A.    Because I couldn't keep count of the money or the -- how

8  much drugs they was doing.

9  Q.    If they got drugs, that meant they were spending your

10 money?

11 A.    Yes.

12 Q.    Why did you need to keep a count of how much drugs they

13 were doing?

14 A.    Because, you know, the more drugs they do, you know what I

15 mean, the -- the more insubordinate they get, the more they

16 start slipping away and feel like they can get it on their own,

17 and they become more independent.

18 Q.    When you gave them drugs, you controlled how much you gave

19 them?

20 A.    Yes.

21 Q.    And as you just testified, that was to keep them from

22 being more independent?

23 A.    Right.

24 Q.    So did you use drugs in order to control these women?

25 A.    Yes.

145

1   Q.    Did you use drugs in order to keep them working?

2   A.    Yes.

3   Q.    Did you ever discuss your business with Faizal?

4   A.    Yes.

5   Q.    Tell the jury about the conversations that you had with

6 Faizal and things he would tell you and things you told him.

7   A.    Well, you know, me and Faizal, we talked about pretty much

8 not on a day-to-day basis, but we talked about when I would

9 have to discipline one of the girls or, you know, we would talk

10 about that.  We would talk about what rooms and who should be

11 with who and how to -- you know what I mean -- things like

12 that.

13   Q.    When you say discipline the girls, what do you mean?

14   A.    Use violence with them.

15   Q.    You told Faizal you used violence against these girls?

16   A.    Yeah.

17   Q.    What kind of -- do you remember any of the exact words you

18 used?  Like, what did you tell him?

19   A.    I had to slap the shit out of the bitch.

20   Q.    Do you remember which woman you were talking about?

21   A.    Probably Rachel or Heather D'Auria.

22   Q.    You told Faizal you had to slap the shit out of one of

23 them?

24   A.    Yeah.

25   Q.    What was his response?

1  A.   He would say, yeah, for what.  He asked me for what or

2  what happened.  And I explained it to him and -- you know,

3  couple times he said, that's what you need to do, you got to do

4  what you got to do.

5  Q.   Did he ever ask you about a particular girl?

6  A.   As far as what?

7  Q.   Like, did he notice any of your girls or ask you about

8  anybody?  Did he take a liking to anybody?

9  A.   Yeah, a couple of them.

10  Q.   Do you remember who?

11  A.   One girl named Peaches that he asked me about.  I think

12  he, like, have a little bit -- he had a few of them that he was

13  --

14  Q.   Did he ever ask you how your business was going?

15  A.   Yeah.

16  Q.   Would you tell him?

17  A.   Yeah.

18  Q.   When the girls would try to get drugs from other sources,

19  how would they do it?

20  A.   They would call them.

21  Q.   Call another dealer?

22  A.   Yeah.

23  Q.   Did they ever try to hide it from you?

24  A.   Yeah.

25  Q.   Did they ever, like, take steps to hide it?

147

1  A.    If I am sitting in the back of the parking lot, they'll

2  have their dealer go to the other door, and they'll either go

3  out the other door or have the dealer put it somewhere in the

4  hotel.  They will put the money there, and the dealer put the

5  drugs there, you know.

6  Q.    Where would they put the money and drugs in the hotel?  Do

7  you remember a particular place?

8  A.    Vending machines.

9  Q.    Did you ever tell Faizal about that?

10  A.    Yeah, I let them know that was happening, yeah.

11  Q.    What did he say?

12  A.    He didn't really say anything.

13  Q.    Did you ever discuss the fact that the girls were on

14  drugs?

15  A.    He knew that.

16  Q.    He knew the girls were using drugs in the hotel?

17  A.    Yeah.

18  Q.    How did he know that?

19  A.    I mean, it was common knowledge.  He knew most of the

20  girls.  He knew -- I mean, the girls was there -- they were

21  there for extended periods of time, so he knew.

22  Q.    Did you talk to him about the fact you were giving them

23  drugs?

24  A.    Yeah.

25  Q.    Did anyone else who worked at the hotel ask you about the

1  girls you were pimping?

2  A.   Yeah, yeah, the guy at the front desk.

3  Q.   The one you described earlier?

4  A.   Yeah.

5  Q.   I think you said he was bald?

6  A.   Yeah, bald.

7  Q.   You said he was light skinned, can pass for Spanish or

8  Indian?

9  A.   Yes.

10  Q.   Did he ask about a particular girl?

11  A.   Yeah, he asked me about -- yeah, he did ask me about a

12  particular girl.  I forget which one though.  He asked me about

13  a particular girl.

14  Q.   Did he ever ask you anything specific like a price?

15  A.   He asked me what the price was and things like that, yeah,

16  what can he get for a certain price.

17  Q.   Why did he ask you and not the girl?

18  A.   Because he knew I was the pimp.  He knew -- I guess he

19  thought I was going to -- let him get a discount, whatever.  He

20  knew I was a pimp.

21  Q.   Did you ever have any advance warning about police

22  presence at the Howard Johnson hotel?

23  A.   Yes.

24  Q.   From whom?

25  A.   Faizal.

149

1  Q.    How would he tell you?

2  A.    And the lady in the front.

3  Q.    Faizal and the lady in the front?

4  A.    Yeah.

5  Q.    Was that the lady you mentioned earlier?

6  A.    Yeah.

7  Q.    Can you describe her?

8  A.    She kind of -- short, long black hair, straight black

9  hair, kind of thick -- I think Spanish or Indian.

10 Q.    Let's start with Faizal.  How did he let you know about

11 police presence?

12 A.    He either text me or call me.

13 Q.    Did you ask him to let you know when police were around?

14 A.    I think, yeah, probably in the beginning, yeah.

15 Q.    He agreed to do that for you?

16 A.    Yeah.

17 Q.    So what did you do when you told you that police were

18 around?

19 A.    I would either -- he would either call me or text me and

20 tell me, look, you might want to go somewhere else and go to

21 the Quality Inn.  He point me into another direction because

22 the police is here or the police going to be here or, you know,

23 they've been asking questions or things like that.

24 Q.    So he told you, you might want to go to the Quality Inn?

25 A.    Yeah.

150

1    Q.    Did he ever recommend another hotel?

2    A.    No.

3    Q.    Quality?

4    A.    By name, yes.

5    Q.    Did you, in fact, go to the Quality Inn?

6    A.    Yeah, I went there a few times.

7    Q.    Did you have girls working for you there?

8    A.    Yes.

9    Q.    Were you giving them drugs there?

10   A.    Yes.

11   Q.    Could you work, or could you have your girls work in the

12   same way at the Quality Inn as they did at the Howard Johnson?

13   A.    No.

14   Q.    Why not?

15   A.    Because the Quality Inn was -- it was a -- I didn't know

16   the staff that worked there.

17   Q.    So what did you change?  What was different?

18   A.    I changed the way I moved, and I had them change the in

19   and out.  So when they would go there, I make sure they have

20   enough drugs so they wouldn't have to be running in and out or

21   having -- trying to seek drugs in and out.

22   Q.    So you cut down on the foot traffic?

23   A.    Yes.

24   Q.    So when you were at the Howard Johnson, was there a lot of

25   foot traffic?

1  A.    Yeah, yeah.

2  Q.    How many guys would the women you are pimping see in a day

3  at the Howard Johnson?

4  A.    10, 15, I mean, I never had one girl at the Howard

5  Johnson.  So if I had three or four girls, probably each see 10

6  guys a day, 10, 15 guys a day.

7  Q.    What time of day was this happening?

8  A.    All day, 24 hours.

9  Q.    What about the woman you said at the front desk, how did

10 she let you know police were around?

11 A.    She would either call the room phone and let one of the

12 girls know, and they tell me, or she would text my phone.

13 Q.    So she had your cell phone number?

14 A.    Yes.

15 Q.    Did you give it to her?

16 A.    Yes.

17 Q.    Did you ask her to let you know if police were around?

18 A.    I don't know if that was that term, but, yes.

19 Q.    Why did you give her your cell phone number?

20 A.    Really I was trying to talk to her, you know.

21 Q.    Talk to her in what way?

22 A.    Try to turn her out.  That's what I was trying to do.

23 Q.    Turn out, you mean have sex with her?

24 A.    No, to get her to have sex for money.

25 Q.    You were trying to recruit the woman at the front desk?

152

1  A.   Yeah, that's what I was trying to do.

2  Q.   All right.  To your knowledge -- not what someone told

3  you.  To your knowledge, did any of the girls working for you

4  ever have sex with Faizal Bhimani?

5  A.   To my knowledge -- I don't have direct knowledge of it,

6  but, you know --

7  Q.   Let me ask you this.  Did Faizal ever tell you anything

8  about him having sex with one of the girls?

9  A.   He never came to me and said he had sex with the girl.

10  Q.   What did he tell you?

11  A.   We text back and forth one time, and he made the statement

12  that I guess one of the girls didn't have the money to pay for

13  the room.  He said, don't worry about it, she don't need the

14  money.  I took that, as, okay, well, he's going to get it

15  another kind of way.

16         MR. BROWN:  Objection, Your Honor, calls for

17  speculation.

18         THE COURT:  I will sustain that.

19         MR. CAMONI:  I will move on.

20  BY MR. CAMONI:

21  Q.   Did you know someone at the time named Anton Woodson?

22  A.   Anton Woodson?

23  Q.   Fat Boy or Dough Boy?

24  A.   Yeah, yeah.

25  Q.   How did you know Fat Boy or Dough Boy?

153

1  A.    I met him prior to the Howard Johnson days.

2  Q.    Did you ever see Faizal talking with him?

3  A.    Yes.

4  Q.    Was he at the Howard Johnson hotel?

5  A.    Yes.

6  Q.    Did you ever talk to Faizal about Fat Boy?

7  A.    Yeah.

8  Q.    What did you -- what was the conversation you had with

9  Faizal about him?

10  A.    I told him he wasn't no good.

11  Q.    Why?

12  A.    Because Fat Boy was just a -- he shady guy, man, you know.

13  He was no good.

14  Q.    Was he conducting criminal activity?

15  A.    Yeah.

16  Q.    What kind?

17  A.    He was a drug dealer.

18  Q.    So you told Faizal that Fat Boy was a drug dealer?

19  A.    Yeah, Faizal knew that though.

20  Q.    That was the time you saw Fat Boy staying at the Howard

21  Johnson hotel?

22  A.    Yes.

23  Q.    Did Faizal introduce you to anyone else at the Howard

24  Johnson?

25  A.    He introduced me to -- I forgot the dude's name, but,

154

1  yeah, yeah.

2  Q.   Who did he introduce you to?

3  A.   Another Indian guy.

4  Q.   Another Indian guy.  Can you describe him?

5  A.   Kind of heavy, kind of heavy set, mustache, black hair.

6  Q.   Do you know anything like how old was he?

7  A.   In his 30s maybe.

8  Q.   Was he older than Faizal or younger or about the same age?

9  A.   I think he was -- might be a little younger than Faizal.

10 Q.   Did he ever introduce you to anybody who worked at the

11 Howard Johnson?

12 A.   The older man, the old guy.

13 Q.   Can you describe him?

14 A.   Old quiet guy, gray hair, Indian, short.

15 Q.   What did he tell about you that person who he introduced

16 you?

17 A.   He said -- I think that was his uncle or cousin, his

18 family.

19 Q.   What -- did he tell you anything else?

20 A.   He said that when he wasn't around I can go to him for

21 anything.

22 Q.   Did you ever physically restrain a girl to keep her from

23 leaving the Howard Johnson or take her back to her room?

24 A.   Yeah.

25 Q.   Can you tell us about that?

155

1   A.    The girl -- Heather, she was trying to leave one time, and

2   --

3   Q.    Were you at the hotel when she was trying to leave?

4   A.    She tried to leave a couple times.  One time I was there,

5   and one time I wasn't.

6   Q.    Okay.

7   A.    So do you want to hear --

8   Q.    What happened -- let's start the time you were there.

9   A.    The time I was there she was trying to leave.  We end up

10  having a -- tussling in the bathroom of the room, and I end up

11  slapping her.

12  Q.    What about the time you weren't there?

13  A.    Actually I heard about it through Faizal because he was

14  there, and I guess she was trying to get into the room and get

15  her stuff and leave, and he wouldn't let her.  He actually

16  called me and asked me -- told me, yo, look, she trying to get

17  in the room, she's mad, I'm not going to open the door.  So I

18  tell him, yeah, don't open the door, just tell her no.

19  Q.    Did he tell you anything else?

20  A.    Well, when I got there -- of course, I came right away.

21  When I got there, I took over the situation.

22  Q.    What did you do when you took over the situation?

23  A.    Took her in the room, and I don't think I was violent that

24  time.  I talked to her.

25  Q.    Did she keep working for you?

156

1   A.    Yes.

2   Q.    You didn't allow her to leave?

3   A.    No.

4   Q.    Did you ever talk to Faizal about that afterwards?

5   A.    He asked what happened with it.  I explained to him

6   everything was cool.

7   Q.    Did you express your thanks to him?

8   A.    Yeah, yeah.  I told him I appreciate it.

9   Q.    Were there any other employees around when that happened?

10  A.    I wasn't there when it happened.

11  Q.    What about when you got there?

12  A.    When I got there, no, it was just -- no, I think he was

13  the only one I talked to about that.

14  Q.    So Faizal saw you take her and take her back in the room?

15  A.    Yeah.

16  Q.    And not let her leave?

17  A.    Yeah.

18  Q.    Did he kick you out of the hotel?

19  A.    No.

20  Q.    Did the police come?

21  A.    No.

22  Q.    Did he continue to let you stay there?

23  A.    Yeah.

24  Q.    What about in the parking lot, any kind of violence or

25  anything in the parking lot?

157

1  A.    Couple times, yeah, I mean, a girl probably --

2  Q.    What happened?

3  A.    End up slapping them or kicking them or something.

4  Q.    Did any of your girls get violent in the parking lot?

5  A.    Yeah, Heather actually punched a guest -- a lady in the

6  face.

7  Q.    Punched a guest in the face?

8  A.    Yeah.

9  Q.    Tell the jury about the circumstances, please.

10 A.    The lady said something to another girl that was with

11 Heather, and Heather heard it and just punched the lady in the

12 face, just punched her in the face.

13 Q.    Did you ever discuss that incident with Faizal?

14 A.    Yeah, he said something to me about it.

15 Q.    What did he say to you?

16 A.    What happened, like, you know what I'm saying, she can't

17 go around punching guests in the case.

18 Q.    What did you say?

19 A.    I said by the time I realized what happened, nothing I

20 could do.  I broke it up, you know what I mean, but --

21 Q.    Was the guest she punched in the face another prostitute?

22 A.    No.

23 Q.    A drug dealer?

24 A.    No.

25 Q.    Criminal?

158

1  A.    No.  She was there because her husband was doing

2  construction, and they was from out of town staying in the

3  hotel doing construction.

4  Q.    Faizal throw you and Heather out of the hotel after she

5  punched someone in the face?

6  A.    No.

7  Q.    Did the police come?

8  A.    No.

9  Q.    You mentioned phone calls and texts.  Was there any other

10 way you communicated with Faizal?

11 A.    Facebook.

12 Q.    What was your name on Facebook?

13 A.    Lamont Stanley.

14 Q.    Why was it Lamont?

15 A.    My middle name.

16 Q.    You said you used that name with friends in your personal

17 life sometimes?

18 A.    Yeah, yeah.

19 Q.    What name did Faizal know you as?

20 A.    Stanley.

21 Q.    He called you Stanley?

22 A.    Yes.

23 Q.    I will show you what's been marked Government's Exhibit

24 85.15.  Do you recognize this, sir?

25 A.    That's my Facebook page.

159

1   Q.    Is this a fair and accurate depiction of what your

2   Facebook page looked like back then?

3   A.    Yeah.

4            MR. CAMONI:   Your Honor, I would like to move to

5   admit Government's Exhibit 85.15.

6            THE COURT:   Any objection?

7            MR. BROWN:   No objection.

8            MS. PAWELSKI:   No.

9            THE COURT:   It's admitted.

10  BY MR. CAMONI:

11  Q.    Did you ever communicate through Facebook with the

12  messenger app or messenger feature with Faizal?

13  A.    Yes.

14  Q.    I would like to show just the witness exhibit 86.03.  Take

15  a moment to review that, Mr. Stanley.  Do you recognize this?

16  A.    Yeah.

17  Q.    What is this?

18  A.    This is me in a conversation with Faizal, Faizal and me.

19  Q.    So are these messages -- some of the messages you sent?

20  A.    Yes.

21  Q.    You sent them to a Facebook account that you understood to

22  be Faizal Bhimani?

23  A.    Yes.

24  Q.    So had you through Facebook made friends with Faizal

25  Bhimani on Facebook?

160

1   A.    Yes.

2   Q.    Had you seen his account?

3   A.    Yeah.

4   Q.    Did you see a picture of him on that account?

5   A.    Yes.

6   Q.    These are messages you sent to him and received back from

7   that account?

8   A.    Yes.

9   Q.    Is this a fair and accurate depiction of those messages?

10  A.    Uh-huh.

11         MR. CAMONI:  Your Honor, at this time I move to admit

12  Government's Exhibit 86.03.

13         MR. BROWN:  Just on the objection that we made

14  before, Your Honor.

15         THE COURT:  Perhaps you should just mention the

16  objection.

17         MR. BROWN:  Sorry about that.  The objection was to

18  authenticity with regard to the fact who is on the other side,

19  Your Honor.  I know he can testify to what he thought the

20  conversation was on his side of it.  It goes to authenticity.

21         MR. CAMONI:  Judge, I think based on the testimony so

22  far, the foundation has been laid to make this admissible, and

23  Mr. Brown can cross-examine as to the basis for thinking that

24  Mr. Bhimani was on the other end of the messages during cross

25  examination.

161

1          THE COURT:  All right.  Counsel, do you have any

2     objection to this?  I know it's not your client.

3          MR. DeSTEFANO:  Our objection would be -- there is a

4     Third Circuit case on point -- forgive me, I forgot the name of

5     it.  I don't think a proper foundation has been laid for the

6     admissibility of this as an exhibit.  Now, refreshing

7     recollection and things of that nature would be a different

8     story, but for the admission of this as an exhibit, I don't

9     think there has been a proper foundation made.

10          THE COURT:  I assume it's being admitted as a

11     statement against a party opponent.  The objections are

12     overruled.  It's admitted, and the jury will decide what

13     weight, if any, to give the exhibit.

14          MR. CAMONI:  May we publish, Your Honor?

15          THE COURT:  Yes.

16     BY MR. CAMONI:

17     Q.   The first message that says recipients, Lamont Stanley, is

18     that you?

19     A.   Yes.

20     Q.   Author, Faizal Bhimani, can you read what it says after

21     body?

22     A.   Hey, Stanley, what's up.

23     Q.   Was that a message you received from the account you

24     understood was Faizal Bhimani's?

25     A.   Yes.

162

1   Q.   Moving to the next message, what's that message in the
2   body there, second one?
3   A.   Laying low or just been quiet.
4   Q.   Now, in the next message, it says recipient, Faizal
5   Bhimani.  Is that a message you sent back to him?
6   A.   Yes.
7   Q.   Can you read that for the jury?
8   A.   L. O. L., what's up, yeah, man, I've been laying low,
9   trying to start my legal business in New York, how you doing.
10  Q.   The date on this, am I correct, is March 28th, 2015?  Do
11  you see that?
12  A.   Yes.
13  Q.   Were you, in fact, in New York at that time?
14  A.   Yes.
15  Q.   What did you mean by legal business?
16  A.   My escort service.
17  Q.   So you were starting an escort service in New York?
18  A.   Yes.
19  Q.   Was that escort service a prostitution business?
20  A.   Yes.
21  Q.   You refer to it as your legal business?
22  A.   Right.
23  Q.   Had you had prior discussions with Faizal about that
24  business before?
25  A.   Yes.

163

1  Q.   What were the discussions you had with him before about
2  that?
3  A.   Well, I had told him I was trying to start an escort
4  service.  I don't think I told him what state or where.  I
5  explained to him, and he actually wanted to go -- go in on it.
6  Q.   Go in on it in what way?
7  A.   Be a part of it.
8  Q.   How?  What was he going to do?
9  A.   I think he had drivers or something.  He can get drivers.
10 Q.   He was going to provide drivers?
11 A.   Yeah.
12 Q.   Is that with the expectation he can make money with you?
13 A.   Yeah.
14 Q.   All right.  The next message down, this is recipient
15 Lamont Stanley.  This is a message you received.  Can you read
16 that to the jury, please?
17 A.   Okay, hotel crap.  March is slow month.
18 Q.   The message you sent him back?
19 A.   Yeah, I know, I might be back around in a few weeks or so.
20 Q.   What was his response?
21 A.   Okay, I don't need any drama, you see the news, L. O. L.
22 Q.   Do you remember what he meant about the news?
23 A.   Yeah, it was a mutual acquaintance we knew by the name of
24 Eric Rolle who had got locked up for prostitution -- promoting
25 prostitution in Monroe County.

164

1    Q.    Was Eric Rolle someone you saw at the Howard Johnson

2    hotel?

3    A.    Yes.

4    Q.    Had you ever seen Faizal Bhimani talking to Eric Rolle?

5    A.    Once or twice.

6    Q.    Did you ever talk about Eric Rolle with Faizal Bhimani?

7    A.    Other than this, did I?  No.

8    Q.    Just this discussion?

9    A.    Yes.

10   Q.    If we can go to the next page or next messages.  And what

11   did you send back?

12   A.    Hell, yeah, that shot -- was supposed to be shit -- is

13   crazy.

14   Q.    What does that mean S. M. H.?

15   A.    Shaking my head.

16   Q.    What was his response?

17   A.    Okay, bring some hotties, not drugged up ones or drama

18   bitches, cool.

19   Q.    What did you write back?

20   A.    L. O. L., I got you.

21   Q.    You said you also exchanged text messages with him?

22   A.    Right.

23   Q.    Is that right?

24   A.    Yes.

25   Q.    I would like to bring up just for the witness exhibit

165

1  85.6.  Do you recognize this?  If we can go in the reverse.  Do

2  you recognize these?

3  A.    Yes.

4  Q.    Slide it up.  What are we looking at?

5  A.    Exchange of text messages from me and Faizal.

6  Q.    So these are text messages that you would have sent not

7  through Facebook but through a telephone?

8  A.    Yes.

9  Q.    And do you recognize messages you sent to the telephone

10  number that you had as Faizal Bhimani?

11  A.    Yes.

12  Q.    Do you see messages you remember receiving from the

13  telephone you understood was Faizal Bhimani's?

14  A.    Yes.

15  Q.    Are these a fair and accurate depiction of those text

16  messages that were exchanged?

17  A.    Yes.

18          MR. CAMONI:  Your Honor, at this time I move to admit

19  Government's Exhibit 85.6.

20          THE COURT:  All right.

21          MR. BROWN:  Judge, I am going to make that same

22  objection.

23          THE COURT:  Your objection is noted.  Any objection?

24          MR. DeSTEFANO:  Same.

25          THE COURT:  Objections are overruled.  It's admitted.

1   BY MR. CAMONI:

2   Q.   So as I said, if you look at the dates and times on the --

3   middle there, this is in reverse, it starts at the bottom.   So

4   what's the first message that you send -- first of all, that

5   number 570-236-7047, do you remember whether that's your

6   number?

7   A.   That was my number, yeah.

8   Q.   It was that your number at the time?

9   A.   Yeah.

10   Q.   So what is that first message at the bottom you sent?

11   A.   Hey, I need to talk to you real quick.

12   Q.   And what was his response?

13   A.   What's your last name.

14   Q.   I'm sorry.  What's that first message on the bottom?

15   A.   Hey, I need to talk to you real quick.

16   Q.   What response did you get?

17   A.   What's your last name.

18   Q.   What did you send back?

19   A.   Thurman Stanley.

20   Q.   What did you receive back from that?

21   A.   Okay, done.

22   Q.   All right.  Let's roll up a little bit, go to the one --

23   so let's start with that number 43.  What was the message you

24   received?  And that's on February 12th, 2015?

25   A.   Hey, Stanley, bro, need to talk, this weekend very busy,

1  sold out.

2  Q.    What did you respond?

3  A.    Do you have something for tomorrow.

4  Q.    What did you get back?

5  A.    Yes.

6  Q.    What did you send to Faizal?

7  A.    Okay.  I don't have a room right now, but I will need he

8  one tomorrow to check out Friday.

9  Q.    And you sent another one after that?

10  A.    And I'm going to need you to check me in.

11  Q.    Why would you need Faizal to check you in?

12  A.    Because I wasn't going to pay for the room right away.

13  Q.    You weren't going to pay for the room right away?

14  A.    Yes.

15  Q.    So weren't paying upfront?

16  A.    Yes.

17  Q.    If someone checked you in other than Faizal would you have

18  had to pay upfront?

19  A.    Unless he would have called them.

20  Q.    Unless Faizal called them?

21  A.    Yeah.

22  Q.    When would you pay, sometime after?

23  A.    Yeah.

24  Q.    Where would you get the money?

25  A.    From the girl that I checked in the hotel.

168

1  Q.    Did Faizal know that?

2  A.    Yeah.

3  Q.    All right.  So at 2:49, No. 38 on same date, February 12,

4  2015, you received a message.  What does that say?

5  A.    Call me.

6  Q.    The next day you sent a message, and what was it?

7  A.    Faizal, are you at the hotel.

8  Q.    What response did you get?

9  A.    Yes, I am, upstairs.

10 Q.    What did you say?

11 A.    I need to see you, I'll be in there in 15 minutes.

12 Q.    What did he say?

13 A.    Okay, call me.

14 Q.    Then on No. 32 at 2:46 on February 13th, same day, what

15 did you send to him?

16 A.    I meet you at the front desk.

17 Q.    What did he say?

18 A.    Okay.

19 Q.    Looks like almost two hours later, what did Faizal send to

20 you?

21 A.    Hey, she going to pay.

22 Q.    What did you say?

23 A.    Oh, shit, yeah, I'm coming.

24 Q.    When you say, I'm coming, where are you coming from?

25 A.    I don't know where I was at at the time.

169

1  Q.   Okay.  What did you send next?

2  A.   How much.

3  Q.   What was his response?

4  A.   76.27.

5  Q.   And you said?

6  A.   I got, I'm coming, be there in 30 minutes.

7  Q.   All right.  He responded?

8  A.   Who this.

9  Q.   He wrote again less than a minute later.

10 A.   Okay, cool.

11 Q.   You responded just about the same time?

12 A.   Stanley.

13 Q.   Little over an hour later he said?

14 A.   He was waiting for me.

15 Q.   All right.  Let's move up to No. 19 on February 14th, the

16 next day.  What did Faizal send you?

17 A.   Hey, where are you, please, too by and pay.  He was

18 saying, please stop by and pay.

19 Q.   What was your response?

20 A.   Hey, do you have a room today.

21 Q.   What did he say?

22 A.   Not many though, pretty busy.

23 Q.   So then that was at 3:21 February 15.  Three hours later

24 6:29, what did you send him?

25 A.   Meet you at the desk.

170

1  Q.    Do you remember did he meet you at the desk that day?

2  A.    Yes.

3  Q.    And did that happen after you sent him that text message?

4  A.    Yes.

5  Q.    So about at 6:52 p.m. on the same day, you received a

6  message.  What was it, No. 15?

7  A.    It says, she looked cute, she likes Indian sausage.

8  Q.    Then what was next message he sent 11 seconds later?

9  A.    Send me picture.

10 Q.    Did you send him a picture?

11 A.    Yes.

12 Q.    Do you remember what woman that was about?

13 A.    It's a girl I was checking in.  Her name was Peaches.

14 Q.    We will come back to that.  Did you send it after he sent

15 that request, send me picture?

16 A.    Yeah.

17 Q.    What did he send after that at 7:19?

18 A.    Very cute.

19 Q.    What was your response to that?

20 A.    Yeah, and it's tight, too, L. O. L.

21 Q.    We can take that down.  I would like to show the witness

22 only No. 85.16.  Again, if we can make that larger.  Do you

23 recognize these?

24 A.    Yes.

25 Q.    What are we looking at?

171

1  A.    That is Back Page pictures of Peaches.

2  Q.    Back Page pictures meaning the pictures you used to

3  advertise her for prostitution?

4  A.    Yes.

5  Q.    Did you just have these on your phone?

6  A.    Yes.

7  Q.    You didn't take that picture when Faizal asked for a

8  picture?

9  A.    No.

10 Q.    These are pictures you already had?

11 A.    Yes.

12 Q.    Did you send those to Faizal?

13 A.    Yes.

14 Q.    This a fair and accurate depiction what you sent to

15 Faizal?

16 A.    Yes.

17        MR. CAMONI:  I will move to admit Government's

18 Exhibit 85.16.

19        MR. BROWN:  Just the same, Your Honor.

20        THE COURT:  All right.

21        MR. DeSTEFANO:  Same.

22        THE COURT:  Objections are overruled.  It's admitted.

23        MR. CAMONI:  May we publish?

24 BY MR. CAMONI:

25 Q.    These were the messages you sent?

172

1   A.    Yes.

2   Q.    The time stamp is February 15th, 2015.  One was sent at

3   6:50, and one was sent at 6:54?

4   A.    Yeah.

5   Q.    Is that correct?

6   A.    Yes.

7   Q.    Take that down and show the witness only, please, Exhibit

8   No. 85.17.  What are we looking at here?

9   A.    Picture of Peaches.

10  Q.    Is that one of the pictures we just saw in the smaller

11  form?

12  A.    Yes.

13  Q.    Is that a fair and accurate depiction of the picture you

14  sent to Faizal?

15  A.    Yes.

16  Q.    One of the three?

17  A.    Yes.

18          MR. CAMONI:  Your Honor, move to admit Government's

19  Exhibit 85.17.

20          THE COURT:  All right.

21          MR. BROWN:  No objection to that one, Your Honor.

22          THE COURT:  Okay.

23          MR. DeSTEFANO:  No objection.

24          THE COURT:  That's admitted.

25          MR. CAMONI:  May we publish?

173

1        THE COURT:  Yeah.

2   BY MR. CAMONI:

3   Q.    Who was Peaches?

4   A.    Peaches was a girl I had.  She from California.

5   Q.    Do you know her real name?

6   A.    No, I can't remember.

7   Q.    You were pimping her out of the Howard Johnson?

8   A.    Yes.

9   Q.    Was she on drugs?

10  A.    Yeah, she was on meth.

11  Q.    Did you provide her that meth?

12  A.    Yes.

13  Q.    Is that the girl that was with you when you checked in

14  that night?

15  A.    Yes.

16  Q.    Is that the girl that Faizal was referring to when he

17  texted you?

18  A.    Yes.

19  Q.    All right.  So in that text exchange you told Faizal you

20  wanted him to check you in?

21  A.    Right.

22  Q.    Did you do that often, ask for him?

23  A.    Yeah, when I had a new girl.

24  Q.    Why when you had a new girl?

25  A.    Because I never want it to come out my pocket to pay for a

174

1  room and she be a dud or she make no money.  So I would tell

2  him, let me get the room, as soon as she make the money, I pay

3  for it.

4  Q.    This would have been a night Peaches was new to you?

5  A.    Right.

6  Q.    You wanted to let her stay without paying upfront?

7  A.    Yes.

8  Q.    Did that often happen?

9  A.    Yeah, not often, but, yeah, a few times, yeah.

10  Q.    When you asked for that, did Faizal ever tell you no?

11  A.    No.

12  Q.    Did Faizal ever give you discounts or free rooms?

13  A.    He gave me discounts and for free rooms -- never gave me a

14  free room, but he let me get a room on consignment where I

15  don't have to pay.

16  Q.    You paid later?

17  A.    Yeah.

18  Q.    What if a particular girl that you had working there

19  didn't make enough money to pay for her room on a given night?

20  A.    Then he would text me, and he normally waited to, like,

21  2:00 the next day, then if she don't pay, he text me, ask me

22  about it.  And either I say, all right, give me some more time,

23  or I'm on my way or, you know.

24  Q.    He would contact you about it?

25  A.    Yeah.

1  Q.    Were the rooms in your name?

2  A.    No.

3  Q.    Whose name were the rooms in?

4  A.    The girls.

5  Q.    Why?

6  A.    Because that was just safety for me.

7  Q.    In what way?

8  A.    Because if they go to jail, the police come, the first

9  thing they look what name the room is in.

10  Q.    Was that -- did you have rules with the girls about what

11  happens if the police come?  Did you ever tell them anything

12  about what to say and not to say?

13  A.    Yeah.

14  Q.    What did you tell them?

15  A.    You know, you explain it to them, you know, it's a

16  misdemeanor charge, prostitution for them, you know, and, you

17  know, if they go to jail, I'm going to come get them so, you

18  know, just -- if they get caught, there's nothing you can do.

19  You are going to have to go to jail.

20  Q.    You wouldn't put your name on the room --

21  A.    No.

22  Q.    So that you wouldn't be detected?

23  A.    Right.

24  Q.    Even though your name wasn't on the room, if there was

25  money owed for the room, Faizal called you for that money?

176

1  A.    Right.

2  Q.    All right.  Let's discuss -- we covered that.  Did you

3  ever give Faizal any money -- other than what you were paying

4  for the room, did you ever give him money directly?

5  A.    Cash in his hand not for the room?

6  Q.    Not for the room, just to him?

7  A.    Yeah, couple times.

8  Q.    Why?

9  A.    Just to -- appreciation I guess.

10  Q.    You gave him a tip?

11  A.    Yeah, a thank you.

12  Q.    Thank you for what?

13  A.    You know, it was, like, a -- you know, you know, saying

14  thank you for you know what's going on, you know, so he was --

15  you know, me and Faizal was cool.  He knew -- he understood

16  what was going on so, you know, it was appreciation.

17  Q.    Appreciation for him knowing but being cool?

18  A.    Right.

19  Q.    Did you ever tip him for letting you know about cops

20  coming or being around?

21  A.    No, I don't think I gave him money for that, no.

22  Q.    Not specifically?

23  A.    Yes.

24  Q.    Did you thank him for it?

25  A.    Yeah.

177

1  Q.   Did you tip him when he helped you keep Heather D'Auria at
2  the hotel?
3  A.   Monetary tip, no, I don't think.
4  Q.   You just thanked him for that?
5  A.   Yeah.
6  Q.   How much money did you give him as tips?
7  A.   Between 2014 and 2015?
8  Q.   Well, yeah.
9  A.   Probably a thousand dollars, 2,000.
10 Q.   What was the most you ever gave him?
11 A.   Like, 500.
12 Q.   $500?
13 A.   Yes.
14 Q.   What was the least you gave him?
15 A.   200.
16 Q.   Where did the girls who used drugs you gave them use those
17 drugs?
18 A.   Where they use it at?
19 Q.   Where did they use at?
20 A.   In the rooms.
21 Q.   In the hotel rooms?
22 A.   Yeah.
23 Q.   Did the girls use heroin or snort or shoot up?
24 A.   Shoot.
25 Q.   They use needles?

178

1  A.    Yeah.

2  Q.    Did you ever see needles and paraphernalia left around the

3  room?

4  A.    That was one of the things I used to -- that was one of my

5  pet peeves because I was -- they knew about it but, you know,

6  you don't want them -- I didn't want customers to come in and

7  see it.  But they used to leave needle bags and dope bags and

8  needles everywhere.

9  Q.    Did the cleaning staff come into the rooms to clean?

10  A.    Yeah.

11  Q.    And were the needles and paraphernalia out, the bags?

12  A.    Yeah, yeah.

13  Q.    When the cleaning staff came in?

14  A.    Yeah.

15  Q.    Did any of your girls ever get thrown out of the hotel for

16  leaving needles and drug paraphernalia around?

17  A.    No.

18  Q.    Did you ever use drugs at the hotel?

19  A.    No, weed, marijuana.

20  Q.    Where did you smoke marijuana?

21  A.    In the rooms, in the parking lot.

22  Q.    Did you ever have a discussion with Faizal or discussions

23  about the staff knowing about what was going on in the back

24  hallway?

25  A.    We didn't -- well, yeah, we spoke about the staff as far

1  as the cleaning staff and things like that because the laundry

2  room was in the back of the hall -- in the back hallway.  So

3  every day they was always there, and sometimes the girls

4  wouldn't want them to clean the room.  He used to come to me

5  and say, tell them they got to clean the room.  So --

6  Q.   You talked about the staff and what they were doing in the

7  back?

8  A.   Yeah.

9  Q.   Was there ever a time the police bothered you or

10 interrupted your business while you were at the Howard Johnson

11 hotel?

12 A.   Bother me specifically personally?

13 Q.   Uh-huh.

14 A.   No, not that I recall, no.

15 Q.   Is the Stroudsburg area and that Howard Johnson the only

16 place you've ever been a pimp?

17 A.   No.

18 Q.   Have you worked as a pimp elsewhere?

19 A.   Yes.

20 Q.   Where?

21 A.   The United States.  Every state in the United States.

22 Q.   Do you work out of hotels?

23 A.   Yes.

24 Q.   Have you worked out of a lot of hotels?

25 A.   A lot, yes.

180

1  Q.   Were there ever any other hotels where you had this kind

2  of arrangement or this kind of freedom?

3  A.   Only one in New York.

4  Q.   One in New York?

5  A.   Yeah.

6  Q.   How -- why did you have that kind of freedom in that

7  hotel?

8  A.   Because it was a same type of management and staff at the

9  Howard Johnson.

10 Q.   So other than the one in New York and the Howard Johnson,

11 all the other hotels you stayed in --

12 A.   I've never seen nothing like it like that.

13 Q.   So how did you have to operate at all other hotels?

14 A.   You have to be very discreet.

15 Q.   Have anybody at any other hotels ever thrown you out for

16 prostitution?

17 A.   Yes.

18 Q.   At the Howard Johnson hotel, did Faizal Bhimani or any

19 other employee ever throw you out for your prostitution

20 business?

21 A.   No.

22 Q.   When you came to check in, did anyone ever tell you, you

23 were not welcome?

24 A.   No.

25 Q.   Did they let you check in every time you wanted to?

181

1  A.    Yes.

2         MR. CAMONI:  May I have a moment, Your Honor?

3         THE COURT:  Sure.

4  BY MR. CAMONI:

5  Q.    Can we please bring back up 85.6, the first page, please,

6  that's already been admitted?  Can we blow up the top half of

7  the page, please?  I'm sorry.  Slide it down.  Keep going.  Mr.

8  Stanley, this exchange is bit after dated February 26, 2015,

9  text message No. 11.  Do you see which one I'm talking about?

10 A.    Yeah.

11 Q.    What did you send?

12 A.    Hey, it's Stanley.

13 Q.    What did you receive back?

14 A.    Hey, with police officers, hold up.

15 Q.    What was your response?

16 A.    Oh, shit, okay.

17 Q.    So why did you say, oh, shit, okay?

18 A.    Because he was talking to police.  Police was there.

19 Q.    Did you take that as a warning?

20 A.    Yeah.

21        MR. CAMONI:  Nothing further.  Tender for cross.

22        THE COURT:  We're going to take our afternoon break

23 and give you a chance to stretch.  Don't form any opinions.

24 You haven't heard all the evidence or the law in the case.  No

25 conversation or discussions including among yourselves.  No

182

1  research or reading or listening to anything about the case.

2  If anyone were to talk to you about the case, you must advise

3  us of that immediately.  All right.  See you in 15 minutes.

4          (A brief recess was taken.)

5          THE COURT:  All right.  Welcome back.  Mr. Brown?

6          MR. BROWN:  Thank you, Your Honor.

7  CROSS EXAMINATION

8  BY MR. BROWN:

9  Q.   Good afternoon, Mr. Stanley.  My name is attorney Bernie

10 Brown.  I have a couple questions for you, okay?

11 A.   All right.

12 Q.   So during direct examination you admitted to a drug sale

13 in 1995, correct?

14 A.   Right.

15 Q.   A robbery charge in 1997, correct?

16 A.   Yes.

17 Q.   That's where you go and you take other people's things,

18 correct?

19 A.   Right.

20 Q.   In 1998, the same thing?

21 A.   Correct.

22 Q.   2008, a robbery charge, correct?

23 A.   Right.

24 Q.   And then also in 2008, you escaped or evaded police,

25 correct?

183

1  A.    Yes.

2  Q.    Do you think the jury can believe a word you just told

3  them here today?

4  A.    Because of that?

5  Q.    Because of your criminal history, the way you behaved in

6  your past.

7  A.    I don't think that has anything to do with it.

8  Q.    Okay.  Let's see.  Your operation when you began to be a

9  prostitute -- or began to be a pimp selling prostitutes, you

10  were in the Monroe County correctional facility and had met

11  Michelle Oswald, correct?

12  A.    I was pimping before that.

13  Q.    You were pimping where?

14  A.    Everywhere, a lot of places, New York, Miami, Texas,

15  Vegas.

16  Q.    Is it true that when you met -- you had mentioned Tamara

17  Ellis.  When you met Tamara Ellis, did you talk to her about

18  becoming a prostitute for you?

19  A.    Yes.

20  Q.    Okay.  And is it true that you interviewed her, correct?

21  A.    Right.

22  Q.    And you made an arrangement with her where there would be

23  a 50/50 split, correct?

24  A.    Right.

25  Q.    One of the places you went to was the Howard Johnson,

184

1  correct?

2  A.   Yes.

3  Q.   And when you went there, you were there for about a week,

4  and you didn't get any clients?

5  A.   Right.

6  Q.   Correct.  Okay.  And when you interviewed -- you would

7  often interview your prostitutes?

8  A.   Correct.

9  Q.   You would talk to them, and as you said, find out what's

10  important to them, correct?

11  A.   Correct.

12  Q.   Find if you can trust them and if they could trust you,

13  correct?

14  A.   No, no.  I don't trust them, but I pretty much want them

15  to trust me.

16  Q.   Okay.  You wanted them to trust you, but isn't it true

17  when you done interviewing them, you would give them a day or

18  two to give them a decision if they wanted to prostitute?

19  A.   On some occasions, yes.

20  Q.   Some occasions they take a day or some a week?

21  A.   Correct.

22  Q.   Is it true prostitutes would deny wanting to be a

23  prostitute for you after that meeting?

24  A.   Yes.

25  Q.   Someone like Lindsay Baxter, she said she didn't want to

1  be a prostitute.  She said she wanted to -- rather sell drugs,

2  correct?

3  A.    Right.

4  Q.    That happened on one occasion, correct -- that happened on

5  two occasions before she actually came back to you to be a

6  prostitute, correct?

7  A.    Right, right.

8  Q.    She voluntarily contacted you to be a prostitute.  Isn't

9  that right?

10 A.    Yeah.

11 Q.    And is it true that when you began your -- well, let me

12 say it this way.  When you were dealing with the girls from

13 this investigation that you didn't trust them with the money.

14 Is that true?

15 A.    Yeah.

16 Q.    Is that a yes?

17 A.    Yeah.

18 Q.    You thought that because they were the Pennsylvania girls

19 that they had problems with drugs and that they were becoming a

20 headache, did you say that?

21 A.    No, I have problems with drug addicts all around the

22 country not because they Pennsylvania girls, no.

23 Q.    Right.  But the reason why you'd pay your girls or drugs

24 or only give them enough money for drugs or enough money for

25 food or money for the hotel is because you were afraid that

186

1  they would go and get strung out and not show up for work,

2  correct?

3  A.    They was already at the hotel.  They didn't come to work

4  or go home or someplace else.  They was planted at the hotel,

5  whatever hotel that was.  They was planted there, and they

6  lived there pretty much until decide to move them.

7  Q.    You decided to move them.  But what I'm saying is when --

8  before -- there had to be a point in time where you rented

9  rooms, correct -- where you had to buy a room from the Howard

10 Johnson or the Super 8 or the Budget Inn or wherever you were

11 operating out of, correct?

12 A.    Me personally?

13 Q.    Yes.

14 A.    I rented rooms, correct.

15 Q.    And at that point, were you concerned that the girls that

16 you were using were using drugs too much, yes or no?

17 A.    No.

18 Q.    Okay.  I'm going to bring up 0395.  And for identification

19 purposes I believe I'm on --

20         MS. ROBERTS:  8.

21         MR. BROWN:  8.  Thank you.

22 BY MR. BROWN:

23 Q.    Did you say -- I'm going to direct your attention to

24 paragraph No. 2, the last sentence -- sorry, paragraph No. 1

25 the last sentence.  Do you recall being interviewed by the

187

1  government on May 17th, 2016?

2  A.   Yes.

3  Q.   And do you recall telling the government that you never

4  physically abused any --

5  A.   Yes.

6  Q.   -- of your girls.  That was a lie, correct?

7  A.   Yeah.

8  Q.   And then did you again tell them more recently, say, on

9  September 24th of 2020 you never hit the girls, you only

10 smooshed their face where it didn't leave a mark?

11 A.   Yeah, I did say that.

12 Q.   And yet you came here today and talked about committing

13 violent acts upon the girls.  Is that true?

14 A.   Yes.

15 Q.   Is it also true that with regard to the agreement and

16 arrangement you had with your women was -- did you call it a

17 mental agreement where there was money and a percentage of

18 profits for the sex they sold?

19 A.   Excuse me?

20 Q.   So did you tell investigators that the arrangement you had

21 with your prostitutes was a mental agreement?

22 A.   I don't recall saying a mental agreement.

23 Q.   Okay.  0396, which would be Defense Exhibit 9, page one --

24 sorry -- paragraph one, sentence six to eight.

25 A.   Yeah.  You taken that as saying I said that it was a

188

1  mutual agreement between -- you are taking that wrong way.

2  What I was saying is that -- originally I mean -- typically

3  it's a mental agreement.  It is.  But it's also a physical

4  agreement.  It's a mental agreement because you try to get into

5  their head.

6      You convince them that they need you for whatever reason.

7  That's the -- they start to agree with that.  That's what a

8  mental aspect is.  So -- the physical -- when they start to

9  realizing they don't need you and physically force them --

10 Q.  Well, I understand that.  But isn't it true you say it's a

11 mental agreement and it's not about control quote/unquote?

12 A.  Well, this is when I was first arrested.  I was lying.  I

13 mean, I was trying to protect myself.

14 Q.  I guess that's what we're getting at.  How about with

15 Jennifer Day, did you deny -- did you lie by denying that you

16 taught her how to pimp?

17 A.  Did I lie about that?

18 Q.  Yeah.

19 A.  Maybe in the beginning, yeah.

20 Q.  You had said during direct examination the way in which

21 your operation worked out of the Howard Johnson hotel would be

22 that you would make sure that you get into the C. wing,

23 correct?

24 A.  Back of the hotel, correct.

25 Q.  Back of the hotel.  Can we bring up 1.1, please?

189

1   Government's Exhibit 1.1.  And can we enhance it a bit?  So can

2   you direct for the jury -- just circle -- where that is in your

3   mind -- where you think that you were operating out of or where

4   you were operating out of.

5   A.   Right here.

6   Q.   And so is it true that there's two exits in that wing?

7   A.   Actually there's -- there's three.

8   Q.   So there's three exits in that wing.  I believe you said

9   on direct examination that there was a lot of foot traffic in

10  and out so you want to be in that wing so the customers can

11  come in and out of the exit.  Is that true?

12  A.   I didn't care where they was in the hotel personally.  The

13  hotel cared about where they was at in the hotel.

14  Q.   Fair enough.  So you are saying you never asked for the

15  smoking section?

16  A.   No.

17  Q.   You never directed your prostitutes to ask for the smoking

18  section?

19  A.   No.

20  Q.   On that, did prostitutes ever possess or control the money

21  to go purchase the hotel room?

22  A.   Yeah.

23  Q.   Okay.  So at some point in time you would give them enough

24  to go purchase the hotel room?

25  A.   If I wasn't there in the morning when it's time to pay for

1  the hotel room and they made money that night, I tell them pay

2  for the hotel room.

3  Q.   And so let's walk through that.  So if they don't -- they

4  either pay in the beginning, correct, they either go into the

5  hotel and pay for the hotel room, true?

6  A.   Check in?

7  Q.   Check in?

8  A.   Yeah.

9  Q.   And they would go to a customer call?

10  A.   Yeah.

11  Q.   They would answer the phone?

12  A.   Yeah.

13  Q.   They would set the prices to the customers -- they would

14  communicate the prices to the customer?

15  A.   Right.

16  Q.   The customer would come, correct?

17  A.   Yeah.

18  Q.   The customer would pay, correct?

19  A.   Yeah.

20  Q.   They would perform their act, correct?

21  A.   Yes.

22  Q.   And they would take the money and have possession of the

23  money, correct?

24  A.   Right.

25  Q.   Okay.  And did the -- did any prostitutes ever try to keep

191

1  the money?

2  A.   Yes.

3  Q.   And you had said sometimes you would not be there,

4  correct?

5  A.   Mostly at late night, late night to early, early morning I

6  wouldn't be there.

7  Q.   And during those periods of time, the girls would be in

8  the hotel room by themselves, correct?

9  A.   Right.

10  Q.   If they wanted to leave and go across the street or if

11  they wanted to leave in general, they could exit the property,

12  correct?

13  A.   I mean, yeah, but again, they could have walked out any

14  time if they -- you know what I'm saying -- if they wasn't

15  controlled -- if they wasn't scared.  If they didn't fear the

16  repercussions of leaving, I am pretty sure they would have

17  left.

18  Q.   If they left and you didn't find them, they can go on with

19  the rest of their lives and be away from you?

20  A.   It had a lot to do with the drug use, too, why they didn't

21  leave.

22  Q.   And you said that when you went to other hotels you had to

23  change up things and had to avoid detection, correct, you would

24  want to change the way in which you're moving so that the hotel

25  staff or the management doesn't know your comings and goings?

192

1  A.    Right.

2  Q.    Did you do that in the beginning at the Howard Johnson

3  before you even met Faizal Bhimani?

4  A.    No.

5  Q.    No.  You just met him and knew --

6  A.    I met -- I met -- I was introduced to the Howard Johnson

7  by a guy named G.

8  Q.    Okay.

9  A.    Who was already pimping at the hotel.

10 Q.    Okay.

11 A.    Who told me it was okay, yeah.

12 Q.    And you trusted this man?

13 A.    Yes.

14 Q.    Okay.  Well, let me ask this.  Was it a concern of you

15 when Faizal told you that he was talking to the cops?

16 A.    No.

17 Q.    Was it a concern of you when he told you he was going to

18 court for the prosecution of Eric Rolle?

19 A.    When he was what?

20 Q.    When he was going to court with the cops, did you know

21 that?

22 A.    No, I didn't know.

23 Q.    Okay.  Could we bring up Government's Exhibit 85.6?  Can

24 we go to No. 21, please?  And that's an incoming text on

25 February 13th, 2013 where Faizal Bhimani is telling you he's

193

1  coming -- something in the beginning -- but he was in court,

2  correct?

3  A.   Right.

4  Q.   Okay.  Can we go to --

5            MR. CAMONI:  Objection, Judge.  That's not what that

6  says.  That says it's coming from the --

7            THE COURT:  No, no, no.  Excuse me.  You're not a

8  witness in the case.  He asked the witness the question, and

9  you can -- if you have on redirect a different question, you

10 can ask that.  The witness can answer if he can answer the

11 question.

12           MR. BROWN:  Can we go to number ten, please?

13 BY MR. BROWN:

14 Q.   This is -- that's a February 26, 2015 text message to you

15 saying, hey, with police officers, hold up, right?

16 A.   Yeah.

17 Q.   And is it your testimony to this jury that doesn't concern

18 you, that the manager where you're committing your crimes in

19 criminal activity is talking to the cops?

20 A.   No, because before all this he warned me about cops.  I'm

21 taking that he's warning me again about cops.  I'm not taking

22 that as he's talking to the police about me.

23 Q.   Okay.  So you had no concern whatsoever?

24 A.   No.

25 Q.   Is it true that Faizal would contact you if the

1  prostitutes didn't pay for their room, correct?

2  A.   Yes.

3  Q.   And did you say on direct examination that the rooms were

4  never free, that you were just taking them on consignment and

5  would pay later?

6  A.   Yeah.

7  Q.   The reason why you would wait in the back of the parking

8  lot is because if the girls were caught with prostitution or if

9  somebody was -- one of the customers were caught in

10  prostitution, they would only receive a misdemeanor on the

11  state level.  Is that true?

12  A.   I don't know what happens to the guy, but I know

13  prostitution is a misdemeanor in the State of Pennsylvania.

14  Q.   Now, I want to talk to you about this other person at the

15  front desk.  Do you recall a man by the name of Francis Joseph?

16  A.   No, I don't -- not by name, no.

17  Q.   All right.  I'm going to ask you to bring up -- this would

18  be Defendant's Exhibit 10 I think, sorry.

19        THE COURT:  That's 10?

20        MR. BROWN:  Yes, I just wanted to double check my

21  number.

22  BY MR. BROWN:

23  Q.   I'm going to ask you to -- sorry.  Making sure I'm in the

24  right spot, Judge.  I apologize.  I'm going to ask you to read

25  paragraph three, please.  Was there an Arabic man at the front

195

1  desk you described was asking to have sex with your prostitutes

2  in exchange for free rooms?

3  A.    I think that's the guy I was talking about earlier, the

4  bald head guy.  He could have -- could have been Spanish,

5  Arabic or Indian, yeah.

6  Q.    But did you describe him as an Arabic man?

7  A.    Yeah, he could be Arabic, Indian.

8  Q.    2320.  Sorry, 2321.

9        THE COURT:  I assume you're marking this Defendant's

10  Exhibit 11.

11        MR. BROWN:  Defendant's Exhibit 11, Your Honor.

12  BY MR. BROWN:

13  Q.    And is it true that Mr. Bhimani never had sex with that

14  Peaches girl, correct?

15  A.    I can't say that.

16  Q.    Okay.  Do you know if Francis Joseph did?

17  A.    Who is --

18  Q.    Sorry, the other guy at the front desk.

19  A.    The guy -- the bald head guy?

20  Q.    Yes.

21  A.    Do I know if he ever had sex with her?

22  Q.    Yes.

23  A.    With Peaches, no, I don't know.

24  Q.    Okay.  I will mark this as 12, Your Honor.  The first

25  paragraph, this is from a more recent interview, and I am going

196

1  to ask you read that to yourself, and I am going to ask you --

2  okay.  Would you recognize the name Francis Joseph now?

3  A.   I don't remember the name.  As long as -- I don't recall

4  the dude's name.  So if that's the same dude, short, bald head

5  guy that used to work at the front desk, light skinned guy,

6  that's Francis Joseph.

7  Q.   I want to make sure.  There might have been a smaller

8  younger bald headed dude, correct?

9  A.   Yeah.

10 Q.   And then there would have been somebody else that you had

11 identified as Francis Joseph to the officers?

12 A.   No.

13 Q.   In your statement?

14 A.   I don't know who Francis Joseph is.  I can't identify

15 Francis Joseph.

16 Q.   You disagree what's in the statement?

17 A.   No.  If Francis is the guy that used to work at the front

18 desk, that's what I'm talking about.  It was only one guy that

19 worked at the front desk that I dealt with.

20 Q.   Okay.  Is it true you're looking for assistance in your

21 sentence here today?

22 A.   Am I looking for that?

23 Q.   Yes.

24 A.   Yes.

25 Q.   That's why you're testifying, correct?

1  A.    I mean, that's part of the reason why I'm testifying.

2  Q.    Okay.

3        MR. BROWN:  Thank you.  No further questions.

4        THE COURT:  All right.  Mr. DeStefano?

5  CROSS EXAMINATION.

6  BY MR. DeSTEFANO:

7  Q.    Hi, Mr. Stanley.  I'm Bill DeStefano.  I represent one of

8  the corporate defendants in this case and Mr. Hassam.

9  A.    Hi.  How are you doing?

10 Q.    Let me -- what I really would like to do is clarify your

11 prior testimony that you gave on direct, okay.  And I do have

12 some questions about certain things.  So if you don't

13 understand one of my inarticulate questions, please stop me,

14 and I will rephrase it, okay.

15 A.    Uh-huh.

16 Q.    Is that a deal?

17 A.    Yes.

18 Q.    We got a deal?

19 A.    Yeah, we got one.

20 Q.    Now, sir, you entered a guilty plea to certain crimes in

21 2016 or 2017?

22 A.    2017.

23 Q.    Yeah.  Here in Pennsylvania?

24 A.    Right.

25 Q.    And you were in federal court before Judge Nealon on those

198

1    -- on those charges?

2    A.    No, I was in front of Judge Munley.

3    Q.    Judge Munley, I'm sorry, okay.  Are you sure that was in

4    2016 -- 2017, I'm sorry?

5    A.    The case -- I got sentenced in 2017, yes.

6    Q.    And when was the indictment returned?

7    A.    2016.

8    Q.    Okay.  And you were detained without bail?

9    A.    Right.

10   Q.    That whole time from the indictment or your arrest

11   forward?

12   A.    Yes.

13   Q.    Okay.  And you were detained where, here in Lackawanna

14   County?

15   A.    Yes, for the most part, yeah.

16   Q.    Okay.  All right.  Now, as I understand it, the indictment

17   you pled guilty to was a certain number of counts of interstate

18   transportation of women for purposes of committing sex?

19   A.    Right.

20   Q.    Okay.  You weren't charged with the crime of sex

21   trafficking, isn't that correct, sir?

22   A.    No.

23   Q.    Okay.  You say no.  Are you disagreeing with me or

24   agreeing?

25   A.    I wasn't convicted of sex trafficking.

199

1  Q.   You were also charged with -- if I understand it correctly
2  -- possession of controlled substance with the intent to
3  distribute same?
4  A.   That's right.
5  Q.   Is that right?
6  A.   Yes.
7  Q.   Okay.  You weren't charged with the crime of drug
8  distribution or managing and using a hotel or anything like
9  that for drug distribution.  Would that be correct?
10 A.   No.
11 Q.   And, in fact, you're not a drug dealer in the sense that
12 you sell drugs to other people for profit?
13 A.   No.
14 Q.   Never have been?
15 A.   I have been, but I --
16 Q.   Not here in Pennsylvania?
17 A.   No.
18 Q.   Now, where were you when you possessed the drugs that you
19 were charged with in this indictment?
20 A.   Where was I?  Where I distributed them at?
21 Q.   I'm sorry?
22 A.   Where did I distribute the drugs at?
23 Q.   Where -- you possessed them with the intent to distribute
24 it.  Where were you possessing those drugs you were charged
25 with?

200

```
 1   A.    In the Howard Johnson.
 2   Q.    And I take it that they claimed it was your intent to give
 3   those drugs to the prostitutes that were working?
 4   A.    Yes.
 5   Q.    But they didn't actually charge you with that
 6   distribution, they charged you with just possession with that
 7   intent?
 8   A.    Yeah.
 9   Q.    All right.  Now, let me go back if I might.  That happened
10   in 2016 into 2017?
11   A.    That's when I got indicted.  The crime happened --
12   Q.    I understand, the indictment.
13   A.    Yeah.
14   Q.    I'm going to direct your attention to -- you said you were
15   at the Howard Johnson intermittently during the years 2014 and
16   2015?
17   A.    Yes.
18   Q.    Correct?
19   A.    Right.
20   Q.    Now, I take it from your testimony, sir, you would agree
21   with me you didn't move into the Howard Johnson on January 1st,
22   2014 and stay there and not move out until the end of 2015; is
23   that correct?
24   A.    No, I did not.
25   Q.    In other words, you weren't there nor were your girls
```

1  there continuously for two years?

2  A.    No.

3  Q.    Okay.  And, indeed, I think if I remember your testimony

4  correctly, you said that you moved them from time to time

5  different places yourself and the girls from different places?

6  A.    I'm going to say from the summer of 2014 to March, April,

7  2015, I had girls at the Howard Johnson every day.

8  Q.    Okay.  So that you're talking about the very end of '14 to

9  the --

10  A.    Summer of 2000 --

11  Q.    Three months of --

12  A.    Summer of 2014 I'm going to say June.  From June, yeah --

13  June to, I'm going to say March, April, 2015.

14  Q.    You didn't clarify that, but you're saying it now that

15  from December of '15 -- '14, late '14 --

16  A.    No, I said from June of 2014, the summertime of 2014 to

17  early 2015, March or April, I had girls in the Howard Johnson.

18  Q.    Okay.  Now, how about the other times?  Did you have other

19  places during those other times in 2014 and later in 2015?

20  A.    I always came back.  Are you talking about consistently?

21  From June of 2014 to 2015, April, March or April, but I always

22  came back periodically.

23  Q.    Periodically?

24  A.    Yeah, yeah.

25  Q.    Okay.  Was your first entry or stay at the Howard Johnson

202

1   in June of 2014?

2   A.   No.

3   Q.   You stayed there before?

4   A.   I stayed there for a couple days.

5   Q.   Couple days?

6   A.   Yeah.

7   Q.   Okay.  And then are you saying that you came back again

8   for a couple days at a time after March of 2015?

9   A.   Yes.

10  Q.   Okay.  Now, you were in South Dakota in early 2016,

11  correct?

12  A.   No, I was North Dakota, yes.

13  Q.   In early 2016 right after 2015, what were you doing in

14  North Dakota?

15  A.   Pimping.

16  Q.   Sorry?

17  A.   Pimping.

18  Q.   Okay.  You were locked up though?

19  A.   I locked up for pimping in North Dakota, yeah.

20  Q.   When did you get locked up for pimping in North Dakota?

21  A.   December 31st, 2015.

22  Q.   December 31st?

23  A.   Yeah, 2015.

24  Q.   When did you first go to North Dakota from --

25  A.   I actually got into North Dakota I am going to say first,

203

1  second week of December of 2015.

2  Q.    Okay.  So were you in North Dakota continuously from early

3  December, second week of December, 2015 onward?

4  A.    Until December 31st I was in North Dakota a free man from

5  the first or second week of December to December 31st.

6  Q.    Did you have prostitutes operating out of North Dakota

7  before December?

8  A.    Before December?  No.

9  Q.    2015?

10  A.    No.

11  Q.    I think by your testimony you said you had girls operating

12  as prostitutes in other states before that time?

13  A.    Before that time, yes.

14  Q.    Okay.  How many other states?

15  A.    At that time?

16  Q.    Yeah.

17  A.    Three.

18  Q.    Three.  Which ones?

19  A.    Washington, Seattle, Washington, L. A. and North Dakota.

20  Q.    Okay.  Did you periodically travel out to those three

21  states to supervise what was going on?

22  A.    Periodically, yes.

23  Q.    Okay.  You just didn't put prostitutes in Arizona, let's

24  say, and just leave them all by themselves for any length of

25  time, did you?

204

1  A.    If they wasn't on drugs, yeah.

2  Q.    If they wasn't on drugs?

3  A.    Yeah.

4  Q.    Was some on drugs?

5  A.    Yeah.

6  Q.    In all three states?

7  A.    Not in Washington or L. A. no.

8  Q.    Not in Washington or L. A.?

9  A.    No.

10 Q.    Now, while you were operating in northeastern

11 Pennsylvania, here, I think you had a house or residence?

12 A.    Yeah.

13 Q.    Where was that residence?

14 A.    Stroudsburg.

15 Q.    Stroudsburg?

16 A.    Yeah.

17 Q.    And you didn't yourself stay at the hotel, but you stayed

18 at your residence for that time?

19 A.    Yeah.

20 Q.    Did there come a time when you sold or disposed of your

21 residence in Stroudsburg?

22 A.    Excuse me?

23 Q.    Did you sell your residence in Stroudsburg after that?

24 A.    Did I sell?

25 Q.    Do you still own it today?

1  A.    No, no.

2  Q.    During the time you were operating prostitution in this

3  area --

4  A.    Yeah.

5  Q.    -- you had the house for the whole time?

6  A.    Yeah.

7  Q.    Okay.  I think your testimony was that while the

8  prostitution was going on or at least when part of the

9  prostitution was going on at the Howard Johnson you stayed out

10 in the parking lot either on the phone in one of your B. M. W.s

11 or hanging out in the parking lot because you wanted to be in

12 the parking lot rather than being in the rooms themselves?

13 A.    Right.

14 Q.    You never rented a room just for yourself to say in at the

15 Howard Johnson?

16 A.    Probably once or twice.

17 Q.    Aside from once or twice where you rented a room to stay,

18 you stayed at home?

19 A.    Yeah.

20 Q.    While the prostitution was going on, maybe except for that

21 one or two times you stayed in the parking lot, you didn't

22 enter the hotel?

23 A.    I entered the hotel periodically throughout the day, yes,

24 yeah.  For the most part I was in the car, yeah.

25 Q.    And that was, again, from June of 2014 through March of

206

1    2015?

2    A.    Yes.

3    Q.    Sir, if you were in the parking lot most of the time the

4    girls were renting rooms or staying in the rooms in the motel,

5    how do you know what the room looked like when they left?

6    A.    When they left?  When who left?

7    Q.    The girls.  They never checked out?  They stayed there the

8    whole time?

9    A.    They did, yeah.  Nobody -- no, they never checked out.

10   Q.    Aside from one or two times you went in, you never went in

11   and physically inspected the room?

12   A.    Oh, yeah, every time I go in I look around and inspect the

13   room.

14   Q.    But you said you only went in a couple times?

15   A.    No.  I said throughout the day.  If I'm sitting in the

16   parking lot throughout the day, I periodically go in and the

17   room.  If I have to go the bathroom, I go in and out the room.

18   Q.    Okay.  I was confused.  When was the first time you spoke

19   to these investigators here in Pennsylvania about the situation

20   that you were doing in northeastern Pennsylvania, specifically

21   at the Howard Johnson?

22   A.    May of 2016.

23   Q.    Okay.  You were locked up in Bismarck, North Dakota?

24   A.    Yes.

25   Q.    In a prison on charges?

207

1   A.    Yes.

2   Q.    Were you convicted of those charges?

3   A.    No, they -- I was convicted of misdemeanors, yeah.

4   Q.    Of a misdemeanor in North Dakota?

5   A.    Yeah.

6   Q.    Did you serve any time other than the time you were locked

7   up on the charges?

8   A.    No, I got time served for, like, five months.

9   Q.    Five months?

10  A.    Yeah.

11  Q.    But the people from Pennsylvania here, the investigators

12  flew out to Bismarck and interviewed you right in the Bismarck

13  detention facility or jail or prison or whatever it was?

14  A.    Yes.

15  Q.    Did they audio record that interview?  Did they have a

16  recorder there when they were talking to you in the Bismarck

17  prison?

18  A.    Not that I recall, no.

19  Q.    And do you remember -- do you remember agent Patton?

20  A.    Yes.

21  Q.    Was he one of the ones who came to talk to you?

22  A.    Yes.

23  Q.    Who else besides agent Patton?

24  A.    There was another gentleman.

25  Q.    He was one of them.  The other one you didn't know?

1   A.   Yeah.

2   Q.   Now, do you remember when the second time they spoke to

3   you was and where it was?

4   A.   The second time, yeah.  Yeah.

5   Q.   When was that?

6   A.   Where?

7   Q.   Where?

8   A.   You said where?

9   Q.   When.  I will ask where.

10  A.   It was here.  The when I want to say probably June, July

11  of 2016, 2000 -- yeah, 2016.

12  Q.   How about August 1st, 2016?

13  A.   Yeah, could have been.

14  Q.   Close enough?

15  A.   Yeah.

16  Q.   And where were you here -- besides being here, were you --

17  okay.  You were at liberty at that time?

18  A.   No, I was locked up.

19  Q.   Was it again agent Patton?

20  A.   Yes.

21  Q.   Okay.  Do you remember any of the other people that

22  interviewed you the second time?

23  A.   The second time?

24  Q.   Yeah.

25  A.   It was U.S. attorney, assistant U.S. attorney I think, my

209

1  lawyer at the time.

2  Q.    Okay.

3  A.    And --

4  Q.    Shelly representing you at that time?

5  A.    Yeah, Shelly Centini, yeah, the same gentleman that was in

6  North Dakota.  I don't know his name.

7  Q.    Patton?

8  A.    And the other guy.

9  Q.    Was that interview recorded to the best of your knowledge?

10  A.    I don't know -- no knowledge.  I never heard -- never seen

11  a tape.  I don't know.

12  Q.    There was no machine sitting on the table --

13  A.    No.

14  Q.    Or anything of that nature?

15  A.    Huh-uh.

16  Q.    Camera in the room?

17  A.    No.

18  Q.    All right.  And then later in 2016 you were actually

19  charged with the crime we were talking about?

20  A.    No, I was charged in May -- no, May or June -- May or June

21  of 2016.

22  Q.    Well --

23  A.    I had two indictments.  I had initial indictment and a

24  superseding indictment.  The superseding indictment came in

25  November.

1  Q.    Okay.   Okay.   All right.   All right.   So when you talked

2  to him the second time you were actually charged?

3  A.    Yes.

4  Q.    Okay.   And that was -- can we establish -- would I be

5  correct -- second time was August 1st?

6  A.    Yes.

7  Q.    So after your first indictment?

8  A.    Yes.

9  Q.    But before you --

10 A.    Before the second.

11 Q.    Before the superseding?

12 A.    Yeah.

13 Q.    And then, of course, as we established, you pled guilty to

14 those offenses and you became a federal prisoner.  You're

15 sentenced to 188 months?

16 A.    Right.

17 Q.    You became a federal prisoner?

18 A.    Right.

19 Q.    Did you have probation violations for your other offenses

20 that occurred because of your conviction of these charges or --

21 A.    No, I wasn't on probation when I caught these charges.

22 Q.    So you were done with all those prior offenses?

23 A.    Yes.

24 Q.    North Dakota offense and the ones in '95 and --

25 A.    Yeah.

1  Q.   And early 2000, you didn't get increased penalties as a

2  result of a violation of parole or violation --

3  A.   No, I got increased penalty because of my criminal

4  history.

5  Q.   In this case?

6  A.   Yeah.

7  Q.   Understood.

8  A.   Yeah.

9  Q.   Okay.  So right now you're doing your 188-month sentence?

10 A.   Right.

11 Q.   As we speak here?

12 A.   Yes.

13 Q.   And as Mr. Brown brought out, you are hoping for a

14 reduction in that sentence so you can finally get out of jail?

15 A.   Yeah, I mean --

16 Q.   Go about your life?

17 A.   Yes.

18 Q.   When you spoke on August 1st, 2016 after you were

19 indicted, did agent Patton or anybody else at that meeting that

20 you had tell you that you can help yourself on your case if you

21 cooperated?

22 A.   What time?

23 Q.   August 1st, 2016.  You're indicted.  No superseding

24 indictment yet.  But did they tell you during that time that

25 you can help yourself --

212

1  A.    No.

2  Q.    -- by cooperating?

3  A.    No, no.

4  Q.    No.  Okay.  And as I think you would agree -- or we have

5  established that during those first two meetings you lied about

6  a lot of stuff that was happening here in Pennsylvania?

7  A.    Yes, sir.

8  Q.    All right.  Okay.  Sir, when you had your next interview

9  if I'm correct -- let me try to help you.  It was September

10  26th, 2019.  Jump ahead almost three years from your previous

11  interview?

12  A.    Uh-huh.

13  Q.    Now, you're speaking to the government people again about

14  the Monroe County situation.

15  A.    Right.

16  Q.    Okay.  Would that be correct?

17  A.    Yes.

18  Q.    And where were you then?  Do you recall?

19  A.    I was in F. M. C. Devens in Massachusetts.

20  Q.    In federal prison in Massachusetts?

21  A.    Yeah, yeah.

22  Q.    Can you remember who came out to talk to you?

23  A.    Yes.

24  Q.    Did they come up to Massachusetts?

25  A.    Yeah.

213

1  Q.    And they interviewed you in the prison?

2  A.    Yeah.

3  Q.    Can you remember who it was?

4  A.    Yes, it was Mr. Camoni, officer Shelley and Patton.

5  Q.    And the point of them talking to you at that time and the

6  thing you made -- made you want to talk to them at that time --

7  I mean, you are locked in prison.  You don't have to see them,

8  right?

9  A.    Right.

10  Q.    Was the opportunity to ameliorate or lesson your 188-month

11  sentence -- you saw that as an opportunity, did you not, sir?

12  A.    Yes.

13  Q.    Okay, all right.  Isn't it a fact that the people you

14  talked to said that if you cooperated with them -- with them

15  they would go to bat for you on a reduction of your sentence?

16  A.    No, I don't think that was the words that was said.

17  Q.    You don't think those specific words were said?

18  A.    It was more of they couldn't promise me anything.  They

19  didn't -- they couldn't say for sure.

20  Q.    But --

21  A.    But if I was to tell the truth, then they could possibly.

22  Q.    Would it be true, sir, they gave you that possibility?

23  A.    No, actually -- no take -- I don't take their words on

24  face value, so it really was like --

25  Q.    I'm talking about your conception of what they were

214

1   saying.  But they did dangle the possibility before you?

2   A.    I knew that though.  I knew that when I --

3   Q.    You knew that's what they were going to do?

4   A.    No, I knew it was a possibility I could help myself if I

5   helped them.

6   Q.    Let's turn the clock ahead to your very last interview

7   before coming into court here today.

8   A.    Uh-huh.

9   Q.    Okay.  And that was at the Lackawanna County Prison, am I

10  correct about that?

11  A.    No.

12  Q.    F.B.I. office?

13  A.    Right.

14  Q.    You were locked up in the Lackawanna County Prison at that

15  time?

16  A.    Right.

17  Q.    And that was September 22nd of this year, 2020?

18  A.    Yes.

19  Q.    And the point of that was to, quote, prepare you for your

20  testimony in this case?

21  A.    Uh-huh.

22  Q.    Would that be correct?

23  A.    Yes.

24  Q.    You were still operating under that possibility, were you

25  not, that if you said something that the government wanted you

215

1  to say that there would be that possibility?

2  A.   No, because I was specifically told if I don't tell the

3  truth that whatever I expected wouldn't happen.

4  Q.   Yeah, who says what the truth and what's not the truth in

5  your plea bargain?  Who has the sole discretion to say what's

6  the truth and whether you're lying or you're telling the truth?

7  Is that your call, or is that the government's call?

8  A.   It's my call if I am going to sit here and lie or not or

9  tell the truth.  That's my call.

10  Q.   When you signed the plea agreement, right, or your

11  cooperation agreement, not your plea agreement -- you had a

12  plea agreement, and then you had a cooperation agreement,

13  right?

14  A.   Uh-huh.

15  Q.   Who does that cooperation agreement say is the sole

16  determiner of whether or not you're telling the truth here

17  today?

18  A.   I don't know.  I don't know who makes that call, the judge

19  maybe, the jury.  I don't know.

20  Q.   Okay.  That document is in evidence.  It speaks for

21  itself.  What it says it says?

22  A.   Yeah.

23  Q.   Okay.  What puzzles me you spoke to these guys on

24  September 20th of this year and then 2019 when you were locked

25  up in Massachusetts and then 2016 when you were locked up in

216

1  Bismarck?

2  A.    Right.

3  Q.    But you were talking about stuff that happened in 2014 and

4  2015 early 2015, correct?

5  A.    Yes.

6  Q.    What puzzles me is how you can remember the detail of

7  stuff that was happening on a day-to-day basis in 2014, let's

8  say, all the way out in 2020, 2019, 2017.

9  A.    How can I remember?

10  Q.    Do you have a photographic memory or something --

11  A.    But something happens every day when that's your

12  life-style, every day, day in, day out, the same routine, same

13  people, the same -- I mean, it's -- you know --

14  Q.    You're saying what happened, gang and women, and they were

15  being prostitutes and they were in the Howard Johnsons, that

16  was the routine, you were out in the parking lot, you went in

17  from time to time, okay, all that -- I understand that.

18  A.    It gets more specific when I can remember -- when I

19  remember a specific female.  I remember every female that I

20  ever had in my whole career with pimping.  I know the

21  circumstances how I met them, how they left, you know what I'm

22  saying, like, I may not remember the further -- the further

23  back day-to-day things, but I remember.  Yeah.

24  Q.    How many females over the course of your pimping career

25  have you had?  You mentioned four or five six during the Monroe

217

1    County thing, right, by name.  But seems to me your pimping

2    empire was --

3    A.    From my career I'm talking from the time I started pimping

4    from the time I was arrested for --

5    Q.    Yeah.

6    A.    How many women?

7    Q.    How many?

8    A.    Probably, like -- I don't know -- a hundred and some.

9    Q.    Isn't it true you never forced a girl to become a

10   prostitute?

11   A.    No, that's not true.

12   Q.    Isn't it true, sir, you told the government that you never

13   forced anybody --

14   A.    That's true.

15   Q.    Isn't it true as you responded to Mr. Brown's question,

16   you always put it to them and gave them a day or couple days or

17   two to think about it and get back to you, correct?

18   A.    On occasions.

19   Q.    Was that the norm, or was that --

20   A.    No, that wasn't the norm.

21   Q.    But on occasion?

22   A.    Yeah, on occasion, yeah.

23   Q.    All right.  And did you ever actually retaliate in some

24   way -- some tangible way for a prostitute who left your employ?

25   A.    Retaliated?

218

1  Q.    Yeah.   Somebody who left.   I understand you made some

2  threats of sorts but somebody -- people left you?

3  A.    Yeah, they --

4  Q.    A lot of people left?

5  A.    Yeah.

6  Q.    Didn't you tell the government that the decision to hire

7  the prostitute was yours but the decision for them to leave was

8  theirs?  You told them that, didn't you?

9  A.    I told them that.  The decision though -- but, see, the

10 decision for them to leave is theirs.  They could leave.  It's

11 the repercussions of them leaving or attempting to leave.

12 That's what keeps them for the long haul.

13 Q.    You never did any repercussions?

14 A.    Yes.

15 Q.    You let the air out of the girl's tires?

16 A.    Yeah, no.

17 Q.    Isn't that a repercussion?

18 A.    That was something -- that wasn't nothing, but -- there's

19 been repercussions behind a girl leaving or attempting to

20 leave.

21 Q.    Sir, it's true, is it not -- and you are under oath here

22 -- what you're doing here today, sir, is simply communicating

23 with these folks indicating what they want you to say in this

24 testimony?

25 A.    No , that's not true.

219

1  Q.   That's something the jury will have to decide?

2  A.   Yeah.

3            THE COURT:  Redirect?

4            MR. CAMONI:  Briefly, Your Honor.

5  REDIRECT EXAMINATION

6  BY MR. CAMONI:

7  Q.   Bring up 86.6, please, and zoom in on 21.  Mr. Stanley,

8  we're looking back at this text exchange you looked at earlier

9  with Mr. Brown.  And No. 22, this was a message sent to

10 570-236-7047.  Whose phone was that?

11 A.   Mine.

12 Q.   22 is a message sent to you?

13 A.   Right.

14 Q.   What does that message say?

15 A.   Waiting, L. O. L.

16 Q.   Faizal Bhimani was telling you he was waiting for you?

17 A.   Yes.

18 Q.   Message 21 Mr. Brown showed you, that message says from

19 570-236-7047, correct?

20 A.   Yes.

21 Q.   Is that a message you sent?

22 A.   Yes.

23 Q.   What was the message you sent?

24 A.   Coming, was in court.

25 Q.   Do you recall being in court in February 2015, or do you

220

1  recall telling Faizal Bhimani you were in court?

2  A.   If I was in court, it had to be to pay a fine, to pay a

3  ticket.

4  Q.   Okay.  Did you pay a ticket around February 13th of 2015?

5  A.   I probably paid on the ticket at that time.

6  Q.   You can take that down, please.  Bring up exhibit 39, page

7  2.  Zoom in on that top half, please.  Mr. Stanley, can you

8  read the part where it says count 11 charges the defendant?

9  A.   Count 11 charges the defendant with the distribution and

10  possession with intent to distribute a controlled substance.

11  Q.   Now, you pled guilty to count 11, correct?

12  A.   Right.

13  Q.   So you were charged with the distribution?

14  A.   Yeah.

15  Q.   Of controlled substances?

16  A.   Yeah.

17  Q.   When you pled guilty, you admitted to the distribution of

18  controlled substances, correct?

19  A.   Yes, yes.

20  Q.   As part of this plea agreement, you said you got an

21  enhancement?

22  A.   Yes.

23  Q.   For your criminal history?

24  A.   Yes.

25  Q.   In fact, did you agree in this plea agreement that you are

221

1  what is known a career offender?

2  A.   Right.

3  Q.   Did you admit that your criminal history is such that you

4  get that enhancement?

5  A.   Yes.

6  Q.   Mr. Brown asked you if Lindsay Baxter came to you

7  voluntarily.  Was Lindsay Baxter on drugs?

8  A.   Yes.

9  Q.   What was she on?

10  A.   Heroin.

11  Q.   Where did she get her heroin while she worked for you?

12  A.   From me.

13  Q.   When Lindsay Baxter came to the Howard Johnson, did you do

14  anything to keep her from leaving?

15  A.   Yeah, I kept her in the room.  Are you talking about the

16  first day?

17  Q.   Yeah.

18  A.   Yes.

19  Q.   What did you do?

20  A.   I wouldn't let her leave the room.

21  Q.   Did you physically stop her from leaving the room?

22  A.   Yes.

23  Q.   Did you do something to her car?

24  A.   Flatten the tires, yes.

25  Q.   So that wasn't retribution.  That was to keep her from

1  driving away?

2  A.    That was to keep her from leaving.

3  Q.    When you mentioned that you delivered retribution for

4  people trying to leave or leaving, what are you talking about?

5  A.    Violence, punching, kicking, beating them up pretty much.

6  Q.    Did you ever do that in the Howard Johnson?

7  A.    Yes.

8  Q.    Did you ever tell Faizal Bhimani about it?

9  A.    Couple times, not every time, but a few times.

10 Q.    Was that when he said, do what you got to do?

11 A.    Yes.

12 Q.    Now, when you said that on occasion you gave them a day or

13 two to think about it, was that during that time when you were

14 recruiting them?

15 A.    Uh-huh.

16 Q.    In the beginning?

17 A.    Yeah, in the beginning.

18 Q.    The things they were thinking about, was that the offer

19 you had made them?  Is that what they were thinking about?

20 A.    No, because, I mean -- yeah, it is pretty much the offer I

21 made them.  But like I said, when you talking to them the first

22 initial time you are speaking to them, you know what they want.

23 You know what they -- how they -- they weaknesses.  You know if

24 they are on drugs.  Say they are on drugs, you know drugs -- I

25 know drugs cost money.  They know drugs cost money.  So you

223

1  know, you make it -- you present a situation where you ain't

2  got to worry about the money to get the drugs.

3  Q.   You find out what they want?

4  A.   Yeah.

5  Q.   Now, what if it's not drugs?  You mentioned sometimes they

6  want to be loved?

7  A.   Yes, sometimes they want to be loved.

8  Q.   Sometimes they want to be taken care of?

9  A.   Yes.

10  Q.   If that's what they want in that initial conversation when

11  you're recruiting them, do you promise them that?

12  A.   Yes.

13  Q.   Do you make them feel that's what they are going to get?

14  A.   Yes.

15  Q.   If they go off to think about it, that's what they are

16  thinking about?

17  A.   Yes.

18  Q.   Is any of that true?

19  A.   No.

20  Q.   Are you lying to them when you tell them that?

21  A.   Yes.

22  Q.   Why?

23  A.   Because I want them to come back.  I don't want them to go

24  think about it really.  I want them to make the decision right

25  then and there.  But if they say, oh, let me think about it, I

224

1  want them to think about -- yeah, that.

2  Q.   So you make them promises?

3  A.   Yes.

4  Q.   And those promises are false?

5  A.   Yes.

6  Q.   And then based on those false promises --

7       MR. DeSTEFANO:   I will object to the repeated leading

8  here.  I think we're in an area here where --

9       THE COURT:   I am going to sustain to the extent -- be

10 more careful in your questions.  There seems to me there's been

11 a lot of repetition.  If there's some new material related to

12 cross, let's talk about that or some confusion from cross that

13 you want to clean up.  Let's do that.  But we're not going

14 through our whole direct again.  Everybody will have to start

15 to get to their point on both sides here rather than kind of

16 meandering around all day.

17      MR. CAMONI:   One last question.

18      THE COURT:   You can ask whatever you want to ask.

19 Let's try to move on.

20      MR. CAMONI:   Understood, Your Honor.

21 BY MR. CAMONI:

22 Q.   So when the girls would come back after thinking about it

23 and they would voluntarily agree to come with you, is that

24 based on the lies you told them during their recruiting phase?

25 A.   Yes.

225

1        MR. CAMONI:  Nothing further, Your Honor.

2        THE COURT:  All right.  You may step down.  Let's

3   clean the witness stand, please.  May I see counsel, please?

4        (A discussion was held off the record at sidebar.)

5        THE COURT:  Next witness?

6        MR. CAMONI:  Your Honor, the government calls Rachel

7   Szlasa.

8        RACHEL SZLASA, called as a witness, being duly sworn,

9   testified as follows:

10  DIRECT EXAMINATION

11  BY MR. CAMONI:

12  Q.    Good afternoon, Ms. Szlasa.  How old are you today?

13  A.    37.

14  Q.    How far did you go in school?

15  A.    I graduated high school.  Currently in college now.

16  Q.    And are you currently facing any charges that you're

17  testifying as part of a plea agreement to?

18  A.    No, sir.

19  Q.    Are you here because you were subpoenaed?

20  A.    Yes, ma'am -- yes, sir, sorry.

21  Q.    Are you familiar with the Howard Johnson hotel in

22  Bartonsville?

23  A.    Yes.

24  Q.    Have you ever stayed there?

25  A.    Yes.

226

1  Q.   When was that?  What years?

2  A.   Oh, I don't know, like, 2014, 2015 maybe, and then again

3  in, like, 2018.

4  Q.   Do you know someone named Thurman Stanley?

5  A.   Yes.

6  Q.   What name did you know him by?

7  A.   Black.

8  Q.   Were you ever at the Howard Johnson with Thurman Stanley?

9  A.   Yes.

10 Q.   Where in the hotel were the rooms where you stayed during

11 that time?

12 A.   In the back.  It was, like, room 182.

13 Q.   How do you remember that room?

14 A.   My birthday is November 1, 1982.

15 Q.   Did you ask for that room?

16 A.   It just stuck out to me.

17 Q.   Did you ever ask for rooms in the back?

18 A.   No.

19 Q.   When you were with Thurman Stanley, were you using drugs

20 during that time period?

21 A.   No.

22 Q.   Why were you at the Howard Johnson?

23 A.   At that time, it was prostitution.

24 Q.   What was your relationship to Thurman Stanley?

25 A.   I worked for him I guess.

227

1  Q.   So what was he to you?

2  A.   Pimp.

3  Q.   So what do you mean by pimp?  What's that mean?

4  A.   I don't know what the dictionary definition is, but he

5  basically got all the money from what we were doing.

6  Q.   You gave him all the money?

7  A.   Uh-huh.

8  Q.   You said we what we were doing.  Were there other women

9  working as well?

10 A.   Yes.

11 Q.   How many others?

12 A.   There was a couple that came in and out, maybe, like,

13 five.

14 Q.   Five total or five at a time?

15 A.   Total, like, that would come in.

16 Q.   Do you remember their names?

17 A.   Yeah.

18 Q.   What names?

19 A.   Crystal, Heather, Michelle, Lindsay, Nicole.

20 Q.   How did you meet Thurman Stanley?

21 A.   Through Heather.

22 Q.   Heather who?

23 A.   D'Auria.

24 Q.   How did it work with Thurman Stanley?  You said you gave

25 him all the money.  Were there any other rules?

228

1  A.    Any other what?

2  Q.    Rules.

3  A.    Not really.

4  Q.    Well, who set the prices?

5  A.    I don't remember.

6  Q.    Who posted on -- how did you attract customers?

7  A.    Back Page.

8  Q.    Is that a website?

9  A.    Uh-huh.

10 Q.    Who posted the ads on Back Page?

11 A.    I did or Heather did.

12 Q.    Did he tell you what to post?

13 A.    No.

14 Q.    Who paid -- go ahead.

15 A.    We pretty much did it ourselves.

16 Q.    Who paid for the ads?

17 A.    Gift cards, or we get a Visa gift card and pay for it.

18 Q.    Where did the money came from?

19 A.    The money we made from prostitution.

20 Q.    Did you get to hold that money?

21 A.    Sometimes, but not really.  Most times, no.

22 Q.    Did Thurman Stanley let you hold money and not let other

23 girls hold money?

24 A.    Yeah.

25 Q.    Why was that?

229

1   A.   Not sure.  Still don't know.

2   Q.   Did it seem like he trusted you more?

3   A.   Yeah, probably because I wasn't on drugs.

4   Q.   He never told you why?

5   A.   No.

6   Q.   So if you weren't getting drugs from the prostitution and

7   you didn't keep the money, why were you doing it?

8   A.   I guess because I liked him.

9   Q.   Did you have a personal relationship with him?

10  A.   Yeah.

11  Q.   What was the nature of that relationship?

12  A.   Well, in hindsight it was not a relationship but seemed at

13  the time boyfriend/girlfriend relationship.

14  Q.   What made it seem that way?

15  A.   Just, I don't know.  He was just more affectionate and

16  just the things he would say.

17  Q.   He made you feel that way?

18  A.   Yes.

19  Q.   Was it a sexual relationship?

20  A.   Yes.

21  Q.   Why are you saying in hindsight -- you don't --

22  A.   I don't know.  I was dumb back then.  Now my life is going

23  a lot better these days.  I don't like to -- honestly like to

24  think about any of the time.  I am not happy I have to be here

25  because I don't want to relive this.  I am doing well for

1  myself right now.  But I was just kind of dumb, I guess, maybe

2  then.  I know now I'm -- like, well, that was silly for me to

3  think, like.

4  Q.    You don't think it was true?

5  A.    No, I know it wasn't true.

6  Q.    At the time you thought it was true?

7  A.    Right, because Heather thought the same thing, and I kept

8  telling her, that's not your boyfriend, that's your pimp, and

9  somehow I got dragged into it, and I did the same thing she

10  did, so --

11  Q.    So are you familiar with someone named Faizal Bhimani?

12  A.    Yeah.

13  Q.    Where did you meet Faizal?

14  A.    The Howard Johnson.

15  Q.    Do you see Faizal in the courtroom today?  If you need to

16  stand up, you can stand up.

17  A.    I should probably stand up.  Yeah.

18  Q.    Can you point him tout to the jury?

19  A.    Yeah.

20  Q.    Can you describe what he's wearing briefly?

21  A.    A mask.  I don't know.  I can't see.  A suit?

22  Q.    What color suit, light or dark?

23  A.    Dark.

24         MR. CAMONI:  Your Honor, let the record reflect --

25         THE COURT:  What color shirt does he have on?

231

1           THE WITNESS:  Maybe I should be moving to -- white.

2           THE COURT:  Okay.  The record will reflect that the

3    witness has identified Mr. Bhimani.

4    BY MR. CAMONI:

5    Q.    Did you ever discuss what you were doing -- where did you

6    meet him?

7    A.    The Howard Johnson.

8    Q.    And did you ever discuss what you were doing with Faizal?

9    A.    No.

10   Q.    At some later time after you no longer you were at the

11   Howard Johnson at a later time?

12   A.    Yes.

13   Q.    Did you ever buy drugs from anyone at the Howard Johnson?

14   A.    Yes.

15   Q.    Who did you buy drugs from?

16   A.    There was this guy Juan.

17   Q.    He was a drug dealer?

18   A.    Yeah, there was a -- yeah.

19   Q.    And what kind of drugs did you buy from him?

20   A.    Heroin.

21   Q.    Now, when you were with Thurman Stanley you said you

22   weren't using drugs then, right?

23   A.    Correct.

24   Q.    Were there other girls that were there with you that were

25   using drugs?

232

1  A.    All of them.

2  Q.    Where did they get those drugs?

3  A.    Not really sure.  They would sneak and go get drugs from

4  people and so --

5  Q.    Did you ever see Thurman Stanley give them drugs?

6  A.    No.  I seen him give Heather drugs but not the other

7  girls.

8  Q.    Okay.  What kind of drugs did you see him give Heather?

9  A.    Heroin.

10 Q.    Did Faizal ever tell you anything about police?

11 A.    There was a time when I went to go get something from -- I

12 went to get heroin from somebody, and I walked in and had

13 showed me this -- I guess still don't know what it is -- looked

14 like some kind of official document, and it had my name on it.

15 He told me I probably shouldn't be there because there was a

16 subpoena or something from, I guess, my records from me staying

17 there.  It wasn't just my name.  There was a lot of names on

18 the paper.

19 Q.    He showed you a document?

20 A.    Yeah, it looked official.  But I still don't know what it

21 was.  Then I just -- and did what I -- I got my drugs, and I

22 left.

23 Q.    So what about when you were with Thurman Stanley, do you

24 recall any times Faizal talked to you about police?

25 A.    No.

1  Q.    Did you ever see Thurman Stanley and Faizal together?

2  A.    Yeah, they would talk, but I mean that's not uncommon.  He

3  ran the hotel, and we stayed at the hotel, so --

4  Q.    Did Thurman Stanley ever hurt you?

5  A.    No, emotionally, yeah, absolutely.  Physically he hit me

6  one time.  I left.  After that I was done.  I left.

7  Q.    He hit you?

8  A.    One time.  After that I didn't see him after that.

9  Q.    Did any of the girls working for him ever assault you?

10 A.    Ever what?

11 Q.    Assault you.

12 A.    Yeah.  Heather did once.

13 Q.    What was that about?

14 A.    That was over Thurman Stanley.

15 Q.    What happened to her after she assaulted you?

16 A.    He hit her.

17 Q.    Are you currently -- you said your life is going better?

18 A.    So much better.

19 Q.    Are you currently using drugs?

20 A.    No.

21 Q.    How long have you been sober?

22 A.    Since July 16th of last year.

23 Q.    And what kind of drugs were you addicted to?

24 A.    Heroin mostly, coke, anything really I could put in a

25 needle.

234

1  Q.    Tell the jury what it's like to be addicted to drugs.

2  A.    Now, it's awful.  Completely ruined my life.  It took away

3  -- my daughter will be 19 on the 25th.  So it took away 15

4  years with her.  I mean, I was still there, but I wasn't

5  present.  Mentally I wasn't for her emotionally.  Our

6  relationship is so much better now, like, so much better.  I

7  work two jobs.  I go to school.  It's hard for me to be here.

8  Again, I'm here because I have to be, but -- things are better

9  now.

10        I couldn't -- I just lost one of my best friends to

11 overdose a month ago.  I got a phone call last week another one

12 of my friends died from an overdose, so it's not worth it.

13 It's not worth everything that I lost.  It was -- it was bad.

14 Q.    Thank you, Ms. Szlasa.

15             MR. CAMONI:  Nothing further.

16             THE COURT:  Mr. Brown?

17             MR. BROWN:  Thank you, Judge.

18 CROSS EXAMINATION

19 BY MR. BROWN:

20 Q.    Good afternoon, Ms. Szlasa.  My name is attorney Bernie

21 Brown.  I have a couple questions for you, okay?

22 A.    Okay.

23 Q.    I just want to talk to you about you said you had a brick

24 a day heroin habit -- or you had a heroin addiction?

25 A.    I didn't say that I had -- I didn't say what my addiction

235

1  -- how much I was doing.  But I mean towards the end, yeah,

2  maybe about 20 bags, 30 bags a day.

3  Q.    Sorry.

4  A.    Go ahead.

5  Q.    Did it affect your ability to recall what was going on

6  during the time you were working for Thurman Stanley?

7  A.    Well, I wasn't using drugs then.  My heroin habit started

8  about a year after I had already left that Thurman Stanley and

9  the prostitution.

10  Q.    So Thurman Stanley was not keeping you on drugs, too?

11  A.    No, not me, no, no.

12  Q.    Okay.  And is it true that you talked about a conversation

13  with Faizal Bhimani?  Did he tell you the cops were called to

14  the hotel and not to do anything illegal and to leave the next

15  day?

16  A.    Yeah.

17  Q.    Did he also kick you out of the hotel when he found out

18  you were prostituting out of the hotel?

19  A.    I don't remember that happening, no.

20  Q.    Okay.  Can we bring up -- on direct examination you said

21  that you were -- you were confronted with some legal paperwork,

22  correct?

23  A.    Right.

24  Q.    And I'm going to ask you to read that paragraph and see if

25  it refreshes your recollection as to what Mr. Bhimani said to

236

1  you.

2  A.   Szlasa went to --

3          THE COURT:  Read it to yourself.

4          THE WITNESS:  Yeah, this is the day you're talking

5  about when he showed me the paperwork.  This has nothing to do

6  with the prostitution.  That was after I stopped doing this,

7  and at this point I was literally a heroin addict.  I had gone

8  there to buy heroin.  He told me that I probably shouldn't be

9  there.  I said, give me a minute, I went to the room I was

10  going to.  I bought the drugs I was buying, and I left.

11  BY MR. BROWN:

12  Q.   He showed you some official paperwork with your name on it

13  and said you shouldn't be there?

14  A.   Right.

15  Q.   Okay.  And then 2340, please.

16          THE COURT:  What page number was that?

17          MR. BROWN:  Last was 0834.

18          THE COURT:  Mark that as Defendant's Exhibit 13?

19          MR. BROWN:  Yes.

20          THE COURT:  This will be 14?

21          MR. BROWN:  Yes.

22  BY MR. BROWN:

23  Q.   Were you confronted by Mr. Bhimani, and he told you, you

24  can never work at the Howard Johnson again?

25  A.   Never said anything that I couldn't work there again.  I

237

1  don't remember those words ever coming out of his mouth, no.

2  Q.   Okay.  Was there also a list at the Howard Johnson that

3  had Heather D'Auria's name, Jennifer Day's name and Thurman

4  Stanley's name on it that you told officers you saw it?

5  A.   I don't remember exactly whose name was on it, but there

6  was -- like I just said, there was a list with a lot of names

7  on it.

8  Q.   Okay.  Do you disagree with what's in the --

9  A.   I don't.  I can say right now I don't remember whose names

10  were on the list.

11          MR. BROWN:  That's all I have, Judge.  Thank you.

12          THE COURT:  Okay.  Mr. DeStefano.

13  CROSS EXAMINATION

14  BY MR. DeSTEFANO:

15  Q.   Just a follow-up for a little bit, ma'am, and get you out

16  of here.

17  A.   Okay.

18  Q.   I know it's not a thrill to be here for you.  It's not a

19  thrill to be here for me either.  Anyway, you said that Mr.

20  Stanley slapped you once?

21  A.   I left.

22  Q.   You didn't -- did he track you down to get you back?

23  A.   No.

24  Q.   Would you say a he's a violent person or a lover or a

25  fighter?

238

1  A.    He was never violent -- that was the only time he ever hit

2  me.  I don't think he was -- he was never violent.  I don't see

3  him as being violent.  That was the one time though that's all

4  it took.  I got up, and I left, and I didn't speak to him after

5  that.

6  Q.    He never tracked you down or do mischief to your car or

7  anything of that nature?

8  A.    No.

9  Q.    Just another question or two.  I think you said you never

10 saw him do any violence to any of the other girls except

11 Heather once?

12 A.    Yeah.

13 Q.    Would that be true?

14 A.    Yes.

15 Q.    How about the other girls?

16 A.    Never saw him do anything to anybody.

17 Q.    You were sober during that time?

18 A.    Correct.  Stone cold sober.

19 Q.    I know.

20        THE COURT:  Redirect?

21        MR. CAMONI:  Nothing, Your Honor.

22        THE WITNESS:  Thank you.

23        THE COURT:  Ladies and gentlemen, it's two minutes of

24 five.  I don't think we can find a two-minute witness.  So what

25 we will do is we will break for the day.  Same admonitions, but

239

1   they become more important when you go home.  You will go home,

2   and after a couple days of the trial, your mother, father,

3   husband, wife, significant other will say, you can tell me

4   what's going on, I mean, come on, give me a break.  You have to

5   tell them you can't speak about the case.  You know the reasons

6   why.  We don't want anyone else to influence your position or

7   thought on this, and we want you only to get evidence from

8   inside the four corners of the courtroom.  So it's truly

9   important.

10          Admonitions are no discussion with anyone including

11  among yourselves.  Don't read or listen to anything about the

12  case.  I don't know that anything will be reported.  But if it

13  was, you know, if you heard all of a sudden on the radio, just

14  turn it off, and if you've seen it in the newspaper, throw it

15  aside.  And when the case is done, you can read it then but not

16  now.  No research of any kind concerning any terminology,

17  words, people, places, anything related to the case in any way,

18  shape or form.  Keep an open mind.  You have not heard all of

19  the evidence in the case and the law that relates to the

20  evidence in the case.

21          If anyone were to try to talk to you about the case,

22  you need to advise us of that immediately.  All right.  Have a

23  safe trip home.  We'll see you tomorrow at 9:30.

24

25

240

1                    REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Pennsylvania, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing is a true and correct transcript of the

8    within-mentioned proceedings had in the above-mentioned and

9    numbered cause on the date or dates hereinbefore set forth; and

10   I do further certify that the foregoing transcript has been

11   prepared by me or under my supervision.

12

13

14                         s/ Laura Boyanowski, RMR,CRR
                           Laura Boyanowski, RMR, CRR
15                         Official Court Reporter

16   REPORTED BY:

17       LAURA BOYANOWSKI, RMR, CRR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       235 N. Washington Avenue
         Scranton, PA  18503
20

21           (The foregoing certificate of this transcript does not
     apply to any reproduction of the same by any means unless under
22   the direct control and/or supervision of the certifying
     reporter.)
23

24

25