1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2   UNITED STATES OF AMERICA :
                             :
3                            :
                             :
4        vs                  :    3:CR-17-324
                             :
5                            :
                             :
6   FAIZAL BHIMANI & OM SRI  :
    SAI, INC.                :
7

         BEFORE:      THE HONORABLE MALACHY E. MANNION
8

         PLACE:       COURTROOM NO. 4
9

         PROCEEDINGS:  JURY TRIAL
10

         DATE:        THURSDAY, OCTOBER 8, 2020
11

    APPEARANCES:
12

    For the United States:
13

    SEAN A. CAMONI, ESQ.
14  JENNY P. ROBERTS, ESQ.
    U.S. ATTORNEY'S OFFICE
15  235 N. WASHINGTON AVENUE
    SUITE 311
16  SCRANTON, PA 18503

17  For Defendant Bhimani:

18  BERNARD J. BROWN, ESQ.
    58 8TH AVE.
19  CARBONDALE, PA 18407

20  For OM SRI SAI, INC.:

21  WILLIAM A. DESTEFANO, ESQ.
    TERRI PAWELSKI, ESQ.
22  STEVENS & LEE
    CENTRE SQUARE - EAST TOWER
23  1500 MARKET STREET
    SUITE 1800
24  PHILADELPHIA, PA 19102

25

2

1                          INDEX TO WITNESSES

2

   FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

3

   LINDSAY BAXTER
4  By Ms. Roberts       6
   By Mr. Brown                 19
5  By Ms. Pawelski              24

6  JENNIFER DAY
   By Mr. Camoni       29                  61
7  By Mr. Brown                 50
   By Mr. DeStefano             56
8
   CHRISTY VANLUVENDER
9  By Ms. Roberts      65                  89
   By Ms. Pawelski              87
10
   HEATHER D'AURIA
11 By Ms. Roberts      90
   By Mr. Brown                102
12 By Mr. DeStefano            109

13 ANASTASIA BYLER
   By Mr. Camoni      110                 247
14 By Mr. Brown                180
   By Ms. Pawelski             211
15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  On the record.  It's my understanding

2   that the government has a witness who somebody they -- their

3   lawyer had tested positive more than 14 days ago.  Is that

4   right.

5        MR. CAMONI:  Your Honor, the meeting with the client

6   during trial prep, the government's team and the client and the

7   defense attorney met on September 22nd, which was more than 14

8   days ago.  The defense attorney notified us this morning that

9   he tested positive yesterday.  He said his doctor told him he

10  was likely exposed sometime last week.  So we think that -- I

11  mean, it's outside of the 14-day period.  The client has no

12  symptoms.  He did not meet with the client after the 22nd.  Out

13  of an abundance of caution after talking to our supervisors we

14  wanted to let the Court know the defense attorney told us he

15  tested positive yesterday.  He last met with him 16 days ago.

16       THE COURT:  He tested positive yesterday.  The last

17  time he met with you or the witness in the case was more than

18  14 days earlier, 16 days ago.

19       MR. CAMONI:  It would have been 15 days before the

20  defense attorney tested positive and 16 days before today,

21  that's correct.  I'm sorry.  He found out yesterday he tested

22  positive.  I don't have information beyond that.  I don't know

23  when the test was administered.  He said he got the results

24  yesterday.

25       THE COURT:  The important number for me right now is

4

1 that the last time he met with the witness that will be

2 testifying today was 16 days ago.

3        MR. CAMONI:  That's correct, Your Honor.

4        THE COURT:  And the witness hasn't indicated any

5 symptomology of any kind or anything of that nature?

6        MR. CAMONI:  To my knowledge, no.  I have not been in

7 direct contact with him myself.

8        THE COURT:  You better get in direct contact to find

9 out.  If he hasn't met with the individual who tested positive

10 for 16 days, then that would be outside of the normal 14-day

11 quarantine the CDC requires, and so that theoretically would

12 not be problematic.

13        MR. CAMONI:  In addition, that witness is in custody.

14 I talked to deputy marshal Summa.  She said he's not exhibiting

15 symptoms.  He would be subject to the COVID protocols at the

16 prison.

17        MR. DeSTEFANO:  The name of the witness who is

18 scheduled to testify?

19        MR. CAMONI:  Ronald McKenna.  We think he will get in

20 by the end of the day just depending on how the day goes.

21        MR. DeSTEFANO:  Thank you.

22        MS. PAWELSKI:  Did you have masks on when you guys

23 were with him?

24        MR. CAMONI:  I don't believe I --

25        THE COURT:  I didn't hear the question.

1          MS. PAWELSKI:  I was asking about masks.  I apologize

2     I have parents who are in their mid 70s.  I am staying in a

3     hotel to try to avoid this --

4          THE COURT:  I want to bend over backwards to make

5     sure everybody is safe.  That's why I am going to reiterate

6     what I said from the very beginning here.  That is, everybody

7     in this courtroom is to keep their masks on.  Occasionally I am

8     seeing masks dropped down below somebody's nose or something

9     like that.  I don't want to see that.  Everybody's mask is to

10    remain on, or they will be removed from the courtroom.  We need

11    to make sure that everybody is safe.  We want all of you to be

12    safe.  Okay.  I mean, it seems to me if it's -- that if we are

13    going to follow CDC guidelines and we are trying to, certainly,

14    and the -- the time when the individual who now has tested

15    positive was with the witness was 16 days ago, that's outside

16    the incubation period of the C. D.  And so if the witness

17    hasn't tested positive or shown symptoms in that period of

18    time, then theoretically under the CDC guidelines he would be

19    safe.  The incubation period is -- normally can be as --

20    quickly as two or three days, and normally it's before ten

21    days, and the outside parameters presently are listed at 14

22    days.  So it appears that we're okay.  We just want to make

23    sure everybody continues to wear their masks except in the very

24    limited circumstances where they are at the podium and

25    questioning for counsel and the witness is inside the enclosed

6

1    area for testifying.  All right.  Anyone have anything else

2    they want to add to that?

3              MR. BROWN:  No.

4              MR. DeSTEFANO:  I assume the government's witnesses

5    are being sequestered for this case?

6              THE COURT:  I don't know.  I don't remember there

7    being a sequestration motion but --

8              MR. DeSTEFANO:  I will make that motion at this time

9    if --

10             THE COURT:  I don't know if -- I would assume they

11   probably were, but there was no motion.  To the extent there's

12   a motion, the witnesses should be sequestered from other

13   witnesses.

14             MR. CAMONI:  Other than the case agents being here --

15             THE COURT:  The case agents are not part of that.

16   The case agent is entitled to be here.

17             MR. CAMONI:  Everyone else has been sequestered thus

18   far.

19             THE COURT:  Okay.  As soon as the jury gets over here

20   we will begin.  Good morning, welcome back.  Ms. Roberts?

21             MS. ROBERTS:  Your Honor, the government is going to

22   call Lindsay Baxter.

23             LINDSAY BAXTER, called as a witness, being duly

24   sworn, testified as follows:

25   DIRECT EXAMINATION

1  BY MS. ROBERTS:

2  Q.    Good morning.

3  A.    Good morning.

4  Q.    Can you tell the jury how old you are?

5  A.    I'm 33.

6  Q.    And how far did you go in school?

7  A.    I graduated high school.

8  Q.    Do you know an individual named Thurman Stanley?

9  A.    Yes.

10  Q.    Do you remember approximately when it was that you met

11  him?

12  A.    December 2014.

13  Q.    Okay.  And how was it you met him?

14  A.    I met him through one of the girls I think I was in jail

15  with.

16  Q.    Okay.  Do you remember who that was?

17  A.    I knew her as Millie.

18  Q.    Okay.  Millie.  You said you were in jail.  What were you

19  in jail for?

20  A.    On a parole violation.

21  Q.    What type of conviction was it?

22  A.    I think it was theft.

23  Q.    So you have a theft conviction.  You have one from 2012?

24  A.    Yes.

25  Q.    You have a theft conviction from 2013?

1  A.    Yes.

2  Q.    A theft conviction from 2014?

3  A.    Yes.

4  Q.    And your final one was in 2017?

5  A.    Yes.

6  Q.    Are you currently under any federal charges or state

7  charges?

8  A.    No.

9  Q.    Did you have a drug problem?

10  A.    Yes.

11  Q.    What type of drug problem did you have?  What drug?

12  A.    Heroin.

13  Q.    Approximately when did that begin?

14  A.    Right after my four-year-old passed away.

15  Q.    When was it your four-year-old passed away?

16  A.    July 2014.

17  Q.    Did you meet Thurman Stanley after your son had passed

18  away?

19  A.    Yes.

20  Q.    So why was it that you got introduced to Thurman Stanley?

21  A.    I guess Millie had showed him a picture, was talking about

22  me, said he wanted to meet me.  I met him.  He said we'd hang

23  out, go to eat, get some drinks.

24  Q.    Did you drive to meet him?

25  A.    Yeah.

1  Q.   Do you remember where it was that you met him?

2  A.   In the Eagle Valley Plaza in East Stroudsburg.

3  Q.   And did you go anywhere with him?

4  A.   Yeah, followed him back to the Howard Johnson.

5  Q.   When you said you followed him, did you have your own car?

6  A.   Yes.

7  Q.   What happened when you went to the Howard Johnson?  Where

8  did you go within the Howard Johnson?

9  A.   He took me to a hotel room, and there were three girls in

10 there.

11 Q.   Now, at that time when you first went to the Howard

12 Johnson with Thurman Stanley, had you been clean from drugs for

13 a period of time?

14 A.   Yeah, for about, like, three months, three and a half.

15 Q.   So when you went into the hotel room, do you remember

16 where that hotel room was within the hotel?

17 A.   It was just all the way around the back of the building,

18 that last strip where the parking lot ends.

19 Q.   I'm going to show you in -- it will pop up on your screen

20 what's marked as evidence as Government's Exhibit 1.1.

21 A.   Do you want me to touch this?

22 Q.   If you -- if you can touch it, you can actually make a

23 mark of what section of the hotel, if you remember, was that

24 you went to the Howard Johnson, okay.  So that's the back

25 section.

10

1    A.    Yeah.

2            MS. ROBERTS:  Judge, does it matter that that --

3            THE COURT:  I'm not sure why that one is not -- see

4    if it comes on.

5    BY MS. ROBERTS:

6    Q.    So that section you marked with the green strip is the

7    back section?

8    A.    Yeah.

9    Q.    Did you park your car back there when you pulled in?

10   A.    Yes.

11   Q.    Do you remember who was in the room when you got there?

12   A.    Millie was there, a girl named Rachel.  I knew her as Sky.

13   There was another girl in there.  I had no clue who she was.

14   Q.    Once you got into the room, what happened?

15   A.    More or less they started, like, talking about guys coming

16   to rooms, they wanted to take my picture.  They were trying to

17   change my clothes.

18   Q.    What did you do?

19   A.    I left.

20   Q.    How far did you get?

21   A.    Part way down 611.

22   Q.    611 that road that's in that upper right-hand corner of

23   exhibit 1.1?

24   A.    Yeah.

25   Q.    So what happened while you were on 611?

11

1   A.    Thurman Stanley, he called me, and I was on the phone with

2   him probably, like, 15, 20 minutes.  At that point I pulled

3   over, and then I don't know, somehow he talked me into coming

4   back, gave me some drugs.

5   Q.    So you came back to the same room at the Howard Johnson?

6   A.    Well, he met me outside in the back, but, yeah, we walked

7   back in.

8   Q.    When you voluntarily went back to the Howard Johnson, what

9   happened when you got back?

10  A.    He gave me drugs.  Then at that point I think they did

11  take pictures.  I wouldn't get changed.  They took my phone.

12  Q.    At that point had you told him you had -- had a drug

13  issue?

14  A.    Yeah.

15  Q.    Had you told him about your son passing away?

16  A.    Yeah.

17  Q.    Did you have anything with you?

18  A.    I had my son's urn.  It was literally three or four months

19  later.  At that point I was carrying it around everywhere with

20  me.  So I had that.  I brought it with me.  I didn't know what

21  was going on.  I didn't know what I was walking into at that

22  moment.  I thought we were to go inside, go get food, hang and

23  chill.

24  Q.    That's what you wanted to do at the time?

25  A.    Yeah.

12

1  Q.   So when you went in that second time, did you still have

2  your son's urn with you?

3  A.   At that point though, he had taken it when they took my

4  phone.

5  Q.   Who took your phone?

6  A.   Black did.

7  Q.   When you say Black --

8  A.   Sorry, Thurman Stanley.

9  Q.   That's okay.  I just want to make sure we're talking about

10  the same person.

11  A.   Yeah.

12  Q.   So once you went back to that hotel, they took your phone.

13  What happened?

14  A.   One of the girls took a couple pictures of me.  They sent

15  it to Black.  Black -- next thing he went outside.  The girls

16  were, like, guys were about to come in or something like that.

17  I had no clue what was going on, and they left the room.  Some

18  guy walked in the room saying I was supposed to do all this

19  stuff and I wasn't okay with it.  I tried to walk back out

20  again.

21  Q.   What type of stuff did the guy want you to do?

22  A.   Sexual things more or less.

23  Q.   Were you high at the time?

24  A.   Yeah.

25  Q.   What type of drug, if you remember, did Black give you?

13

1  A.    Gave me heroin.

2  Q.    And what happened when you tried to leave after that man

3  came to the room?

4  A.    He was sitting outside.  He cut the tires on my car.

5  Like, I think three or four of them were all flat.  He grabbed

6  me and told me I was going back inside.  He gave me more drugs,

7  and I stayed in there.

8  Q.    Did you want the drugs?

9  A.    Yeah.

10 Q.    Is that why you went back because he had offered you

11 drugs?

12 A.    Pretty much.

13 Q.    So do you know how you were advertised?

14 A.    Not for, like, the first week or two I was there.  Like,

15 he dealt with all of the e-mails, phone calls, messages, or the

16 other girls did.

17 Q.    Okay.  Did you ever answer the phone when someone would be

18 calling?

19 A.    Not probably for the, like, the first two or three weeks I

20 was with him.

21 Q.    After that, would you answer the phone?

22 A.    Yeah, when he finally gave me my phone back.

23 Q.    When he gave you your phone back, were you still using

24 drugs?

25 A.    Yeah, I was, like, definitely fully addicted again at that

14

1  point.

2  Q.    Do you remember -- with heroin it's by bags.  Do you

3  remember how many bags a day at that point that you were using?

4  A.    Probably doing close to 30 at least.

5  Q.    Were you using them at the Howard Johnson?

6  A.    Yes.

7  Q.    Was Black providing them to you at the Howard Johnson?

8  A.    Yes.

9  Q.    Did you ever go anyplace else with Black?

10  A.    We came to a hotel up here in Scranton.  I was in Jersey

11  with him.  There's another hotel in East Stroudsburg right off

12  exit 308.  He had me there.

13  Q.    After you would go to those places, did you ever go back

14  to the Howard Johnson?

15  A.    Yeah, that was kind of, like, a pit stop in between, like,

16  if he take me to Jersey, we do back at Howard Johnson for a

17  couple days, and then we'd go back somewhere else.

18  Q.    Did you ever get the room at the Howard Johnson?

19  A.    No, I don't think I did.  I think I may have paid for it

20  once.  I don't think it was under my name when I was with him.

21  After I left him, I did have a room under my name though.

22  Q.    And then while you were with Black, did he ever threaten

23  you?

24  A.    Yes.

25  Q.    What type of threats we would tell me?

15

1  A.   He tell me he would beat me up, like, he was going to get

2  rid of my son's urn, like --

3  Q.   Did you believe those threats?

4  A.   Yeah.

5  Q.   Why?

6  A.   Because I saw him hit one of the other girls like he

7  already hit me, like, I don't know.

8  Q.   And did he hit you when you were at the Howard Johnson?

9  A.   Yes.

10  Q.   When you say hit, what did he do, slap you, punch you?

11  A.   No, he punched me.

12  Q.   Were you familiar with anyone who worked at the Howard

13  Johnson at that time?

14  A.   I knew who Faizal was.

15  Q.   Do you see Faizal in the courtroom today?  You can stand

16  up if you need to if that's okay with the Court.

17  A.   He has the white mask on sitting next to the guy with the

18  blue mask on.

19          THE COURT:  The record will reflect she identified

20  the defendant Bhimani.

21  BY MS. ROBERTS:

22  Q.   Did you ever see Faizal communicate with Black?

23  A.   I heard them talk over the phone.

24  Q.   How did you hear them talk over the phone?

25  A.   Black would be in my room, and he had him on speaker more

16

1   or less.

2   Q.   Who on speaker?

3   A.   He'd have Faizal on speaker.

4   Q.   And how would you know it was Faizal's voice?

5   A.   I used to go down to the bar, like, here and there once in

6   a while, and I sat and talked with him a couple times.   My

7   sister is friends with him.

8   Q.   So you actually had spoken to him yourself before?

9           THE COURT:   You have to say yes or no --

10          THE WITNESS:   I'm sorry, yes.

11          THE COURT:   The court reporter can't take down a nod

12   of the head.

13          THE WITNESS:   Sorry.

14   BY MS. ROBERTS:

15   Q.   When you heard Faizal talk to Black, what would Faizal say

16   that you can remember?

17   A.   The one time it was just that we needed to move, the cops

18   were coming in to, I guess, pick up some of the girls that were

19   also doing prostitution out of the hotel.

20   Q.   So would he tell that to Black?

21   A.   Yeah, and then, like, we either go to another hotel, or we

22   switch our rooms, put it under somebody's name and get moved.

23   Q.   While you were there you said you were using drugs.   Did

24   you see anybody else use drugs?

25   A.   Yes.

17

1  Q.    Do you remember who?

2  A.    Millie was using drugs.  Rachel had.  Some of the other

3  girls that I knew just from them being with -- while they were

4  with another pimp more or less, but I knew quite a lot of them.

5  They were all using.

6  Q.    At the hotel?

7  A.    Yeah.

8  Q.    You said with another pimp.  Were there other prostitutes

9  working out of the hotel that you saw?

10 A.    Yes.

11 Q.    And where would they be staying in the hotel?

12 A.    They were also on that back strip.

13 Q.    The same one that you identified in Government's Exhibit

14 1.1?

15 A.    Yes.

16 Q.    Do you remember some of their names by any chance?

17 A.    Jenn Day was running three or four girls.  One was

18 Elizabeth Ruffa, Christy VanLuvender.  I can't remember the

19 other two.  Like, I know -- Christina Zumara.  I don't remember

20 the other girl's name though.

21 Q.    Okay.  Do you remember approximately how long it was that

22 you were with Black?

23 A.    Probably about three months.

24 Q.    How was it you actually were able to leave Black?  What

25 happened?  Can you describe that for the jury?

18

1  A.   I got in a fight with him.  We were driving, and I don't

2  know.  Apparently I said the wrong thing to him, and he threw

3  me on the side of the road and my son's urn and my bags and

4  left me on the side of the road.

5  Q.   Apparently you said the wrong thing.  Did that happen a

6  lot with Black?

7  A.   Yeah.

8  Q.   What did he do?

9  A.   Hit me and scream and yell, wouldn't take me to get food,

10  just --

11  Q.   When you were with Black and paid by men, what did you do

12  with the money?

13  A.   The girl Rachel or Sky, whatever you call it, she take it

14  if he wasn't there, or he come in the room directly afterwards

15  and get it.

16  Q.   Did he allow you to keep any of the money?

17  A.   No.

18  Q.   How would you buy food?

19  A.   He would bring me food once a day or so, but I was always

20  high.  So I didn't really eat.

21  Q.   Was it high from the drugs he was providing?

22  A.   Yes.

23         MS. ROBERTS:  Your Honor, if I can have a moment?

24         THE COURT:  Yeah.

25         MS. ROBERTS:  Your Honor, I have no further questions

19

1  for this witness.

2          THE COURT:  Mr. Brown?

3          MR. BROWN:  Thank you.  Your Honor.

4  CROSS EXAMINATION

5  BY MR. BROWN:

6  Q.    Good morning, Ms. Baxter.  My name is attorney Bernie

7  Brown.  I have a couple questions for you, okay?  You were

8  arrested for theft by deception in 2012.

9  A.    Yes.

10  Q.    Theft by deception in 2014, correct?

11  A.    Yes.

12  Q.    And theft by deception in 2017, correct?

13  A.    Yes.

14  Q.    Can the jury believe anything you said here today?

15  A.    They don't have to, but I have no reason to lie.  I'm not

16  in trouble.  I'm not here over any deal or anything whatsoever.

17  Q.    Okay.

18  A.    I've been clean for about three years now.

19  Q.    Okay.  So let's test that.  When you got out of prison,

20  you weren't using drugs at that time, I believe, you said you

21  were sober, correct?

22  A.    Yes.

23  Q.    And a man named Thurman Stanley contacted you, correct?

24  A.    Yes.

25  Q.    And you went to somewhere, I believe it was the Eagle

20

1  Valley Plaza, to meet him, correct?

2  A.    Yes.

3  Q.    And when you met him, you had a conversation with him,

4  correct?

5  A.    Yes.

6  Q.    And he asked you to go back to a hotel room?

7  A.    Yes.

8  Q.    When you went back to that hotel room, you went back with

9  him voluntarily, meaning you followed him in your own car,

10 correct?

11 A.    Yes.

12 Q.    When you got into that hotel room, there were two other

13 individuals there wanting to take photographs of you, correct?

14 A.    Yes.

15 Q.    Okay.  And what you did when you saw those two individuals

16 is you left, correct?

17 A.    Yeah.

18 Q.    Okay.  Now, can I bring up Government's Exhibit 1.1?  Now,

19 you had indicated the area.  If you can do that again where

20 those rooms were located.  And I believe you said you parked in

21 the back area of the parking lot, correct?

22 A.    Yeah.

23 Q.    And you went into an entrance -- a side entrance that was

24 there, correct?

25 A.    Yeah, I don't remember what entrance we went in but --

21

1  Q.    Okay.  And when you left, you actually got in your car and
2  went back out to 611 and went some distance down the road,
3  correct?
4  A.    Yeah.
5  Q.    Okay.  What had happened next -- you were still sober at
6  the time, correct?
7  A.    Yeah.
8  Q.    Okay.  What happened next was Mr. Stanley called, and you
9  spent 15 to 20 minutes with you on the phone, correct?  And at
10 that point you voluntarily went back to the Howard Johnson,
11 correct?
12 A.    Yeah.
13 Q.    Even though you know what was going on in that hotel room,
14 correct?
15 A.    Yeah.
16 Q.    And the reason why you went back there is because you
17 wanted drugs, correct?
18 A.    Yeah, I wanted to get high.
19 Q.    You don't know how the hotel rooms were paid for, correct?
20 A.    No.
21 Q.    And I believe you said that there were a period of time
22 when you had left Stanley to still prostitute?
23 A.    Yeah.
24 Q.    You did that for yourself?
25 A.    Yes.

22

1   Q.    You kept the money from that, correct?

2   A.    Yes.

3   Q.    You said that you had worked out of other hotels in the

4   area as well as in Scranton, Allentown and Jersey City?

5   A.    Yes.

6   Q.    Okay.  Did you work out of the Super 8 motel?

7   A.    That's the one off the exit in East Stroudsburg, yes.

8   Q.    How about the Budget Inn, do you recall that?

9   A.    Is that the one right next to it?

10  Q.    I think so, yes.  If I remember correctly --

11  A.    No.

12  Q.    Okay.  And the Days Inn, does that ring a bill?

13  A.    Is that on Main Street?

14  Q.    Yeah.

15  A.    I don't think I was ever there with Stanley.

16  Q.    You did prostitute out of there?

17  A.    I'm sorry, this is, like, six -- I'm sorry.

18  Q.    That's all good.  I just trying to get an idea where else

19  you worked when you were a prostitute.  You said that Stanley

20  paid for the hotel room, correct?

21  A.    Yes.

22  Q.    And you knew a man by the name of Faizal there, correct?

23  A.    Yes.

24  Q.    Okay.  You identified him here in the courtroom, correct?

25  A.    Yes.

23

1  Q.   Is it true that there was another individual who worked

2  the front desk, an Indian or Arabic man who traded rooms for

3  sex?

4  A.   Black told me the one day to go up to the front desk

5  because he wasn't there to pay for the room, and I needed to

6  keep the room more or less.  He told me to go talk to him.  But

7  I told him I wasn't doing that.  One of the other girls in the

8  room said they had done that.  I don't know who it was if they

9  actually did it.  You know what I mean.

10  Q.   Okay.  But you know the difference between Faizal who you

11  identified --

12  A.   Yeah.

13  Q.   And the man who asked you for sex that day?

14  A.   Yeah, definitely -- no.

15  Q.   Now, is it true that Faizal told you guys to leave the

16  hotel because the cops were coming?

17  A.   That's what he said over the phone to Black.

18  Q.   Right.

19  A.   Said they were already there.  They were looking I think

20  -- they were looking for a certain one or two girls so --

21  Q.   And do you know if Mr. Bhimani assisted the officers and

22  the cops in identifying and finding those individuals?

23  A.   I have no clue.

24        MR. BROWN:  No further questions, Judge.

25        THE COURT:  Ms. Pawelski?

24

1    MS. PAWELSKI:  Yes, Your Honor.

2  CROSS EXAMINATION

3  MS. PAWELSKI:

4  Q.    Good morning, Ms. Baxter.

5  A.    Good morning.

6  Q.    My name is Terri Pawelski.  I have a few questions for

7  you, okay.  If you don't understand my questions because they

8  are confusing or they are inarticulate, let me know, and I will

9  try to rephrase, okay?

10 A.    Okay.

11 Q.    You started off by saying you were in prison in Monroe

12 County?

13 A.    Yes.

14 Q.    Okay.  And do you recall what year that was?

15 A.    2014.

16 Q.    Okay.  And you had a probation officer or a woman that

17 worked with you at Monroe County facility, do you remember her

18 name?

19 A.    My probation officer was --

20 Q.    Was it Crystal?

21 A.    Crystal Boden.

22 Q.    And do you know that Ms. Boden contacted the federal

23 government and said that it would be good for you to cooperate

24 because it came to Monroe County's -- Monroe prison's attention

25 you smuggled bags of heroin into the prison?

1  A.    Yes, but that was for Thurman Stanley's case.  I didn't

2  even know I was going to be subpoenaed for this one.  I have no

3  problem with Faizal.

4  Q.    Right.  That -- that was the beginning of your cooperation

5  with the federal government, correct, after that happened, the

6  four bags being smuggled in?

7  A.    Yes.

8  Q.    Can we please bring up Government's Exhibit 1.1 for just a

9  moment?  Thank you.  This is the picture you looked at earlier,

10 Ms. Baxter?

11 A.    Yes.

12 Q.    You indicated where you stayed in the hotel?

13 A.    Yes.

14 Q.    Could you do just again for me, please?  Thank you.  And

15 it's true that there was an exit or a door back there?  Do you

16 remember that?

17 A.    There was one on the one side and another on the other

18 side.  They were -- ran that whole hallway.

19 Q.    And you and the other girls would worked -- I will ask you

20 first.  You could open that door freely, correct?

21 A.    Yes.

22 Q.    You can go in and out?

23 A.    Yes.

24 Q.    Mr. Stanley, he would often be in the parking lot?

25 A.    Yes.

26

1  Q.    Back there.  And he would use that back door, correct, to

2  come in and out?

3  A.    Yes.

4  Q.    So he didn't have to come in through the lobby?

5  A.    No.

6  Q.    He could -- you could let him in, or if you wanted to, you

7  can prop the door open so he can get in?

8  A.    I don't remember the doors really being locked back there.

9  Q.    Okay.  So he can walk in -- he was able to walk in through

10 the back door?

11 A.    Yes.

12 Q.    Without going through the rest of the hotel, and you could

13 enter and exit that door as well?

14 A.    Yes.

15 Q.    And the other girls working for Mr. Stanley, I assume,

16 could do the same?

17 A.    Yes.

18 Q.    Now, after you left Mr. Stanley, you started working for

19 another person by the name of Cook?

20 A.    Yes.

21 Q.    Okay.  And you worked at the Red Roof Inn with him?

22 A.    Probably.

23 Q.    Okay.  And then just to go back to your time with Mr.

24 Stanley so I understand that time period correct, you said you

25 were with him for about three months?

27

1  A.    Yes.

2  Q.    Okay.  And you said that you did stay at the Howard

3  Johnson but you stayed at other hotels as well during that

4  three-month period?

5  A.    Yes.

6  Q.    So in other words, you would leave the Howard Johnson, go

7  to another hotel and work?

8  A.    Yes.

9  Q.    Come back to the Howard Johnson and leave again?

10  A.    Yes.

11  Q.    So you weren't there consistently for those three months?

12  A.    No.

13  Q.    Okay.  And then when you -- I assume you left Mr. Cook at

14  some point, and you started prostituting on your own and making

15  money?

16  A.    Yes.

17  Q.    And then you rented rooms in your own name at the Howard

18  Johnson?

19  A.    That was, like, right after I left Thurman Stanley I did

20  that, but did I do that.

21  Q.    So that was sometime before Mr. Cook?

22  A.    Yes.

23  Q.    Okay.

24        MS. PAWELSKI:  May I have the Court's brief

25  indulgence?

28

1          THE COURT:  Pardon me?

2          MS. PAWELSKI:  May I have the Court's brief

3  indulgence?

4          THE COURT:  None of you have to ask for that.  Go

5  back and talk and do whatever you have to do.

6          MS. PAWELSKI:  Thank you.  Just quickly, Ms. Baxter,

7  and we will get you out of here.

8  BY MS. PAWELSKI:

9  Q.   The incident that I spoke of briefly at the beginning with

10  the four bags of heroin, were you ever charged for that?

11  A.   No.

12  Q.   And you're still cooperating, obviously, with the

13  government by testifying here today?

14  A.   I really didn't have a choice.

15  Q.   Okay.

16  A.   I'm sorry.

17  Q.   That's fine.  Thank you for your time.  Thank you for

18  answering my questions.

19  A.   You're welcome.

20          THE COURT:  Redirect?

21          MS. ROBERTS:  Nothing, Your Honor.

22          THE COURT:  All right.  You may step down.  Thank

23  you.  Who is the next witness going to be?

24          MR. CAMONI:  The government is going to call Jennifer

25  Day.

29

1          JENNIFER DAY, called as a witness, being duly sworn,

2   testified as follows:

3   DIRECT EXAMINATION

4   BY MR. CAMONI:

5   Q.   Good morning, Ms. Day.

6   A.   Good morning.

7   Q.   How old are you today?

8   A.   39.

9   Q.   How far have you gone in school?

10  A.   Graduated.

11  Q.   From high school?

12  A.   Yes.

13  Q.   Are you currently facing any federal or state criminal

14  charges?

15  A.   No.

16  Q.   So are you here today because you've been subpoenaed to be

17  here?

18  A.   Yes.

19  Q.   Do you know a man named Thurman Stanley?

20  A.   Yes.

21  Q.   How did you know him?

22  A.   He was my boyfriend.

23  Q.   When was he your boyfriend?

24  A.   2014.

25  Q.   Do you know what he did for a living at that time?

30

1  A.   He was a pimp.

2  Q.   And how do you know that?

3  A.   He told me.

4  Q.   Did you ever see him with the girls that worked for him?

5  A.   Yes.

6  Q.   Did you have any role in that business?

7  A.   Yes.

8  Q.   What was your role?

9  A.   I was also a pimp and a drug dealer.

10  Q.   So in working with Thurman Stanley, what was your role?

11  A.   I sold him drugs for his women.

12  Q.   You sold him drugs for the women?

13  A.   Yes.

14  Q.   What drugs?

15  A.   Heroin and cocaine.

16  Q.   What type of cocaine, powder?

17  A.   Yes.

18  Q.   And what quantities did you sell him?

19  A.   Grams, half grams and bundles.

20  Q.   Bundles of heroin?

21  A.   Yes.

22  Q.   What's a bundle of heroin?

23  A.   Ten bags.

24  Q.   How often did you sell him these drugs?

25  A.   Pretty much every day.

31

1  Q.    And where did you deliver those drugs to Thurman Stanley?

2  A.    The Howard Johnson, one time at the Quality Inn, or he'd

3  come to my house.

4  Q.    Where was your house?

5  A.    In Bartonsville.

6  Q.    Was that Howard Johnson also in Bartonsville?

7  A.    Yes.

8  Q.    Did you see Thurman Stanley use the drugs that you brought

9  to him?

10 A.    No.

11 Q.    Did you ever stay at the Howard Johnson hotel?

12 A.    No.

13 Q.    Did you ever book rooms at the Howard Johnson hotel?

14 A.    Yes.

15 Q.    For what?

16 A.    For my girls.

17 Q.    You mentioned you were a pimp?

18 A.    Yes.

19 Q.    So when you say your girls, what are their names?

20 A.    The girls that worked for me?

21 Q.    Who worked for you?

22 A.    Christina Zumara, Michelle Zumara and Melissa McKee.

23 Q.    Zumaras, were they related?

24 A.    Mother/daughter.

25 Q.    So how did it work?  What was -- how did the business work

32

1  with the girls that worked for you?

2  A.    I placed the ads.  They made the money, and I get the

3  money.  I supplied them with drugs.

4  Q.    So you got all of the money?

5  A.    Yes.

6  Q.    And you paid them in drugs?

7  A.    Yes.

8  Q.    When you say you placed ads, where did you place the ads?

9  A.    Back Page.

10 Q.    Where did you learn how to conduct the sex trafficking

11 business?

12 A.    Thurman.

13 Q.    And what about the drugs, did the girls who worked for you

14 also sell drugs for you?

15 A.    Yes.

16 Q.    Who did they sell to?

17 A.    To the johns.

18 Q.    And was it both cocaine and heroin?

19 A.    Yes.

20 Q.    Where did you book rooms for the girls that worked for you

21 to work?

22 A.    The Howard Johnson.

23 Q.    Was that the only hotel you worked girls into?

24 A.    In Monroe County, yes.

25 Q.    Where else did you book them into?

33

1  A.    Scottish Inn, Allentown.

2  Q.    Allentown?

3  A.    Yes.

4  Q.    What time period were you in the Howard Johnson in Monroe

5  County?

6  A.    2014, 2015.

7  Q.    So was that the only hotel in Monroe County that you used?

8  A.    Yes.

9  Q.    So if the girls were meeting their johns, where were they

10 meeting them?

11 A.    At the Howard Johnson.

12 Q.    If they were selling their johns drugs, where were they

13 selling?

14 A.    Howard Johnson.

15 Q.    Did they do out calls?

16 A.    No.

17 Q.    So everyone, all the dates they met came to the Howard

18 Johnson?

19 A.    Yes.

20 Q.    Did you know a man named Faizal Bhimani?

21 A.    Yes.

22 Q.    How did you know him?

23 A.    He was the owner of the Howard Johnson.

24 Q.    And did you ever talk to him about rooms for the girls?

25 A.    Yes.

1  Q.    Did you talk to him in person?

2  A.    Yes.

3  Q.    Did you communicate with him in any other manner?

4  A.    Text messages and Facebook Messenger.

5  Q.    Do you see Mr. Bhimani in the courtroom today?  If you

6  need to stand up, you can stand up.

7  A.    I can't really tell with masks on.

8  Q.    You can't tell with masks on?

9  A.    No, I can't.

10  Q.    Just say that into the microphone so the --

11  A.    I can't tell with masks on.

12  Q.    Can you describe Mr. Bhimani as you remember him?

13  A.    Short, Indian, fair skinned, you know, medium-brown skin.

14  Q.    Okay.  So you said you talked to him about rooms for the

15  girls?

16  A.    Yes.

17  Q.    How did you pay for those rooms?

18  A.    Cash.

19  Q.    Did you pay cash upfront when you booked room?

20  A.    Not always, no.

21  Q.    When did you pay?

22  A.    Whenever we got the money.

23  Q.    And how did you get the money?

24  A.    The girls would make the money.

25  Q.    Through selling sex?

1  A.    Yes.

2  Q.    So if a girl -- who would pay for the room, you or the

3  girls?

4  A.    Most of the time them.

5  Q.    The girls?

6  A.    Yeah, when I wouldn't be there.

7  Q.    If a girl owed money for a room that hadn't paid, who

8  would Faizal call?

9  A.    Me.

10  Q.    Whose names were the rooms booked in?

11  A.    Most of the time Christina Zumara.

12  Q.    Where in the hotel itself were those rooms?

13  A.    The back hallway.

14  Q.    I would like to bring up what's been previously admitted

15  as Government's Exhibit 1.1.  Do you recognize this photo?

16  A.    Yes.

17  Q.    What are we looking at?

18  A.    The Howard Johnson.

19  Q.    All right.  Can you tell from this photo where in the

20  hotel the rooms you got for the girls were situated?

21  A.    Yeah, they'd be in the back.

22  Q.    You can touch that screen.  It will make a mark.  Indicate

23  on the screen where.  You can circle the area.

24  A.    Back hallway.

25  Q.    Back there.

36

1  A.    Yeah.

2  Q.    What floor were they on?

3  A.    The bottom.

4  Q.    Okay.  We can take that down.  So when the johns would

5  come into the hotel to meet with your girls, what entrance

6  would they use or entrances?

7  A.    That back door or the side back door, two doors all the

8  way toward the back.

9  Q.    All right.  What was the reason for that?

10  A.    That's always where he put us.

11  Q.    Who?

12  A.    Faizal.

13  Q.    Did you ever ask for those rooms?

14  A.    No.

15  Q.    Was there -- did he ever talk to you about what entrance

16  to use?

17  A.    He said the back -- use the back.

18  Q.    Did he say for the johns to use the back?

19  A.    Yes.

20  Q.    Did he tell you why?

21  A.    No.

22  Q.    No.  Did Faizal ever tell you anything about police?

23  A.    Yes.

24  Q.    What did he tell you?

25  A.    He would let us know not to come around if the cops came.

37

1  Q.    How did he let you know that?

2  A.    He would text me or call me.

3  Q.    What did you do when he texted you or called you about

4  that?

5  A.    Let the girls know.

6  Q.    Did you give them instructions?

7  A.    Yeah.

8  Q.    What did you tell them?

9  A.    Stay in the room.

10 Q.    Did you ever communicate -- you mentioned text messages.

11 Was there another way you communicated, too?

12 A.    Facebook Messenger.

13 Q.    That is through texting just through Facebook?

14 A.    Yes.

15 Q.    You had a Facebook account at the time?

16 A.    Yes.

17 Q.    I would like to show just the witness what's been

18 previously marked as exhibit 85.14.  Do you recognize this?

19 A.    Yes.

20 Q.    What is this?

21 A.    My Facebook.

22 Q.    Is this a accurate and fair representation of what your

23 Facebook account looked like back then?

24 A.    Yes.

25 Q.    2014.

38

1        MR. CAMONI:  Your Honor, move to admit Government's
2   Exhibit 85.14.
3        MR. BROWN:  No objection, Your Honor.
4        MS. PAWLESKI:  No objection.
5        THE COURT:  It's admitted.
6        MR. CAMONI:  May we publish?
7   BY MR. CAMONI:
8   Q.    So this was your Facebook account?
9   A.    Yes.
10  Q.    And were you Facebook friends with Faizal at the time?
11  A.    I don't believe so.
12  Q.    But you communicated through Messenger?
13  A.    Yes.
14  Q.    All right.  I would like to take that down and bring up
15  for the witness exhibit 85.13.  Do you recognize this?
16  A.    Yes.
17  Q.    What are we looking at?
18  A.    Picture of me.
19  Q.    Is this a fair and accurate representation of you?
20  A.    Yes.
21  Q.    All right.
22        MR. CAMONI:  I would like to move to admit
23  Government's Exhibit 85.13.
24        MR. BROWN:  No objection.
25        THE COURT:  Ms. Pawelski?

39

1        MS. PAWELSKI:  No.

2        THE COURT:  It's admitted.

3   BY MR. CAMONI:

4   Q.    So that's a photo of you?

5   A.    Yes.

6   Q.    Is that what you looked like then?

7   A.    Yes.

8   Q.    Take that down.  I would like to show the witness what's

9   been previously marked as Government's Exhibit 86.4.  I would

10  like you to look at this, particularly the middle portion of

11  the page.  Do you recognize this?

12  A.    Yes.

13  Q.    What is this?

14  A.    Messages between me and Faizal.

15  Q.    Is this a fair and accurate representation of messages you

16  sent to the Facebook account that you understood to be Faizal

17  Bhimani's?

18  A.    Yes.

19  Q.    Had you -- did you communicate with Faizal through

20  Facebook often?

21  A.    Yes.

22  Q.    Did you receive messages from him at times?

23  A.    Yes.

24        MR. CAMONI:  Your Honor, at this time move to admit

25  Government's Exhibit 86.4.

40

1      MR. BROWN:  Just on that objection from the Facebook

2  --

3      THE COURT:  All right.  It's overruled.

4      MS. PAWELSKI:  Same objection.

5      THE COURT:  The objection is overruled.  It's

6  admitted.

7      MR. CAMONI:  May we publish, Your Honor?

8      THE COURT:  You can publish.

9  BY MR. CAMONI:

10 Q.   That says recipient Faizal Bhimani.  Is that a message you

11 sent?

12 A.   Yes.

13 Q.   What date does that say there?

14 A.   It looks like 6/6/2015.

15 Q.   June 6, 2015?

16 A.   Yes.

17 Q.   Can you read that message to the jury, please?

18 A.   Hey, I'm going to Virginia for a week, the girls are

19 staying there.  They are supposed to pa for the room every day

20 as they make the money.  If they fall short, I got it as soon

21 as I get back Saturday.  Cool.  Question mark.  Any issues just

22 let me know, but I got in their ass before I left so everything

23 should be cool and my phone number.

24 Q.   Was that your phone number at the time?

25 A.   Yes.

1  Q.   When you they are supposed to pay for the room every day

2  as they were making money, how were they making money?

3  A.   Selling sex.

4  Q.   Was Faizal aware of that?

5  A.   Yes.

6  Q.   What did you mean by, I got in their ass before I left?

7  A.   I yelled at them.

8  Q.   Did you yell at them often?

9  A.   Yeah.

10  Q.   Why did you do that?

11  A.   I considered them like my kids to be honest because they

12  argued like children.

13  Q.   So was it your job to discipline them?

14  A.   I guess you could say that.

15  Q.   What would happen if you didn't?

16  A.   Nothing.

17  Q.   Would you not make as much money?

18  A.   Yeah.

19  Q.   So is it fair to say you yelled at them so you would make

20  more money?

21  A.   Yes.

22  Q.   I would like to take this one down and bring up just for

23  the witness Government's Exhibit 86.5.  This one is a few

24  pages.  So if you can take a look at this, let me know when

25  you've seen enough to know whether you recognize it.

42

1  A.    Yeah.

2  Q.    What are we looking at?

3  A.    Messages between me and Faizal.

4  Q.    Same account?

5  A.    Yes.

6  Q.    On your side?

7  A.    Yes.

8  Q.    Were they sent to and from the same Facebook account you

9  understood to be Faizal Bhimani's?

10 A.    Yes.

11 Q.    Is this a fair and accurate representation of the messages

12 you exchanged with that account?

13 A.    Yes.

14         MR. CAMONI:  Move to admit Government's Exhibit 86.5.

15         THE COURT:  All right.

16         MR. BROWN:  Same objection.

17         MS. PAWELSKI:  Same objection.

18         THE COURT:  All right.  It's admitted.

19         MR. CAMONI:  Publish.

20 BY MR. CAMONI:

21 Q.    Slide it down to page two.  This one that says recipient,

22 Faizal Bhimani, author, Jennifer Day, August 8th of 2015, do

23 you see that message, Ms. Day?

24 A.    Uh-huh.

25 Q.    Can you read that to the jury, please?

43

1   A.    They got to stay one more night.

2   Q.    Who was they?

3   A.    The girls Zumara, Zumara and McKee.

4   Q.    Zumara and McKee?

5   A.    Yeah.

6   Q.    The next message, was that a message you received from

7   Faizal in response?

8   A.    Yes.

9   Q.    August 8th, 2015?

10  A.    Okay, price is 169, but for you 109.

11  Q.    Did Faizal often give you discounts?

12  A.    Yes.

13  Q.    What was the reason for the discounts?

14  A.    I don't know to be honest.  We just stayed with him a lot,

15  and that was always the price from when I first met him.

16  Q.    He gave you discounts of his own free will, or did you ask

17  for them?

18  A.    No, he did.

19  Q.    Your response, the next message down, same day?

20  A.    Okay, thanks, babe.

21  Q.    If we can slide it down again, two days later August 10,

22  2015, what was your message to Faizal Bhimani?

23  A.    They coming down to pay for the room.

24  Q.    Again, who was they?

25  A.    Zumara and McKee.

44

1  Q.   Okay.  If we can go to the next page.  This is -- actually

2  slide up first.  So this breaks over the pages.  But this is

3  recipient, Jennifer Day, author, Faizal Bhimani, August 13th,

4  2015.  Do you see that one?

5  A.   Yes.

6  Q.   Read that message.

7  A.   Hey, Jen, ladies need to check out today plus for this

8  weekend.

9  Q.   What was your response?

10 A.   If it's day I'll check out tomorrow, they'll come down and

11 pay now.

12 Q.   What was his response to you?

13 A.   Okay, Friday.

14 Q.   If we can continue down the page, please.  Now, on August

15 14th, 2015 recipient, Jennifer Day, author, Faizal Bhimani, do

16 you see that?

17 A.   Yes.

18 Q.   What is that that was sent to you?

19 A.   Pocono Record article about a sting.

20 Q.   What kind of sting?

21 A.   Prostitution sting.

22 Q.   So Faizal sent you a Pocono Record article about a

23 prostitution sting?

24 A.   Yes.

25 Q.   Can we go to the next message, please?  Continue.  All

1  right.  So August 21st, recipient, Jennifer Day, author, Faizal

2  Bhimani, what was that message?

3  A.    Sorry, sold out plus race weekend.

4  Q.    What's race weekend?

5  A.    Pocono Raceway.

6  Q.    Was that a busy time in your experience at the hotel?

7  A.    Yes.

8  Q.    What was your response?

9  A.    Fuck.

10  Q.    And what did Faizal send back after that?

11  A.    Indy race on Sunday, yes.

12  Q.    Your response was?

13  A.    Damn, that sucks.

14  Q.    So did that mean you couldn't have any rooms for the

15  girls?

16  A.    Yes.

17  Q.    Did that mean you couldn't work?

18  A.    No.

19  Q.    Or they can't work?

20  A.    Well, yes.

21  Q.    Did you put them in another hotel?

22  A.    Yes.

23  Q.    In what hotel did you put them in?

24  A.    I don't recall at that time.

25  Q.    Was it another hotel in Monroe County?

46

1  A.    Possibly could have been, yeah.

2  Q.    May there have been another hotel in Monroe County you

3  used besides the Howard Johnson?

4  A.    Not for them to work at, just to stay at while we couldn't

5  stay there.

6  Q.    They weren't working while they were at that other hotel?

7  A.    No.

8  Q.    Why not?

9  A.    I didn't really trust any of the hotels in Monroe County.

10 Q.    Why?

11 A.    For the reason, the stings.

12 Q.    So you thought it was too dangerous at another hotel?

13 A.    Yes.

14 Q.    Did you trust the Howard Johnson?

15 A.    Yes.

16 Q.    Did the manager at other hotel, whichever one it was, warn

17 you about police?

18 A.    No.

19 Q.    Did they give you discounts?

20 A.    No.

21 Q.    All right.  Can we slide down to September 3rd of 2015?

22 You sent a message looks like at 2:21.  What was that message?

23 A.    Everything okay over there, I just passed you, good.

24 Q.    Why did you send that message?

25 A.    There was cops in the parking lot.

47

1  Q.    Slide down.  I'm sorry.  It looks like there's a response

2  that breaks the page.  Author, Faizal Bhimani, recipient,

3  Jennifer Day.  What was his response, top of next page?

4  A.    Okay.

5  Q.    And what did you send?

6  A.    Okay, just checking, seen mad cops.

7  Q.    What was Faizal's cops?

8  A.    My uncle is handling it, the top boss, I'm the little

9  boss.

10 Q.    What did you say?

11 A.    I was just making sure everything was good, I just passed,

12 like, damn.

13 Q.    So September 4th, 2015, author, Jennifer Day at the top of

14 the page, recipient, Faizal Bhimani.  What was your message?

15 A.    Hey, how much for a room for tonight.

16 Q.    What was his response?

17 A.    79.

18 Q.    What did you say?

19 A.    K.

20 Q.    You sent another message after that?

21 A.    They need room.

22 Q.    Can we slide down the next page?  So at any time when you

23 asked for a room for your girls, were you told they can't stay

24 there?

25 A.    No.

48

1  Q.    Were your girls ever kicked out for prostitution?

2  A.    No.

3  Q.    Were they ever told they can't come back because they were

4  prostituting the last time?

5  A.    No.

6  Q.    Did the police ever come to the Howard Johnson to arrest

7  your girls?

8  A.    No.

9  Q.    Were you ever arrested at the Howard Johnson?

10  A.    No.

11  Q.    Have you ever been to the Quality Inn in Stroudsburg?

12  A.    Yes.

13  Q.    For what?

14  A.    To drop off drugs to Thurman.

15  Q.    Thurman Stanley was at the Quality Inn?

16  A.    Yes.

17  Q.    You gave him drugs at that hotel?

18  A.    Yes.

19  Q.    Did you know anybody at that hotel?

20  A.    No.

21  Q.    You mentioned a hotel in Allentown?

22  A.    Yes.

23  Q.    That was someplace where your girls did work?

24  A.    Yes.

25  Q.    Was because you trusted that hotel?

1    A.    No.

2    Q.    Why?

3    A.    They made a lot of money there.

4    Q.    Did anything about the way you conducted business at that

5    hotel differ from how you conducted your business at Howard

6    Johnson?

7    A.    No.

8    Q.    You weren't more careful or any other measures?

9              MR. DeSTEFANO:   Objection.

10             THE COURT:   Hold on.

11             MR. CAMONI:   I can rephrase.

12             THE COURT:   Yeah, I will sustain it to the extent --

13    you can rephrase.

14    BY MR. CAMONI:

15    Q.    Did you take any additional precautions in Allentown as

16    opposed to Howard Johnson?

17    A.    The girls did.  I wasn't always there.

18    Q.    So were you part of making the decision to take extra

19    precautions?

20    A.    Yes.

21    Q.    What were those extra precautions?

22    A.    Just told them to be careful.  They actually would get in

23    good with the manager at that hotel.

24    Q.    So they knew the manager there as well?

25    A.    Yeah.

50

1  Q.   So did that make it easier to do their business?

2  A.   Yes.

3  Q.   Did that manager warn them about police?

4  A.   No.

5  Q.   Were they ever arrested there?

6  A.   Yes.

7          MR. CAMONI:  Nothing further, Your Honor.

8          THE COURT:  Mr. Brown?

9          MR. BROWN:  Yes.

10  CROSS EXAMINATION

11  BY MR. BROWN:

12  Q.   Good morning, Ms. Day.  My name is attorney Bernie Brown.

13  I have a couple questions.

14  A.   Good morning.

15  Q.   I think I'm going to pick up where you left off.  Isn't it

16  true that Scottish Inn in Allentown you knew the manager named

17  Nick who actually charged you more money for the rooms for your

18  prostitution operation?

19  A.   False.

20  Q.   That's false?

21  A.   Uh-huh.

22  Q.   All right.  I'm going to bring up 409, paragraph 3.

23          MR. BROWN:  I'm at defense 14?

24          THE COURT:  I don't know.  You have to keep track of

25  -- that's not my job.

51

1        MR. BROWN:  This would be 15.  Thank you, Kevin.

2   BY MR. BROWN:

3   Q.    According to the --

4        THE COURT:  You're refreshing her recollection?

5        MR. BROWN:  I wasn't refreshing -- thought she said

6   no, she never made that statement.  So I was going to ask if

7   she agreed or disagreed.

8        THE COURT:  Is this her statement or the agent's

9   statement?  Do you not understand what a 302 is?  We had this

10  discussion now for three days, all right.  This is not her

11  statement.  This is an agent's statement.  You can use it to

12  refresh her recollection if it works.  But unless it's signed

13  by her or adopted by her, it's not her statement, okay.  Let's

14  understand the rules in federal court, please.

15  BY MR. BROWN:

16  Q.    Does that refresh your recollection?

17  A.    No, I know who Nick was.  He was the manager.  I didn't

18  deal with him.

19  Q.    You didn't deal with Nick, the manager?

20  A.    No.

21  Q.    Do you know if the Scottish was investigated for human

22  trafficking?

23  A.    I don't.

24  Q.    And you were never charged with human trafficking or drug

25  trafficking you admitted here today in court in federal court?

52

1   A.   I was charged.

2   Q.   In federal court?

3   A.   No.

4   Q.   And so the government, federal government never charged

5   you for the crimes that you admitted here in court today,

6   correct?

7   A.   No, not by the federal, no.

8   Q.   When you first met Thurman Stanley, he was in prison,

9   correct?

10  A.   Yes.

11  Q.   And then you got out in March of 2014, correct?

12  A.   Yes.

13  Q.   Okay.  And is it true that Mr. Stanley tried to contact

14  you, correct?

15  A.   Yes.

16  Q.   Is it true that he was trying to contact you to work for

17  him, correct?

18  A.   No.

19  Q.   No?

20  A.   No.

21  Q.   Well, did you deny his requests to communicate with you?

22  A.   No, we spoke on Facebook.

23  Q.   Okay.  Did you tell investigators that he attempted to

24  contact you and you denied his request to communicate with you?

25  A.   Yes.

1  Q.   Okay.  And did you also tell investigators that when you

2  were in prison he told you that you were going to be his girl?

3  A.   Yes.

4  Q.   And is it true that it wasn't until you actually saw his

5  car on Facebook that you decided to speak with him?

6  A.   Yes.

7  Q.   And the reason why you decided to speak with him was to

8  get money, correct?

9  A.   Yes.

10 Q.   Is it true that he taught you how to pimp?

11 A.   Yes.

12 Q.   And is it true that you would pay him ten percent?

13 A.   No.

14 Q.   No?  Now, you had a number of girls working for you,

15 correct?

16 A.   Yes.

17 Q.   And is it true in the beginning you would do a 50/50 cash

18 split with them?

19 A.   No.

20 Q.   If you told investigators that, that would be untrue?

21 A.   No.

22 Q.   Did you tell investigators that you would shop for them or

23 purchase their drugs for them?

24 A.   Yes.

25 Q.   Okay.  And did you say that you would -- it would be

54

1  easier to control your women that way, the girls that worked

2  for you?

3  A.    Easier to control them?

4  Q.    By paying them in drugs instead of the cash that --

5  A.    Yes.

6  Q.    Is it true you had a harder time with your girls because

7  you would not physically hit them or strike them?

8  A.    No, I had no problem with my girls.

9  Q.    Okay.  Did you tell investigators that?

10 A.    No.

11 Q.    Is it true you didn't have to pay extra at the Howard

12 Johnson for the rooms?

13 A.    Yes.

14 Q.    And the rooms were $79 a night, correct?

15 A.    I don't recall the exact amount.  I believe we used to pay

16 $60 cash, 65.

17 Q.    So you were paying staying a weekend, and it was 65 in

18 cash, right, that would be three nights, correct?

19 A.    The weekend?  Yeah.

20 Q.    At $65, correct?

21 A.    Yes.

22 Q.    That would come to about 178, correct?

23 A.    Yes.

24        THE COURT:  195.

25        MR. BROWN:  195.  Sorry.

55

1  BY MR. BROWN:

2  Q.   I apologize, 195.  And you would get discounts from

3  Faizal, correct?

4  A.   Yes.

5  Q.   Okay.  You operated out of other hotels in the area.  Is

6  that true?

7  A.   No, not in Monroe County.

8  Q.   So you didn't operate out of the Super 8?

9  A.   No.

10  Q.   Did you say that Stanley tried to have mentally an

11  agreement with his girls?  Do you recall that?  Do you know if

12  Stanley had an agreement with his girls and mentally manipulate

13  them or talk to them or try to keep them under control?

14  A.   I don't know how he would do his business.

15  Q.   Okay.  And did you know that Mr. Bhimani would provide

16  information to the police about what was going on at his hotel?

17  A.   I don't know what he would tell the police.

18  Q.   Okay.  But you at least know that on -- can we bring up

19  Government's Exhibit -- what was that, the text message?

20  Government's Exhibit --

21           THE COURT:  What government exhibit --

22           MR. BROWN:  86.5.

23  BY MR. BROWN:

24  Q.   And first thing -- as far as the text messages go, you

25  said you were not friends with Faizal on Facebook, is that

56

1  correct?

2  A.    I'm not sure if we were actually friends.

3  Q.    Did you say on direct examination you were not friends?

4  A.    I'm not sure.  I don't believe we were friends on

5  Facebook.

6  Q.    Okay.  So can we agree that although this says coming from

7  Faizal Bhimani's Facebook, you don't know who actually sent you

8  that text message, you believe it to be Faizal?

9  A.    I believe it to be Faizal.

10  Q.    And when -- the 2/22/17 one, please.  And you had driven

11  by, correct?

12  A.    Yes.

13  Q.    And you had seen cops there, correct?

14  A.    Yes.

15  Q.    And that concerned you, correct?

16  A.    Yes.

17  Q.    And Faizal told you that the management was talking to the

18  cops, he and his uncle, correct?

19  A.    Yes.

20  Q.    Okay.

21        MR. BROWN:  Nothing further, Judge.

22        THE COURT:  All right.

23  CROSS EXAMINATION

24  BY MR. DeSTEFANO:

25  Q.    Hi, Ms. Day.  Is it Ms. Or Mrs.?

57

1  A.    Miss.

2  Q.    Did you have another last name?

3  A.    Mrs. Day?  I am Day.  I've been Day.

4  Q.    Just a few questions, ma'am, all right.  And I think you

5  testified clearly during your direct examination you had three

6  women working for you as prostitutes not only at the Howard

7  Johnson but other places as well in 2014 and 2015?

8  A.    Yes.

9  Q.    I notice the text messages all seem to be in mid to late

10 2015.  Would that be correct -- well, would that be your

11 impression -- with Mr. Bhimani?

12 A.    It could be.  I'm not exactly sure.  It was a long time

13 ago now.

14 Q.    Right, right.  So would -- would it be accurate to say

15 that these people were working -- these women were working for

16 you at the Howard Johnson more in 2015 than in 2014?

17 A.    It could possibly be, yes.

18 Q.    All right.  So with that in mind and going through --

19 these text messages, would you say your testimony should be

20 modified to say it was really 2015 rather than 2014?

21 A.    It was when I came out of jail in 2014 and on until I went

22 back to jail.  So I --

23 Q.    When did you come out of jail in 2014?

24 A.    I don't even know the exact date when I came out of jail.

25 Q.    Was it early, late, middle?

58

1    A.    I don't know to be honest.

2    Q.    Okay.  Do you know how many months or years you served in

3    jail for those -- I guess it was the retail -- I'm sorry -- for

4    whatever?

5    A.    The first time I went to jail I was in there for six

6    months.

7    Q.    Six months?

8    A.    Yeah.

9    Q.    And you don't remember when you were released?

10   A.    No.

11   Q.    Okay.  When you were released, were you on parole or

12   probation?

13   A.    Yes.

14   Q.    For how long?

15   A.    At the time I don't remember to be honest.  I have a few

16   charges that went in there.

17   Q.    Okay.  So your testimony is that you recruited the girls

18   or you started doing the prostitution sometime after you came

19   out of jail in 2014?

20   A.    The first time I came out of jail I did not do -- I did

21   not -- nothing with prostitution.  I was back to selling drugs.

22   I got caught again selling drugs.  I got a probation violation.

23   I was in jail for 90 days.  When I got out of jail after those

24   90 days, that's when I started with the prostitution.

25   Q.    Okay.  But the question, I guess, on the floor is, was

59

1  that in 2014, or was that in 2015?

2  A.    I don't know the exact date of when I got out of jail.

3  Q.    Okay.  The second time?

4  A.    It was the second time I got out of jail.

5  Q.    Okay.  All right.  So that date could have been in 2015?

6  A.    I don't know.

7  Q.    Okay.  All right.  Now, how did you know these three

8  girls?

9  A.    Jail.

10  Q.    They were all in jail?

11  A.    Yes.

12  Q.    The -- what's their names?

13  A.    Michelle Zumara, Christina Zumara and Melissa McKee.

14  Q.    You met them in jail?

15  A.    Yes.

16  Q.    Did you talk to them about prostitution while you were all

17  three in jail?

18  A.    No.

19  Q.    That was later?

20  A.    Yeah.

21  Q.    Okay.  Now, ma'am, my impression of your testimony -- and

22  you correct me if I'm wrong -- but you did not testify that you

23  forced these girls in any way to work for you as prostitutes,

24  would that be correct?

25  A.    Yes.

60

1  Q.   And it's my conception of your testimony on direct that

2  you did not defraud these girls, lie to these girls about what

3  they were doing and such in order to get them to become

4  prostitutes?

5  A.   No.

6  Q.   And would I be correct in saying that you didn't really

7  coerce these girls into doing the prostitution for you, they

8  wanted to do it?

9  A.   No, it took coercing to --

10 Q.   What --

11 A.   I'm promising them drugs in order to prostitute.  I mean,

12 that's some form of coercion.

13 Q.   All right.  Were they drug addicts before?

14 A.   Yes.

15 Q.   And were they clean in jail, or were they still drug

16 addicts?

17 A.   I mean, they were clean when they were in prison.  There's

18 no drugs in there.

19 Q.   You know how long these girls were in prison?

20 A.   No.

21 Q.   But you don't have to be a prostitute to get drugs, right?

22 A.   No.

23 Q.   You can get drugs with -- anyplace where you're making

24 money?  In other words, you can be a clerk at the Rite Aid and

25 get your paycheck and then go out and buy drugs with it?

1   A.    Yes.

2   Q.    And as far as leaving your employment as a prostitute, did

3   these girls at some point leave, stop being prostitutes?

4   A.    Yes.

5   Q.    And you didn't try to force them to stay on with you, did

6   you?

7   A.    No.

8   Q.    Or coerce them into staying on?

9   A.    No, I went to jail.

10  Q.    Okay.  All right.

11  A.    They continued to do it, and I was in jail.

12  Q.    Okay.  But they continued to do it even after you were

13  gone?

14  A.    Yes.

15  Q.    Because they wanted to be prostitutes?

16  A.    Yes.

17  Q.    And not because of any promise, lie, force or coercion

18  that you were able to exert?

19  A.    No.

20  Q.    Thank you so much.

21         THE COURT:  All right.  Redirect?

22  REDIRECT EXAMINATION

23  BY MR. CAMONI:

24  Q.    Just to clarify, the answer to Mr. DeStefano's last

25  question, you were in jail when they continued to prostitute,

62

1  right?

2  A.    Yes.

3  Q.    So you only know what they did because they told you?

4  A.    Yes.

5  Q.    Do you have any idea why they kept doing it?

6  A.    No.

7  Q.    Were they still addicted to drugs?

8  A.    As far as I know.

9  Q.    Did you ever recruit any prostitutes who weren't addicted

10 to drugs?

11 A.    One.  I stole her from Thurman.

12 Q.    You said using drugs -- you testified on direct using

13 drugs was a way to control the girls?

14 A.    Yes.

15 Q.    How did you do that?

16 A.    That's how -- if they wanted drugs, they had to make

17 money.

18 Q.    Did you give them all the drugs they wanted all at once?

19 A.    No.

20 Q.    How did you do it?

21 A.    When I first get them, I need to know what their habit is.

22 That's what they get.

23 Q.    Again, did they get it all at once?

24 A.    Yes, for their day.

25 Q.    For a day?

63

1  A.    Yes.

2  Q.    So if they don't give you the money at the end of the day,

3  do they get the drugs for the next day?

4  A.    Well, no, not until the next day.

5  Q.    But if they don't give you the money, do they get their

6  drugs?

7  A.    Yes.

8  Q.    You give them the drug even if they give you their money?

9  A.    Yes.

10  Q.    Why?

11  A.    That was the way I dealt with them.

12  Q.    Was that so they would work that day?

13  A.    Yeah.

14  Q.    Now, you told attorney Brown that you would shop for the

15  girls?

16  A.    Yes.

17  Q.    Did you buy them food?

18  A.    Yes.

19  Q.    Did they have any money to buy food themselves?

20  A.    No.

21  Q.    They relied on you entirely for their food?

22  A.    Yes.

23  Q.    Did you buy them clothes?

24  A.    Yes.

25  Q.    Did you buy them medicine when they needed it?

64

1  A.    Yes.

2  Q.    Did you buy them tampons?

3  A.    Yes.

4  Q.    Did they have any money to get that stuff on their own?

5  A.    No.

6  Q.    So is it fair to say they were dependant on you when they

7  were in your employ?

8  A.    Yes.

9  Q.    We had Facebook messages where you were talking about

10  prices, correct?

11  A.    Yes.

12  Q.    Where the person who you understood was Faizal Bhimani

13  sent you a price for the room?

14  A.    Yes.

15  Q.    Was that the price you paid for the room?

16  A.    I don't recall, but most likely, yes.

17  Q.    Okay.

18  A.    Whatever he asked for, that's what we paid.

19  Q.    In the messages that were sent, and whether it's these

20  particular messages or other text messages you received, you

21  said you communicated through text?

22  A.    Yes.

23  Q.    Would you discuss, as we saw, the girls need to work,

24  they'll pay you when they're done?

25  A.    Yes.

1   Q.    When they showed up, were they allowed to do that?

2   A.    Yes.

3   Q.    What was in the messages was confirmed in what happened?

4   A.    Yes.

5         MR. CAMONI:  Nothing further, Your Honor.

6         THE COURT:  All right.  You may step down.  All

7   right, ladies and gentlemen.  We will take our morning break.

8   No conversation or discussions among yourselves or anyone else.

9   Don't form any opinions.  You have not heard all the evidence

10  or law related to the case.  No research of any kind related to

11  anything related to the case.  No listening to or reading

12  anything about the case.  If anyone were to talk to you, you

13  must advise us of that immediately.  All right.  Have a good 15

14  minutes or so and stretch.

15        (A brief recess was taken.)

16        THE COURT:  Welcome back.  Mr. Camoni?

17        MR. CAMONI:  The government calls Christy

18  VanLuvender.

19        CHRISTY VANLUVENDER, called as a witness, being duly

20  sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. CAMONI:

23  Q.    Good morning, ma'am.

24  A.    Good morning.

25  Q.    Tell the jury how old you are today?

66

1  A.    I am 38.

2  Q.    And are you testifying under any kind of plea agreement

3  based on criminal charges?

4  A.    No.

5  Q.    Are you here because you were subpoenaed?

6  A.    Yes.

7  Q.    Have you been ever been convicted of a felony crime?

8  A.    Yes.

9  Q.    And that was a drug conviction, correct?

10  A.    Yes.

11  Q.    Have you ever used illegal drugs?

12  A.    Yes.

13  Q.    Have you ever been addicted to drugs?

14  A.    Yes.

15  Q.    What substances have you used?

16  A.    Heroin, cocaine, pretty much everything.

17  Q.    And what were you addicted to?

18  A.    Heroin.

19  Q.    Are you currently undergoing any kind of treatment for

20  addiction?

21  A.    Yes.

22  Q.    What kind of treatment?

23  A.    Heroin, methadone.

24  Q.    Methadone treatment for heroin addiction?

25  A.    Uh-huh.

67

1  Q.    Are you sitting here today having undergone that

2  treatment?  Are you able to think clearly today?

3  A.    Yes.

4  Q.    All right.  Have you able to remember things that happened

5  several years ago?

6  A.    Uh-huh.

7  Q.    All right.  Have you ever stayed at the Howard Johnson

8  hotel in Bartonsville?

9  A.    Yes.

10  Q.    When was that?

11  A.    2013, 2012, I think 2014 maybe, around there.

12  Q.    All right.  How often did you stay there?  How many times

13  approximately?

14  A.    It's hard to give an estimate.  I mean, I would say on and

15  off a couple weeks here and there, like, two weeks after,

16  couple weeks here and there.

17  Q.    When you say a couple weeks when you were there, does that

18  mean you stayed there for one or two weeks at a time?

19  A.    Yeah, or could be longer or less.

20  Q.    What was the longest stretch you stayed at that hotel?

21  A.    Maybe, like, two weeks.

22  Q.    All right.  Why were you there?

23  A.    For prostitution.

24  Q.    All right.  So were you working alone, or did you work for

25  a pimp?

68

1    A.    For a pimp.

2    Q.    Who was your pimp?

3    A.    Thurman Stanley.

4    Q.    Did you call him by that name?

5    A.    No.

6    Q.    What did you call him?

7    A.    Black.

8    Q.    And was he at the Howard Johnson hotel, too?

9    A.    Yes.

10   Q.    All right.  When you stayed at the Howard Johnson, where

11   were the rooms located at the hotel?

12   A.    In the back, like, right by the entrance, like, where you

13   can park in the back.

14   Q.    When you say by the entrance, main entrance or rear

15   entrance?

16   A.    Rear entrance.

17   Q.    And what floor was that on?

18   A.    It was on the bottom -- like, the regular floor, main

19   floor.

20   Q.    Downstairs, not upstairs?

21   A.    Not upstairs.

22   Q.    Whose names were the rooms put under when you stayed

23   there?

24   A.    It would be under Michelle, mainly under Michelle that I

25   would know.  I'm trying to remember her last name.

69

1    Q.    Were they under your name?

2    A.    Never.

3    Q.    Who checked you into the rooms?

4    A.    Who checked in the rooms -- he would have a key the most

5    of time.

6    Q.    Who was that?

7    A.    Black.

8    Q.    Black would have a key to the room?

9    A.    Or Heather would have it.

10   Q.    You didn't get the key yourself from the front desk?

11   A.    No.

12   Q.    When you say Heather, who is Heather?

13   A.    Heather D'Auria.

14   Q.    Who is Heather D'Auria?

15   A.    One of the girls there with Black, one of the main girls.

16   Q.    Did Black have other girls beside you and Heather working

17   for him?

18   A.    Usually -- only time that I was there was either with

19   Heather D'Auria, and one time I was just by myself, so -- it

20   was mainly with Heather.

21   Q.    When you say you were by yourself, by yourself working for

22   Black or by yourself on your own?

23   A.    No, by myself with Black at one point, which was real

24   short, two weeks once and then not even maybe a week.  The rest

25   of the time it was with Heather D'Auria.

70

1  Q.    How did you meet Thurman Stanley?

2  A.    At this guy Jerome Hilliard's house, his nickname is D. C.

3  I met him there.

4  Q.    Who is Jerome Hilliard?

5  A.    A friend of mine.

6  Q.    Okay.  So you and Heather D'Auria during the time you were

7  with Black were the only two working for him you knew of?

8  A.    Uh-huh.

9  Q.    What was the deal with Stanley working for him?  What did

10 you have to do?

11 A.    The deal was we would have to take calls.  He would give

12 us drugs, but it would be, like, bare minimal, just to

13 basically get us through the day, maybe, like, two or three

14 bags of heroin just basically enough to be able to do the

15 calls, and that was it just --

16 Q.    When you say calls, who was calling?

17 A.    The johns or whoever -- however you want to call them, the

18 men calling these phones that we had and who wanted dates.

19 Q.    So men who wanted dates, does that mean they were men who

20 wanted to buy sex?

21 A.    Buy sex, spend time with you, do anything that -- whatever

22 they requested.

23 Q.    So how did they know what number to call?

24 A.    Back Page.

25 Q.    That's a website?

71

1  A.    Uh-huh.

2  Q.    Who placed the ads on Back Page?

3  A.    Black did.

4  Q.    Did he pay for those ads, too?

5  A.    Yes.

6  Q.    All right.  And did Stanley pay you money for the work you

7  were doing?

8  A.    No.

9  Q.    You said he gave you drugs?

10 A.    Uh-huh.

11 Q.    What kind of drugs did he give you?

12 A.    Heroin.

13 Q.    And at that time, were you addicted to heroin?

14 A.    Yes, very badly.

15 Q.    Where would he give you the heroin?

16 A.    Just anywhere in the room.  It wouldn't be in front of

17 anybody.  He would make minimal appearances.  He would be gone

18 most of time or sleeping outside in his car, in his B. M. W.,

19 white B. M. W. would be outside.  He come in, give us a little

20 bit for the day and then be gone.  That was basically it.

21 Q.    So these men came to see you.  They paid you for sex or

22 company?

23 A.    Uh-huh.

24 Q.    What did you do with the money they gave you?

25 A.    Heather instantly -- Heather collected it, and Heather

72

1   paid Black.

2   Q.   So Heather would collect the money from you for Black?

3   A.   Uh-huh.

4   Q.   Was she -- did she have any kind of specific role?  Why

5   was she he collecting the money?

6   A.   Well, that was -- I guess she thought of herself as his

7   girlfriend so, you know.

8   Q.   So she had added responsibility?

9   A.   She did a lot -- she did a lot of dates.  She was with him

10  before I was.  She was actually the one that told me what she

11  was doing besides Black.  You know, because I had -- she was,

12  like, a middle school friend that, like, kind of told me what

13  was going on when he had told me, you know, about what they

14  were doing, and she just -- basically had a lot of pull with

15  him because she made a lot of money, a lot of money.

16  Q.   Did all of that money go to Black?

17  A.   Oh, yeah.

18  Q.   She didn't keep any of that money?

19  A.   No.

20  Q.   You didn't keep any of your money?

21  A.   No.

22  Q.   Why didn't you keep any of that money?

23  A.   No, because -- out of fear.

24  Q.   Out of fear?

25  A.   Yeah.

73

1   Q.    Fear of what?

2   A.    What he would do because he wasn't a really nice man at

3   all, you know.  He wasn't -- I mean, he didn't even come back

4   to bring us money for food or anything.

5   Q.    If he was gone for long periods of time, why did you stay

6   and keep working?

7   A.    That's why I didn't.  There would be times, like I said, I

8   would be there for a week or two.  I would leave.  Then I would

9   be good for long periods of time.  If I come up on a hardship

10  where I was sick or struggling, how am I going to get drugs.  I

11  would be, like, let me call Black.

12  Q.    When you say sick, what kind of sick?

13  A.    Dope withdrawal.

14  Q.    What's that like?  Can you tell the jury?

15  A.    Terrible.  It's basically like a flu, one of the worst

16  flus you can ever have, chills, stomach pains, stomach

17  cramping, nausea, vomiting, diarrhea, restless legs.  You can't

18  sleep.  You're sweating.  You have the hot and colds.  You're

19  up for days.  This goes on for, like, a week, week and a half.

20  Q.    What goes through your mind when you can't get heroin and

21  you're feeling like that?

22  A.    It's terrible.  You pretty much -- I mean, you will figure

23  out any way to get it because you do not want -- you can't do

24  nothing like that especially if you have kids or if you have

25  any responsibilities you have to take care of, you can't take

74

1  care of it like that.  It's impossible.

2  Q.   Did Thurman Stanley when you started working with him know

3  that you were addicted to heroin?

4  A.   Absolutely, uh-huh.

5  Q.   All right.  When you were staying -- when you were staying

6  at the Howard Johnson -- let me go back to something you said.

7  You said that sometimes you would leave.

8  A.   Uh-huh.

9  Q.   Why did you leave?

10 A.   Because it just -- it was terrible.  It was really, like,

11 not only -- it wasn't really -- it wasn't anything that I ever

12 wanted to do.  Nobody, like, says, I want to aspire to go sleep

13 with a bunch of men who degrade you, treat you terrible for

14 three bags of heroin a day because that's basically about what

15 we got.  I mean --

16 Q.   You would return when that sickness got bad enough to make

17 it worth it?

18 A.   Basically that's what it felt like sometimes.

19 Q.   So --

20 A.   Sometimes anything felt like it was worth it.

21 Q.   If it wasn't for that heroin addiction, would you have

22 been doing what you were doing with Thurman Stanley?

23 A.   Never.

24 Q.   If he wasn't giving you heroin, would you have been doing

25 what you were doing?

75

1  A.    Never.

2  Q.    Would you have given him all that money?

3  A.    Never, huh-uh.

4  Q.    Did Thurman Stanley when he gave you drugs -- let's talk

5  about the times you were at the Howard Johnson.  Where did you

6  use those drugs?

7  A.    In the room.

8  Q.    And when you used heroin, how did you use it?

9  A.    I. V.

10  Q.    So you used the syringe?

11  A.    Yes.

12  Q.    Did you reuse your syringe or use disposables?

13  A.    They were disposables, yeah.

14  Q.    So when you -- after you used, what would you do with the

15  syringe, times it was left out or always clean it up?

16  A.    Oh, what we did was we used them -- if we didn't have any

17  extra ones, use them, and we each had our own drawers.  We just

18  threw them in the drawer.

19  Q.    Keep them in the drawer?

20  A.    We had a collection of drawers but a collection in our

21  drawers, a whole bunch.

22  Q.    Did you ever sell drugs for Thurman Stanley?

23  A.    No.

24  Q.    Did you share drugs with any of the johns?

25  A.    No.

1   Q.   Did any of johns want to do drugs with you?

2   A.   Yes.

3   Q.   Did you do that?

4   A.   No.

5   Q.   Why not?

6   A.   Because Black was, like -- one thing was a rule we could

7   not do drugs with any of the guys on any of the calls.

8   Q.   What would have happened if you broke one of the rules?

9   A.   I'm sure it wasn't going to be good.  So I didn't try to

10   -- I mean, I broke one of the rules once, and he really flipped

11   out and acted really crazy.  So I didn't want to really keep

12   trying him with some of the rules.  He was very aggressive,

13   very nasty, screaming, yelling, get in your face.

14   Q.   Threaten you?

15   A.   Threaten me, nasty, threaten to kick you out, stuff like

16   that, threaten to put you on the street, things of that nature,

17   very mean.

18   Q.   Would you -- you said you broke one of the rules once.  Do

19   you remember what rule you broke?

20   A.   Yeah, I had a date.  I kept the money.

21   Q.   So there was a time when you kept money and didn't give it

22   to Thurman Stanley?

23   A.   Uh-huh.

24   Q.   And why did you do that?

25   A.   Because we had not eaten in days.

77

1  Q.   When you did get food, where did you get it from?

2  A.   Sometimes, like, we had have to, like, call him up and beg

3  him.  It would be, like, days later, and Heather would have to

4  call and, come on, Black, you haven't been here in days.

5  She's, like, are you going to come back and bring us food,

6  like, what's going on, we have no cigarettes, no food, no dope,

7  nothing.  She was, like, you have not been here.  You just left

8  us here.  She was, like, nobody -- we haven't had calls.  This

9  is especially if we were really slow.  If we were busy and

10  calls and money, he would have made sure to come there and

11  collect that money.

12  Q.   So there was a time when it was slow and you weren't

13  making money, and he didn't bring you food so you hid money?

14  A.   No -- we were slow.  Like, he wouldn't come over there

15  because -- I think of no reason to come there for any reason at

16  all.  There was no money.  Like, we didn't have a bunch of

17  money there.  He wouldn't come over and bring us food.  We were

18  just, like -- he's spiteful.

19  Q.   I am trying to focus on the time you had a date and you

20  kept the money.

21  A.   Oh, yeah.

22  Q.   What was that reason you kept that money?

23  A.   Oh, I kept it because for the days prior he wasn't feeding

24  us, so I kept it.

25  Q.   To buy food?

1  A.    Uh-huh.

2  Q.    Did he find out?

3  A.    Yeah.

4  Q.    What happened?

5  A.    Well, he found out because Heather told him, and he

6  flipped out.  He was screaming.  Heather went out to the car

7  and told him.  He came back in.  He was just yelling.  He was,

8  like, how are you going to keep that money.  He's, like, you're

9  a fucking thief.  He's, like, I can't fucking trust you.  He's,

10 like, I want you out of this fucking room.  He's, like, you

11 need to leave now.  He was, like -- he was just yelling.  I

12 remember him enraged screaming.

13 Q.    What did you do?

14 A.    I just remember, like, just crying because at this point I

15 didn't even know what to do.  Like, I had a terrible addiction,

16 nowhere to go.  I burned a lit of bridges.  I never stole from

17 my family, but they were tired of my bullshit.  They were tired

18 of my addiction.  You know, I didn't really know where to go.

19 Q.    So when he was yelling at you that day, did you give him

20 the money?

21 A.    Yeah, I gave it back.

22 Q.    All right.  Did Stanley ever hurt you physically?

23 A.    Physically, no.  I remember he put his hands on me once.

24 He was just aggressive, like, when we were, like, sexually,

25 like, once, but put his hands on me.  As far as fighting, no.

1  Q.   You had sex with Thurman Stanley?

2  A.   Yes.

3  Q.   Was that at his -- when he wanted to?

4  A.   Oh, yes it was, like, I had to, yeah.

5  Q.   Were there rules about condom use?

6  A.   Yes.

7  Q.   What was the rule?

8  A.   Always condoms.

9  Q.   What about -- did you place the ads or Thurman Stanley?

10 A.   Thurman Stanley did.

11 Q.   When there was a response from the ad, did you answer the

12 call or did someone else?

13 A.   No, he did.  He had the phones.

14 Q.   He kept the phones?

15 A.   Yes.

16 Q.   Did you ever have a john or a date that didn't pay you?

17 A.   Yes.

18 Q.   And what happened then?

19 A.   I had a john that called, placed an ad.  I went up to the

20 room, got up to the room.  When you go into for a date, they

21 are supposed to pay you as soon as you walk in the door.  He

22 didn't pay me.  I said, listen, I have to take this money

23 upfront, or I have to leave.  He said, relax, calm down, relax,

24 talk to me, it's okay, I got the money.  Next thing I know it's

25 half hour later he don't have the money.  I am, like, listen, I

1  got to go.  I call him up.  I was, like, Black, come get me.
2  He comes and gets me.  He's, like, where's the money.  I was,
3  listen, he never paid me.  I don't know what you want me to
4  tell you.  He did not pay me.  He was, like, what, he didn't
5  pay you.  Give me whatever money you have on you.  He's, like,
6  I don't fucking believe you.  You're a liar.  He basically did
7  not believe me.  He thought I was lying to him and made me give
8  him whatever money I had on me.
9  Q.    You did have money on you?
10  A.    Yeah.
11  Q.    You gave it to him?
12  A.    Uh-huh.
13  Q.    Did you ever see him hurt Heather?
14  A.    No.
15  Q.    Did you ever see Heather with any kind of injuries or
16  signs of abuse?
17  A.    Oh, yeah.  I've seen, like, signs on both of them from
18  them fighting each other.
19  Q.    From Heather and Thurman Stanley?
20  A.    I never seen them actually fighting, but I've seen, like,
21  the after effects on, like, their faces and stuff.
22  Q.    What kind of effects did you see on Heather?
23  A.    Little bumps, Heather -- she ended up losing a tooth
24  because of him.  She had to get a tooth pulled or something.
25  Q.    Did you see Thurman Stanley with a gun?

1    A.    A gun, I'm pretty sure he had one.  He had one in his car

2    present, but he didn't run around with it, like, flashing it.

3    Q.    He kept it in the car?

4    A.    Yes.

5    Q.    The car was that B. M. W. you mentioned?

6    A.    Yes.

7    Q.    Where did he park that car?

8    A.    In the back on the first floor.

9    Q.    At the Howard Johnson?

10   A.    Yeah.

11   Q.    Who set the prices that the johns had to pay?

12   A.    Black did.

13   Q.    And how did it work with the prices?  Do you remember what

14   they were?

15   A.    Honestly I really don't remember.

16   Q.    Was it a different amount for a different amount of time?

17   A.    Yeah, it was, like, different amounts per time, and then

18   depending on, like, what you would do, like, whether it was,

19   like, anal or whether it was, like, girl with two guys or girl

20   with, you know, guy and his wife -- it just depends on

21   different situations.

22   Q.    What are the units of time?  Do you remember?

23   A.    It was, like, half an hour, hour, two hours.

24   Q.    Was there something called a short stay?

25   A.    Short stay, yes.

82

1  Q.   Was there any -- ever anything that Black wanted you to do

2  with these customers you didn't want to do?

3  A.   He always was trying to push anal, and I was, like, no,

4  I'm not doing that, I'm not doing it.

5  Q.   Were you supposed to charge more for that?

6  A.   Uh-huh.

7  Q.   What was his reaction when you told him you didn't want to

8  do it?

9  A.   Nothing really.  He was, like, you can make so much more

10  money.  I'm, like, no, no.  He's, like, Heather won't do it,

11  you got it, man.  He was trying to talk me into it.  He wasn't

12  forceful about it but trying to talk me into it.

13  Q.   Did you ever know someone who went by the name G.?

14  A.   Yes.

15  Q.   Did you ever see G. at the Howard Johnson?

16  A.   Yes.

17  Q.   What was he doing there?

18  A.   Same thing as Black.  I always seen him with, like, one of

19  his -- one girl Lori.

20  Q.   You said same thing as Black.  What's that?

21  A.   Prostitution.  He was a pimp.

22  Q.   Okay.  Did you know Lori?  Did you talk to him?

23  A.   Here and there, not, like, great friends with her but in

24  passing.

25  Q.   Did you know anyone who worked at the Howard Johnson?

83

1    A.    Huh-uh.

2    Q.    You never met anyone?

3    A.    Like, never on a talking basis, no.

4    Q.    Okay.  How about just on a recognize-the-person basis?

5    A.    I mean --

6    Q.    Did you ever see Black talking with anyone who worked at

7    the hotel?

8    A.    I'm not really -- Black was most of the time either, like

9    -- I as I said, in the back of his car if he made an appearance

10   -- we were really only allowed to stay in the rooms.  He was

11   really, like, stay in your rooms, don't go in the restaurant.

12   Like, he made sure we were -- he wanted us in the rooms but --

13   or if not, we were, like, going to his car out to either do,

14   like, parties or going to their -- the people's houses.  He

15   didn't want us really running around too much in the hotels.

16   He tried to keep it as minimal possible.

17   Q.    He tried to?

18   A.    Yeah.

19   Q.    Was he always successful?

20   A.    I mean --

21   Q.    Did you always stay in your room?

22   A.    Yeah, I mean for the most part, yeah.  Except for if I had

23   to do laundry or something, then I would go over there to do

24   laundry.

25   Q.    Do you recall a time in 2014 when there was police manhunt

84

1    for Eric Frein?

2    A.    Yes.

3    Q.    Did you stay at the Howard Johnson at that time?

4    A.    Yes.

5    Q.    The whole time?

6    A.    No.

7    Q.    What happened during that time?

8    A.    I believe we had a knock at the door from somebody that --

9    was at the -- that worked there and they were looking for

10   Black, and I told them that Black was not there.  And Black

11   came back after he got the message.  I gave him the message

12   somebody was looking for him.  Black came back all panicked.

13   He was, like, yo, pack all your shit, get your shit now, let's

14   go, hurry, we got to get out of this hotel, the cops are coming

15   there's going to be cops here because of the Eric Frein thing.

16   We had to pick all of our stuff and leave.

17   Q.    Did you see the person that knocked on the door and asked

18   for Black?

19   A.    Yes, it was the owner.

20   Q.    Can you describe that person?

21   A.    He was, like, Indian or --

22   Q.    A male?

23   A.    Yes, uh-huh.

24   Q.    About how old?

25   A.    Like, 40s, 50s.

85

1  Q.    Okay.  Did you ever work anywhere else with Thurman

2  Stanley any other hotels?

3  A.    Yes, Baymont, Super 8, Quality, everywhere.

4  Q.    How long did you stay at the Quality Inn?

5  A.    Quality we didn't stay -- maybe one day here or two days

6  there, nothing like the Howard Johnson.

7  Q.    And did you use drugs while you were at the Quality?

8  A.    Yeah.

9  Q.    What happened when you worked at the Baymont?

10 A.    The Baymont, we went there once.  We went in there, paid

11 for the room.  I remember getting our luggage, bringing our

12 luggage in.  And I think maybe we were there a total of -- I

13 don't even know if it was two hours -- but I think we might

14 have went out to the car, maybe, like, once or twice, me and

15 Heather.  I don't know if it was by the way we were dressed

16 because we didn't have much on -- we were very dressed very

17 skimpy all the time -- talking close to nothing on.  I think

18 they pretty much knew we were prostitutes because they came and

19 knocked on the door, and they kicked us out.

20 Q.    In under two hours?

21 A.    Yes.

22 Q.    Did you dress that way when you were at the Howard

23 Johnson?

24 A.    Absolutely.

25 Q.    When you said you went out to do laundry?

86

1   A.    Uh-huh.

2   Q.    Did you ever go to the doors to let the johns in?

3   A.    Yes.

4   Q.    Did you ever go out to the parking lot to talk to Thurman

5   Stanley at his B. M. W.?

6   A.    Yes, and I used to sit outside the door when she had

7   dates, too.

8   Q.    Outside in the hallway?

9   A.    Yes.

10  Q.    You sat outside in the hallway while Heather was working

11  in the room?

12  A.    Yes.

13  Q.    How would you be dressed at that time?

14  A.    Thigh highs, underwears, bra, whatever I had on.

15  Q.    Did you ever see any employees walking by?

16  A.    Sometimes.

17  Q.    Any staff cleaning stuff, anything like that?

18  A.    Yes, yes.

19  Q.    Did the Howard Johnson ever throw you out for

20  prostitution?

21  A.    No.

22          MR. CAMONI:  Nothing further, Your Honor.

23          THE COURT:  Mr. Brown?

24          MR. BROWN:  No questions for this witness, Your

25  Honor.

87

1    THE COURT:  Okay.

2  CROSS EXAMINATION

3  BY MS. PAWELSKI:

4  Q.   Good morning, Ms. VanLuvender.  I am Terri Pawelski.  I

5  have a few questions for you.  You said that Black or Thurman

6  Stanley brought you cigarettes to smoke when you needed them?

7  A.   Uh-huh.

8  Q.   Did you and Heather smoke a lot?

9  A.   I mean, when we can get them we smoked.

10 Q.   Okay.  And the section in the hotel that you were in, do

11 you know whether that was the smoking section of the hotel?

12 A.   We made it a smoking section.

13 Q.   Okay.  But do you know whether it was actually designated

14 as the smoking section?

15 A.   I don't know.  I know it was the area where the pool is,

16 like, when you come -- like, if I was going to go out by the

17 door to the left of me, the pool is on the -- the left side.

18 Like, if I was going to go out that one door to the left, the

19 pool is out there.  So --

20 Q.   Okay.  So it --

21 A.   Pool is, like, right around to the left.

22 Q.   Okay.  So it may have been the smoking designated section,

23 but you just don't know --

24 A.   I think it may have been.

25 Q.   Okay.  And you first spoke to -- do you remember who the

88

1  agents were that you spoke to in this case, agent, federal

2  agents?  Do you remember a Christopher Shelly sitting there?

3  A.    Uh-huh.

4  Q.    Yes?

5  A.    Uh-huh.

6  Q.    And at the time you were in the Monroe County correctional

7  facility?  Do you recall that?

8  A.    Uh-huh.

9  Q.    Do you recall what year that was?

10  A.    2014 maybe.

11  Q.    Okay.  And you had -- is that when you had been violated

12  for -- you had a parole violation for possessing over 600 bags

13  of heroin?

14  A.    Probably.

15  Q.    Okay.  And you told Shelly that you wanted to cooperate in

16  return for some sort of judicial consideration, correct?

17  A.    Uh-huh.

18  Q.    Yes.  And you've been very upfront with Shelly about the

19  amount of drugs and other things that you have either used or

20  purchased, correct?

21  A.    What do you mean?

22  Q.    You told the agents that you -- you told Shelly in

23  particular there were times you bought over two bricks of

24  heroin and two grams of coke?

25  A.    Yeah, I mean if I said it, then that was what -- what it

1  was.  If that's what I said, I've always been very forthright

2  and honest.

3  Q.   About the drugs?

4  A.   Absolutely.

5  Q.   Right.  Okay.  And the feds have not brought any drug

6  charges against you, correct?

7  A.   Not to my knowledge.

8  Q.   Okay.

9          MS. PAWELSKI:  One moment.  That's all of the

10  questions that I have for you.

11          THE COURT:  Any redirect?

12          MR. CAMONI:  Briefly, Your Honor.

13  REDIRECT EXAMINATION

14  BY MR. CAMONI:

15  Q.   Ms. VanLuvender, did Shelly charge you in the state with

16  possession with intent to distribute?

17  A.   Yes.

18          MR. CAMONI:  Nothing further, Your Honor.

19          THE COURT:  All right.  You may step down.  Thank

20  you.  Next witness.  This will be a good time to break for

21  lunch.  So we will break for lunch.  It's five minutes of 12.

22  If you can be back at quarter after one, an hour and 20 minutes

23  to -- we have some other matters we need to cover in between.

24  No conversation or discussion among yourselves or with anyone

25  else.  Don't form any opinions.  You have not heard all of the

1  evidence and the law that's related to the case.  Don't read or

2  listen to anything about the case.  No research of any kind

3  concerning anything related to the case.  If anyone were to try

4  to talk to you about the case, you must advise us of that

5  immediately.  All right.  We will see you after lunch, thanks.

6          THE COURT:  Welcome back.  Ms. Roberts?

7          MS. ROBERTS:  Thank you, Your Honor.  The government

8  is going to call Heather D'Auria.

9          HEATHER D'AURIA, called as a witness, being duly

10  sworn, testified as follows:

11          THE COURT:  Ms. D'Auria, pull that microphone down to

12  you.

13          THE WITNESS:  Sure.

14  DIRECT EXAMINATION

15  BY MS. ROBERTS:

16  Q.   Good afternoon, ma'am.

17  A.   Good afternoon.

18  Q.   Can you tell the jury how old you are today?

19  A.   37.

20  Q.   How far did you go in school?

21  A.   Graduated high school.

22  Q.   Did you get any further education after high school?

23  A.   I took my C. N. A.

24  Q.   Can you tell the jury whether or not you have a problem

25  with drug addiction?

91

1  A.    I do.

2  Q.    And how long have you had a problem with addiction?

3  A.    I started smoking marijuana at 14, and it just kind of

4  went on from there.

5  Q.    What other drugs have you tried?

6  A.    Cocaine and heroin.

7  Q.    How old approximately were you when you started using

8  cocaine?

9  A.    21.

10 Q.    What about heroin?

11 A.    23.

12 Q.    Have you struggled with heroin use since the age of 23?

13 A.    Yes.

14 Q.    Has your drug addiction caused you to get in trouble with

15 the law?

16 A.    Absolutely.

17 Q.    In 2014, were you convicted of providing false information

18 in New Jersey?

19 A.    Yes.

20 Q.    You said you have a problem with addiction.  Are you still

21 struggling with that problem today?

22 A.    Off and on, not as bad as I, was but, yeah, I do here and

23 there.

24 Q.    And you said not as bad as you -- in the past.  How bad

25 did it get?  At the height of your addiction, how bad was it?

1   A.   It was pretty bad.  I was using quite a bit of heroin to

2   the point the withdrawals were so bad that I was vomiting blood

3   and -- when I was arrested and go to jail, and I was -- I

4   thought I was going to die in the jail.  It was that bad.

5   Q.   When you thought you were going to die was it because of

6   the withdrawal symptoms?

7   A.   Yes.

8   Q.   Other than vomiting blood, what did they include?

9   A.   The chills, restless, unable to sleep, anxiety, body

10  aches.

11  Q.   Do you know an individual named Thurman Stanley?

12  A.   Yes.

13  Q.   How did you meet Thurman Stanley?

14  A.   I met him through a friend of mine.

15  Q.   And did you call Thurman any particular name?

16  A.   Black.

17  Q.   Okay.  And so when did you meet Black?

18  A.   When I was staying with a friend of mine on Second Street.

19  Q.   Second Street.  What town was that located?

20  A.   Stroudsburg.

21  Q.   What was that friend's name?

22  A.   Jerome.

23  Q.   And when you first met Black, did you two become friends?

24  A.   Not right away.

25  Q.   Okay.  Can you explain to the jury how it was that you two

93

1  eventually ended up in some type of relationship?

2  A.   He had approached me about working to see men for money in

3  exchange for sex and --

4  Q.   Was that in 2014 when you first met him?

5  A.   Yes.

6  Q.   At first did you want to do it?

7  A.   No.

8  Q.   Okay.  Did you tell him that?

9  A.   Yes.

10 Q.   Okay.  And then what happened?

11 A.   It just got to a point where I just didn't want to stay

12 where I was at, and I was uncomfortable.  And I just felt like

13 it was the better option out of the two evils, so it was --

14 made more sense to do that and have my own money and be taken

15 care of and, you know, live kind of a little bit better than I

16 was so --

17 Q.   You said at that time you were living in Stroudsburg with

18 Jerome?

19 A.   Yes.

20 Q.   Can you tell the jury how you were living?  What was the

21 situation like where you were?

22 A.   It was crazy.  We were using.  I remember there was a

23 sewage problem.  It was -- the smell was bad, so it was just --

24 it was, like, horrible.

25 Q.   So when you decided to get out of that situation, were you

94

1  using drugs?

2  A.    Yes.

3  Q.    And did Black know that you were using drugs?

4  A.    Yes.

5  Q.    So did you yourself reach out to black?

6  A.    Yes, well, I had made Jerome call him.

7  Q.    And what was that purpose of calling him?

8  A.    For work.  He didn't want to, but I -- you know, kind of,

9  like, I need you to call him, like, I'm going to find a way

10 either way, so --

11 Q.    Was that because you wanted to get out of the situation

12 you were in?

13 A.    That and so that, you know, I was able to get drugs, you

14 know, I know Black had the drugs and --

15 Q.    Okay.  Would it help your addiction to actually get those

16 drugs?

17 A.    Yes.

18 Q.    So when you agreed to work with Black, how did you think

19 it was going to be?

20 A.    I kind of -- you thought he was going to okay tear of me,

21 you know.  I shouldn't want or anything for anything.  He made

22 it seem like -- you know, it started off as supposed to be,

23 like, a business relationship type of thing, and -- but, you

24 know, I was supposed to be taken care of, and it just wasn't

25 like that at all.

Q.    When you say taken care of, do you mean you were supposed to be given food?

A.    Food, drugs, a place to stay.

Q.    Clothing?

A.    Clothing.

Q.    So based upon that and what Black was telling you, did you agree to work for him as a prostitute?

A.    Yes.

Q.    When did you realize that that wasn't how working for Black was going to be?

A.    It started off that way.  He made it look pretty good I guess.

Q.    What did he do for you?

A.    At first he was around all the time.  He spent a lot of time with me.  He, you know, made sure I had what I needed, if I needed something to eat, he would check on me.  And everything was okay.  And then all of a sudden it gradually got to the point he was gone for however long at a time, and I was without food and everything, like, it was just -- yeah.

Q.    So while you were working for him even in the beginning, were you able to keep any of the money from the men?

A.    No.

Q.    Who did you give that money to?

A.    I gave it to Black.

Q.    And in exchange for you working, what did he provide you?

96

1  A.   Drugs, food.

2  Q.   At that time what drugs were you using?

3  A.   Heroin, cocaine, crack.

4  Q.   If you can remember at that time when you first started

5  working for Black, what was your heroin addiction?  How much?

6  A.   It was about three bags a day.

7  Q.   Three?

8  A.   Yes.

9  Q.   And at some point did that three-bag-a-day habit increase?

10 A.   Yes.

11 Q.   Okay.  Was that while you were with black?

12 A.   Yes.

13 Q.   So how much drugs would Black provide you on a daily

14 basis?

15 A.   I think I got up to about 30 bags a day.

16 Q.   Is that how many he would provide to you then?

17 A.   For the most part.

18 Q.   If he did not provide that, would you get sick?

19 A.   Yes.

20 Q.   Where were you when you were working for Black?

21 A.   In different hotels in the Monroe County area.

22 Q.   Was there any particular hotel that you spent more time

23 at?

24 A.   The Howard Johnson.

25 Q.   And is that located in Bartonsville?

97

1    A.    Yes.

2    Q.    While you were at the Howard Johnson, did you see any

3    other girls working for Black?

4    A.    Not that I know of.  I had two friends of mine that I know

5    who were -- there was other girls I believe that were working,

6    but I don't know if they worked for him or not.

7    Q.    Okay.  Did you think at any time that you and Black were

8    in some type of relationship?

9    A.    Yes.

10   Q.    What type of relationship was that?

11   A.    He made me think that I was his girlfriend and, you know,

12   there wasn't anybody else and it was just me and him and --

13   Q.    How did he make you think that?  What did he do to make

14   you believe that?

15   A.    Oh, I mean other than telling me that, you know, first he

16   was spending a lot of time with me.  And so I really thought he

17   actually cared about me, and turns out like I start hearing

18   other things and find out about other girlfriends and --

19   Q.    Was it true you were his girlfriend?

20   A.    No.

21   Q.    Was he ever physically violent with you while you were at

22   the Howard Johnson?

23   A.    Yes.

24   Q.    Did you receive any injuries from any of those times when

25   he was physically violent with you?

1  A.    Yes, he had hit me one time in the face.  He thought I had

2  stole a bundle of heroin from him, and I --

3  Q.    What's a bundle of heroin?  I'm sorry to interrupt you.

4  A.    Ten bags.

5  Q.    So what did he do?

6  A.    He hit -- punched me in my face.  I am missing teeth from

7  hitting me, so --

8  Q.    Did he knock your teeth out?

9  A.    It was, like, it cracked, so eventually, like, a couple --

10 probably a week or so later it came out.

11 Q.    Are you still missing that same tooth?

12 A.    Yes.

13 Q.    From that contact with Black?

14 A.    Yes.

15 Q.    Did you know any of the employees at the Howard Johnson?

16 A.    Not really, just -- I mean, I really stayed mostly in the

17 room.

18 Q.    Did you ever see any -- did you ever see Black talk with

19 any of the employees from the Howard Johnson?

20 A.    Like, once or twice, but I mean, I didn't really stick

21 around to find out or know what they were talking about.  I

22 just --

23 Q.    Why would you stay in the room a lot?

24 A.    Probably because I was getting high, and I just didn't

25 want to be seen and --

1  Q.    Were other people getting high with you in the rooms?

2  A.    Occasionally.

3  Q.    Do you remember any of their names?

4  A.    Rachel and Christy.

5  Q.    You had testified that you thought he was going to take

6  care of you including providing you food.  At any time did that

7  not happen where he would -- where he stopped providing you

8  actual food?

9  A.    Yes.  I had been without -- I don't know -- I probably

10 hadn't eaten for a day or so, and, you know, when I was getting

11 high, I didn't eat all the time anyhow, but I had contacted

12 him, and he was, like, oh, I'll be back in a little while, and

13 I'm, like -- I don't know.  And then he didn't come back for,

14 like, probably a whole another day, and I was without money or

15 food and --

16 Q.    Approximately -- you said you were working for Black.  How

17 much money did you make approximately a day for black?

18 A.    It was about anywhere from 500 to a thousand dollars a

19 day.

20 Q.    Was that from men coming to your hotel room?

21 A.    Them coming there or me going to them.

22 Q.    You testified that you had also stayed in other hotels in

23 -- I believe you said Monroe County?

24 A.    Yes.

25 Q.    What other hotels did you go to if you can remember?

1  A.    I was at the Quality Inn.

2  Q.    The Quality Inn the one that is now the Pocono Plaza?

3  A.    Yes.  I was at the -- it was the Budget, which is -- I

4  guess now the Quality Inn?

5  Q.    What was the Budget at the time?

6  A.    Yes.  The comfort Inn, which is now I guess the Baymont.

7  They change everything around.

8  Q.    So when you stayed at the Budget Inn, who did you stay

9  with if you can remember?

10  A.    I was with Black.

11  Q.    And while you were at the Budget Inn, did you ever get in

12  trouble for prostitution or drugs?

13  A.    There was a time that I was kicked out of there.  He had

14  been smoking marijuana in the room, and I guess, you know --

15  Q.    You say he, who --

16  A.    Black.  They kicked us out.  There was times they didn't

17  want me there.  They was, like, she can't stay here, do not

18  rent her a room.

19  Q.    That was at the Budget Inn?

20  A.    Yes.

21  Q.    When you say Black was smoking marijuana, does marijuana

22  have any type of distinct odor you can smell?

23  A.    It's very strong, and it lingers.

24  Q.    If someone were to be standing outside the hotel room at

25  the Budget room?

1  A.   Absolutely you can probably smell it down the hallway.

2  Q.   You mentioned at the Comfort Inn as well, which is now the

3  --

4  A.   Baymont.

5  Q.   Sorry, Baymont.  When you're at the Comfort Inn, did you

6  get in trouble there or ever get kicked out?

7  A.   Yeah, we were -- we had to leave.  A friend of mine

8  Christy was with me, and we were told we had to leave?

9  Q.   Do you know Christy's last name?

10  A.   VanLuvender.

11  Q.   You were with Christy at the Comfort Inn.  What happened?

12  A.   I guess they suspected prostitution going on because there

13  wasn't going on at the time and hadn't been since we got there.

14  But they suspected it and kicked us out.  We were only there a

15  couple hours.

16         MR. DeSTEFANO:  I object and move to strike on the

17  basis of speculation.

18         THE COURT:  That's overruled.  We heard that from a

19  prior witness as well.  Overruled.

20  BY MS. ROBERTS:

21  Q.   When you stayed at the Howard Johnson hotel, did you ever

22  get kicked out for your prostitution activities?

23  A.   No.

24  Q.   Did you ever smoke marijuana in the room?

25  A.   No.

102

1  Q.   Did Black ever smoke marijuana in that room?

2  A.   Yes.

3  Q.   Did he ever get kicked out that you're aware of for

4  smoking marijuana at the Howard Johnson?

5  A.   No.

6  Q.   You said you also stayed at the Quality Inn?

7  A.   Yes.

8  Q.   Which is now known as Pocono Plaza?

9  A.   Yes.

10 Q.   Did you ever get kicked out of there when you were with

11 black?

12 A.   No.

13          MS. ROBERTS:  Your Honor, I don't have any further

14 questions for this witness.

15          THE COURT:  Mr. Brown?

16          MR. BROWN:  Thank you, Your Honor.

17 CROSS EXAMINATION

18 BY MR. BROWN:

19 Q.   Good afternoon, Ms. D'Auria.  My name is Bernie Brown.  I

20 have a couple questions.

21 A.   Okay.  Good afternoon.

22 Q.   Do you agree that you were a drug addict?

23 A.   Yes.

24 Q.   Especially when you were prostituting?

25 A.   Yes.

103

1  Q.   Do you agree a drug addict will do anything to get their

2  drug of choice?

3  A.   Yeah pretty much.

4  Q.   They would lie?

5  A.   I mean they would.  I don't particularly do that, but I

6  mean there are people that do.  I know many of them.

7  Q.   Would they steal?

8  A.   Absolutely.

9  Q.   And is it true that the first time you met Thurman Stanley

10  was in May of 2014?

11  A.   Yes.

12  Q.   Okay.  And is it true that when he tried to recruit you,

13  you ignored him?

14  A.   Yes.

15  Q.   And is that because you were working for somebody else as

16  an escort at that time?

17  A.   No.

18  Q.   Okay.  Do you recall testifying at a previous trial?

19  A.   Yes.

20  Q.   Do you remember being asked a question of whether or not

21  you were working for a man named G. in May 2014?

22  A.   Yes, but they weren't, like, right at the same time.

23  Q.   Okay.

24  A.   They were --

25  Q.   Was --

104

1  A.   I was not with G. at the time when Thurman had approached

2  me.

3  Q.   I guess that's my point is that before Thurman approached

4  you, you were working for G. as an escort, correct?

5  A.   Yes.

6  Q.   So you were already an escort before Thurman Stanley took

7  you as his prostitute?

8  A.   Yes, I had.

9  Q.   And that was seeing men for money, correct?

10  A.   Correct.

11  Q.   And the reason why you went to Mr. Stanley because you

12  were living in squalor.  Do you remember saying that?

13  A.   Yes.

14  Q.   You contacted Thurman Stanley so you can make money as a

15  prostitute?

16  A.   Correct.

17  Q.   Is it true you met Thurman Stanley, had a conversation

18  with him before deciding to prostitute for him?

19  A.   Yes.

20  Q.   And it was after meeting you made a decision to work for

21  him?

22  A.   Correct.

23  Q.   And is it true that you testified previously that no one

24  forced you to go with Mr. Stanley?

25  A.   No.

1  Q.   That's not true?

2  A.   Nobody forced me.

3  Q.   And is it true that your arrangement with Mr. Stanley he

4  would give you drugs, correct?

5  A.   Correct.

6  Q.   Clothes, correct?

7  A.   Yeah.

8  Q.   Food?

9  A.   Uh-huh.

10  Q.   He would pay for the ads, correct?

11  A.   Yes.

12  Q.   He would also let you -- he would also pay for the

13  manicures or hair?

14  A.   Yes.

15  Q.   And did you try stealing from Mr. Stanley?

16  A.   I had come across a bundle of heroin in the hotel room,

17  and it was kind of, like, up on, like, the ledge of the door.

18  So I had seen it, and I was going into withdrawal.  I had taken

19  it, and he accused me of stealing.  I argued with him the fact

20  I don't feel like it was stealing because I paid for it.

21  Q.   And is that when one of the issues that you talked to Ms.

22  Roberts about one of the fights?

23  A.   Correct.

24  Q.   Also did you try to keep tip money from him?

25  A.   I think, like, once or twice, yes, I tried to keep tip

106

1  money for food.

2  Q.   Okay.  And did that also cause a fight and issue with him?

3  A.   Yes.

4  Q.   You said the other hotels that you worked in the area, the

5  Hampton Inn, right?

6  A.   Yes.

7  Q.   Howard Johnson?

8  A.   Uh-huh.

9  Q.   Quality Inn?

10  A.   Yes.

11  Q.   Holiday Inn, correct?

12  A.   No.

13  Q.   Lake Harmony?

14  A.   Maybe I was, yes.

15  Q.   Lake Harmony and the Budget Inn?

16  A.   Uh-huh.

17  Q.   To your knowledge, are any of those hotels or managers

18  indicted?

19  A.   Not that I know of.

20  Q.   Okay.  And is it true that Mr. Stanley would rent rooms in

21  other people's names?

22  A.   Yes.

23  Q.   Okay.  And he would do that to avoid detection so that

24  nobody would call the cops on him, correct?

25  A.   Yes.

1  Q.    Is it true Mr. Stanley paid for the rooms you stayed in?

2  A.    Yes.

3  Q.    Do you know if Mr. Stanley always asked for the smoking

4  room?

5  A.    Usually if they were available, yes.

6  Q.    And is it true you didn't know any arrangements as far as

7  payments and moneys he had regarding Mr. Stanley's operation?

8  A.    No, not usually.  I mean, I paid for a room, I think, once

9  or twice, but he gave me the money to do so.

10  Q.    So he would give you money so you could pay for the room?

11  A.    Right.  I think it was only one or two times I even had

12  done so.

13  Q.    And you had talked about on direct examination that he

14  would leave you in the hotel for long periods of time, correct?

15  A.    Yes.

16  Q.    Did you ever try to leave?

17  A.    I had left a couple times.

18  Q.    Couple, how many?

19  A.    I don't know probably, like, three times I think I had

20  left for at least a period of time.  Sometimes I would leave

21  for a few hours and come back, but I mean, several times I left

22  for a week or so, and two weeks I think at one point I hadn't

23  talked to him or spoke to him.

24  Q.    And --

25  A.    That was because he left me in the room for -- until the

1  next day, and I had nothing, no food or anything, and I was

2  just fed up.

3  Q.    Okay.  Then when you didn't have anything else, you made a

4  decision to contact him?

5  A.    Yes.

6  Q.    Do you recall a time when you were asked to leave the

7  Howard Johnson because Pennsylvania State Police were going to

8  stay there during the Eric Frein thing?

9  A.    That was during the Eric Frein thing that was going on.

10  We were informed they were going to be there and --

11  Q.    And basically set up their operations in that hotel,

12  correct?

13  A.    Correct.  But they were pretty much in every hotel at that

14  time.

15  Q.    Right.  You agree that Mr. Stanley lied to you, correct?

16  A.    Yes.

17  Q.    He made you think that you guys had a relationship,

18  correct?

19  A.    Uh-huh.

20  Q.    He made you think you guys were close, correct?

21  A.    Yes.

22  Q.    Do you think he did the same thing with other people?

23  A.    Absolutely.

24  Q.    How about Mr. Bhimani?  Do you know about Mr. Stanley's

25  relationship with --

109

1  A.     Who?

2  Q.     Mr. Bhimani, my client.

3  A.     No, I do not.

4          MR. BROWN:  Fair enough.  Thank you.  No other

5  questions.

6          THE COURT:  Mr. DeStefano.

7  CROSS EXAMINATION

8  BY MR. DeSTEFANO:

9  Q.     Can you pinpoint when you left Mr. Stanley for good?

10  A.     Well, October sometime I had left and --

11  Q.     Just October is no good without a year.

12  A.     I want to say it was the second week in October.  I

13  remember his birthday at the end, so I left for about two

14  weeks.  I was pretty much done, and then I contacted him right

15  before I went to jail.

16  Q.     Okay.  Was it the same October than the prior May date you

17  met Mr. Stanley?

18  A.     Yeah, it was in 2014.

19  Q.     Okay.  So you left him -- started with him sometime in

20  May, and you left in October for good?

21  A.     I mean, I think I went to jail in November.  I mean, I

22  still contacted him prior to me going to jail so -- oh, God, I

23  think I went in on November 3rd, I believe.

24  Q.     And then prior to that you left him intermittently?

25  A.     Yes, there was periods of time where I had, like I said,

1   left maybe a week or so or here and there and --

2   Q.   Did he try to track you down during any of these periods?

3   A.   No.

4   Q.   Did he ever call you and say, please come back?

5   A.   No, he never asked me to come back.  Like, I mean, he

6   messaged me, like, I miss you or whatever, but it wasn't to

7   come back or --

8   Q.   Okay.  Was there any retaliation whatsoever by Mr. Stanley

9   when you left?

10  A.   No.

11  Q.   Did he ever threaten you?

12  A.   No.

13  Q.   All right.  Thank you.  That's all I have.

14           THE COURT:  Redirect?

15           MS. ROBERTS:  Nothing, Your Honor.

16           THE COURT:  All right.  You may step down.  Your next

17  witness.

18           MR. CAMONI:  The government calls Anastasia Byler.

19           ANASTASIA BYLER, called as a witness, being duly

20  sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. CAMONI:

23  Q.   Good afternoon, Ms. Byler.

24  A.   Hi.  Sorry.

25  Q.   Can you please tell the jury why you're here today?

1  A.    To testify.

2  Q.    Were you subpoenaed?

3  A.    Yes.

4  Q.    Were you threatened to charges if you refused to testify?

5  Did anybody say you were going to be charged with a crime you

6  didn't?

7  A.    I mean, the subpoena said I had to be here, yes, so --

8  Q.    Other than that, are you -- is this part of a plea

9  agreement or anything?

10  A.    No.

11  Q.    So is there any kind of deal between you and the

12  government for your testimony?

13  A.    No.

14  Q.    Just the subpoena?

15  A.    Yes.

16  Q.    Are you a paid informant for the government?

17  A.    No.

18  Q.    Have you ever been?

19  A.    Yes.

20  Q.    So in that capacity what did you do?

21  A.    It was a couple years ago --

22  Q.    Did it involve drug buys?

23  A.    Yes.

24  Q.    Did that have anything to do with this case?

25  A.    No.

1  Q.    And that was for the F.B.I., correct?

2  A.    Yes.

3  Q.    All right.  How did your involvement with this

4  investigation start?

5  A.    I'm sorry.  Can I just --

6  Q.    Take your time.

7  A.    It was about two years ago, I think, around two years ago.

8  Q.    What happened?  What was the first thing that happened?

9  A.    F.B.I. showed up at my apartment when I lived in

10  Wilkes-Barre.

11  Q.    Did you know they were coming?

12  A.    No, I wasn't there.

13  Q.    Okay.

14  A.    I wasn't home at the time.

15  Q.    Could this have been around November of 2017?

16  A.    Yes.

17  Q.    And what happened when they showed up?

18  A.    My neighbor contacted my landlord, and they basically told

19  me they were there.  So I contacted the F.B.I. myself to ask

20  what it was about and later on met with Bill.

21  Q.    That same day?

22  A.    Yes, I met him with his partner in a vehicle that day just

23  to basically tell I wasn't in trouble or anything.

24  Q.    How long a meeting was that in the car?

25  A.    15 minutes, less than.

113

1   Q.   Okay.

2   A.   Just to say -- tell me what it was about.

3   Q.   Had you had any warning they were coming?

4   A.   No.

5   Q.   And then at that time in November of 2017 when they showed

6   up, had you given any thought to Fredrick Brown or the events

7   we are going to talk about before they showed up at your door?

8   A.   No.

9   Q.   In a while?

10  A.   Years.

11  Q.   Were you interviewed at greater length after that first

12  meeting?

13  A.   I was.

14  Q.   When was that?

15  A.   It was within the same week, and I was interviewed here.

16  Q.   Here meaning?

17  A.   In Scranton.

18  Q.   In this building?

19  A.   I think it was in this building.  It was in, like, a

20  holding room with a table.

21  Q.   That was by officers from the F.B.I.?

22  A.   Yes, Bill and some other people, too.  I don't remember

23  all of the -- everyone that was involved at that time.

24  Q.   Bill Patton?

25  A.   Yes, Bill Patton.

114

1  Q.    Did any of the information to your memory change between

2  that 15-minute meeting in the car and the next day or later

3  that week in the F.B.I. office?

4  A.    I hadn't thought about this for year.   I moved on with my

5  life.   I worked.   It wasn't something I thought about often.

6  When he mentioned what it was about, it was an interruption of

7  memories.   So within that time span, I started to unburying

8  basically all of my past all over again.

9  Q.    Okay.   So did the answers that you gave the first time you

10 talked about it change in later interviews?

11 A.    I would say, yes, with more information.

12 Q.    And have you testified previously about the same time

13 period and the same events?

14 A.    A year ago, yes.

15 Q.    Did you meet with anyone in preparation for that previous

16 trial?

17 A.    Like -- can you ask the question again?

18 Q.    Did you meet with anyone prior to giving that testimony to

19 prepare for that testimony?

20 A.    I went through trial prep, yes.

21 Q.    Who did you meet with?

22 A.    You, Jenny, Bill, Shelly.

23 Q.    So that's officers from the F.B.I. and attorneys from the

24 U. S. Attorney's Office?

25 A.    Uh-huh.

115

1  Q.    How many times did you meet with us?

2  A.    Trial prep I think it was twice, once here and once in

3  Harrisburg where I live.

4  Q.    Was that closer to the time of the trial?

5  A.    Yes.

6  Q.    When was that trial?

7  A.    March of last year.

8  Q.    March of 2019?

9  A.    2019.

10  Q.    And did you meet with anyone in preparation for your

11  testimony in this trial?

12  A.    I did.  I met with you and Jenny and Shelly.

13  Q.    How many times did you meet with us for this trial?

14  A.    Once.

15  Q.    So between that first meeting way back in the vehicle when

16  the F.B.I. showed up at your door and the conversations you had

17  up until today, has anything changed about what you remembered

18  or what you told the government?

19  A.    I don't think so, no.

20  Q.    From that very first meeting with the F.B.I.?

21  A.    Oh, yes.  After that initial -- after that initial

22  meeting, I kind of had -- it was, like, three years -- it was

23  four or five years before that that all those events happened,

24  so I just kind of had to sit down with myself and kind of,

25  like, relive it all over again.  So it was kind of a memory

116

1  lane where I had to basically, kind, of remember everything, so

2  I would say a lot more information and time stamps were more

3  accurate and through it and I wasn't in a room on the spot.

4  Q.    That trial you testified at previously, whose trial was

5  that, who was on trial?

6  A.    Fredrick Brown.

7  Q.    Did you know him by any other names?

8  A.    G.

9  Q.    Who was G. in relation to you when you knew him?

10 A.    My pimp.

11 Q.    Ms. Byler, you said you're here under subpoena, right?

12 A.    Yes.

13 Q.    You said that if you don't answer the subpoena by showing

14 up, you can face charges?

15 A.    Yes.

16 Q.    Is that your understanding of the subpoena?

17 A.    Yeah.  When you get a subpoena, you come, so --

18 Q.    Are you here because you really want to be here?  Do you

19 want to tell all of these strangers in a room these details of

20 your life?

21 A.    Not particularly, no.

22 Q.    Let's take our time.  I understand.

23 A.    Sorry.

24 Q.    You're fine.  You're fine.  How old are you today?

25 A.    I'm 26.

117

1  Q.    Where were you born?

2  A.    Russia.  Yekaterinburg, Russia.

3  Q.    Say again.

4  A.    Yekaterinburg, Russia.

5  Q.    Laura is going to need that spelling.  How did you end up

6  in America?

7  A.    I was adopted when I was eight.

8  Q.    So let's move forward to the time period we're talking

9  about here.  In around 2011, where were you living?

10 A.    I was living in Henryville in a foster home.

11 Q.    Is that in Monroe County?

12 A.    Yes.

13 Q.    Were you in a foster home because the adoption didn't work

14 out?

15 A.    Yes, I had -- adoption was disrupted when I was 13 so --

16 Q.    At some point in 2011, did that foster home arrangement

17 change?

18 A.    Yes, I had run away when I was 17.

19 Q.    So you ran away in 2011?

20 A.    Uh-huh, yes, sorry.

21 Q.    So at the time when you ran away, where were you laying

22 your head at night?

23 A.    I was homeless for a couple months right after I ran away.

24 Q.    So where did you sleep, what kind of places?

25 A.    I would sleep in abandoned buildings and abandoned houses,

1  people's couches I didn't know.  Once it was in a McDonald's,

2  kind to figure out, anywhere.

3  Q.    Was that around the time you met Fredrick Brown or the

4  person you knew as G.?

5  A.    Yes, on Valentine's day.

6  Q.    Of that same year?

7  A.    Yes.

8  Q.    Was that still while you were 17?

9  A.    Yes.

10 Q.    Can you tell the jury how you met him?  Where were you?

11 A.    I met him at a Wawa, and he asked me if I needed a ride.

12 I said yes, and that's kind of how that relationship started.

13 Q.    So why were you at that Wawa?

14 A.    I was hungry.

15 Q.    Were you going to buy food?

16 A.    I was going to steal food.  I didn't --

17 Q.    You didn't have money to buy food?

18 A.    No.

19 Q.    And what did G. say to you if you remember?

20 A.    You recall he said he caught my attention by saying he

21 wished I was his Valentine's and then basically implied I was

22 stealing food and asked me if I needed a ride.

23 Q.    What did you say?

24 A.    I said I got to do what I got to do if I remember

25 correctly.

119

1  Q.   Did you go with him?

2  A.   I did.

3  Q.   And where did he take you?

4  A.   To his house or where he lived, like, above a laundromat

5  in Stroudsburg.

6  Q.   Stroudsburg?

7  A.   Yes.

8  Q.   At the time, what did he tell you his name was?

9  A.   G.  I never knew his name until later.

10 Q.   Let's bring up what was previously marked as Government's

11 Exhibit 27 and previously admitted as 27.  It will come up on

12 your screen.  Do you recognize this man?

13 A.   Yes.

14 Q.   Who is that?

15 A.   That's Fredrick Brown.

16 Q.   Is that G.?

17 A.   Yes.

18 Q.   Take it down.  So he takes you to his house in Stroudsburg

19 above a laundromat you said.  What happened next?

20 A.   He gave me marijuana, so I smoked with him.

21 Q.   Had you ever had marijuana before?

22 A.   No.

23 Q.   Okay.  So what happened after you smoked together?

24 A.   I was pretty out of it.  It was, like, really out of it.

25 I recall sex happening.

1  Q.    At that point in your life, had you had consensual sex

2  before?

3  A.    No.

4  Q.    Had you ever kissed a boy?

5  A.    No.

6  Q.    Did G. know anything about the circumstances that you were

7  living under?

8  A.    He did.

9  Q.    How did he know?

10 A.    I told him almost right away.

11 Q.    And did he make you any offers at that time?

12 A.    Not right away, no.

13 Q.    How long did it take?

14 A.    Maybe a couple days of hanging out.  It wasn't -- I don't

15 recall.  It wasn't right away.

16 Q.    After a couple of days, did he offer you something?

17 A.    Yeah.

18 Q.    What did he tell you?

19 A.    He offered to help me out and get me back on my feet.  He

20 said he saw something in me, he wanted me to be great, I guess,

21 and he knew a way to do it, but it would take -- I just had

22 listen to him and trust him and he would get me where I need to

23 be in life and I had dreams and goals, and he told me he can

24 get me there.

25 Q.    Did you tell you how that would work, what would you have

1  to do get there?

2  A.    Not necessarily.  It was more of listen to me and do as I

3  say, and I did.  I mean, he was feeding me at the time, and I

4  had a place over my head, and I had food, and it was probably

5  the safest I felt since I'd run away.

6  Q.    Did he tell you what kind of things you would get if you

7  listened to him and stuck with him?

8  A.    Yeah, he painted a life of luxury and, you know, security

9  and being able to, you know, have a future and a life and money

10  and, like I said, a roof over my head, food in my stomach, not

11  having to worry about anything and having to struggle.

12  Q.    What was your response to this offer?

13  A.    Of course, it was better than -- sounded like an ideal

14  arrangement.

15  Q.    Did you know what you would have to do at that point?

16  A.    No.

17  Q.    So how did it start?  What was the first thing that he

18  told you to do after he said you just have to listen to me?

19  A.    He had -- I was already somewhat aware of the drugs that

20  he was dealing, so there's many places that he would just drive

21  and stop.  And he stopped a trailer park where I had seen

22  before but I'd never been inside.  And he had asked me to go

23  inside with him and basically just left me with the man that

24  was there and told me to make him happy.  So I didn't know what

25  that meant.

122

1  Q.   Did you know who the person in that trailer was?

2  A.   No, one of his customers.

3  Q.   One of his drug customers?

4  A.   Yes.

5  Q.   Did G. tell you what to do?

6  A.   No.

7  Q.   He just left you?

8  A.   He just left me there.

9  Q.   How old were you at the time?

10  A.   I don't remember because I had just turned -- I just

11  turned 18 that following month, so I don't recall if it was --

12  Q.   You turned 18 in --

13  A.   March.

14  Q.   March of 2011.  So this was sometime around your 18th

15  birthday?

16  A.   Yes, but it was very close.  It was within a couple weeks

17  of meeting him.  I just --

18  Q.   A couple weeks of Valentine's day?

19  A.   Yes.

20  Q.   After G. left, what happened in the trailer?

21  A.   I had sex with him.

22  Q.   Did he give you money?

23  A.   No.

24  Q.   Did you see him give G. money?

25  A.   I don't recall.

123

1  Q.    So what happened after you had sex with him?

2  A.    He picked me up.

3  Q.    Who did?

4  A.    G.  Well, I actually just went outside, and he was there,

5  so --

6  Q.    So then did you stay with G. and work with him for a

7  while?

8  A.    I did.

9  Q.    After that first meeting, did you understand what it was

10  that G. wanted you to do?

11  A.    I did.  I didn't think it was -- I thought it was more

12  sporadic, and when the time arise, I didn't know it was a whole

13  job.

14  Q.    So you understood that he wanted you to be a prostitute?

15  A.    I didn't understand the depth of that at the time, no.

16  Q.    Okay.

17  A.    I think once I was in the hotel I did.  It was not just

18  friends anymore.  It was complete strangers.

19  Q.    How did you feel when he walked out of that trailer and

20  you were there with his drug customer?

21  A.    I was terrified.

22  Q.    Did he tell you anything about the clock or the time when

23  he left?

24  A.    He explained to me that the time that I spent with these

25  people had to be timed and once I understood more of the

1  payments, I understood the time value of it.  So, you know, if

2  it was half an hour, an hour, two hours, it all had to be

3  timed, and if it wasn't then -- I don't know.

4  Q.   We will come back to that.  You're doing fine.  Did G.

5  give you any money that man in the trailer gave you that day?

6  A.   No.

7  Q.   And did you continue to stick with G. after that day?

8  A.   I did.

9  Q.   How long did you end up working with G.?

10  A.   Over two years.

11  Q.   So after that point as you progressed, did you end up

12  working as a prostitute for G.?

13  A.   I did.

14  Q.   Was that for the duration of those two years?

15  A.   Yes.

16  Q.   So where did you meet customers or clients?

17  A.   It was first house calls he would, you know, post on Back

18  Page.  He'd drop me off at the houses, and then after a couple

19  weeks, it turned into hotel stays.

20  Q.   And what states did you work in?

21  A.   P.A. obviously, New York, Virginia, Jersey.

22  Q.   And you mentioned hotels.  Did you stay in hotels in

23  various locations?

24  A.   I did.

25  Q.   So in Pennsylvania in particular, where in Pennsylvania

125

1  were you?

2  A.    I was -- where I was living or --

3  Q.    Where were you working with G.?

4  A.    In Bartonsville.

5  Q.    And was there a particular hotel?

6  A.    Howard Johnson.

7  Q.    Were there any other hotels in Pennsylvania that you

8  stayed in that you worked in?

9  A.    I stayed at -- what is -- the Quality Inn.  It's in -- I

10  don't remember -- that's what it's called, right, the Quality

11  Inn.  It's at the end of Main Street.

12  Q.    Is there a Perkins across the street?

13  A.    Yes, I stayed there a couple times but not as many as --

14  Q.    Did you stay with G. while you were working for G.?

15  A.    I did.

16  Q.    So in the -- that's in Monroe County, right?

17  A.    Yes.

18  Q.    So in the Monroe County area, were there any other hotels

19  besides the Howard Johnson and the Quality Inn?

20  A.    Not that I remember, no.

21  Q.    Okay.  How many times over the course of those two years

22  did you stay at the Howard Johnson with G.?

23  A.    I couldn't count, more than 20, more than 30 -- I couldn't

24  count on one --

25  Q.    Would you stay there for extended periods of time?

1  A.    Days, weeks sometimes.

2  Q.    Weeks?

3  A.    I usually would stay there on Thursday, Friday, Saturday

4  into Sunday, check out from Monday, Tuesday.

5  Q.    Where would you go on Monday and Tuesday?

6  A.    Usually sometimes allowed a break to go see friends, which

7  was rare, but -- or he would just -- we go somewhere else

8  sometimes.

9  Q.    Another state?

10  A.    Yeah.

11  Q.    When you were given a break, how did that work?  Were you

12  on your own?

13  A.    I wasn't allowed that very often, so it would be, like, a

14  day and he would drop me at my friend's house and let me, you

15  know, spend time with my friends and pick me up that night.  So

16  it wasn't even a full day.

17  Q.    He knew where you were?

18  A.    Yes, at all times.

19  Q.    So what was the arrangement when you worked with G.?  How

20  did it work between you?

21  A.    Once we got to the hotels, he started explaining more and

22  more about -- he called it the game.  So every day there was,

23  like, a new lesson how this worked.  But he basically explained

24  that 50 -- the financial split was 50/50 and 50 percent of my

25  -- a 50 percent of the 50, so 25 he kept for me for my future

1  and for -- so I didn't spend it and for -- he would tell me for

2  my house or my car and, like, just false dreams and -- yeah.

3  Q.    Let's unpack that a little bit before you keep going.  So

4  he told you originally that the 50/50 split, that applied to

5  the men paying you for sex?

6  A.    Yes.

7  Q.    He was going to take 50 percent; is that right?

8  A.    For himself, yes.

9  Q.    The other 50 percent was yours?

10 A.    Yes, but he kept 50 percent of that 50.

11 Q.    So half of your half he also kept?

12 A.    Yes.

13 Q.    Did he give you 25 percent of the money you made?

14 A.    Most of the time the 25 percent got spent on food,

15 condoms, hotel itself.  He would tell me if we stayed at a

16 different hotel that would come out.

17 Q.    So the expenses of the business came out of your 25

18 percent?

19 A.    Yes.  So I didn't really see much of the money if any.

20 Q.    Were there times he did give you some money?

21 A.    Not usually.  It would usually be -- I would say I need

22 clothes and he would buy them for me, so I didn't physically

23 have the money if you know what I mean.

24 Q.    If he bought you clothes, he took that out of your share?

25 A.    Yeah, uh-huh.

128

1  Q.   What about food?

2  A.   Same thing.

3  Q.   What about if you needed medication or toiletries?

4  A.   Everything came out.

5  Q.   Did you have to ask him even if you needed hygiene

6  products like tampons or something like that?

7  A.   Yes.  Most of time he wouldn't buy that stuff for me

8  because he said the hotel had it.

9  Q.   He said the hotel had it?

10  A.   Yes.

11  Q.   Is that what he said?

12  A.   Yeah, he wouldn't get me feminine products or anything

13  because the hotel has shampoo in those little bottles.  That's

14  not important, but --

15  Q.   I didn't know that.  He would tell you to ask the hotel

16  for it instead of buying it?

17  A.   Yes.

18  Q.   Were you familiar with something called a cash-in fee?

19  A.   For when you start working?

20  Q.   You tell me.  Is that a term you recognize?

21  A.   Basically it's, like, a hiring fee, so for him to be my

22  pimp, protector, he basically said that I had to balance so he

23  made up an amount.  I think it was 1,500 hundred or 2,000 and

24  until that's paid up I didn't see a penny for weeks.

25  Q.   So your 25 percent in the beginning was supposed to go to

1  a fee for having him as your pimp?

2  A.   Yes.

3  Q.   Now, did you ever handle the money that came in from the

4  customers?

5  A.   I did.

6  Q.   How did it work?

7  A.   When my clients would come in, that's the first thing I

8  would do before anything happened is take the money and put it

9  somewhere safe, and then text him, like, a K., which means I

10  have the money and I'm about to start.

11  Q.   When you say him, who did you text?

12  A.   G., and the time I would start from then.

13  Q.   Who kept the clock or the time?

14  A.   We both did.  He knew if he ran over time, and I kept a

15  clock because I didn't want to get in trouble.

16  Q.   So how did you know to take the money upfront?  How did

17  you know how to do that?

18  A.   He explained all that to me.

19  Q.   And what did you do with it after the client gave it to

20  you?

21  A.   I would usually put it in the middle drawer or under -- in

22  a drawer somewhere that if I had to excuse myself to the

23  bathroom or something I would hear it opening, something loud.

24  Q.   Was that prevent the john from stealing his money back?

25  A.   Yes.

1  Q.    Did G. give you any other instructions about how to deal

2  with the customer?  Did he tell you anything else?

3  A.    How to scream and ask if they are law enforcement and

4  safety precautions.

5  Q.    What did he tell you, what kind of things?

6  A.    Basically, like, how to talk without saying, you know,

7  things like money and things, like, pay for sex, so basically

8  like code words like roses for money or like short stay or

9  flowers or -- trying to think of -- there's so many code words.

10  I forgot a lot of them.

11  Q.    For example, flowers was code for what?

12  A.    Money.  Ten roses means, like, a hundred -- I mean, I

13  think -- sorry.  Two roses means 200.  Three roses means three

14  and four -- it's by hundreds usually.

15  Q.    And what would happen when you first started out with him

16  when you would take the money and the date what happened and

17  the date would leave?  What would G. do?

18  A.    He'd come in right away and take the money.

19  Q.    Why was that?

20  A.    It was never safe to have money in the room because in

21  case I got robbed or anything bad happened at least that person

22  only takes what they came with, there's nothing else to steal.

23  Q.    You mentioned Back Page.  Is that how you found customers?

24  A.    Yes.  I mean, he did it first.

25  Q.    He posted the ads on Back Page.  In the beginning or the

131

1  whole time?

2  A.   Towards the end I was doing my own Back Page ads.

3  Q.   Did he review them first or have to tell you how?

4  A.   Yes, he would usually word them and write them, and I

5  would just post and refresh them.

6  Q.   What kinds of things were in the ads you posted?

7  A.   Pictures and --

8  Q.   Pictures of you?

9  A.   Yes.

10 Q.   Okay.  What else besides the pictures?  Did you use your

11 real name?

12 A.   No.

13 Q.   What names did you use?

14 A.   I was called Pink and Sapphire.  I think I did Roxy -- he

15 changed it to Roxy one time.

16 Q.   Was there any one you went by most?

17 A.   Pink.

18 Q.   Who took the pictures of you?

19 A.   Fredrick did.

20 Q.   What were you wearing in these pictures?

21 A.   Lingerie.

22 Q.   Where did you get the lingerie?

23 A.   He provided it.

24 Q.   Did he give you various pieces or various things?

25 A.   There was usually a full suitcase of it, so he'd pick out

1    what he wanted to me wear.  There was corsets, skirts, heels,

2    stockings, all that stuff.

3    Q.    He kept it in a suitcase?

4    A.    Yes.

5    Q.    What else was in the ads besides the picture?

6    A.    Just an explanation of basically -- I remember just, like,

7    if you want to have a good time, relaxing, it always said I was

8    independent, which means that I was working alone as to not

9    scare clients away.  There was --

10   Q.    Was there any way to contact you in the ad?

11   A.    There was a phone number.

12   Q.    Okay.  So what phone number was it?

13   A.    I had a work -- Verizon prepaid phone.

14   Q.    Where did you get that?

15   A.    He provided it.

16   Q.    Who answered the phone when someone would call?

17   A.    I answered the phone talking wise.

18   Q.    Okay.

19   A.    Sometimes -- he would handle texts sometimes.  Once I knew

20   what I was doing, I handled all that stuff by myself.  He would

21   keep tabs on it and check.

22   Q.    How would he do that?

23   A.    Look over the phone every single day or if he saw me

24   texting he would ask who I'm texting and look through it.

25   Q.    Were there prices in the ads?

133

1   A.   No.

2   Q.   Do you remember how the pricing worked?

3   A.   A little bit.  It was usually, like, short stay, half

4   hour, full hour.  There was different -- there was, like,

5   different things on there, like, girlfriend experience and

6   different, like, fetishes and stuff.  So it was just saying

7   that I could basically do it all, and variety he would say.  I

8   don't know.

9   Q.   So for those different things -- we don't have to go into

10  detail.  But for those different things, was there a different

11  charge or an added charge?

12  A.   Yes.

13  Q.   Okay.  Was there -- who set those prices?

14  A.   He did.

15  Q.   Was there a time a customer didn't pay you what they were

16  supposed to pay you?

17  A.   Yes.

18  Q.   What happened?

19  A.   Usually he got aggressive and stuff so -- when I messed

20  up.

21  Q.   When you say he, you mean G.?

22  A.   Yes.

23  Q.   Can you describe for the jury what you mean by aggressive?

24  A.   He became very violent with me once.  Like, I missed my

25  first phone call because I had been working for days straight

134

1  and fell asleep and I didn't hear it.  I used to try to stay

2  awake as long as I could.  And anytime I messed that up -- or

3  one time I miscounted money, and there was, like, 20 short, and

4  it -- he accused me of stealing it.  And he'd get aggressive

5  and violent with me, and he had a gun that he loved to taunt

6  with me and scare me.  It was just a power -- it was a power

7  game for him all the time.

8  Q.   Were there rules to this game that G. told you about you

9  had to follow?

10 A.   Many, yes.

11 Q.   Such as?  Can you think of any examples?  Were you allowed

12 to date?  Did you have a boyfriend?

13 A.   No.

14 Q.   Why not?

15 A.   I was told that any sexual experience -- any sexual things

16 done -- like, he basically told me he owned me and that I

17 couldn't -- that's wasting -- basically if I went and had other

18 sexual relationships that I was using his products, like -- I

19 don't know how to say it.

20 Q.   Unless he was getting paid you weren't allowed?

21 A.   Yes.  Thank you.

22 Q.   What if you were in a hotel and saw another pimp?

23 A.   I was told to keep -- have no eye contact and keep my head

24 down.

25 Q.   Why is that?

135

1  A.   Apparently if you make contact with another pimp that

2  shows you are trying to leave that pimp to join another team.

3  There was different codes for -- he -- he was very passionate

4  about it.  So I didn't understand all of the rules, but I tried

5  to do as I was told.

6  Q.   When was the first time you went to the Howard Johnson in

7  Bartonsville?  Do you remember?

8  A.   It was within a couple weeks within the month of meeting

9  him I was already working out of a hotel.  That was the first

10 hotel I ever went to.

11 Q.   So within a month from meeting him in February of 2011,

12 you were working at the Howard Johnson?

13 A.   Yes.

14 Q.   By the time you got to the Howard Johnson, would you have

15 been 18 at that point?

16 A.   Yes.

17 Q.   Barely by a couple weeks?  Did you know anyone, or did you

18 come to know anyone over time that worked at the Howard Johnson

19 hotel?

20 A.   I became comfortable with the staff at the Howard Johnson.

21 Fredrick always said it was his home base.  He told me he knew

22 everybody and I was safe and that this is where he works, and

23 this is where he said we're safe from the police.

24 Q.   So you said you became comfortable with the staff.

25 Anybody in particular that you came to know?

1  A.   I became comfortable with the owner -- one of the owners

2  and some of the -- one of the guys that worked at the desk.  I

3  was there a lot.  So --

4  Q.   Do you remember any names in particular?

5  A.   Faizal.

6  Q.   Okay.  Do you see Faizal in the courtroom today?

7  A.   I do.

8  Q.   Can you describe what he's wearing for the jury, please,

9  and point him out?

10  A.   I can't see him.

11  Q.   Can you stand up?

12  A.   Sure.  Light blue top with navy blue suit.

13          THE COURT:  The record will reflect she identified

14  the defendant.  You can sit back down.

15  BY MR. CAMONI:

16  Q.   To your knowledge, at the time what was Faizal's role at

17  the hotel?

18  A.   Faizal -- I first thought he owned it.  He told me he was

19  the -- well, sorry.  Fredrick told me he was the owner.  So --

20  and he said he was cool and --

21  Q.   Did you get to know Faizal on your own as time went on?

22  A.   I did.

23  Q.   And what about the person at the front desk, do you know

24  that person's name?

25  A.   I never knew his name.  I know -- it's Nazim or something.

1  I don't remember his name.  But he had a nose ring and a bald

2  head, and he told me it was a cop from a different country.

3  Q.   You knew that person as Nazim?

4  A.   No -- I'm sorry.  I am getting mixed up.  I don't know his

5  -- Nazim is the other owner.  I get them all mixed up.

6  Q.   Did you know Nazim?

7  A.   Barely.  I knew who he was.  I didn't have much

8  interaction with him.

9  Q.   You saw him in the hotel?

10  A.   I did.

11  Q.   He see you?

12  A.   He did.

13  Q.   Do you see him in the courtroom today?

14  A.   I do.

15  Q.   Can you point him out to the jury and describe what he's

16  wearing?

17  A.   White button up shirt with yellow tie, I think, and white

18  mask.

19        THE COURT:  The record will reflect she identified

20  that defendant.

21  BY MR. CAMONI:

22  Q.   Did you know anyone else at the hotel besides the person

23  you described, a bald male at the front desk, Faizal and Nazim?

24  Do you know anyone else?

25  A.   I became friendly with the maid staff.  They were very

1  nice to me, and then I specifically -- I don't know his name,

2  but he did the garbage cans and -- I think he was a maintenance

3  man.  He would empty the soda machine and give me candy.  He

4  was really a nice guy.

5  Q.   Where -- when you were in the hotel, where in the hotel

6  did you stay with G.?

7  A.   I usually stayed in C. hall, which was in the back of the

8  hotel.

9  Q.   What floor is that on?

10 A.   First floor.

11 Q.   So did you ever see G. with Faizal?

12 A.   I did.

13 Q.   Where would you see G. with Faizal?

14 A.   They would talk a lot or walk outside, or they would go in

15 the bar sometimes and talk, or when we'd go to check in, they

16 would walk on the side to the left.  There's, like, a

17 restaurant on the left and then the office on the right, and it

18 goes out to the pool.  They would often go in there to talk

19 before, and I would just stand out front.  That's when I would

20 chitchat with the staff and the front desk people and stuff.

21 Q.   So when you would check in with G., you went into the

22 lobby to check in?

23 A.   Yes.

24 Q.   And you were with G. at the time?

25 A.   I was.

1  Q.    And what kind of things would you be wearing?

2  A.    I would wear very skimpy clothes.

3  Q.    All right.  So can you tell the jury a little bit about

4  the first time you met Faizal?  Actually first let's take it

5  the day or two before.  Did something happen around that time

6  if you remember?

7  A.    I was allowed to have a day with my friends.  I think I

8  was coming back -- we -- sorry.  I'm tongue tied.  I had time

9  with my friends, and one of my friends did my hair, and she

10 did, like -- like, extension -- braided extensions that were

11 down to my knees basically.  They were pink.  I don't know.  I

12 was having fun for a day.

13 Q.    I want to show you what's been previously marked as

14 Government's Exhibit No. 28.  It will come up on your screen.

15 What are we looking at here?

16 A.    That's me.

17 Q.    And are those the extensions you were describing?

18 A.    They are.

19 Q.    When was this picture taken?  I don't mean a date.

20 A.    Howard Johnson.  I was sitting on the bed taking a selfie

21 before.

22 Q.    About how long -- what was the time span between when you

23 took this picture and when you met Faizal for the first time?

24 A.    Probably within 15 minutes after I took that photo that I

25 actually had my first correspondence with him.

140

1  Q.   So 15 minutes after you took this photo was when you met

2  Faizal for the first time?

3  A.   Within that, yes.

4  Q.   Is this a fair and accurate depiction of the picture you

5  took in the Howard Johnson that day?  In other words, has it

6  been changed at all?

7  A.   Yes, that's the original picture.

8  Q.   All right.

9            MR. CAMONI:  Move to admit Government's Exhibit 28.

10           MR. BROWN:  No objection.

11           MS. PAWELSKI:  No objection.

12           THE COURT:  It's admitted.

13 BY MR. CAMONI:

14 Q.   Ms. Byler, can you describe what happened the first time

15 you met Faizal?

16 A.   He walked in, and he just looked at me.

17 Q.   Let's back up a minute.  Where were you?

18 A.   Sorry.  I was in my room.

19 Q.   In a room at the Howard Johnson?

20 A.   Yes.

21 Q.   Okay.  And when you say he walked in, was he alone?

22 A.   He was with G.

23 Q.   So Faizal and G. both came in?

24 A.   Yes.

25 Q.   What happened?

1  A.   He looked at me, and he just -- it was awkward.   He looked

2  at G., and he told him to call him when he had something

3  better.

4  Q.   That was something Faizal said?

5  A.   Yes.

6  Q.   And what did he do after he said that?

7  A.   He left.

8  Q.   What did G. do?

9  A.   G. went after him.

10  Q.   Outside of the hotel room?

11  A.   Yes.

12  Q.   Okay.

13  A.   Then he came back in, like, within a couple minutes.

14  Q.   What happened?

15  A.   He started freaking out because I didn't ask permission to

16  put those things in my hair and they were trashy and, like, I

17  looked ghetto.   And all this basically got really, like -- and

18  I remember very vividly getting snappy back saying I should be

19  able to do what I want in my free time and if it's to get hair

20  extensions it would be get hair extensions.   He didn't like

21  that answer, and he got physical.   And it was the first time he

22  put his hands on me like that, and he basically cut all of the

23  extensions out of my hair.

24  Q.   Where were you in the room when this happened?

25  A.   I was on the bed.

142

1  Q.    Where was he?

2  A.    He was standing over me.

3  Q.    Did he strike you?

4  A.    Yes.

5  Q.    Did he do anything else?

6  A.    He told me that the reason that he was angry I never asked

7  about the extensions because I was basically -- I was -- I

8  can't -- I was -- I was merchandise basically and I ruined his

9  merchandise.  That's what he said something along the lines of

10  that, and I didn't understand, but it was basically the

11  extensions made me look bad so I couldn't -- he basically said

12  he's losing money because I went and did this and now he lost

13  money.  He tore the extensions out, cut my hair and told me to

14  clean up, and he walked out.

15  Q.    Do you remember what he cut the extensions with?

16  A.    I don't.  It happened so fast I don't remember if it was a

17  knife or scissors.

18  Q.    What was the state of you and the room when he walked out?

19  A.    I was a mess.  I was crying, like, all red from the

20  physical altercation.  There was extensions everywhere.  My

21  hair was everywhere.  He cut some of my actual real hair with

22  the extensions.  So I was just -- I didn't know what happened.

23  I think I was in shock for a little bit.

24  Q.    So what happened next?

25  A.    Within, like, a short amount of time, he came -- he came

143

1  back -- he basically told me to get my life together, and he

2  left, and I was -- I didn't -- I just laid there, and I was

3  crying, and I was a mess.  My shirt was ripped.  I went and

4  changed my shirt.  He came back -- he came back and just opened

5  the door, and that's when Faizal came back in.

6  Q.    G. came back and opened the door?

7  A.    Yes.

8  Q.    Faizal came into the room?

9  A.    Yes.  I tried to, like, pick up the extensions.  I didn't

10  really make much effort to look like I had it together.

11  Q.    So were they extensions that had been cut out of your hair

12  or --

13  A.    I placed them somewhere and put them in a pile.

14  Q.    In the room?

15  A.    Yes.

16  Q.    And what happened next?

17  A.    I had intercourse with Faizal.

18  Q.    Did he pay you?

19  A.    He didn't.

20  Q.    Why didn't he pay you?

21  A.    G. told me don't worry about it.  He explained later to me

22  they had an arrangement and they were buddies and that he took

23  care of it.

24          MR. BROWN:  Objection to what he said.  Hearsay.

25          MR. CAMONI:  Your Honor, it's a coconspirator

144

1  statement during and in furtherance of the conspiracy.

2            THE COURT:  Is he going to testify?

3            MR. CAMONI:  I'm sorry, who is going to --

4            THE COURT:  Is he going to testify?

5            MR. CAMONI:  Fredrick Brown?  No.  It would fall

6  under the exception for hearsay for coconspirator statement

7  given during and in the course of and in furtherance of the

8  conspiracy.

9            THE COURT:  I will overrule the objection and allow

10 it on the basis and also for the fact it's not being offered

11 for the truth of the matter but what she did as a result of

12 that.

13 BY MR. CAMONI:

14 Q.   All right.  Ms. Byler, had you finished your answer?

15 A.   Yes.

16 Q.   Okay.  Did Faizal ever come to see you again while you

17 were working for G.?

18 A.   He did.

19 Q.   And did you have sex with him again?

20 A.   I did.

21 Q.   Did he ever give you cash while you were working for G.?

22 A.   Never.

23 Q.   Did you ever have any other employees of the Howard

24 Johnson hotel as clients while you were working for G.?

25 A.   I did.

1   Q.    Who?

2   A.    The police officer -- the cop that worked the front desk.

3   Q.    Why do you call him the cop?

4   A.    Because I genuinely don't remember his name.  I am not

5   good with names.  I've never been.  So when I -- I make up my

6   own name in my head for them, so I -- that's one thing he

7   always talked about being a cop from -- whatever country he's

8   from, and it just -- that's how I think of him as the cop

9   because we didn't --

10  Q.    That's the name you gave him in your mind?

11  A.    Yes.

12  Q.    This is the man you described earlier?

13  A.    Yes.

14  Q.    Can you repeat the description?

15  A.    He had a nose piercing, bald -- I thought he was Indian.

16  I am not sure if that was his race or not.

17  Q.    Okay.  How did it come about he became a client?

18  A.    He actually called on my work phone on Back Page, and once

19  I answered, he was, like, Pink, it's me and, like, who is you.

20  He'd say, I'm at the front desk, we were just talking.  And I

21  was, like, oh, okay.  He asked if I had any availability that

22  night, and I told him I did, and he asked if he can come see

23  me, but he asked me to keep it private and not to tell anybody

24  else working there.

25  Q.    Did he come to see you?

1  A.   He did.

2  Q.   Did you have sex?

3  A.   I did.

4  Q.   Where did that happen?

5  A.   In the room.

6  Q.   Did he pay you?

7  A.   He did.

8  Q.   Did you ever talk to him or see him while G. was with you?

9  A.   I never talked to him while G. was -- I didn't talk to

10 anybody while G. was with me.  I was kind of a mute.

11 Q.   When he was at the front desk, did you ever come in with

12 G.?

13 A.   I did.

14 Q.   How many times did you end up having sex with that man?

15 A.   Twice that I recall.

16 Q.   And did it happen in the room both times?

17 A.   No, it happened in the office behind the check -- the

18 check in counter.

19 Q.   In the lobby?

20 A.   Yes, it was in the middle of the night.

21 Q.   I am going to show you what's been previously admitted as

22 Government's Exhibit 6.  Do you recognize this?

23 A.   Yeah.

24 Q.   Is this that counter you were just talking about?

25 A.   Yeah, I spent a lot of time there in that area, space.

```
 1  Q.   The office you were talking about with the cop, is that
 2  behind this desk?  Is that what you meant?
 3  A.   Yes.
 4  Q.   Take it down.  Did you ever see G. talking with anyone
 5  else who worked at the hotel?
 6  A.   He talked to the other owner sometimes.
 7  Q.   Who was the other owner?
 8  A.   Like I said, I'm not -- I'm bad with names -- but Nazim.
 9  He's over there.
10  Q.   The person you identified earlier?
11  A.   Yeah.
12  Q.   And did you ever talk -- did there come a time you and
13  Faizal developed a conversational relationship?
14  A.   We did.  We became friends.
15  Q.   You liked Faizal, right?
16  A.   I did.
17  Q.   Did you talk to him about your situation?
18  A.   I did.
19  Q.   Did you talk to him about your life and the circumstances
20  that brought you to where you're at?
21  A.   I did.
22  Q.   Did you talk to him about G.?
23  A.   I did.
24  Q.   What kind of stuff did you tell him?
25  A.   He was one of the only people -- one of the few people I
```

1  could talk to about G.  I vented to him.  He would -- used to

2  open the pool for me late at night.  Sometimes Fredrick would

3  go to sell drugs, so I wasn't watched, and I could have a few

4  moments to kind of sneak out.  And I would often, like, call

5  Faizal or text Faizal and ask him, would you mind opening the

6  pool for me, and he would sit in there, and we would just talk.

7  I would tell him -- he would ask about marks on my body and

8  asked -- he asked all the time about, like, how did I get them

9  or what I did to get that one.  He was -- I have a very, like

10  -- my defense mechanism is making things funny, so I would

11  describe things that happened and then I would chuckle, and he

12  would chuckle with me.  And it's just the only way I know how

13  to handle stuff like that.  Often times we'd have long talks

14  and I tell him I missed a phone call or fell asleep or

15  miscounted or who knows, someone stole money from me once and

16  he -- he became a friend to me, a confident.

17      When you're in that environment to find the lesser of two

18  evils.  At that time he was a friend of mine, and I did tell

19  him just about everything that was going on with me and G., and

20  he would come up to me and say -- when he'd see me in the hall

21  or something, he would say, slow night, and I would tell him

22  that, you know, yeah, I didn't get much calls.  He asked me if

23  I was in trouble or not, and I say not yet.  We just had a

24  bantering relationship where I didn't have to hide from him.  I

25  can tell him anything.

149

1  Q.   You said he saw marks on you.  What kind of marks?

2  A.   Bruises.

3  Q.   And what kind of remarks would he say when he saw the

4  bruises?

5  A.   If he was walking the halls, I was, like, sitting on the

6  dryer, he'd walk by and say, that's a shiny one, what did you

7  do to get that one, and then, of course, I'd chuckle and tell

8  him what happened.

9  Q.   You mentioned a couple of things that happened meaning you

10 did something wrong, right.  You said you fell asleep or

11 miscounted?

12 A.   Sometimes it was from customers as well, so it wasn't

13 always from G.  I told him everything.

14 Q.   So when you told Faizal that this is what you did, did you

15 also tell him what G. did to cause the marks?

16 A.   I did.

17 Q.   What kinds of things did you tell him specifically?  I'm

18 sorry -- but specifically.

19 A.   There was one time where he had hit me on the arm with his

20 gun, and there was, like, a really big black mark, and he --

21 that's what -- he asked me, that's a shiny one, and I told him

22 -- I said -- I said, yeah, it was worse than with the fist.

23 And he asked me to elaborate, and I told him it was from a gun.

24 So he seemed actually a little startled at that time, but he

25 asked me if I was okay, if I needed anything.  And I would just

1  shrug it off basically.

2  Q.   Did you tell him about other incidents in detail of

3  violence?

4  A.   Yes.

5  Q.   From G.

6  A.   I did.

7  Q.   Did you tell him whether what you wanted to be doing what

8  you were doing?

9  A.   I did.

10  Q.   What did you tell him?

11  A.   I told him I was going to get out of this and it was

12  temporary until I got my citizenship until I got back on my

13  feet.  I didn't even have an I. D.  I couldn't get a job if I

14  wanted one, which I did.  I was trying to get back in school.

15  I would tell him everything I'm doing -- Fredrick took my

16  school laptop.  I was trying to graduate.  He took my laptop

17  and told me I wasn't worth anything.  I was trying to tell

18  Faizal that and that I'm better than this.

19  Q.   Did you tell him you didn't want to do prostitution

20  anymore?

21          THE COURT:  Let's take a break for a minute.  All

22  right.

23          MR. CAMONI:  Okay.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  Take your time.

1            THE WITNESS:  Faizal knew a lot about my personal

2    life I didn't let many people know, so I told him what I wanted

3    to be when I grew up and what, like, I aspired to be after all

4    this.  I did talk about that a lot and small my escape for a

5    moment to talk about being normal.

6    BY MR. CAMONI:

7    Q.   You said you didn't talk to the person you thought was the

8    cop when G. was around.  Did you talk to him when G. wasn't

9    around?

10   A.   I did.

11   Q.   Did you ever tell him what was going on?

12   A.   I didn't tell him as in depth, but I did tell him, and he

13   never really had much to say about it.  He would just listen to

14   me.  He never really, like -- never said much.  It was kind of,

15   like, oh, okay, and that's why I didn't talk to him as much

16   because he didn't seem to care.

17   Q.   Did you tell him about violence, physical abuse?

18   A.   I did.  When, you know, it's going into fears, I didn't

19   bother to keep venting to him.

20   Q.   So you vented to Faizal more because you thought he was

21   listening to you?

22   A.   I did.

23   Q.   Did you trust him?

24   A.   I did.

25   Q.   After you told him about these things, did he continue to

1  come to see you and have sex with you?

2  A.   He did.  It was, like, two separate people.  It was the

3  person I knew outside of the room was completely different than

4  the person inside.  It wasn't him.  It was -- the person out

5  there was my friend.  The person in that room was a job that I

6  had to do, so it wasn't -- it was weird.  It was, like, to this

7  day it's just, like -- I don't know.

8  Q.   Were there any other hotel employees who commented on

9  marks on your body or things they saw?

10  A.   The guy with the cart -- the guy -- I thought of him as a

11  maintenance man.  He would -- he asked me all the time, and

12  once he got me ice for my ankle because I had tripped during an

13  altercation.  It was swollen.  He got me ice and always giving

14  me candy bars and just -- he was just a sweet guy.

15  Q.   Anybody else talk to you about what was going on?

16  A.   I never got into depth.  I do recall a bartender.  I

17  wasn't 21, but I'd go in there for Shirley Temples when I had a

18  second, and the bartenders were really nice to me.  I didn't

19  really tell them though.  I didn't -- there was a woman with

20  very long, long black hair.  I don't know her name.  But she'd

21  work at the desk.  She would -- I never talked to her about

22  what was going on, but she would basically look at me and just

23  say, you know, be careful, and she would always tell me you

24  matter and to be safe.

25  Q.   She said even though you hadn't told her what was going

1  on?  When she said that, did it seem as if she knew?

2  A.   I'm very -- I read people really well, and she just -- I

3  can feel a heaviness about her she knew, and that's nothing I

4  can prove but --

5  Q.   Did you know a man during that time period named Thurman

6  Stanley?

7  A.   Yes.

8  Q.   Did you see him at the Howard Johnson?

9  A.   I did.

10 Q.   Did you see him often?

11 A.   I did.

12 Q.   What was he doing at the Howard Johnson?

13 A.   He was a pimp as well, and he had many different women on

14 his side all the time.

15 Q.   Did you ever get to know any of the women that worked for

16 him?

17 A.   A few of them in passing.

18 Q.   Okay.

19 A.   Some of them tried to recruit me so --

20 Q.   To work for Stanley?

21 A.   Yeah.

22 Q.   Did you ever see Thurman Stanley and G. together?

23 A.   I did.

24 Q.   Tell the jury about that.

25 A.   Well, the meantime was -- when I was trying to get away

154

1  from them, they busted into my room and beat the crap out of me

2  and took -- sorry -- I shouldn't have said that -- beat me up

3  and took all my money and stuff.

4  Q.   That was Thurman Stanley and G.?

5  A.   To teach me a lesson.

6  Q.   Where was that?

7  A.   At the Howard Johnson.

8  Q.   You said you were trying to get away?

9  A.   Yes.

10 Q.   How were you trying to get away?  What were you doing?

11 A.   I would tell him I was done, and it was, like, a game to

12 him.  We would let me go for a couple days and just a lot of

13 psychological mind games.  He would tell me where I can stay,

14 where I can't.  He told me the Howard Johnson was his

15 territory.  But the fact I didn't have I. D. or money or

16 anything, I didn't have many options.  I was just as homeless

17 as I was before I met G.  So I had spoken to Faizal, and he

18 said he was going to help me out.  So I was trying to do things

19 on my own to try to get a little bit of money to try to move

20 and get away from him or have -- I had nothing.

21 Q.   Do things on your own, do you mean prostitution?

22 A.   Yes.

23 Q.   What did you talk to Faizal about?  How was he helping you

24 out?

25 A.   He would help me get a room without paying for it, and

1   then he would let me get a couple calls and then pay the next

2   morning, or sometimes we agreed on trading.

3   Q.    For sex?

4   A.    Yes.

5   Q.    During that period, that was something you were doing on

6   your own, right?

7   A.    Yes.

8   Q.    What happened with G. and Thurman Stanley during that

9   time?

10  A.    They would pretend to be clients, and then they would bust

11  into my room and pretend -- like, I would be walking the halls,

12  and I see them, and they -- they -- constantly they wanted to

13  know they were there and no matter what I was being watched.

14  It was, like, a psychological game because I would go three

15  days by myself and try to get away from that whole area.  I was

16  sucked back in because I didn't -- I didn't have anywhere to

17  go.

18  Q.    After that time you said Stanley and Brown came into your

19  room and beat you?

20  A.    Yes.

21  Q.    Did they take anything from you?

22  A.    Everything.

23  Q.    Did Faizal contact you after that beating?

24  A.    He did.  He said there was a noise complaint and to tone

25  it down.

156

1  Q.   What did you say?  How did you respond to that?

2  A.   I was crying.

3  Q.   Did you tell him what happened?

4  A.   I did.

5  Q.   What did you tell him?

6  A.   I told him that I -- we called him Black.  I didn't call

7  him Stanley.  I said G. and Black busted in my room and they

8  took my money.  He basically told me to be more careful who I

9  let in the room and to tone it down.

10 Q.   Faizal said that?

11 A.   Yes.

12 Q.   Did he come into your room after that?  Did he come to see

13 you?

14 A.   I don't recall, no.  I don't remember.

15 Q.   Okay.  During this time did Faizal refer you to someone

16 else as a client?

17 A.   He did.

18 Q.   Do you remember who?

19 A.   Once again, I don't know his name, but he told me it was

20 his brother.  He had black hair.  He looked a lot like him, but

21 I met him -- he introduced me to him at the bar, and he made

22 arrangements for a date with me that night.

23 Q.   Did you have that date?

24 A.   I did.

25 Q.   And was that in the Howard Johnson?

1   A.    Yes.

2   Q.    Did that man pay you?

3   A.    He did.  He underpaid me, but he paid me, nonetheless.

4   Q.    Did Faizal ever tell you about other things going on at

5   the hotel at the Howard Johnson?

6   A.    He would.

7   Q.    So as you would talk to him, would he talk to you?

8   A.    Yes.

9   Q.    What kind of things did he tell you about?

10  A.    Faizal would, like, be an informant.  He would call me if

11  someone else was -- like, there was one time there was an

12  altercation with Black and one of his girls.  And he called me

13  to tell me the cops were there and lay low or weekends that I

14  wanted to go if he had a banquet or anything like that, he

15  would be, like, it's too hot, too many people here, you can't

16  come here this weekend.  Or if there was cops in the building

17  for other reasons, he would always give us the go.  Or I

18  remember one time there was cops eating wings at his restaurant

19  and told me to lay low.  So he would always kind of just tell

20  us when to stay out of the hallways, stay out of the front

21  room, stay out of the pool.

22  Q.    When you were staying at the Howard Johnson while you were

23  with G., how often did you meet with men?

24  A.    Every day.  Every day.

25  Q.    How many times a day?

1  A.    It could go from 10 to 20 to 30.  It was constant.

2  Q.    Would they come to your room?

3  A.    Yes.

4  Q.    Where would they enter the building?

5  A.    Through the C. door or the back door because they were

6  unlocked and didn't need a key to get in.

7  Q.    Can you just describe for the jury a typical day,

8  schedule?  How did it work?  When did it start?  When would

9  clients first come in?  What was the first time of day?

10 A.    There was busy times and slow times.  The schedule would

11 be in the morning you get your first hit, which was about

12 around 5 a.m. until about 8 a.m. I think and a lot of

13 businessmen before they would go to work or men that would

14 leave after, you know -- there was a morning rush, and then

15 there would be probably a couple hours -- two or three hours in

16 between lunch.  There was a lunch break hour.  So a lot of,

17 like, businessmen would come on their lunch breaks to see me

18 for, like, half an hour or quickly, and there was an evening

19 rush after dinnertime, and then there was a late night rush.

20 So there was busy times in the schedules.  There was busy days

21 and slow days, and you can kind of got adjusted to it and the

22 schedule.

23 Q.    When did you sleep?

24 A.    I rarely -- I would get a nap in, but I was -- I never

25 actually fully slept because of the fact that one missed phone

1 call was one missed opportunity for him to make money off me.

2 Q.   When you fell asleep and you didn't answer, what would

3 happen?

4 A.   It was -- it was a game.  It was -- it was psychology.  He

5 would just taunt me.  He would take a picture of me sleeping

6 and sit there while I slept just to like make a big loud noise

7 so I'd wake up and be scared and he was already there and I

8 didn't know it.  Sometimes we would laugh at me.  Other times

9 he got physical with me.  Other times he would take money out

10 of my 50 percent off that I got.  It was just -- it was

11 constant.  It was a constant back and forth psychological game.

12 There was days he was nice to me and say, oh, take a nap, and

13 then I would wake up to five missed calls, and I'd still get in

14 trouble.  It was -- it was so confusing.  It was a lot.

15 Q.   Was it -- how many days a week did this go?

16 A.   There was times -- he would say we would work three months

17 and I get a month off.  I never got the month off.

18 Q.   Seven days a week?

19 A.   Yeah.  Even when I wasn't in the hotel, he'd have an ad up

20 and I was posted for ads and out calls.

21 Q.   Did you like what you were doing?

22 A.   No.

23 Q.   Tell the jury how it made you feel.

24 A.   Disgusting.  I would shower after every client.  I would

25 sit in bath tubs for hours and scrub and scrub and scrub.  It

160

1  became -- it became such a clone thing where I had to learn how

2  to shut my emotions out of it and just not be physically or

3  mentally.  I got good at it.  It stopped affecting me as it

4  should have, which was really scary.

5  Q.   Did he tell you why he recruited you?

6  A.   He told me the day he saw me that he -- he knew he was

7  going to make me into something.  He told me I was like clay in

8  his hands, that he saw something and he was able to just make

9  it and form it to what he wanted.  He said I was going to be

10  great one day.  He said I would become a high -- like, high end

11  escort where I wouldn't have to do all this dirty stuff and the

12  stuff would end, and he just kept feeding me this dream.

13  Q.   I know this is hard.  Did it ever hurt?

14  A.   What?

15  Q.   When you met with the men, was it painful?

16  A.   Yeah.

17  Q.   Were you injured?

18  A.   Yes.

19  Q.   Did you ever tell G. that you were hurt?

20  A.   All the time.

21  Q.   How did he react?

22  A.   I really don't remember a reaction.  He had no emotions.

23  There was nothing that phased him.  I would tell him about

24  clients getting pretty aggressive and things that weren't

25  supposed to happen happened, and he would just be, like, he

1  didn't care.

2  Q.   You mentioned he didn't want you to sleep.  Did he ever

3  give you anything for that?

4  A.   He would give me -- it wasn't all the time, but he'd give

5  me uppers and things like molly and ectasy to keep me awake.

6  Q.   Any times you went long spans without sleep?

7  A.   Days.

8  Q.   And the punishments for falling asleep, did you ever tell

9  Faizal about all that?

10 A.   I did.  He caught me sleeping -- I don't know if this

11 matters.  He caught me sleeping outside on the couch once.  I

12 fell asleep and woke me up.  He basically told me I was lucky

13 he saved my ass from -- sorry again -- he saved me from G.

14 catching me sleeping outside of the room.

15 Q.   Oh, so Faizal woke you up because he didn't want G. to

16 find you because he knew what would happen?

17 A.   Yeah.

18 Q.   After that incident, did Faizal come to have sex with you

19 again?

20 A.   Yes.

21 Q.   Did G. use violence on you in the Howard Johnson hotel?

22 A.   Many times.

23 Q.   Where in the hotel?

24 A.   In the hallway, in the rooms.  There was even one time in

25 the restaurant that he, you know, got aggressive.  It was in

1  the yard outside where, like, I would go in the back -- I used

2  to smoke back then.  I would sit out there and smoke a

3  cigarette, and one time Faizal walked out while me and G. were

4  having an altercation, and he just walked right by and went

5  into the door as if he didn't even see me.

6  Q.    What kind of altercation?

7  A.    We were arguing about something, and he would always,

8  like, grab my arm and, like, push me around, and he was

9  screaming.  He would literally be waving his hands in my face

10 like he was going to hit me.  Faizal was right there.  I saw

11 him out of the corner of my eye.  He said, what, do you think

12 he's going to save you.

13 Q.    G. said that?

14 A.    Yeah.

15 Q.    Did men who came to see you at the hotel -- did they ever

16 see the marks on your body or on you?

17 A.    Excuse me?

18 Q.    The men who came that responded to the ads, did they say

19 the marks on you?

20 A.    Some of them did.

21 Q.    Did you do anything to hide them?

22 A.    I tried to cover up with makeup.

23 Q.    Did anyone help you try to cover up the marks with makeup?

24 A.    I mean, G. would buy me makeup to cover it up.

25 Q.    Was there anyone else who helped you at the hotel with you

163

1   and G. at the time?

2   A.   The girls when we had other women with us, yes.

3   Q.   Do you remember any names where this happened at the

4   Howard Johnson?

5   A.   Serenity.

6   Q.   You knew someone named Serenity?

7   A.   Yes.

8   Q.   She helped you put makeup on the bruises?

9   A.   She did.

10  Q.   Was that in one of the rooms at the Howard Johnson?

11  A.   Yes.

12  Q.   You mentioned G. had a gun?

13  A.   He did.

14  Q.   Did he have it at the hotel?

15  A.   He did.

16  Q.   Where did he keep it?

17  A.   On him or the safe.

18  Q.   The safe in the hotel room?

19  A.   Yes.

20  Q.   Do you know what kind of gun it was?

21  A.   No.

22  Q.   Was it a handgun or rifle?

23  A.   It was, like, a black handgun.

24  Q.   Did he ever threaten you?

25  A.   G.?

164

1   Q.    Yeah.

2   A.    All the time.

3   Q.    What kind of threats?

4   A.    He was going to kill me, he was going to burn my -- I had

5   like an -- you're not a citizen you have an I. 90.  I was in

6   the process of trying to get a citizenship.  My adoptive

7   parents didn't finish the paperwork, so I was kind of stuck

8   with that.  So he would -- he had that, and he'd threaten to

9   burn it.  He threatened to go to my adoptive family's house,

10  and he told me he was going to hurt my family.

11  Q.    If you did what?

12  A.    If I left -- that if I left that he would find them.  He

13  knew my name and last name.  He knew my social.  He burned my

14  social in front of me, so --

15  Q.    Did he ever threaten you with a gun?

16  A.    He did.

17  Q.    Did he ever threaten anyone else in your presence?

18  A.    Gina.

19  Q.    She another one of the girls?  Did you ever see him use

20  violence on anyone?

21  A.    I saw him use violence on Gina, I think, once.

22  Q.    So when he made threats, did you believe he meant it?

23  A.    Yes.

24  Q.    Did you have reason to believe that he meant it?

25  A.    I was on the other side of that barrel enough times where

165

1  I thought he was going to shoot me, and I wish he had sometimes

2  during that time. I just -- I said, just do it so it's --

3  yeah.

4  Q.  Did you ever seek medical attention after any one of these

5  incidents while you were staying at the Howard Johnson?

6  A.  Yes.

7  Q.  Can you tell us about --

8  A.  I had seek medical attention many times as far as I had

9  gone to the hospital, but I had gotten -- I had seeked medical

10 attention from -- I called 911 one day when I was hurt. I

11 don't remember why I was hurt or how I was hurt. But I was

12 picked up at the Sonic right next to Howard Johnson. I was

13 picked up by --

14 Q.  How did you get there?

15 A.  I walked.

16 Q.  You were picked up by?

17 A.  By an ambulance. The E. M. T. just checked me out, and he

18 -- actually was one of my clients, so it was really awkward,

19 and I kind of told him what happened. And he basically just

20 checked me out and told me I was good to go.

21 Q.  Do you remember what you told him had happened?

22 A.  I recall telling him about G. and Fredrick and what was

23 going on.

24 Q.  Was there any other time?

25 A.  There was another time -- I really don't remember it

1   because I was unconscious.  But I was picked up by an ambulance

2   down the street from Howard Johnson by a woman E. M. T.  It was

3   so blurry.  I was very -- I had a concussion so --

4   Q.   What's the first thing you remember after that?

5   A.   After?

6   Q.   Where did you wake up?  In the hospital?

7   A.   I was in the ambulance.

8   Q.   You said the E. M. T. at that time was a woman?

9   A.   Yes.

10  Q.   Do you know her name?

11  A.   I don't.

12  Q.   Did you ever exit the hotel in a means other than going

13  through a door?

14  A.   Me and Fredrick had an altercation where he basically

15  threw me across the room, and I hit my head really hard.  I

16  still have the scar.  I was bleeding from my head, and he left

17  me there.  I don't think he thought I had much in me, and I

18  opened up the window out of Howard Johnson and crawled out of

19  there and started running.

20  Q.   Where did you go?

21  A.   I just started running on the highway, and that's when I

22  was unconscious.  I passed out.

23  Q.   Did there ever come a time maybe more than once where you

24  refused to do what G. told you to do?

25  A.   Yes.

167

1  Q.    Did he make you do it anyway?

2  A.    Yes.

3  Q.    Again, we don't have to get into details.  Were there

4  things he wanted you to do with the clients you didn't want to

5  do?

6  A.    Yes.

7  Q.    Did he make you do them anyway?

8  A.    Yes.

9  Q.    Did he use violence to do that?

10 A.    Yes.

11 Q.    Did he use threats?

12 A.    Yes.

13 Q.    If he hadn't used violence and threats, would you have

14 done those things?

15 A.    No.

16 Q.    When you did those things with those clients, were you

17 paid for that?

18 A.    I was.

19 Q.    Did that money go to G.?

20 A.    Yes.

21 Q.    Did you use condoms?

22 A.    For the most part, yes.  But there's people that

23 apparently don't like them.  So that was one of my hard, hard

24 rules, and for G. it was money.  So once the number climbed

25 high enough for him he was -- he didn't give a crap about me

and what my limits were.  There was times where I had to do

things without protection because when I refused it, it was --

it just ended with violence.

Q.   G. wanted you to do because the client would pay more for

that?

A.   Yes.

Q.   Again, if he hadn't forced you to do it, would you have

done it?

A.   No.

Q.   Did you ever contract any sexually transmitted diseases

while working for G.?

A.   Yes.

Q.   What did you do when that happened?

A.   I went to the hospital.

Q.   Did you tell G. you needed medical help?

A.   Yes.

Q.   What did he do?

A.   Nothing.

Q.   He didn't help you?

A.   No.

Q.   Did he hurt you?

A.   Yes.  I went to the hospital several times.  One day I was

allowed to go because at least I can go and they would treat me

for the -- the things that I was struggling with.  So I would

go on my days I had free time because he would let me work in

1  the same condition without being treated.  So it just got

2  worse, and I was in a lot of pain.  And I would have to sneak

3  to the hospital because if I have had a cold sore on my lip I

4  would get assaulted because -- not appeasing for a client.  So

5  he just -- there was no -- like, there was no, like, medical,

6  like -- nothing.  I still -- if I brought it up, it was still

7  my fault that I had gotten some form of, like, you know --

8  still my fault even though I was forced to do things that could

9  have prevented that.  So that made no sense.

10 Q.  Did you ever consider telling the police about what was

11 going on?

12 A.  No.

13 Q.  When you went to the hospital for treatment, did you ever

14 think about telling them, I need help, get me out of this?

15 A.  No.

16 Q.  Why?

17 A.  I was terrified more of the police than of G.

18 Q.  Why?

19 A.  I thought what I was doing was -- I didn't understand -- I

20 didn't understand back then the -- I have a better

21 understanding now of what happened to me and that I was very --

22 you know -- how do I say the word?  I know it's grooming, but I

23 wasn't prepared to be put in that position.  At that time he

24 would use tactics, like, if you get caught, you go to jail, if

25 we get caught, who is going to get you out of jail.  It was a

1  lot of manipulation to say the police are bad and you are a

2  prostitute and you are doing something illegal and you will go

3  to jail and you will get caught.  And in my very young and

4  vulnerable mind, I didn't understand that the police aren't

5  necessarily bad, so, no, I didn't because I didn't want to go

6  to prison and I didn't want to get deported and go back to

7  Russia.

8  Q.  Is that what he told you would happen?

9  A.  Yes.

10  Q.  Did G. promise to protect you?

11  A.  He did.

12  Q.  Did he?

13  A.  No.  No, he didn't even when situations happened that he

14  was supposed to step in and save me, which is what he was there

15  supposed to be -- what he's meant to be.

16  Q.  Situations with customers?

17  A.  Yes.

18  Q.  Violence?

19  A.  Yes.

20  Q.  And G. didn't help you, did he?

21  A.  He couldn't have, no.

22  Q.  All right.  You mentioned earlier that G. also sold drugs?

23  A.  Yes.

24  Q.  What kind of drugs?

25  A.  He sold crack cocaine.

171

1   Q.   Did you ever see him with drugs at the Howard Johnson

2   hotel?

3   A.   I did.

4   Q.   Did you ever see him with crack?  Is that what you saw him

5   with?

6   A.   Yes.

7   Q.   Did you ever see him sell crack while at the Howard

8   Johnson hotel?

9   A.   Yes.

10  Q.   Did he store crack at the Howard Johnson?

11  A.   He did.

12  Q.   Where?

13  A.   In the safes.

14  Q.   In the room?

15  A.   In the safe.  It wasn't right away.  He didn't trust me,

16  but after a while he did start trusting me, so he used to leave

17  drugs in the safe.

18  Q.   When he would sell it at the Howard Johnson, where would

19  he make the sales?

20  A.   In the parking lot, in the hallways even.  He would run

21  things out all the time.

22  Q.   So people would -- buyers would come to him at the Howard

23  Johnson?

24  A.   Sorry, yeah.

25  Q.   That's okay.  Take your time.

172

1  A.   Yes, he would have them back out back by the garbage cans,

2  and Stanley did the same thing all the time.  I would sit out

3  there and smoke and see people coming back and forth and back

4  and forth.

5  Q.   A lot of traffic?

6  A.   Uh-huh.

7  Q.   To drive into that back parking lot, they'd have to come

8  in through the front entrance, right?

9  A.   Yes, I'm sorry.

10  Q.   Does that road pass by the front entrance of the hotel?

11  A.   Sorry, yes.  When you drive in, it goes all the way

12  around, and there's a dead end in the back.  So you have to

13  drive back through the front to get through.

14  Q.   Oh, so you'd have to pass by the front door twice?

15  A.   Every single time.

16  Q.   Did you ever do deliveries?  Did he ever have you do

17  deliveries of crack for him?

18  A.   I did.

19  Q.   Did he ever give you crack?

20  A.   He did.

21  Q.   Did you ever sample crack for him?

22  A.   Once I recall, yeah.

23  Q.   Did you use crack while you were with him?

24  A.   No, not -- not regularly at all, no.

25  Q.   What did you do use -- sampling or occasionally whatever

1  it was -- did it ever make you sick?

2  A.   Violently.  That's why I didn't use it.

3  Q.   And was that crack he gave you?

4  A.   Uh-huh.

5  Q.   All right.  So you mentioned he gave you crack.  You

6  mentioned he gave you marijuana when you first met him, right?

7  A.   Uh-huh, yes.

8  Q.   I don't remember if you said it.  What other drugs did he

9  give you?

10  A.   Molly and ectasy.  He always -- he used to tell me the

11  reason he liked me and the fact he saw potential is in me

12  because I was never doing the actions I was doing for drugs.  I

13  was doing it because I wanted something better and I didn't

14  have a lot of options so I wasn't -- I didn't use drugs because

15  I wasn't an addict.  I would -- I would, like -- when I had

16  hadn't slept in three days, I would take something to just keep

17  me awake.  I wasn't a functioning -- I didn't use hardly ever.

18  That's why I think he gave me, like, crack once or twice, and

19  other than that I wasn't just -- he always said -- he's, like,

20  you are better than that.  He would say that to me because

21  he's, like, I see girls out here who do this just for drugs --

22  and not that I'm at all -- I don't find myself better than

23  anyone, but that's not why I was doing what I was doing.  So I

24  wasn't really about the drugs.

25  Q.   Did he give you anything else?  Did he give you any kind

174

1  of pain pills or anything?

2  A.    Yeah, like Percocets and Vicodens and stuff.

3  Q.    When did he give you those?

4  A.    After I -- I had an abortion.

5  Q.    We don't have to talk about that.

6  A.    That's why.

7  Q.    Did he give you Adderall?

8  A.    Yes.

9  Q.    Why did he give you Adderall?

10  A.    Keeps me awake.

11  Q.    Why did he want to keep you awake?

12  A.    So I can work.

13  Q.    Did you ever want to just stop?

14  A.    All the time.

15  Q.    You talked about how had he stole your citizenship papers?

16  A.    Yes.

17  Q.    He told you you'd be deported if you were arrested?

18  A.    I wasn't a citizen yet.  So it was actually the paperwork

19  to become a citizen.

20  Q.    To become a citizen?

21  A.    That was very expensive.  Like, each form costs a certain

22  amount of money.  So what I was trying to do -- he told me what

23  he was doing was saving that 50 of the 50 for my citizenship

24  paperwork so I can get it done, but he -- I never saw it so --

25  Q.    He never spent that money on it?

175

1  A.    No.

2  Q.    Those forms, did that come from before?

3  A.    What do you mean?

4  Q.    The paperwork you did have -- you said he stole some

5  paperwork?

6  A.    That was upcoming to file those.  I needed money.  I

7  didn't have that yet.  It was the I. 90 and all that stuff.

8  Q.    You had the forms, but the forms themselves it would have

9  cost money to file?

10  A.    Yes.

11  Q.    Did you ever tell Faizal about these citizenship issues

12  and what was going on?

13  A.    I did.

14  Q.    Did he know what G. was doing to you with that?

15  A.    Yes.

16  Q.    You mentioned at one point you tried to leave --

17         THE COURT:  Mr. Camoni, do we have much more here?

18         MR. CAMONI:  10 or 15 minutes.

19  BY MR. CAMONI:

20  Q.    Did you try to leave more than once?

21  A.    I did.

22  Q.    What kinds of things did you do to try to leave?

23  A.    What do you mean?  I would run away.  I would try to hide

24  at friend's houses.  I would -- the one time I tried to leave

25  he broke into my little apartment that he got me.  So, of

1  course, I never spent any time there, but he broke in and,

2  like, robbed everything I owned, like, bagged up all my

3  clothes.  He urinated on my bed.  He, like, destroyed my place.

4  Q.    When you tried to leave, he came after you?

5  A.    Yes, and I hadn't that -- he got me an apartment, and I

6  had it for, like, a week.

7  Q.    Did you ever ask a client for help or anybody?  Did you

8  ask anybody to try to help you?

9  A.    No.

10  Q.    Did you try to go back to the foster system?

11  A.    I did.

12  Q.    Did that work out?

13  A.    I was 18.  I already signed myself out.

14  Q.    Did you ever try to go to a homeless shelter?

15  A.    I called, and they were booked.  They were, like, busy.  I

16  mean, there was a waiting list.

17  Q.    You said you tried to go back to school and finish -- was

18  that high school?

19  A.    Yes.

20  Q.    What about -- why didn't you seek public housing or public

21  assistance, something like that?

22  A.    I did.  There was just waiting lists for everything in the

23  Poconos.  My ideal -- my ideal -- idea was to get enough money

24  to move far away, which I ended up doing later on.  I moved to

25  Scranton, but that was the whole goal.  I did call around to

1  see if there was any resources, and there was just nothing.  I

2  was so scared of admitting what I was involved in that I didn't

3  seek any kind of legal help because I was terrified.

4  Q.    So when you would try to go out away from him, what did

5  you do to make money?

6  A.    I would do what I knew how to do, so I would try to get

7  hotels in other places and work and just make a little bit of

8  money to get back on my feet, but I never got back on my feet,

9  so it was just --

10  Q.    Was there a name for that when you were working on your

11  own even though you were supposed to be with a pimp?

12  A.    It's referred to as renegading.

13  Q.    Who told you that?

14  A.    G.

15  Q.    And what was G.'s response to your renegading?

16  A.    He would find me.  He would trap me.  He would call me,

17  pretend to be a client.  He would literally taunt me and just

18  follow me.  Like, if I was walking from the hotel to a gas

19  station, he would be following me in his vehicle.  It was -- it

20  was just constant.  He broke into my room, took my computer.

21  The one time -- every time he would take every penny I had.  If

22  I had, like, a hundred dollars or -- anything, he would take

23  it.  It was impossible.  I tried to -- that's why I tried to

24  change my name because I thought if I changed my name in my

25  Back Page ad -- I knew enough about how to do things that I was

178

1  trying to, like, get work for a night and then be able to have

2  a little bit of dump of cash and just go.  I never got that

3  far.

4  Q.   When you were trying to do that, sometimes you would stay

5  at other hotels, too?

6  A.   Yes.

7  Q.   G. would take you to other states and stay in hotels, too?

8  A.   Yes.

9  Q.   At any other hotels, did the people that worked there ever

10 warn you about police?

11 A.   No.

12 Q.   Did you have anybody that you confided in and told what

13 was going on?

14 A.   No, I wasn't there long enough to.  I would stay there

15 once.

16 Q.   Did you act -- did you and G. act differently in other

17 hotels than you did at the Howard Johnson?

18 A.   Yes.

19 Q.   How so?

20 A.   I wasn't allowed to leave my room.  It was very --

21 Q.   At other hotels?

22 A.   Yes, there was New York and Jersey, and a lot of traffic

23 going on.  He always said to keep low because when you're from

24 out of town, you attract attention, so I would just work, and

25 we'd get out quick flipping, constantly moving.

179

1  Q.    You didn't do that at the Howard Johnson?

2  A.    No, it was home base.

3  Q.    Was it a safe place?

4  A.    Yes.

5  Q.    You said he was saving half of your money for you.  Did

6  you ever ask him for that money?

7  A.    I did.

8  Q.    What did he do?

9  A.    Laughed at me.

10 Q.    So you said at some point you finally stopped?

11 A.    I did.

12 Q.    What did you do when you stopped?  How did you stop?

13 A.    I met someone that helped me, and he helped me get out of

14 the area.  And he showed up to my house with a U. Haul and

15 said, we are leaving.  I shut off my social media.  I went

16 ghost, and nobody ever knew.

17 Q.    You left the area entirely?

18 A.    I got clean fully, like, off and just tried to start my

19 life fresh, got my citizenship, got a job, had a child, started

20 my life all over again.

21 Q.    How long have you been without G. in your life right now?

22 A.    Besides the trial, it's been five, six years since my --

23 six.  My son just turned six, so over six years, probably about

24 seven.

25 Q.    How are you doing now as compared to then?

1   A.   I just graduated school.   I opened my own salon with a

2   partner.   I am trying to buy a house, and I am so happy.   I am

3   engaged, and my life is beautiful, and I couldn't be more

4   grateful for that.

5           MR. CAMONI:   Your Honor, I have nothing else.

6           THE COURT:   We're going to take our afternoon break

7   for 15 minutes.   No conversations or discussions among

8   yourselves or with anyone else.   Don't form any opinions.   You

9   haven't heard all of the evidence or the law related to the

10  case.   No research of any kind on anything that you heard,

11  names, locations, terminology, anything of that nature.   You're

12  not to read or listen to anything about the case.   If someone

13  were to talk to you about the case, you must advise us of that

14  immediately.   All right.   See you in about 15 minutes.

15          (A brief recess was taken.)

16          THE COURT:   Welcome back.   Mr. Brown?

17          MR. BROWN:   Thank you.

18  CROSS EXAMINATION.

19  BY MR. BROWN:

20  Q.   Good afternoon, Ms. Byler.

21  A.   Hi.

22  Q.   Do you recall meeting with agent Shelly and Patton?

23  A.   I do recall.

24  Q.   Do you remember when you met with him that you said that

25  you knew you were committing the crime of prostitution, yes or

181

1  no?  Did you tell them that you knew that you were committing

2  the crime of prostitution?

3  A.    Yes.

4  Q.    So when the F.B.I. showed up at your door initially, were

5  you concerned for your own -- whether or not you were going to

6  get in trouble?  When they first came and knocked on your door

7  that very first time, were you concerned that you were in

8  trouble?

9  A.    I was, but I -- I had no idea what it could have been

10  about.

11  Q.    Okay.  Well, I guess that's the question is -- if you

12  didn't think you didn't anything wrong, why would you think you

13  were in trouble if the cops came to your door?

14  A.    It's not every day F.B.I. comes to your door.  I was

15  working and living a straight forward life.  I didn't have any

16  idea or clue why the F.B.I. were at my door, but it was

17  terrifying.

18  Q.    When was that?  When did they come?  Do you recall?

19  A.    2011 I think.  The years are a little --

20  Q.    Okay.  You don't remember when they came?

21  A.    It's about two years ago.

22  Q.    About two years ago?

23  A.    A year ago was the -- March of last year was the initial

24  trial.  It had been going on for a year that I had been working

25  with them.

182

1  Q.   Okay.  March of 2019 was the trial, and a year prior -- so
2  it would have been 2018, correct?
3  A.   Yes, yes.
4  Q.   When the F.B.I. first came to your door, did you think
5  about the affiliations that you had meaning the connections to
6  certain people like Fredrick Brown?
7  A.   No, it was that far in my life I didn't even think that
8  that could -- I thought someone I knew got murdered or
9  something.  It didn't dawn on me it was about Fredrick.
10 Q.   You talked about your child.  Who is the father of your
11 child?
12 A.   Wali Henderson.
13 Q.   Isn't it true Mr. Henderson became your pimp after you
14 left Fredrick Brown?
15 A.   No, not necessarily.
16 Q.   Not -- what does that mean not necessarily?
17 A.   I stopped what I was doing.  And when hard times came, I
18 reverted to old patterns within the first year, I think, after
19 I left.  So I was with him at the time dating him, but he
20 wasn't pimping me out.  I made choices at the time for specific
21 reasons in my life I couldn't -- so, no.
22 Q.   Okay.  You said you'd previously been a confidential
23 informant, correct?
24 A.   Correct.
25 Q.   When you were a confidential informant, was that to set up

183

1   Wali Henderson?

2   A.   No.

3   Q.   You were a confidential here in Lackawanna County,

4   correct?

5   A.   I was.

6            MR. BROWN:  I'm actually going to bring up Bates

7   9392, 939 to 940, Judge.  This would be Defendant's Exhibit 16.

8            MR. BROWN:  May we approach?  I just want to tell him

9   what it is.

10           MR. CAMONI:  Ask the judge.

11           MR. BROWN:  May we approach?

12           THE COURT:  Sure.

13           (The following discussion took place at sidebar:)

14           MR. BROWN:  It's her actual statement so you know.

15           THE COURT:  Let me ask you in terms of you're not

16  going to can ask her any questions about any individuals have

17  her name, people she cooperated against?

18           MR. BROWN:  No, no, no.

19           THE COURT:  Make sure --

20           MR. BROWN:  No.

21           THE COURT:  What is it we're showing her?

22           MR. BROWN:  Interview that was -- she was a

23  confidential informant before and does that have to playing a

24  role similar to what I am --

25           THE COURT:  Did it what?

184

1          MR. BROWN:  Did it involve her setting somebody else

2     playing a role to try to get drugs to --

3          THE COURT:  When you say it's her statement, tell me

4     what it is.

5          MR. BROWN:  It is her statement that she worked for

6     -- as a confidential informant for Lackawanna County detectives

7     to set someone up.  That's her exact statement.

8          MR. CAMONI:  I think to use the statement she would

9     have to have denied that.  She hasn't done that.

10         MR. BROWN:  She did.

11         MR. CAMONI:  She denied against it Wali Henderson.

12         MR. BROWN:  I will ask her, but I just wanted you to

13    know what I am referring to.  It is her own statement.

14         THE COURT:  And that's always okay.  In other words,

15    you're trying to use 302s in the past.

16         MR. BROWN:  I understand that.  I misunderstood 607.

17    I apologize.

18         THE COURT:  You can certainly ask questions.  I don't

19    want to hear a question about -- unless it was something that

20    related to these defendants or in this case if she cooperated

21    against somebody.  I don't want it publically made she

22    cooperated against a particular person unless that person is

23    part of this case and, therefore --

24         MR. BROWN:  No.

25         MR. CAMONI:  Judge, we purposely -- there was

1  activity by that person at the Howard Johnson.  We left that

2  out so she wouldn't be outed as a cooperating against that

3  person.  I can tell you who it is, but --

4           MR. BROWN:  No.

5           THE COURT:  The process is if it's her statement --

6           MR. BROWN:  It's her own statement.

7           THE COURT:  But it would then come in as a prior

8  inconsistent statement if she then under 613, if she doesn't

9  say it happened.  But it isn't like because she said something

10 before you can put that in as a statement.  You got to ask --

11          MR. CAMONI:  She has testified she was a confidential

12 informant and she did a drug buy.  She said that.

13          MR. BROWN:  I understand that.  My question -- when I

14 saw the exhibit, my question would be based off her statement.

15 I just wanted to make that clear so we don't have a problem

16 like we did last time.

17          (The discussion at sidebar concluded.)

18          THE COURT:  We're going to take another short break.

19 This one is going to be short, but sometimes these things

20 occur.  No conversation or discussion among yourselves or with

21 anyone else.  No forming any opinions.  No doing any research,

22 no reading or listening to anything about the case.  Did I

23 forget one?  If anyone were to talk to you, you must advise us

24 of that immediately.  That being said everybody -- juror No.

25 14, we want to talk to right now.

186

1          (A brief recess was taken.)

2          THE COURT:  Juror 14, which should be really

3    alternate No. 3 -- alternate No. 2 would be juror 14.  We got a

4    call downstairs that indicated his wife was taken to the

5    emergency room, and so we advised him of that and excused him,

6    so he can go to the hospital and follow his wife.  All counsel

7    is in agreement as to that.  All right, Mr. Brown.

8          MR. BROWN:  Thank you, Your Honor.

9    BY MR. BROWN:

10   Q.   And did you tell case agents you worked to set someone up

11   in a controlled buy?

12   A.   I did.

13   Q.   And you admitted you were on drugs while you were working

14   for Mr. Brown, is that true, Fredrick Brown?

15   A.   At times I was, yes.

16   Q.   Sometimes that would be crack?

17   A.   Twice, yes.

18   Q.   Adderall I believe you said, correct?

19   A.   Yes.

20   Q.   Heroin?

21   A.   I never used heroin in my life.

22   Q.   Heroin.  Cocaine?

23   A.   At that time, no, I didn't do cocaine either.

24   Q.   Do you think that the drugs had any effect on your memory

25   of what was going on, yes or no?

1  A.    No.

2  Q.    Okay.  But we can at least agree that you met many times

3  with the government not only in this case, correct, did you --

4  how many times did you meet with the government in this case?

5  A.    A couple times.

6  Q.    Couple --

7  A.    With this case you mean -- with this trial itself or the

8  last trial as well?

9  Q.    That's what I want to get to.  With this trial itself, how

10  many times did you meet with the government?

11  A.    Four or five.

12  Q.    Okay.  And you talked about another trial.  How many times

13  did you meet with them --

14  A.    Oh, I'm sorry.  I thought that was included in this.

15  Q.    So overall you met with the government four or five times,

16  correct?

17  A.    Yes.

18  Q.    And when you met with them they would talk to you about

19  different parts of your life that they wanted you to remember

20  and --

21  A.    No.  They asked me what happened, and they told me to tell

22  them my story, and it was very scattered in the beginning

23  because there was just a lot -- it's three years of my life.

24  It's not something -- it took me time to just kind of piece

25  everything together -- a lot of trauma to be remembered.  They

188

1  let me talk.  I did most of the talking if I recall.

2  Q.   Did you tell case agents you had trouble remembering

3  names?

4  A.   I did.

5  Q.   Did you also say that you had trouble remembering certain

6  situations that you --

7  A.   Time lines, yes, situations, no.  I remember.

8  Q.   Did you tell case agents that you would block out some of

9  the sexual expenses you had?

10  A.   I would, yes.

11  Q.   And did that prevent you from remembering those instances,

12  or did you need to be directed by the government to remember

13  those instances?

14  A.   I was able to remember everything that happened to me by

15  myself so, yes, it was -- I don't think I fully understand your

16  question.

17  Q.   Okay.  Well, I guess my thing is that were you able to

18  recall because you said it was a lot the first time you met

19  with case agents you're in a car.  It's about 15 or 20 minutes.

20  They tell you, hey, listen, we want to talk to you about

21  Fredrick Brown.  At that point, you said that -- you can

22  correct me if I'm wrong -- I believe you said that it was after

23  that flood of memories came back, correct?

24  A.   Yes, it kind of forced me to remember -- bring it all

25  back.

1  Q.   And then the case agents bring you in again, correct?

2  A.   Yes.

3  Q.   And they interview you, correct?

4  A.   Correct.

5  Q.   Okay.  And when they are interviewing you, they're asking

6  you about certain scenarios you were in, correct?

7  A.   Yes.

8  Q.   Okay.  Such as when you were with Fredrick Brown, correct?

9  A.   Correct.

10  Q.   How you met Fredrick Brown, correct?

11  A.   Yes.

12  Q.   And where you would go with Fredrick Brown, correct?

13  A.   Correct.

14  Q.   And is it true that once you met with case agents and

15  understood what they were looking for, meaning what topics they

16  were looking for or what their purpose was, it put you at ease

17  to be able to remember the situations, yes or no?

18  A.   No.

19  Q.   No, okay.

20  A.   None of this is -- puts me at ease.

21  Q.   Well, I understand that.  Did agent Patton try to make you

22  feel a lot more comfortable so you can talk about the

23  situations you were in in the past?

24  A.   No, he didn't by any means.

25  Q.   Can we bring up Bates 2141?

190

1        MR. BROWN:  This will be marked as Defendant's

2   Exhibit 17.  It will be her previous testimony, Your Honor.

3   BY MR. BROWN:

4   Q.   And do you recall testifying at the Fredrick Brown trial?

5   A.   I do.

6   Q.   Okay.  And do you recall saying that when you first came

7   in the building you didn't know what you were coming in for or

8   how much intensity the situation was?

9   A.   That's correct.

10  Q.   Do you remember saying that you were asked a whole bunch

11  of questions, correct?

12  A.   Correct.

13  Q.   And you said that, so over this past year I had kind of

14  time to kind of remember everything and piece every part of

15  your life back together in your head, correct?

16  A.   Yes.

17  Q.   Okay.  And the more they asked you questions the more you

18  were able to remember what happened?  Is that fair to say?

19  A.   No.

20  Q.   No?

21  A.   Like I said before it was about over three years of my

22  life.  And even though I wasn't consciously thinking about the

23  memories are there, they're not -- you don't forget things like

24  this.  So when they were all asked -- asked me what happened, I

25  told my story, and there was times where timelines I had to put

1  them back together myself because I mean, do we all remember

2  what happened five years ago in our life exactly week by week?

3  We don't, so -- it was more of my own -- my own conscious

4  thinking and kind of just being okay with thinking about,

5  remembering it and putting myself in that mental space.

6  Q.    And so that would occur after you would meet with case

7  agents and go back home?  Is that what you're saying?

8  A.    Well, of course, after the subject was talked about and I

9  was -- because I -- originally I didn't want anything to do

10  with this.  I didn't want to be here, and I didn't want to tell

11  anybody anything.  I didn't want pictures up for people to see,

12  and those are my secrets.  That's my shame to hide.  I hid it

13  for a long time.  When the F.B.I. came, it was the Band Aid

14  ripped, and I had to sit there and remember it all and choose

15  to speak on it because if I didn't people like these people

16  will go do it to somebody else.  That's why I'm here.

17  Q.    Let me ask you, you were never charged with any crimes,

18  correct?

19  A.    I -- like -- my whole life?

20  Q.    Related to your prostitution.

21  A.    No, I got -- I got in an altercation.  I don't remember

22  what year with prostitution in Harrisburg.

23  Q.    Okay.

24  A.    Which was never held on me.  I never got charged with it

25  though.

192

1  Q.    How did you get out of it?

2  A.    What do you mean?

3  Q.    You said you never got charged and never held on you.  So

4  you were arrested for prostitution, and they let you go?

5  A.    Yes.

6  Q.    How did that happen?

7  A.    Who I was with was charged with promoting prostitution,

8  and I was never charged.

9  Q.    Okay.  So whoever your pimp was was charged and you

10 didn't?

11 A.    He wasn't my pimp, but he was with me, so --

12 Q.    Fair enough.  And when you met with case agents were you

13 still -- do you recall meeting with case agents on November

14 22nd of 2017?

15 A.    I do.

16 Q.    Okay.  And during that time, were you still seeing being

17 paid for your time by two customers?  Do you recall telling

18 case agents that?

19 A.    Excuse me?

20 Q.    Do you recall telling the case agents when you were

21 interviewed on 11/22/17 you were still seeing two customers and

22 they were paying you for your time?

23 A.    I do not recall.

24        MR. CAMONI:  Judge, I am going to object.  November

25 22nd of 2017 falls outside the scope of counts one and two.

193

1  This was the subject of a motion in limine.  This is not

2  subject to questioning.

3          THE COURT:  Let's have a sidebar conference.

4          (The following discussion took place at sidebar:)

5          THE COURT:  Motion in limine related to when acts

6  under 412 could come in related to prior sexual activity.  My

7  ruling was that only that during the course of the proceedings

8  in the indictment in that time frame was what was allowed.

9          MR. CAMONI:  That's correct, Your Honor.

10         THE COURT:  This is not your argument.

11         MR. DeSTEFANO:  It is.

12         THE COURT:  It's his argument first, but it's not

13 your argument.

14         MR. BROWN:  Your Honor, I understand that what you

15 said 412.  I'm asking her if she made a statement to the --

16 it's a statement, so it comes under impeachment.

17         THE COURT:  No, no.

18         MR. CAMONI:  It has nothing to do with her

19 credibility whatsoever.

20         THE COURT:  This relates to her other sexual

21 activity.  There's a specific ruling I made in writing that you

22 all have based upon that.  Is this outside the time frame

23 that's in that writing?  Why don't you get the memo so we can

24 look at it?  If it's outside of the time frame, I will be very

25 unhappy.

194

1          MR. DeSTEFANO:  The time of indictment is --

2          MR. CAMONI:  October 24th -- October 24th, 2017

3   outside the scope -- this is exactly what the Court ruling is

4   supposed to prevent.  It's other sexual acts in order to

5   impeach a witness.  That's exactly what 412 --

6          THE COURT:  Time frame of the sex trafficking charges

7   go until October 24th -- exactly why that section of the rules

8   are there because anyone could then argue anything related to

9   sexual activity is related to their credibility.  That's why

10  that's placed in there.  I had specifically ruled on it.  The

11  sex trafficking charge go to October 24th.  What's the date

12  you're asking about?

13         MR. BROWN:  November 22nd when she made a statement.

14         THE COURT:  You have to be very careful.  Apparently

15  this is, like, the third or fourth time you have not looked at

16  the rules in a proper method.  I suggest you take more time to

17  do that.  It will -- the objection will be sustained and

18  stricken from the record.  I don't want to hear another word

19  something outside the time frame in counts one or two related

20  to sex trafficking pursuant to the memorandum you had in

21  advance of trial in the order.

22         MR. DeSTEFANO:  Your Honor, can I say something for

23  the record?

24         THE COURT:  Sure.

25         MR. DeSTEFANO:  However, the remaining counts of the

195

1  indictment which relate -- all relate to --

2        THE COURT:  Drug trafficking.

3        MR. DeSTEFANO:  And conspiracy --

4        THE COURT:  Sex trafficking ends on October 24th.

5  The drug trafficking is a different item.

6        MR. DeSTEFANO:  But since --

7        THE COURT:  This is not unclear, Mr. DeStefano.  It

8  is not unclear.  End of record.

9        MR. DeSTEFANO:  Wait a minute.

10        (The discussion at sidebar concluded.)

11        THE COURT:  Ladies and gentlemen of the jury, the

12  last question is stricken from the record.  You are to

13  disregard any answers or anything related to that.  Mr. Brown,

14  move on to a different subject matter.

15        MR. BROWN:  Thank you, Your Honor.

16  BY MR. BROWN:

17  Q.   When you first met Fredrick Brown, you said it was a Wawa

18  in Stroudsburg, correct?

19  A.   Correct.

20  Q.   You said you were homeless at the time, correct?

21  A.   I was.

22  Q.   And you said you went in to steal something, correct?

23  A.   Correct.

24  Q.   And you had talked about on direct examination you had

25  paperwork to be -- you had immigration paperwork, correct?

1  A.    Correct.

2  Q.    Okay.  At that time, isn't it true that you didn't try to

3  get a job at McDonald's or that Wawa you went into?

4  A.    Excuse me?

5  Q.    You did not try to get a job anywhere else, you met

6  Fredrick Brown, and you wanted to go with him at that point?

7  A.    I didn't want to go, and I couldn't get a job because you

8  need a legal I. D. to get a job, and I couldn't, and I tried.

9  I tried to get a job while I was in foster care.  I couldn't

10  get a job then either because I didn't have any legal --

11  Q.    Let me ask this.  Did you say that the way in which Brown

12  brought up prostitution to you is because you and your room

13  mate couldn't pay rent?  Did he overhear you talking about rent

14  and I couldn't pay rent?

15  A.    Yes.

16  Q.    That's why he brought up prostitution, correct?

17  A.    I mean, I -- correct, but I wasn't -- that wasn't my home.

18  That was a friend of mine that I was trying to live with, but I

19  didn't have money to live with her.  That's why I was homeless

20  in the first place.  So she was letting me stay there every now

21  -- at that time I had been homeless, and I slept other places.

22  But at that particular time she was letting me sleep there, and

23  I was trying to figure out how to -- because there was a

24  possibility for me to live there.

25  Q.    So you were staying with a friend, correct?

A.    At that time, yes.

Q.    Okay.  And is it true that what caught your eye you
noticed Brown's car and that's why you talked to him?

A.    I didn't notice him at all.  He called out to me in a -- I
don't think his car was very impressive.  It was just a vehicle
he was in.

Q.    Okay.  You did leave with him at that point and go -- you
weren't under the influence when you met him, correct?

A.    No.

Q.    And you did leave with him voluntarily, correct?

A.    I did.

Q.    And the idea of prostitution came up because you needed
money, correct?

A.    Correct, he overheard me talking to a potential room mate.
I didn't have the money to pay her.  He overheard it in the
first place.

Q.    He told you you can make money with him, correct?

A.    Correct.

Q.    And that is when he made the offer for you to become a
prostitute for him, correct?

A.    No.  He never used that word.

Q.    He never use that had word?

A.    He told me he can help me make money to get me on my feet.
He never use that had word.

Q.    So the decision you made was before you were using drugs,

198

1  correct?

2  A.   Correct.  Sir, I was left in a room with a man three times

3  my size.

4            MR. BROWN:  Your Honor --

5            THE COURT:  Ms. Byler, you can answer the question

6  fully, but you --

7            THE WITNESS:  Sorry.

8  BY MR. BROWN:

9  Q.   Did you say -- during an interview did you say it's all

10 about money and your time is money?

11 A.   Yes.  That's what I was told to say, yes.  I mean that's

12 what I was told to think that time is money, so that's what my

13 mindset was at, yes.

14 Q.   After a while you made an arrangement with Brown to have

15 sex for money, correct?

16 A.   It wasn't a conversation, no, no.

17 Q.   So then you said it wasn't a conversation, but I thought

18 you said on direct examination that you and Mr. Brown had an

19 arrangement of a 50/50 split?

20 A.   That was later told once I was already being -- once I was

21 already being sold.

22 Q.   Right.  And so it was a 50/50 split?

23 A.   Yes.

24 Q.   Okay.  And I believe through your direct examination you

25 talked about at least keeping 25 percent?

199

1   A.    Yes.

2   Q.    Did you ever try to keep extra money or tips that you

3   received?

4   A.    Yes, I did.

5   Q.    And did you ever post on Facebook the money that you

6   received?

7   A.    Yes, I did.

8   Q.    And I believe you testified that -- did you ever -- you

9   did have time off to go shopping with your friends, correct?

10  A.    I recall one occasion that I actually went shopping, and

11  other times I would just spend time with my friends.

12  Q.    And did you put pictures on Facebook of yourself with

13  money?

14  A.    Yes.  Am I allowed to explain why?

15           THE COURT:  No.

16           THE WITNESS:  Okay.

17           THE COURT:  But if counsel asks you on redirect, you

18  can, but not unless it would answer the question more

19  particularly.  So you have to answer this time counsel's

20  questions.

21           THE WITNESS:  Okay.

22           MR. BROWN:  Thank you, Your Honor.

23  BY MR. BROWN:

24  Q.    Is it true that Brown also taught you how to run the game

25  and spot people that are johns?

200

1  A.    Yes.

2  Q.    Any customers -- and did he teach you how to spot other

3  workers?

4  A.    Yes.

5  Q.    And did he teach you how to spot pimps?

6  A.    Yes.

7  Q.    Did he teach you how to spot regular guys?

8  A.    Yes.

9  Q.    And did he teach you how to work and talk to those

10 customers in order to get them to hire you for long periods of

11 time?

12 A.    Yes.

13 Q.    You said Faizal was a nice guy, correct?

14 A.    He was.

15 Q.    You considered him a friend, correct?

16 A.    I did.

17 Q.    Did you try to run the game on him at all?

18 A.    What does that mean?

19 Q.    The game that you were running and taught by Brown, did

20 you try to run that on my client in order to get money from him

21 for sex?

22 A.    No.

23 Q.    Would you recruit other girls for Mr. Brown?

24 A.    I did.

25 Q.    Did you ever become a girl who would run -- did you ever

201

1  become the bottom for Mr. Brown?

2  A.    I did.

3  Q.    And will you explain what the bottom is?

4  A.    I was told the bottom was a female that basically was the

5  right-hand man or right hand of the pimp and that once you get

6  to that position you don't have to have sex with clients

7  anymore, you don't have to do that, you don't have to do the

8  dirty work, and that I was promised if I got him other girls

9  that I didn't have to do that anymore.

10 Q.    Okay.  So despite the fact you felt awful doing it, you

11 were embarrassed, you still went out and got other females to

12 engage in the same activity that you were engaged in, correct?

13 A.    I did.

14 Q.    And you would handle their calls, correct?

15 A.    Yes.

16 Q.    And you would hold their drugs, correct, the drugs that

17 Brown wanted paid to them?  Did you give those girls underneath

18 you drugs?

19 A.    No.

20 Q.    Okay.  Did you collect money for Mr. Brown?

21 A.    A few occasions, yes, I did.

22 Q.    So you actually collected the money from the other girls

23 to give to him?

24 A.    For a short amount of time, yes.

25 Q.    Would you run the operation if he wasn't around?

202

1  A.    I did.

2  Q.    When did you stop working for Mr. Brown?

3  A.    I was either 19 or 20.  I don't know for sure.  I think --

4  Q.    Is it your testimony from 2011 to 2000 -- between 2011 and

5  2017 your only pimp was Fredrick Brown?

6  A.    Yes.

7  Q.    You talked about renegading?

8  A.    Yes.

9  Q.    Renegading is when you go and make money for yourself as a

10 prostitute, correct?

11 A.    Yes.

12 Q.    And is it true that you didn't care about the consequences

13 because you were being paid for your time at that point?

14 A.    No.

15 Q.    Mr. Bhimani didn't know that when you were in the Howard

16 Johnson you were renegading, did he, my client?

17 A.    Faizal?

18 Q.    Yes.

19 A.    He did.

20 Q.    He did.  And did he give you rooms?

21 A.    He did.

22 Q.    Anyway.  Did you go back to prostitution to get your

23 citizenship paperwork?

24 A.    I didn't.

25 Q.    You did not?

203

1   A.    No, I had some help.

2         MR. BROWN:  Bring up Bates 915.  I believe this is in

3   the same exhibit, Judge.

4   BY MR. BROWN:

5   Q.    Did you ever have sex for crack or drugs?

6   A.    No.

7   Q.    You never -- I am going to direct your attention to 915

8   line 16, and A. B. is you in this interview, correct?

9   A.    It was Claude --

10  Q.    I am not asking who.  I am asking did you have sex for

11  drugs?

12  A.    Yes, I apologize.  I thought we were referring to this

13  situation.

14  Q.    That's fine.  Did you ever say that it was a bad date if

15  you didn't get paid?

16  A.    Yes.  Bad date is that what you said?

17  Q.    Yes.

18  A.    Yes.

19  Q.    You talked certain sexual acts you didn't want to perform.

20  Did you perform sexual acts you didn't want to for more money

21  to be paid more?

22  A.    By force, yes.

23  Q.    Now, when you were asked about the Howard Johnson, you

24  identified a guy with a nose ring and there would be -- he

25  asked you about five or six times to have sex.  Is that true?

204

1  A.    Can you repeat that, please?

2  Q.    The guy with the nose ring, you had sex with him about

3  five or six times, correct?

4  A.    No.

5  Q.    How many times did you have sex with the --

6  A.    I clearly recall twice, but I'm not positive if there was

7  more than that.  I just remember twice for sure.

8  Q.    Okay.  Do you recall a man named Francis Joseph?

9  A.    I know the name, yeah.

10 Q.    Okay.  Is that the man at the Howard Johnson?

11 A.    That's his name, yeah.  Sorry, names --

12 Q.    That's okay.  That's all right.  And he worked at the

13 front desk at the Howard Johnson, correct?

14 A.    Yes.

15 Q.    Did you tell case agents how he contacted you to have sex

16 with him, meaning Mr. Joseph?  Did you tell them how he

17 contacted you?

18 A.    Yes.

19 Q.    And how did he?

20 A.    Called -- he called the -- my number.

21 Q.    Would that be the number on Back Page or your room number?

22 A.    I don't remember if it was on the phone or the room

23 number.  I don't actually.

24 Q.    When you'd set up calls, you had a Back Page ad, correct?

25 A.    Uh-huh.

1  Q.   You would advertise yourself as Pink or Sapphire, correct?

2  A.   Yes.

3  Q.   And that would be a made up name obviously?

4  A.   Yes.

5  Q.   You talk about being a girlfriend experience or different

6  type of experiences you could give to certain customers,

7  correct?

8  A.   Yes.

9  Q.   Okay.  And you would do that -- you would actually play a

10 role for them in that and be paid for it, correct?

11 A.   Yes.

12 Q.   Did you do this for the money that they would pay you?

13 Did you play the role, take the call for the money you were

14 getting?

15 A.   Yes, that was the point.

16 Q.   And is it true that -- who paid for the rooms at the

17 Howard Johnsons?

18 A.   Technically I did because it came out of my pay, but

19 Fredrick had his arrangements.  I never saw him checking in or

20 anything.

21 Q.   You never saw him check into the hotel or have a

22 conversation about rooms with Mr. Bhimani?

23 A.   I did see him have conversations with Faizal, yes.

24 Q.   You didn't overhear them?

25 A.   I heard -- overheard some of them, yes, about dates and

206

1  when we would be there and how long.

2  Q.    Okay.  Did you know that Mr. Brown got discounts for the

3  rooms because he initially told Faizal that he was a

4  contractor?

5  A.    I didn't know that, no.

6  Q.    Did you know that Mr. Brown got discounts from the Howard

7  Johnson for the rooms?  Did you know that?

8  A.    I did know that, yes, but I also -- sorry.

9  Q.    And I believe you said on direct examination that one of

10  the things you learned was don't have sex unless you're getting

11  paid, correct?

12  A.    Yes.

13  Q.    Did you have sex with Faizal because he was a paying

14  customer?

15  A.    I was told not to worry about it, and I was told to do as

16  I was told.  And I did as I was told.  So I was told not to

17  worry about it.

18  Q.    And is it true that Mr. Bhimani never forced you to have

19  sex with him?

20  A.    Faizal?

21  Q.    Yes.

22  A.    Sorry, he didn't force me, no.

23  Q.    Now, you had talked about meeting your customers in the

24  Howard Johnson, they would come in through the C. section

25  entrance, correct?

207

1  A.    Correct.

2  Q.    Would you go out to the parking lot and meet them, true?

3  You would go out to the parking lot?

4  A.    Not always, no.  If the door was unlocked and a regular or

5  someone I seen before come to my room number.  If I never met

6  them, I go to the door to make sure they weren't dangerous.

7  Q.    That's how the customers came in?

8  A.    Uh-huh, yes.

9  Q.    Do you know if Mr. Brown asked for the smoking section?

10  A.    I never heard him ask for the smoking section, but we were

11  always put in it.

12  Q.    And is it true that from your calls you would handle them

13  until you met back up with Mr. Brown?

14  A.    With who?

15  Q.    Mr. Brown, your pimp.

16  A.    Yes.

17  Q.    And the hotels you worked out of was the Howard Johnson,

18  correct?

19  A.    Yes.

20  Q.    Quality Inn?

21  A.    Correct.

22  Q.    Did you work in Allentown as a prostitute?

23  A.    I don't remember.

24  Q.    Okay.  How about Reading?

25  A.    I don't remember.

208

1  Q.   And you mentioned Harrisburg?

2  A.   Yes, I do remember that.

3  Q.   Were you ever kicked out of the Howard Johnson by Mr.

4  Bhimani?

5  A.   No, not that I remember.

6  Q.   Did you ever tell case agents that you were kicked out of

7  the hotel by Mr. Bhimani?

8  A.   Not that I remember.

9  Q.   I'm going to bring up 2172.  And at the end of the calls,

10  you would handle the money when you were paid by the client,

11  correct?

12  A.   Yes.

13  Q.   Did you say in your interviews you didn't remember having

14  sex with Faizal because you were under the influence of drugs?

15  A.   I don't remember saying that.

16  Q.   Can I bring up 937 lines 3 through 30?  Does that refresh

17  your recollection as to what you said?

18  A.   Hold on.  I'm still reading.

19  Q.   Okay.  Sorry about that.

20  A.   Okay.

21  Q.   Does that refresh your recollection as to whether or not

22  you were under the influence sometimes when you had sex with my

23  client?

24  A.   Sometimes then, yes.

25  Q.   Is it true that Faizal never saw you get actually

209

1  assaulted or beaten?

2  A.    He did see one altercation in person.

3  Q.    Okay.  But did you previously tell case agents that you

4  didn't -- that Faizal never saw you get beat up?

5  A.    I don't remember saying that.

6  Q.    Okay.  937 lines 32 to 34.  Focus you down to near the

7  bottom 32 to 34.  And did you say in that interview Faizal

8  never saw you get beaten up?

9  A.    I did say that, but --

10  Q.    Did you also say that Faizal would call the cops when he

11  had to?

12  A.    There was a couple instances he did that I remember.

13  Q.    Do you remember -- you talked about your situation with

14  Faizal and your situation with Mr. Brown and how you wanted to

15  get out of there and don't do what you were doing anymore.

16  A.    Correct.

17  Q.    Didn't Faizal tell you his life would be threatened if he

18  did something about it?

19  A.    I don't remember him ever saying that to me.

20  Q.    Okay.  I'm going to bring up -- did you tell case agents

21  in your interview that's what he said to you?

22  A.    I don't remember.

23  Q.    919, 17 to 25.  Does that refresh your recollection?

24  A.    It does.

25  Q.    Did you say that Faizal said he could not call the cops

210

1  because he was afraid for his own life?

2  A.    I do recall that now.

3  Q.    And did you also say that Faizal felt like there was

4  nothing he could do about the fact -- about the way you were

5  being treated?  Did Faizal -- that he -- sorry.

6  A.    I do --

7  Q.    Did Faizal tell you he felt like there was nothing he

8  could do about the way you were being treated?

9  A.    I do.

10  Q.    And did he say that to you?

11  A.    I do remember that.

12  Q.    You talked about your life after Mr. Brown.  Is it true

13  that you tried to get a job back at the hotel?

14  A.    I did.

15  Q.    And did Faizal Bhimani give you that job?

16  A.    He did.

17  Q.    He didn't ask you for sex?

18  A.    No.

19  Q.    He didn't ask you for money?

20  A.    No.

21  Q.    Lastly, you said the type of life you were living that Mr.

22  Brown would be manipulative and would prey on you and talk

23  about your emotions, correct?

24  A.    Correct.

25  Q.    Do you think he was doing the same thing to Mr. Bhimani?

211

1          MR. CAMONI:  Objection, Your Honor, calls for

2  speculation.

3          THE COURT:  Yeah, I am going to sustain that

4  objection.

5  BY MR. BROWN:

6  Q.   At the end of your interview, did you ask about Mr.

7  Bhimani?

8  A.   I don't remember.

9  Q.   Bring up 940.  Does that refresh your recollection?

10 A.   Yes, asking, yes.

11 Q.   Did you ask about Mr. Bhimani at the end of your

12 interview?

13 A.   I did.

14          MR. BROWN:  No further questions, Judge.

15          THE COURT:  All right.  Mrs. Pawelski?

16 CROSS EXAMINATION

17 BY MS. PAWELSKI:

18 Q.   Good afternoon, Ms. Byler.  My name is Terri Pawelski.  I

19 represent Nazim Hassam and two hotels essentially in this.  I

20 have some questions for you.  If I am not clear or you don't

21 understand them, please let me know, and I'll rephrase them,

22 okay?

23 A.   Okay.

24 Q.   All right.  First, let me talk about the dates of your

25 interviews.  You had one in the car with -- you said Bill, Bill

212

1  Patton?

2  A.   Yes.

3  Q.   Do you recall when that was?

4  A.   It was November of --

5  Q.   2017 sound correct?

6  A.   Yes.

7  Q.   Could it have been 11/26 of '17?

8  A.   Like, time wise?

9  Q.   Yeah.

10  A.   Yeah.

11  Q.   And then you said you came to Scranton and met with them

12  the next day.  When I say they, was Bill Patton in the room

13  again?

14  A.   Yes.

15  Q.   And do you recall there being another gentleman in the

16  room?

17  A.   I do.

18  Q.   But you don't know who that was?

19  A.   Yeah --

20  Q.   It wasn't Mr. Shelly, correct?

21  A.   I don't recall him being there the first time, no.

22  Q.   So that would have been 11/27/17, the next day?

23  A.   Yes.

24  Q.   And then you had a second interview, same spot in Scranton

25  again?

213

1   A.   Yeah.

2   Q.   And agent trooper Patton was there, and was Mr. Shelly

3   there -- I'm sorry, Shelly --

4   A.   I don't remember.

5   Q.   You don't remember?

6   A.   I know Bill was there, but -- that's who I mainly talked

7   to at that time so --

8   Q.   Do you recall what the date of that was?

9   A.   I don't.

10  Q.   If I told you that it was -- do you recall being

11  videotaped?

12  A.   I do.  Yeah.

13  Q.   The one prior to that was videotaped as well when you met

14  with the Bill the first time?

15  A.   I do recall.

16  Q.   If I told you 6/20/19, would that make sense to you time

17  wise?

18  A.   Yes.

19  Q.   Now, did you meet Mr. Brown in 2011 or 2012?  You said it

20  was Valentine's day, correct?

21  A.   Brown you mean?

22  Q.   Fredrick Brown?

23  A.   Yes.

24  Q.   Was the year 2011 or 2012?  I think we have both years in

25  this case.  I want to make sure we have that correct.

214

1  A.   I was 17, so I -- literally not sure what year that would

2  have been.

3  Q.   You think that was 2012?

4  A.   I think so if it's -- not with my age then, yes.

5  Q.   And you stayed with or worked for Fredrick Brown for how

6  long?

7  A.   Over two years.

8  Q.   Over two years?

9  A.   Almost three.

10  Q.   That would have been into 2014?

11  A.   Okay.

12  Q.   So after you left Fredrick Brown, you then worked for

13  whom, was it a Brooklyn Cage?

14  A.   I didn't work for him, no.

15  Q.   What did you do?

16  A.   I made arrangements with him.

17  Q.   I'm sorry?

18  A.   I made -- I was supposed to work for him, but it didn't

19  work out.  I was -- it was -- I don't necessarily remember all

20  of it, but I was supposed to work for him, and I, like -- we

21  only had a couple arrangements, and then it didn't --

22  Q.   Okay.  Did you work as a prostitute in exchange for drugs

23  for Brooklyn Cage after Mr. Brown?

24  A.   I did.

25  Q.   How long -- you said that was a short period of time?

215

1  A.   Not very long, yeah, not very long.

2  Q.   Do you recall how long?

3  A.   I don't, not right now, no.

4  Q.   Months?

5  A.   I honestly don't know.  I don't remember.

6  Q.   Was it prior to 2015?  Would it have been -- do you recall

7  if it was prior to 2015?

8  A.   I really don't know.

9  Q.   Okay.  So you work for Brooklyn Cage for a short period of

10 time, and I think you testified -- correct me if I'm wrong, you

11 described what is called renegading, you went out on your own,

12 okay.  Did that happen right after the Brooklyn Cage -- is it

13 cage or gauge?

14 A.   I think it's Cage.  I'm not sure.  I called him C.

15 Q.   We will refer to him as C.  After C. you described what

16 you called renegading.  That was prostituting on your own?

17 A.   Yes.

18 Q.   Do you recall when you did that?

19 A.   It would have been around that -- like, 2013, '14.

20 Q.   Well, you said you worked for Mr. Brown --

21 A.   '14.

22 Q.   For about two years.  So that would take you into 2014.

23 You spent sounds, like, a very short period with C., and then

24 you went on and renegading on your own.  So that may have been

25 2014 into '15?

216

1  A.   It wouldn't have been into '15.

2  Q.   You think still it was 2014?

3  A.   Yes.  I was pregnant.  I just remember things when my

4  pregnancy was because --

5  Q.   And the person -- the father of your child you said that's

6  Wali Henderson?

7  A.   Yes.

8  Q.   Now, you and Wali Henderson moved in together?

9  A.   Correct.

10 Q.   And for a period of time what did you do when you first --

11 when you first moved in with Wali?

12 A.   Couple months I just rested and -- rested.  I was getting

13 clean off everything, and I was he kind of -- he helped me get

14 sober and helped me figure out my citizenship status and get me

15 to Philadelphia and stuff so --

16 Q.   When did you get your citizenship?

17 A.   It had to have been that year.  I have the date somewhere.

18 I just don't have access to it right now.

19 Q.   Are you sure it wasn't earlier?  You don't know if it was

20 earlier?

21 A.   I don't.  It was a long time ago.  I was trying to get my

22 citizenship for years, so --

23 Q.   I apologize.

24 A.   It should have been way sooner than --

25 Q.   I'm sorry?

217

1  A.   My citizenship --

2  Q.   Is it possible you got your citizenship in 2013?

3  A.   That's literally what I am thinking, '13.

4  Q.   July 24th of 2013 sound correct?

5  A.   It was in '13 for sure.

6  Q.   Okay.  Let's do this.  Can we please bring up -- did you

7  maintain a -- you have a Facebook profile, correct?

8  A.   I do.

9  Q.   Facebook account, okay.

10          MS. PAWELSKI:  Mr. Siegel, please bring up the

11 Facebook profile of Ms. Byler.  And --

12          MR. CAMONI:  Judge, I'm sorry.  I hadn't seen this.

13 There's no foundation.  I don't know if it is the Facebook

14 profile of Ms. Byler.

15          MS. PAWELSKI:  She's going to testify just as you --

16 they used Facebook profiles in their and case brought them up

17 without authentication.

18          THE COURT:  Did they turn them over to you in

19 advance?

20          MR. CAMONI:  We haven't.  I've never seen this.

21          MS. PAWELSKI:  We never received the Facebook photos

22 they used.

23          MR. CAMONI:  Judge, I'm sorry -- if we can have a

24 sidebar.

25          THE COURT:  Yeah.

218

1          (The following discussion took place at sidebar:)

2          MR. CAMONI:  Only Facebook photos we have used in

3   this case came off Bhimani's cell phone.  We offered to the

4   defense in 2017, 2018 and 2019 to provide us with -- we told

5   them we had a cell phone dump from Faizal Bhimani's phone based

6   off the search warrant, that data was six gigabytes, so if they

7   provided a hard drive, we will turn it over and if they came

8   and reviewed it, they can review it any time they wanted it.

9   All the Facebook photos we showed came from that phone dump.

10          They never reviewed it but made available to them.

11   That's all our obligation under rule 60.  That was turned over

12   the first day of trial as part of the trial exhibits.  We

13   authenticated them before we showed the jury from Faizal

14   Bhimani's Facebook page.  It was referred to in open court as

15   Anastasia Byler's Facebook page.  It's not been authenticated.

16   I don't know what it is.

17          THE COURT:  Let's -- what is it?

18          MS. PAWELSKI:  It's her Facebook profile and --

19          THE COURT:  When?

20          MS. PAWELSKI:  Currently.

21          THE COURT:  What does that have to do --

22          MS. PAWELSKI:  I am going to a part of her statement

23   that she posted about when she got her citizenship back in the

24   relevant time period.

25          THE COURT:  What does that have to do with anything?

219

1          MS. PAWELSKI:  It's cross examination.

2          THE COURT:  What does it have to do with anything?

3          MS. PAWELSKI:  She is saying she can't get jobs.  I

4    am hesitant to put forward my defense in front of the

5    prosecution.  But she said that --

6          THE COURT:  Hold on a minute.  If I'm asking you for

7    an offer of proof because I am not finding why your evidence is

8    at all relevant, then you need to tell me that.  If you don't

9    want to tell me that, that's okay.  You will not be able to do

10   what it is.

11         MS. PAWELSKI:  She testified several times she

12   couldn't get a job because she didn't have citizenship.  She

13   got her citizenship in 2013.  That's what I want to establish.

14         THE COURT:  You can establish that.  I don't see why

15   her present Facebook page has any relevance.

16         MS. PAWELSKI:  The way Facebook works -- I want to

17   show her profile so she can say, yes, this is my Facebook

18   profile.

19         THE COURT:  Do you want to show it to her to refresh

20   her recollection?

21         MS. PAWELSKI:  So she can say it's her Facebook

22   account just as they did.

23         THE COURT:  If the only reason you're trying to get

24   in the Facebook account is because you want to show that she

25   was a citizen on whatever the date is in 2013, can't you show

220

1  her that?  And then if she says yes -- doesn't sound like she's

2  disagreeing with you on the date of her citizenship.

3          MS. PAWELSKI:  Okay.  So okay.  So I wanted to make

4  sure that it was clear that it was 2013 a certain --

5          THE COURT:  No problem with that.

6          MR. CAMONI:  I want to make clear --

7          THE COURT:  Hold on.  I didn't ask you to speak.  I

8  have no problem with that.  If you want to show her whatever it

9  is, you can show her that.

10          MS. PAWELSKI:  Okay.

11          THE COURT:  Does that refresh her recollection that

12  your citizen date whatever the date you say --

13          MS. PAWELSKI:  Judge, my only hesitancy when you do a

14  post -- I can show you -- the picture is very small.  So I just

15  want to make sure she understood I was using her account.  I

16  was just doing it for -- to not try to be sneaky.

17          THE COURT:  I am okay with it, okay.  I didn't know

18  what the reason was for it because I want to try to make sure

19  -- we had a problem with going outside of the parameters of the

20  case.

21          MS. PAWELSKI:  I will not ask her about any sexual

22  activity post '17.

23          THE COURT:  It will be a classic 612 refreshing

24  recollection.  The jury won't see it.  Show it to her, whatever

25  page you want, and ask her the question.  Do you want to add

221

1  something?

2          MR. CAMONI:  Only if this is all based on a prior

3  inconsistent statement --

4          THE COURT:  She's refreshing recollection.

5          MR. CAMONI:  Her prior testimony here today she

6  couldn't get job.  Attorney Brown asked --

7          THE COURT:  That's a whole different issue.  They

8  will be allowed to challenge things like that.

9          (The discussion at sidebar concluded.)

10         MS. PAWELSKI:  7/24/13 Facebook page for the witness.

11 This would be D. 18.

12         THE COURT:  Actually I have it as Defendant's Exhibit

13 23 only because all of those pages that were shown before that

14 none of them were identified if we went through each one.  I'm

15 happy to leave it at 18.  When we finish today we are going to

16 have a conversation on how we identify exhibits in court so

17 that we're on the same page.  Okay.

18 BY MS. PAWELSKI:

19 Q.   Is that -- we need the 7/24 of '13.  Okay.  I am going to

20 move on, and we can perhaps come back to that.  But your best

21 recollection is that you think it was in 2013 when you got your

22 citizenship papers, which would allow you to freely work?

23 A.   If I legally remember that's what my paperwork says.

24 Q.   And let's go back to where we were in the timeline.  You

25 move in with Wali Henderson.  You two get a house, and you

222

1  don't really do anything for a certain period of time you said?

2  A.   Yes.

3  Q.   Okay.  And you said -- and maybe we can use the birth of

4  your child or the date of your child to help us establish this

5  timeline.  Do you recall when that was?  You said your child is

6  six now.  So does that help you remember when you moved in with

7  Mr. Henderson, the year?

8  A.   This is where I really -- timeline, years it's just all a

9  blur.  I'm sorry.  I can't give you any --

10  Q.   Let's see.  Let's do it this way.  You met Brown in 2012.

11  You worked for about two years.  You were -- very short period

12  with Brooklyn Cage.  Your child you said -- your son is six

13  now?

14  A.   Yes.

15  Q.   Okay.  So it would have been 2014 or 2015, right?  Would

16  that make sense?

17  A.   Yeah.

18  Q.   So you're with Mr. Henderson in 2014 or 2015.  After you

19  describe this period of sort of doing nothing, and I think at

20  that point in time were you perhaps baby-sitting and cleaning

21  houses?

22  A.   I was.

23  Q.   Okay.

24  A.   Cleaning houses a lot actually.

25  Q.   That's -- that was in your neighborhood?

223

1  A.    Uh-huh.

2  Q.    And then money became an issue, correct, between you and

3  Mr. Henderson?

4  A.    Yes.

5  Q.    Okay.

6  A.    He lost his job.

7  Q.    You guys didn't have enough money?

8  A.    To pay rent, yeah.

9  Q.    After that happens, you and Mr. Henderson then decide to

10 reenter the prostitution business, correct?

11 A.    It was my decision.

12 Q.    Okay.  So you decided to -- I don't want to put words in

13 your mouth.  What did you decide?

14 A.    I decided that I was going to keep a roof over my head and

15 I would do whatever I had to do to do it.  If that's going on

16 old habits, it was all I knew.

17 Q.    Okay.  We think again this is somewhere 2014, 2015?

18 A.    Yes.

19 Q.    Okay.  I think you -- let's be honest.  You described what

20 happened at the Howard Johnson as terrible, we all understand

21 that, correct?

22 A.    Correct.

23 Q.    Okay.  When you started prostituting again where -- with

24 Mr. Henderson, and you said that was your decision, correct?

25 A.    We went to do it once, yeah.

1  Q.    Where did you go?

2  A.    We went to Harrisburg far away from where we lived.

3  Q.    Is that when you were arrested?

4  A.    Yes.

5  Q.    Okay.  Did you start prostituting at any point after that?

6  A.    No.

7  Q.    Okay.  But Mr. Henderson started -- what happened with Mr.

8  Henderson?  How were you making money?

9  A.    After the Harrisburg incident, I decided that was it for

10 me, it scared me, and I just -- I quit.  I told him I was done

11 and he -- like I said, it was my decision.  I did it to try to

12 take care of myself and us at the time, and I told him, what

13 you do is your business, I don't want any part of it, I didn't

14 want to be involved in anything illegal.  I wanted a straight

15 and narrow life, and I told him to keep his business to himself

16 and mine to myself.

17 Q.    And then you went out and recruited a girl who was your

18 foster sister to serve as a prostitute for Mr. Henderson,

19 correct?

20 A.    No.

21 Q.    Who was your foster sister who worked for Mr. Henderson?

22 A.    I have a lot of foster sisters.

23 Q.    You don't remember her name?  How about Sunny, Santoya?

24 A.    I do remember, yeah.

25 Q.    How did you know Santoya?

1  A.    She was my foster sister.

2  Q.    Okay.  And did Santoya start working for Mr. Henderson?

3  A.    She did.

4  Q.    And that was at the same time while you're residing with

5  Mr. Henderson, correct?

6  A.    Yes.

7  Q.    And you had the relationship with Santoya because, as you

8  say, it was your foster sister?

9  A.    I did.

10  Q.    And there was a second girl who you know?

11  A.    Misty.

12  Q.    I'm sorry?

13  A.    Misty.

14  Q.    Do you remember her last name?

15  A.    Freeland.

16  Q.    You recruited a prostitute to bring in money?

17  A.    I did not recruit them, no.

18  Q.    You did not go to them and say, hey, this is something you

19  can do to make money?

20  A.    Absolute not.

21  Q.    How did that come about?

22  A.    They already -- I had a reputation in the Poconos.  I was

23  known as a whore and a prostitute and a slut.  So my name was

24  well known.  So they came to me, and I specifically told them

25  this is not the life you want, this isn't the path you want to

226

1  go down, but they are going to make their own decisions.  So

2  when they made the decision to talk to Wali, I told them I

3  didn't want to be a part of it.  I told them this is not the

4  life you want, but part of me did -- I know what Wali was.  I

5  was with him.

6  Q.    You thought he was a good guy?

7  A.    I did.

8  Q.    Right.  Understandable.  He's the father of your child?

9  A.    If anything they are going to do this anyway, and I

10 thought that it would be safer with someone like him.  I

11 thought he was going to be a good human unlike Fredrick.

12 Q.    You went and booked the rooms at the Howard Johnson where

13 you had that experience, correct?

14 A.    Yes, because I had the connection with Faizal, so I didn't

15 -- that's basically all I did was --

16 Q.    That was all you did?  You didn't visit them at the Howard

17 Johnson?

18 A.    Of course I did.  They were my friends.

19 Q.    You provided them with food?

20 A.    Food, clothes, shampoo, anything they needed.

21 Q.    Because you wanted them to keep working for you and Wali?

22 A.    No.

23 Q.    No?

24 A.    I didn't see that money.

25 Q.    Did you have a job at that point?

227

1   A.    I was -- started a job at Macy's.

2   Q.    When was that?

3   A.    Right after I got citizenship.

4   Q.    After your citizenship?

5   A.    Yes.

6   Q.    You got a job at Macy's in 2013?

7   A.    I don't remember what year I had it.

8   Q.    You got your citizenship in 2013.  How long after did you

9   get a job at Macy's?

10  A.    I don't remember.  I just know I got a job.

11  Q.    So didn't you testify that while you were living with Mr.

12  Henderson for a while you did nothing and --

13  A.    Yeah.

14  Q.    You established that was in 2014 or 2015.  So when did you

15  get a job at Macy's, before that?

16  A.    I got it right after my got my citizenship.  If I got my

17  timeline and years wrong, I moved in with him -- I didn't do

18  anything for a couple months.  I got my citizenship and a job.

19  Q.    Ms. Byler, you got your citizenship in 2013.  You were

20  with Mr. Henderson in 2014 or 2015.  Is that -- I mean, I

21  thought we established that, correct?

22  A.    Yes.

23  Q.    So are you saying you worked at Macy 's before you moved

24  with Mr. Henderson?

25  A.    No, I was already moved in with him then.

228

1   Q.   So when did you get the job at Macy's?

2   A.   2013.

3   Q.   You didn't get a job until much later on?

4   A.   Then I don't recall.

5   Q.   Okay.

6   A.   Like I said, the timeline is just kind of --

7   Q.   Well, okay.  Did you testify already that when the agents

8   began talking to you that in response to Mr. Brown's questions

9   that you didn't have to remember -- they didn't have refresh

10  your memory, you remembered everything on your own?

11  A.   My own memories, they would show me pictures of people

12  that would remind me of -- of situations.  I remember faces.  I

13  don't forget them.

14  Q.   How long did your foster sister and Misty work for Mr.

15  Henderson?

16  A.   I remember a month or two.  Santoya left first and Misty.

17  I wasn't heavily involved with it.

18  Q.   Santoya left because you attacked her in the parking lot

19  of the Howard Johnson?

20  A.   She attacked me, and I had a --

21  Q.   That's not correct?

22  A.   I got attacked, and I had to go to the hospital to get

23  staples in my head because she beat me bloody in the parking

24  lot.  And there's witnesses to that.

25  Q.   And that was because -- do you remember telling the agents

229

1  that you got in a fight with Santoya in the Ho Jo parking lot

2  because you thought one of them was sleeping with Wali?

3  A.   Yeah, that was part of it.

4  Q.   You didn't tell them that she attacked you, correct?

5  A.   I don't remember if it I -- I don't remember what I told

6  them, but I know what happened.

7  Q.   Okay.  You said that that second interview was recorded,

8  correct?

9  A.   Yes.

10 Q.   Okay.

11      MS. PAWELSKI:  Kevin, can we go to the 6/20/19 video

12 interview of Ms. Byler, please?

13      THE COURT:  Exhibit number?

14      MS. PAWELSKI:  Exhibit 20, Your Honor.  6/29/19

15 video.  Time stamp would be 27:54.  It's to the left.  We're

16 using the time to the left.  I'll keep going, Your Honor.

17      THE COURT:  Replay that if you want.

18      MS. PAWELSKI:  I thought the technology was --

19      THE COURT:  It's okay.  You can play it.

20      MS. PAWELSKI:  Can we replay the -- that last clip?

21 Thank you.

22 BY MS. PAWELSKI:

23 Q.   Okay.  So you had a fight with Santoya because she slept

24 with Wali?

25 A.   There was accusations, but apparently it never happened.

230

1  Q.   Okay.  But -- okay.  Now, let me ask you this, Ms. Byler.

2  The -- did you engage in any more prostitution after you

3  described that one time?

4  A.   I don't remember.

5  Q.   Do you recall telling the agents that you would do it when

6  you needed money?

7  A.   Back then, yes.

8            MR. CAMONI:  Objection, I think we're still --

9            MS. PAWELSKI:  No, I am asking her about conduct --

10  Your Honor, I'm asking her about conduct prior to --

11            THE COURT:  Hold on.  Hold on.

12            MS. PAWELSKI:  Excuse me.  I didn't hear you, okay.

13            THE COURT:  We have a specific date that we --

14  there's a rule.  So there will be no -- there will be no

15  questions concerning --

16            (The following discussion took place at sidebar:)

17            THE COURT:  Are you referring to a date past October

18  --

19            MS. PAWELSKI:  Absolutely no.

20            THE COURT:  Your questions you need to be clear

21  because if your questions are designed to draw out an answer by

22  not putting something in there, then that's going to be a real

23  problem for you as a lawyer.  So everyone understands the time

24  frame.  Don't bait the witness into getting an answer that's

25  different than the time frame.  So maybe you need to make sure

231

1  your question is properly phrased so that doesn't occur.

2          MS. PAWELSKI:  I in no way tried to bait the witness

3  to answer a question post 2017.

4          THE COURT:  The question I thought was there any time

5  after -- I thought was the question.

6          MS. PAWELSKI:  I said with Mr. Henderson.

7          THE COURT:  I don't care when that was.  I don't know

8  if she's with him today.  I don't know.  Anytime after is not

9  making sure that you don't violate my order.

10          MS. PAWELSKI:  Understood.

11          THE COURT:  You need to get yourself all tightened up

12  here because I am not going to stand for a game around the

13  orders that I make.  So everyone is clear, let's be very

14  careful in our wording.  I'm trying to give you as much leeway

15  as I can, but don't -- don't play with me.  That's all.

16          MS. PAWELSKI:  I am not attempting to --

17          MR. DeSTEFANO:  I am sure that was not our intention.

18          THE COURT:  Make sure that -- then just make sure

19  that your questions are posed in a manner that does not cause

20  something I previously ruled on to come in kind of, oh, you

21  know, it's inadvertent.  You make sure of that in terms of your

22  questions.

23          MS. PAWELSKI:  It's ten after five.

24          THE COURT:  No.  We are going to finish this witness

25  today.

232

1          MS. PAWELSKI:  I might have another hour.

2          THE COURT:  We will keep on going.

3          (The discussion at sidebar concluded.)

4    BY MS. PAWELSKI:

5    Q.   Just to be clear I'm asking you as far as my timeline when

6    I asked you if you engaged in prostitution with Mr. Henderson,

7    I'm talking about 2014, 2015.  Were you with Mr. Henderson in

8    2016?

9    A.   Yes.

10   Q.   Okay.  Did you engage -- and how about early 2017?

11   A.   No.

12   Q.   Okay.  So did you engage in more prostitution after the

13   time you were arrested in Harrisburg prior to 2016, let's

14   include '16, prior to 2017?

15   A.   I recall once or twice I did before I found out I was

16   pregnant.  So --

17   Q.   I am going to ask you about the statements about your past

18   and what you told to the agents and at what time, okay?  In

19   that the first videotaped interview in November of 2017, okay,

20   when you met Mr. Patton and another man you couldn't remember

21   his name, okay -- that's the interview I'm focusing on, okay?

22   A.   Okay.

23   Q.   You did not tell them about anything that occurred with

24   Wali or Santoya or Misty?  You didn't tell them anything about

25   that, correct?

233

1    A.    Correct.

2    Q.    Okay.  And then something happened.  The F.B.I. contacted

3    Santoya and Misty, correct?

4    A.    Correct.

5    Q.    And they in turn contacted -- they called you and said the

6    FBI called us?

7    A.    Yes.

8    Q.    And then in turn you got scared and called the F.B.I. and

9    said, I want to meet with you in 2019?

10   A.    I don't remember calling them.

11   Q.    You didn't -- you didn't contact them and request the

12   interview?

13   A.    I don't remember.

14   Q.    Did you not tell them that Santoya and Misty had contacted

15   you, and you wanted to talk to them?

16   A.    They contacted me, yes, and I just --

17   Q.    Then you called the F.B.I. because you got scared --

18   A.    No, I called --

19   Q.    Told them about anything about Mr. Henderson and pimping

20   in the Ho Jo?

21   A.    Mr. Henderson is the father of my child.  I wasn't asked

22   about him in the initial interview -- yes, if I protected his

23   name because I had a child with him, so that wasn't the first

24   thing I taught to talk about.

25   Q.    Is it not true you were getting part of the proceeds you

1  were making from your foster sister --

2  A.   Absolutely not, absolutely not.

3         MR. CAMONI:  Judge, I am going to object.  This line

4  of questioning I don't see the relevance.  It's not impeachment

5  about credibility or impeachment about the time period that she

6  testified about when she was forced.  I mean, the relevant

7  testimony she gave happened earlier with someone else.

8         THE COURT:  Okay.

9         MS. PAWELSKI:  It absolutely goes to her credibility

10  as to what she told the agents and when.  Was she concealing

11  something or not?

12         THE COURT:  No, actually I'm having a hard time

13  finding this is relevant to the actions that are involved in

14  this indictment in this charge.  This indictment and this

15  charge is about activities that occurred on or between 2011 and

16  2000 -- October 24th, 2017 related to the sex trafficking and

17  between 2011 and July 9th, 2019 related to the drug trafficking

18  or -- so I'm having a hard time figuring out -- I'm trying to

19  give you leeway.  I'm not going to into some 2019 offenses or

20  potential case that's not part of this indictment.

21         MS. PAWELSKI:  I am not asking her, Your Honor, about

22  any activity that occurred in 2019.  I'm asking her about

23  relevant conduct that occurred prior to 2017 that she told --

24         THE COURT:  I thought --

25         MS. PAWELSKI:  Because timing when she told agents

235

1  this information is relevant to her credibility.

2          THE COURT:  Okay.  You're going to move on, no.  I'm

3  not buying that.  Let's stay with the focus on the activities

4  and charges that are in this case.

5  BY MS. PAWELSKI:

6  Q.   Do you recall being frustrated in the 2019 interview with

7  respect to the agent's questioning of you about Mr. Henderson?

8  A.   Yes.

9  Q.   You do.  And did you feel like they were trying to put

10 words in your mouth?

11 A.   No.

12 Q.   No.  Did you feel like they were trying to say that Wali

13 Henderson forced you to do something?

14 A.   They asked me and just like I said now and I said then, it

15 was my choice, he didn't traffic me.

16 Q.   Okay.  But you don't recall saying that the agents had

17 tried to put words in your mouth?  Do you remember a victim

18 witness being in there?

19 A.   Yes, Melissa.

20 Q.   Do you recall at the end of the interview the agents left

21 the room for a period of time and you spoke to the victim

22 witness?  You spoke to Melissa?

23 A.   Yes.

24 Q.   And didn't you tell her that the -- you felt they were

25 trying to put words in your mouth?

236

1  A.    Shouldn't that be confidential what I talked -- I'm sorry,

2  shouldn't that be confidential -- what I say to my victim

3  witness whether --

4            MS. PAWELSKI:  Your Honor, I am going to ask her to

5  answer the question.

6            MR. CAMONI:  Judge, I am going to renew my objection.

7  The stuff with Wali Henderson has nothing to do with forced

8  prostitution at the Howard Johnson.

9            THE COURT:  We will do this, ladies and gentlemen.  I

10 want to finish today, so this is going to be a -- with this

11 witness.  So we're going to be for a little bit yet.  So we're

12 going to take a ten-minute break in case if you have to call

13 anybody to let them know we will be here longer.  I'm going to

14 have a conversation with counsel during that period of time.

15 Same admonitions.  No discussions or conversations.  Don't form

16 any opinions.  Don't speak to anyone and no research about the

17 case.  We'll see you in a couple minutes, all right.

18           MR. CAMONI:  I don't want to break the rules while

19 she's on cross.

20           THE COURT:  You can certainly talk with her.  Don't

21 talk about the case.  Let's talk about Mr. Henderson and what

22 he has to do with this case.

23           MS. PAWELSKI:  I am now -- I moved on from Mr.

24 Henderson.  I am now --

25           THE COURT:  That was just the question that caused

237

1  the --

2           MS. PAWELSKI:  It doesn't have to do with Mr.

3  Henderson.  It has to do with the agent's conduct during the

4  interview.  The question was, do you recall telling the victim

5  witness interviewer that you felt like the agents were putting

6  words in your mouth.  How is that not relevant to --

7           THE COURT:  I didn't say it wasn't relevant.  My

8  concern was the discussion with Mr. Henderson.  It seems to me

9  we're off on to something that is unrelated to this particular

10 case.

11          MS. PAWELSKI:  But the -- I understand your concern,

12 Your Honor.  But the question has to do with the -- this

13 question -- I moved on from Mr. Henderson.  This question has

14 to do with Shelly --

15          THE COURT:  What other questions do we have?  What

16 other subject matter are we going into after this?

17          MS. PAWELSKI:  I am going to ask her about some

18 postings that she made on Facebook during the relevant time

19 period.

20          THE COURT:  Okay.  All right.  Go ahead.

21          MS. PAWELSKI:  And a few questions about her adopted

22 -- family that adopted her because they went into that on

23 direct.

24          THE COURT:  What exactly about that?  She went into

25 the fact that G. said that he would cause them harm or -- what

238

1  is it you're going to ask about her adoptive family?

2          MS. PAWELSKI:  She said she was homeless and that she

3  didn't have anywhere else to go, and I would like to question

4  her about whether she couldn't go back to her adoptive family

5  based upon her Facebook postings.

6          THE COURT:  Okay.  What's your concerns about any of

7  that?

8          MR. CAMONI:  My concern was about the Wali Henderson.

9          THE COURT:  I think we have covered that.  That's --

10  I don't see how it's relevant.  Ms. Pawelski said she's done

11  with that.  The question is whether the agent put words in her

12  mouth.  That's fair game.  You can certainly ask questions

13  about that and anything that sounded to me like it was okay.  I

14  just want us to get back on track here in terms of the

15  questions that we're going to ask and areas we are going to

16  cover.  I don't want any more following ourselves or finding

17  ourselves into areas that I already ruled on or areas that are

18  just not relevant to the facts in this case.

19          MS. PAWELSKI:  Right.  Her conduct with Mr. Henderson

20  falls within the conspiracy -- the indictment.

21          THE COURT:  I get that.

22          MS. PAWELSKI:  And -- I just wanted to make that

23  clear.  I moved on.

24          THE COURT:  Okay.  If you moved on, we moved on, all

25  right.  Let's -- we will wait until -- I thought somebody was

239

1  gone.  No.  Why don't we get Ms. Byler, please?  Ms. Pawelski?

2           MS. PAWELSKI:  Thank you, Your Honor.

3  BY MS. PAWELSKI:

4  Q.   Ms. Byler, we established you were working for Mr. Brown

5  in 2013, correct?

6  A.   I don't remember.

7  Q.   Okay.  Well, you've already testified that you started

8  working for him in either 2011 or 2012 -- your best memory was

9  2012, and you worked for two years, correct?

10  A.   To my knowledge.

11  Q.   Okay.  2013 you went to New York City with him, do you

12  recall that?

13  A.   I don't recall the timeline, but I recall the trip.

14  Q.   Okay.  And you have -- you maintained a Facebook account

15  in 2013, correct?

16  A.   Yes.

17  Q.   Okay.  And it was under the name Anna Byler?

18  A.   Anna Byler, yes.

19  Q.   It was a public account, it wasn't private, correct?

20  A.   I didn't know that, but --

21  Q.   But it was public so everyone could see what you were

22  writing?

23  A.   Okay.

24  Q.   And you had -- you had friends, Facebook friends, correct?

25  A.   Correct.

240

1  Q.   And you wrote things quite often on that Facebook account,

2  correct?

3  A.   To my knowledge, yes.

4  Q.   Okay.  I'm going to ask you if you remember making a post

5  about that New York City trip on April 4th of 2013 with Mr.

6  Brown.  Do you recall making a post about that?

7  A.   I don't recall.

8  Q.   Okay.

9       MS. PAWELSKI:  I'm going to mark for identification

10  D --

11       THE COURT:  20.

12       MS. PAWELSKI:  D. 20, thank you.  Mr. Siegel, bring

13  that post up for the witness.

14  BY MS. PAWELSKI:

15  Q.   Can you please look at the second post there of April 4th,

16  2013, and tell me if that refreshes your recollection?  Do you

17  remember writing that?

18  A.   I don't remember writing that.  I've been to New York City

19  a lot of times.  This might not have been the trip with

20  Fredrick because I've been to New York with my friends.  I've

21  been to New York with G.  I've been to New York lots of times,

22  so that could be from my trips not with G.  I don't know if

23  that's the trip with G. or not, and I don't think it is.

24  Q.   But you were still working for Mr. Brown in 2013, correct?

25  I think we have established that.  There's no doubt you were

241

1  working for Mr. Brown in 2013, correct?

2  A.   I don't know.

3  Q.   Okay.  I'm going to ask you if you remember writing this

4  statement --

5  A.   I don't.

6           MS. PAWELSKI:  Your Honor, I would ask that this post

7  be -- I be able to read this post and publish it to the jury.

8           THE COURT:  As what?

9           MS. PAWELSKI:  As her -- as a statement that she made

10  in 2013.

11           THE WITNESS:  That I was --

12           MS. PAWELSKI:  It's her statement.

13           MR. CAMONI:  She doesn't remember it.  We have no

14  basis to understand what this came from, whatever account it

15  came from.  All we have is a --

16           THE COURT:  I don't think there's any dispute it

17  comes from Ms. Byler's account.

18           MR. CAMONI:  I don't know that, Your Honor.  There's

19  nothing here -- no metadata or says it was downloaded.  It

20  could be created.  It has her picture on it.  If she doesn't

21  remember writing it --

22           THE COURT:  I will overrule the objection.  You can

23  read the account.

24           MS. PAWELSKI:  Thank you, Your Honor.  Thank you,

25  Your Honor.  Can we please have this -- can we publish -- are

242

1    you the one that published it to the -- sorry.  Can you please

2    read what you posted April 4th, 2013 to the jury?

3         THE WITNESS:  On my way to New York City five

4    exclamation points, so happy to leave P.A., the N. word -- I

5    shouldn't have written -- and laughing my ass off.

6    BY MS. PAWELSKI:

7    Q.    In this point in 2013 you were in good spirits?

8    A.    Sounds like I was going on a fun trip, not a work trip.

9    Q.    Did you work for the United Way sometime in 2012?

10   A.    I had an internship through, like, a foster care program

11   that I was allowed to, like, do an internship.  It wasn't a

12   paid job, but, yeah, in my teens, trying training to get a job

13   when I was older the foster system provided.

14   Q.    Okay.  You were adopted by the Bylers or -- those are the

15   people who brought you over from Russia, correct?

16   A.    Yes.

17   Q.    Okay.  And they -- would you agree they were -- you can

18   take that down, Kevin.  Thank you.  Would you agree that they

19   were a very nice family?  Did they treat you well?

20   A.    Am I to talk about my childhood trauma as well now?

21   Q.    You said you were homeless, correct?

22        THE COURT:  No, but you can -- listen to the

23   question.

24        THE WITNESS:  Okay.

25        THE COURT:  Just answer the question that's being

243

1  asked of you.

2  BY MS. PAWELSKI:

3  Q.    Did the Bylers treat you well?

4  A.    No.

5  Q.    No.  Okay.

6  A.    It wasn't ideal.

7  Q.    Your foster mom was Elizabeth?

8  A.    Yes.

9  Q.    I am going to ask something you wrote in 2013, Elizabeth

10 and Dean -- do you recall wishing them a happy 19th --

11 A.    I wish them a happy anniversary every year.

12 Q.    Do you recall making a specific post on that July 23rd,

13 2013?  I'm going to mark --

14 A.    I recall doing it every year so usually, yes.

15 Q.    Okay.  Do you remember what else you said in that post

16 about them?

17 A.    Which one because I make one every year?

18 Q.    2013 one.

19 A.    No, I don't recall.

20 Q.    Okay.

21       MS. PAWELSKI:  I'm going to mark as D. 21 your

22 Facebook account.

23       MR. CAMONI:  Judge, can we have a sidebar, please?

24       THE COURT:  No, I don't know what this is having to

25 do with anything.  No.  Go ahead.

244

1          MS. PAWELSKI:  Can we publish just for the witness

2    July 23rd, 2013?  Do you see that middle post there?

3          THE WITNESS:  Yes.

4    BY MS. PAWELSKI:

5    Q.   Do you recall wishing them a happy anniversary?

6    A.   Like I do every year, no, I don't recall this specific

7    one.

8    Q.   Do you recall -- do you recall saying that you were

9    blessed to have such committed parents?

10   A.   No.

11   Q.   Do you recall saying that they are a true example of love

12   and commitment?

13   A.   No.

14   Q.   Do you recall posting you loved them and you wish them the

15   best in future years to come?

16   A.   I don't recall.

17   Q.   That doesn't refresh your memory looking at your Facebook

18   account?

19   A.   Like I said, Facebook is social media.  My parents and I

20   have not a good relationship for a long time, so if I made

21   this, it's very -- it's social media.  You say a lot of things

22   on social media that you might not necessarily mean.  It's a

23   show.

24   Q.   Okay.  July 31 --

25   A.   I don't know.

245

1  Q.    You made a statement you've never given up on me all those

2  years?

3  A.    No.

4  Q.    Do you recall stating, I love you so much, and I'm so

5  grateful to have you in my life?

6  A.    No.

7  Q.    By the way, when they adopted you, they adopted other

8  children as well, correct?

9  A.    Correct.

10 Q.    And they actually made an effort to adopt your half

11 brother and bring him over to live with you?

12 A.    Yes.

13 Q.    Okay.  And did you ever go back to them and say, I'm

14 homeless, I'm not doing what I like to do, can you let me back

15 into your home?

16 A.    Being my rapist brother was in the home, no, I didn't.

17 Q.    Your rapist brother, okay.

18        MR. CAMONI:  Judge, I have to object to this line of

19 questioning.  I'm sorry this is -- this is exactly what I was

20 seeking to avoid.  This is in the transcript from the prior

21 trial that we turned over, and this is earlier on the scope of

22 the indictment and it's --

23        MS. PAWELSKI:  I did not bring up the fact she was

24 raped.

25        MR. CAMONI:  You brought up the fact that she didn't

246

1  go home.

2          THE COURT:  Excuse me, Mr. Camoni.  Arguments are

3  made to me, not between counsel.  You can argue all you want

4  outside.  Are you going to move on to something else?  Are we

5  almost done here?

6          MS. PAWELSKI:  Yes.

7          THE COURT:  Let's go.  Let's move on.

8  BY MS. PAWELSKI:

9  Q.  Do you say that you don't maintain a healthy relationship

10  with your adoptive parents to this day?

11  A.  I am trying to mend it.  It's hard.  They never see past

12  my choices in life, so they can never live and move on.  That's

13  where we're at.

14  Q.  Did you recently -- didn't your mom recently praise you

15  for the work you've been doing?

16  A.  Yes, my --

17  Q.  On her Facebook account?

18  A.  My mom and I have been trying to mend our relationship the

19  last year.

20  Q.  And it's your testimony that they wouldn't let you back in

21  over this whole time period?

22  A.  Never.  I'm not allowed at the house right now because I

23  am engaged to a woman so, like, my parents are all face on

24  Facebook on social media.  It's all for the show.  That's why

25  they have eight of us.  That's why when one of us messed up,

247

1  they got kicked out of the family because mental health issues.

2  Don't believe everything you see on a Facebook page.

3          MS. PAWELSKI:  Nothing further.

4          THE COURT:  Any redirect?

5  REDIRECT EXAMINATION

6  BY MR. CAMONI:

7  Q.    Since we are talking about Facebook, you were asked about

8  a picture of yourself holding money during the time when you

9  were with G.  You took pictures of yourself with money?

10  A.    I did.

11  Q.    Large amounts of money, right?

12  A.    Yes.

13  Q.    Where did you get that money?

14  A.    From him.

15  Q.    From G.?

16  A.    Yes.

17  Q.    Why did you have it?

18  A.    I had a reputation.  Everyone called me a whore and

19  prostitute, and I got bullied, and people just said bad things

20  about me.  So I was -- at least from presentation I wanted to

21  show off that what I was doing wasn't that bad so I did it for,

22  like, the show of it, and I was already ashamed of what I was

23  doing so people already hated me and said bad things about me

24  so they can say more but at least --

25  Q.    Did you get the money from G. just to take the picture?

248

1  A.    Just for the picture he let me do it because I told him
2  why.
3  Q.    What happened to the money after the picture?
4  A.    He took it back.  He was standing right there when it was
5  taken.
6  Q.    During time period when you were 18 and 19 years old?
7  A.    Yes.
8  Q.    You were asked whether Faizal forced you to have sex with
9  him.  You said no, correct?
10  A.    Correct.
11  Q.    Would you have sex -- would you have had sex with Faizal
12  if G. wasn't forcing you to do it?
13  A.    No.
14  Q.    You testified on cross that Faizal offered you a job when
15  you asked for one at the Howard Johnson?
16  A.    Yes.
17  Q.    Was that after you left G.?
18  A.    A long time after.
19  Q.    While you were with G. and told Faizal -- you said you
20  told Faizal that you were being beaten, correct?
21  A.    Wait.
22  Q.    I'm sorry.  When you were with G.?
23  A.    Okay, yes, I did.
24  Q.    You told Faizal you were being abused?
25  A.    Yes.

249

1  Q.   You told Faizal you didn't want to be prostituting any

2  more?

3  A.   Yes.

4  Q.   Is that your prior testimony?

5  A.   Yes.

6  Q.   When you told him that, did he say come work for me and

7  you can stop?

8  A.   No, that wasn't an option at that time.

9  Q.   Did he keep having sex with you?

10  A.   Yes.

11  Q.   You testified that when you met Fredrick Brown just before

12  your 18th birthday that you had recently tried to get a job.

13  Is that what you testified to?

14  A.   Yes.

15  Q.   Okay.  And at that time were you able to get a job?

16  A.   When I -- when I met him?

17  Q.   Before you met him, like, around that time?

18  A.   No.  I tried, like, McDonald's, and they -- they said no.

19  Q.   Was that because you didn't have I. D. or paperwork?

20  A.   Uh-huh, yes.

21  Q.   Okay.  Once you were with G., did he for a time -- did you

22  testify that he held your citizenship issues and your paperwork

23  over your head, held that against you to keep you there?

24  A.   Yes.

25  Q.   Was that the only thing that he did to keep you there?

250

1  A.    Between -- I mean --

2  Q.    Was your citizenship the only way he kept you working?

3  A.    No.

4  Q.    I think you covered the other ways.  But if you -- are you

5  clear on the timeline when you got your citizenship?

6  A.    I am.  It's -- like I said, I'm bad with timelines, but

7  you know, when I met him.  I know periods of time just seem,

8  like, a little bit confusing for me, but I know when I had my

9  son and when I found out I was pregnant I never went back to

10  doing that.  So I know when my son was born obviously.  My

11  timeline in my head.  I apologize with dates and stuff.  I

12  simply don't know.

13  Q.    If you'd gotten your citizenship -- if you got your

14  citizenship while you were with G., was that the only thing he

15  was using to keep you there?

16  A.    No.

17  Q.    So was getting your citizenship a magic key to get you

18  out?

19  A.    No.

20  Q.    You were asked about an internship with United Way through

21  the foster care program?

22  A.    Yeah.

23  Q.    Did that happen before you ran away?

24  A.    Yeah, I was young.

25  Q.    So you didn't do that internship while you were being

251

1   trafficked, right?

2   A.    No, it was when I was in high school still and summer job.

3   It was an internship to learn to work.  There was all these

4   programs where we got to, like, learn what a job is, and that's

5   something -- that's a program I got into.  So --

6   Q.    That was before you ran away?

7   A.    Yeah.

8   Q.    Before you met G.?

9   A.    Before.

10  Q.    Before you were pimped out?

11  A.    A hundred percent, yes.

12  Q.    It's been suggested -- I want to ask you what your

13  reaction to this is.  Are you playing a role here today?

14  A.    No -- a role?  What does that mean?

15  Q.    You were asked earlier playing a role for your clients,

16  talking about Facebook.  Are you playing a role here today?

17  A.    No.  I was taught how to do something, and I did it.  So I

18  didn't consider -- until now I don't consider myself playing a

19  role.  I didn't have anything against anybody.  I can sit here

20  to say Faizal was a good person, but facts are facts, and that

21  is where my life was at that time.

22  Q.    Do you have any reason to hurt Faizal Bhimani?

23  A.    No, I don't.

24        MR. CAMONI:  Nothing further, Your Honor.

25        THE COURT:  All right.  Ms. Byler, you may step down.

252

1          THE WITNESS:  Thank you.

2          THE COURT:  All right.  Thank you for your

3    indulgence.  When we are finished with you, we have other work

4    to do so.  If nothing else, it gives you some better sense and

5    what sometimes you'll see or read in the media.  Same

6    admonitions, as I said, they become so important as the case

7    goes on.  Because you will hear more and yet, you still have to

8    keep an open mind because you have not heard all of the

9    evidence.  And so you have to wait until you heard all that and

10   the law that relates to that evidence before you can begin to

11   form opinions in your mind.  Now is just collecting facts.

12   It's not forming opinions.  No conversations and discussions

13   with anyone including among yourself because only you have

14   heard so far and seen so far what's been admitted in this

15   courtroom.  Nobody else has.  And so the result is that only

16   you know what the evidence is, and you got to base your

17   decision based only on that evidence.  No research of any kind

18   because, as I said, things change all the time, and what could

19   have been correct at one point may be different at another

20   point.  Again, it goes back to you only learn the facts and

21   circumstances from inside the courtroom.  That way one or two

22   of you don't know something different than anybody else.  If

23   anyone were to try to talk to you about the case, you must

24   inform of that immediately.  That being said, again thank you

25   for your indulgence today, and have a safe trip home.  We'll

253

1   see you all tomorrow morning at 9:30.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

254

1                     REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                        s/ Laura Boyanowski, RMR,CRR
                          Laura Boyanowski, RMR, CRR
15                        Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503
20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)
23

24

25